# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MANUEL ANGEL CALDERON, Individually and On Behalf of All Others Similarly Situated,** <br><br> **Plaintiff,** <br><br> **-against-** <br><br> **NETWORK INFRASTRUCTURE INC. and PATRICK CLARKE, Jointly and Severally,** <br><br> **Defendants.** | **1:24-cv-05442 (ALC)(BCM)** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**PELTON GRAHAM LLC**
Brent E. Pelton
Taylor B. Graham
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700

*Attorneys for Plaintiff, the FLSA Collective*
*and putative Class*

**TABLE OF CONTENTS**

                                                                                            **Page**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF THE CASE................................................................................................. 2

I.      Course of Proceedings ................................................................................................ 2

II.     Relevant Facts.............................................................................................................. 3

        A.      Defendants' Construction Business ................................................................ 3

        B.      Defendants' Practices Regarding Yard Work, Meetings and Trainings ................. 5

        C.      Plaintiffs' Construction Work for Network Infrastructure ....................................... 6

        D.      Defendants' Common Timekeeping and Payroll Practices.................................... 8

        E.      Defendants' Unklawful and Ongoing Classwide Wage Violations ........................ 9

ARGUMENT............................................................................................................................. 12

I.      THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER
        PLAINTIFFS' STATE LAW CLAIMS ................................................................... 12

II.     THIS COURT SHOULD CERTIFY PLAINTIFFS' NYLL CLAIMS AS A RULE
        23(B)(3) CLASS ACTION .......................................................................................... 12

        A.      Rule 23(a)(1): Numerosity................................................................................ 13

        B.      Rule 23(a)(2): Common Questions.................................................................... 14

        C.      Rule 23(a)(3): Typicality ................................................................................... 17

        D.      Rule 23(a)(4): Adequacy of Representation ..................................................... 18

        E.      Rule 23(b)(3): Common Questions Predominate ............................................. 20

                1.      Common Questions Predominate With Respect to Liability for
                        Plaintiffs' Claims ................................................................................... 20

                2.      Common Questions Predominate With Respect to Damages.................... 21

        F.      Rule 23(b)(3): Superiority.................................................................................. 23

III.    PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL…… ...25

CONCLUSION……………………………………………………………………………..25

**TABLE OF AUTHORITIES**

**Page**

CASES

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................................20

*Ansoumana v. Gristede's Operating Corp.*,
201 F.R.D. 81 (S.D.N.Y. 2001) ...........................................................................13, 23

*Caridad v. Metro-North Commuter Railroad,*
191 F.3d 283 (2d Cir.1999)..................................................................................12, 18

*Chime v. Peak Sec. Plus, Inc.*,
137 F. Supp. 3d 183 (E.D.N.Y. 2015) .......................................................................15

*Cinar v. R&B Brenner Income Tax, LLC*,
No. 20-cv-1362, 2024 WL 4485331, 2024 U.S. Dist. LEXIS 110045 (E.D.N.Y. June
21, 2024) ...............................................................................................................13, 22

*Cinar v. R&B Brenner Income Tax, LLC*,
No. 20-cv-1362, 2024 WL 4224046, 2024 U.S. Dist. LEXIS 168579 (E.D.N.Y. Sept.
18, 2024) .....................................................................................................................22

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir.1995)................................................................................... 13-14

*Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)........................................................................................18

*Damassia v. Duane Reade, Inc.*,
250 F.R.D. 152, 156 (S.D.N.Y. 2008) ..................................................................12, 18

*Garcia v. Pancho Villa's of Huntington Village, Inc.,*
281 F.R.D. 100, 105 (E.D.N.Y. 2011) .......................................................................14

*Gortat v. Capala Bros.*,
2010 U.S. Dist. LEXIS 35451 (E.D.N.Y. Apr. 9, 2010) ..........................................13

*Guzman v. VLM, Inc.*,
No. 07-cv-1126, 2008 WL 597186, 2008 U.S. Dist. LEXIS 15821 (E.D.N.Y. Mar. 2,
2008) ...........................................................................................................................23

*Indergit v. Rite Aid Corp.*,
293 F.R.D. 632 (S.D.N.Y. 2013) ...............................................................................24

*In re Beacon Assocs. Litig.*,
    282 F.R.D. 315 (S.D.N.Y. 2012) ........................................................................................14

*In re Nassau County Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)........................................................................................20, 22

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017)..............................................................................................25

*In re Visa Check/Mastermoney Antitrust Litig. v. Visa U.S.A. Inc.*,
    280 F.3d 124 (2d Cir. 2001)...............................................................................................24

*Johnson v. Brennan*,
    No. 10-cv-4712, 2011 WL 4357376, 2011 U.S. Dist. LEXIS 105775 (S.D.N.Y. Sept.
    16, 2011) .............................................................................................................................22

*Lassen v. Hoyt Livery, Inc.*,
    No. 13-cv-1529, 2014 WL 4638860, 2014 U.S. Dist. LEXIS 129784 (D. Conn. Sept.
    17, 2014)  ...........................................................................................................................22

*Lee v. ABC Carpet & Home*,
    236 F.R.D. 193, 204 (S.D.N.Y. 2006)  ..............................................................................18

*Lewis v. Alert Ambulette Service Corp.*,
     No. 11-cv-442, 2012 WL 170049, 2012 U.S. Dist. LEXIS 6269 (E.D.N.Y. Jan. 19,
    2012) ................................................................................................ 14, 15, 18-19, 21

*Lin v. Benihana N.Y. Corp.*,
    No. 10-cv-1335, 2012 U.S. Dist. LEXIS 186526 (S.D.N.Y. Oct. 23, 2012).....................13, 19

*Meyers v. Crouse Health Sys.*,
    274 F.R.D. 404 (N.D.N.Y. 2011) .................................................................................13, 23

*Meyer v. United States Tennis Ass'n.*,
    297 F.R.D. 75 (S.D.N.Y. 2013) .........................................................................................13

*MMT Sales, Inc. v. Channel 53 Inc.*,
    No. 92-cv-7207, 1993 WL 541242, 1993 U.S. Dist. LEXIS 18208 (S.D.N.Y. Dec. 27,
    1993) ...................................................................................................................................12

*Morangelli v. Chemed Corp.*,
    275 F.R.D. 99 (E.D.N.Y. 2011)..........................................................................................17

*Moore v. Paine Webber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)..............................................................................................20

iv

*Morris v. Affinity Health Plan, Inc.*,
   859 F.Supp.2d 611, 615 (S.D.N.Y. 2012) ...............................................................................17

*Myers v. Hertz Corp.*,
   No. 02-cv-4235, 2007 WL 2126264, 2007 U.S. Dist. LEXIS 53572 (E.D.N.Y. July
   24, 2007) ...............................................................................................................................17

*Perez v. Isabella Geriatric Ctr.*,
   No. 13-cv-7453, 2016 WL 5719802, 136855 (S.D.N.Y. Sept. 30, 2016) .........................15, 22

*Pichardo v. Carmine's Broadway Feast Inc.*,
   No. 15-cv-3312, 2016 WL 4379421, 2016 U.S. Dist. LEXIS 78276 (S.D.N.Y. June
   13, 2016) ...........................................................................................................................15, 24

*Poplawski v. Metrople on the Atlantic, LLC*,
   No. 11-cv-3765, 2012 U.S. Dist. LEXIS 46408 (E.D.N.Y. Apr. 2, 2012) ...............................14

*Porter v. MooreGroup Corp.*,
   No. 17-cv-7405, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187 (E.D.N.Y. Aug.
   11, 2021) ........................................................................................................................ *passim*

*Promisel v. First American Artificial Flowers Inc.*,
   943 F.2d 251 (2d Cir. 1991)....................................................................................................12

*Ramos v. SimplexGrinnell LP,*
   796 F. Supp. 2d 346 (E.D.N.Y. June 21, 2011) .........................................................................1

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)....................................................................................................14

*Shahriar v. Smith & Wollensky Restaurant Group, Inc.*,
   659 F.3d 234 (2d Cir. 2011)...............................................................................................12, 16

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S.Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) ................................................................14, 15

*Willix v. Healthfirst, Inc.*,
   No. 07-cv-1143, 2009 WL 6490087, 2009 U.S. Dist. LEXIS 114818 (E.D.N.Y. Dec.
   3, 2009) .................................................................................................................................24

**STATUTES, RULES AND REGULATIONS**

28 U.S.C. § 1367......................................................................................................................12

Federal Rules of Civil Procedure
   Rule 23 ........................................................................................................................ *passim*

## PRELIMINARY STATEMENT

Named Plaintiff Manuel Angel Calderon ("Calderon" or the "Named Plaintiff") respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 23, for certification of his state law claims for adjudication on a class-wide basis (the "Motion").

This case presents a straightforward challenge to the uniform timekeeping and payroll practices of defendants Network Infrastructure Inc. ("Network Infrastructure") and Patrick Clarke (together with Network Infrastructure, "Defendants"). Throughout the relevant time period, Defendants subjected all construction laborers, laborer-drivers, operators, mechanics, and all other workers performing manual construction labor to the same companywide policies governing when the workday began and what time was recorded for payroll purposes. Critically, Defendants' construction workers have no ability to record their time and no mechanism to ensure that yard work, travel time, safety meetings, trainings, and other required tasks were included in the hours recorded for payroll, resulting in the workers not being paid for a substantial number of hours worked each week. Whether Defendants' compensation practices unlawfully excluded compensable work time presents a question that can be resolved through common proof applicable to the Class as a whole. That is why courts routinely find that wage claims such as these, challenging Defendants' uniform compensation policies, are "especially suited to class litigation… despite differences in hours worked, wages paid, and wages due. *Ramos v. SimplexGrinnell LP*, 796 F.Supp.2d 346, 359 (E.D.N.Y. 2011), *vacated in part on other grounds*, 773 F.3d 394 (2d Cir. 2014).

Accordingly, through this Motion, Plaintiff seeks an Order:

(1) certifying his New York Labor Law (NYLL) claims (Counts II and III) on behalf of the following class (the "Class"): all construction laborers, laborer-drivers, operators,

1

mechanics, and all other workers performing manual construction labor, excluding yard-only workers, who worked for Network Infrastructure, Inc. at any time from December 2, 2017 through the entry of judgment in this Action (the "Class Members");

(2) appointing the Named Plaintiff as the representative for the Class;

(3) appointing Plaintiff's counsel, Pelton Graham LLC, as counsel for the Class; and

(4) authorizing Plaintiff to issue Notice to the Class.[1]

For the reasons set forth below, Plaintiff's Motion should be granted in its entirety.

## STATEMENT OF THE CASE

### I.    Course of Proceedings

This Fair Labor Standards Act (FLSA) collective action and NYLL class action was commenced with the filing of the Complaint on July 18, 2024 (the "Complaint") by the Named Plaintiff. (Dkt. No. 1). Defendants filed an Answer to the Complaint on September 12, 2024, denying all substantive allegations. (Dkt. No. 14).  A Court-ordered mediation was held on October 23, 2024; the parties failed to reach a resolution. (*See* Order dated Oct. 8, 2024, Dkt. No. 16).

Plaintiff moved to conditionally certify a collective pursuant to the FLSA § 216(b) on March 19, 2025. (Dkt. Nos. 22-24). Subsequently, the parties negotiated a proposed stipulation and order to resolve the motion with the mailing of agreed-upon notice to members of the stipulated collective, which the Court approved. (Dkt. Nos. 27, 28). Defendants identified 238 members of the FLSA collective. (Pelton Decl. ¶ 12). Twenty-seven (27) individuals returned consent forms to join this Action. (Dkt. No. 78 at 2, fn. 1). At this time, there are twenty-two opt-in plaintiffs (the "Opt-In Plaintiffs" and, together with the Named Plaintiff, the "Plaintiffs"). (Pelton Decl. ¶ 14).

---

[1] If Plaintiffs' Motion is granted, Plaintiffs propose to confer with Defendants on the form of Class Notice and production of Class Member contact information and submit a Proposed Notice to the Court.

The parties have exchanged document discovery. (Pelton Decl. ¶ 15). Plaintiffs produced all the relevant documents in their possession, including paystubs, tax forms, text messages, timesheets, handwritten notes, and union membership cards. (*Id.*). Defendants produced time and pay records, Pre-Trip Inspection Reports, and GPS data for approximately one hundred (100) vehicles for the period between 2021 and 2026. (*Id.*). Plaintiffs deposed Defendant Clarke and Ken Walsh for Network Infrastructure, and Defendants have deposed plaintiffs Manuel Calderon, Lourenco Alves, Thomas Doyle, Carlos Fuentes, and Francisco Onofre. (*Id.*). At this time, one other motion is pending in this matter: Defendants' motion to dismiss this action on preemption grounds. The motion has been fully briefed. (Dkt. Nos. 97-99, 103, 106).

## II.    **Relevant Facts**

### A.    **Defendants' Construction Business**

Defendant Clarke founded Network Infrastructure in 1999. (Clarke 9:21-10:6). Deponent Ken Walsh joined Network Infrastructure in 2001 as a vice-president, director, shareholder and officer. (*Id.* 11:14-19). Network Infrastructure is a utility construction contractor performing installation, excavation, maintenance, and repair work for Consolidated Edison Company of New York, Inc. ("Con Edison") and other utilities throughout New York City, Long Island, and Westchester County. (*Id.* 12:17-13:15, 17:6-22). Indeed, work for Con Edison comprises approximately 95% of Network Infrastructure's business. (*Id.* 18:14-17). Network Infrastructure also provides work on other utility projects, telecommunications, and other subsurface work. (*Id.* 14:24-15:14, 19:4-9). Overall, the type of work performed by Network Infrastructure has remained consistent throughout the relevant time period. (*Id.* 114:10-115:3).

While the number of projects, size and composition of crews has varied, the total number of Network Infrastructure employees throughout the relevant time has remained relatively stable.

3

(Clarke 15:15-22). Network Infrastructure employs construction workers including foremen, operating engineers, laborers, welders, fusers, drivers, flaggers, pavers, carpenters, maintenance men and gas mechanics. (*Id.* 20:7-22:22, 27:3-23). Network Infrastructure maintains over twenty (20) backhoes and/or excavators at any given time in good working order. (*Id.* 25:10-25). There are approximately fifteen (15) foremen, "a large number" of laborers, three (3) to four (4) carpenters, approximately four (4) pavers, and between two (2) and ten (10) welders, with some fluctuation depending upon the season, workload, and year. (*Id.* 24:16-21, 27:13-29:12). There may be ten (10) or more drivers working out of a given Yard. (Walsh 29:25-31:8). The size of a crew can vary significantly, from a two (2) person crew performing minor repairs to a fifteen (15) person crew installing a transmission main. (Clarke 35:9-36:3). Network Infrastructure also employs approximately six (6) workers permanently stationed at one of the company's Yards. (Clarke 33:13-15).[2] In total, Network Infrastructure employs over one hundred and forty (140) individuals (*id* 13:20-23), over one hundred (100) of whom work in the field. (Walsh 28:13-16).

When traveling to a Con Edison worksite, a Network Infrastructure construction crew typically takes out a box truck with the necessary equipment, tools, and materials. (Clarke 39:18-21, *see also* 64:4-67:7 [listing items commonly carried in box trucks]). Crews working on gas mains typically also require a backhoe, excavator, or both. (*Id.* 43:22-44:5). Network Infrastructure maintains permanent yards as well as temporary sites to keep equipment during certain projects. (*Id.* 14:2-8, 45:23-46:11). Defendant Clarke estimated that approximately fifty (50) people work out of Defendants' Bronx Yard. (*Id.* 46:23-47:5). During the relevant time period, Network Infrastructure has also maintained a Yard in Hempstead, New York and Pelham, New York, as well as an office and garage in Steinway, Queens. (Clarke 14:2-8, 47:15-48:9; Walsh 18:16-19:4).

---

[2] Plaintiffs do not seek certification on behalf of these yard workers.

**B.      Defendants' Practices Regarding Yard Work, Meetings and Trainings**

Workers who drive trucks and equipment and their helpers are required to report to the Yard to perform a pre-trip inspection protocol. (Clarke 58:20-59:16; Walsh 19:19-21; Fuentes 44:1-42:5; Kuveke ¶¶ 13-14; Ilan ¶ 7; Dunn ¶ 8). All vehicles and mobile machinery must be inspected before they leave the Yard, which is done by an app that provides a checklist to be reviewed. (Clarke 59:6-16). The process includes a walk around the vehicle to ensure tires are pressurized and to make sure that features such as windshield wipers, directional signals, brakes, and headlights all function properly. (*Id.* 60:20-61:7). Drivers and helpers also fuel up trucks at the Yard. (Walsh 31:22-32:9). Operators are responsible for knowing the fuel levels of their equipment and to fuel up their machinery as needed. (Clarke 71:21-72:7; Walsh 32:20-23). Equipment such as backhoes and excavators are maintained on a Yard when not in use on a given project and are returned to a Yard after the end of a project. (Clarke 72:23-74:11; Dunn ¶ 7). Box trucks are returned to one of Defendants' Yards every night and sometimes are transferred between Yards as needed. (*Id.* 74:12-75:11). Crews may be transferred from one Yard to another for a new project assignment. (*Id.* 74:19-75:11).

Network Infrastructure holds weekly safety meetings, where Network Infrastructure shares current information regarding safety protocols, rules, and requirements, particularly from Con Edison, as well as lessons learned from other contractors, in order to promote a culture of safety. (Clarke 55:24-56:24; Calderon 106:17-107:1, 109:15-23; Alves 77:6-22, 119:5-121:3; Onofre 93:12-17; Fuentes 81:17-82:16; Kuveke ¶¶ 21-22; Ilan ¶¶ 21-22; Dunn ¶¶ 20-21). These meetings are run by Network Infrastructure employees, including Ken Walsh and others. (Clarke 56:25-57:28; Alves 78:11-18). These meetings typically started around 6:00 am or 6:30 am and lasted between twenty (20) and forty-five (45) minutes or longer. (Clarke 57:16-58:3; Calderon 99:12-

5

100:8; Alves 79:5-8; Kuveke ¶ 21; Ilan ¶ 21; Dunn ¶ 20). Network Infrastructure maintains sign-in sheets for these meetings (Clarke 104:18-24; Calderon 100:9-12; Fuentes 81:23-82:8; Kuveke ¶ 21; Ilan ¶¶ 21; Dunn ¶¶ 19-20; Dunn ¶ 23)[3]. Safety meetings were held at all active Yards. (Calderon 99:19-22, Alves 119:20-120:17).

Network Infrastructure workers must obtain and maintain certain certifications and qualifications in order to perform work, some of which are common to all workers, such as OSHA training, some specific for certain tasks, and some specific to Con Edison projects. (Clarke 50:12-54:10; Walsh 61:13-62:7; Kuveke ¶ 25; Ilan ¶ 25; Dunn ¶ 24). Network Infrastructure provides some of this training, including remedial training, to its workers. (Clarke 51:13-19, 54:16-55:7). In addition, workers receive training from Con Edison and their unions. (*Id.* 51:5-13, 53:11-54:10; Walsh 61:13-22). Defendant Clarke estimated that there are 132 tasks on which a person must be qualified in order to work on natural gas projects. (Clarke 55:14-23). Finally, Network Infrastructure's employees are subject to mandatory drug testing. (*Id.* 106:2-4).

C.    **Plaintiffs' Construction Work for Network Infrastructure**

Testifying Plaintiffs worked as laborers, laborer-drivers, mechanic/fitters, gas mechanics, backhoe operators, and laborer-helpers. (Calderon 24:11-26:10; Alves 41:12-16; Doyle 33:7-16; Onofre 17:18-18:5, 30:30-18; Fuentes 44:1-42:5; Kuveke ¶ 1; Ilan ¶¶ 1, 6; Dunn ¶ 1). This work often included driving duties. (Calderon 37:13-38:8; Alves 47:2-6; Doyle 33:14-16; Onofre 17:25-19:6; Kuveke ¶¶ 6, 13; Ilan ¶ 7; Dunn ¶ 8). Plaintiffs belonged to trade unions including Local 731, Local 60, Local 15, and Local 1298, although they were not provided with copies of the pertinent collective bargaining agreement. (Calderon 22:5-17, 34:18-35:5; Alves 36:13-37:16,

---

[3] Despite Plaintiffs' requests for these records, to date, Defendants have not produced. (Pelton Decl. ¶ 19)

99:8-18, 101:15-21; Onofre 16:17, 79:10-81:4; Kuveke ¶ 2; Ilan ¶ 2; Dunn ¶ 2).

Network Infrastructure field workers typically worked between seven (7) and eight (8) hours per day at jobsites and sometimes longer, five (5) days per week. (Clarke 68:2-14; Alves 107:13-18; Onofre 60:11-17, Fuentes 88:13-16, 92:19-93:8; Kuveke ¶ 9; Ilan ¶¶ 8, 10; Dunn ¶ 9). There is no standard start time for construction projects, as local permits often dictate what times and days of the week certain work can be performed. (Clarke 68:22-69:3, 87:7-11).

Plaintiffs who reported to the Yard typically arrived between 5:30 am and 7:00 am, as instructed by foremen and as necessary to perform their tasks before traveling to jobsites. (Calderon 30:19-25, 45:11-12, 101:15-20; Alves 58:3-59:9, 107:22-108:15; Doyle 30:20-24, 61:6-62:13; Onofre 20:12-18, 39:3-41:6; Fuentes 31:19-24, 94:10-23; Kuveke ¶ 16; Ilan ¶ 7; Dunn ¶¶ 8, 15). In addition to drivers and helpers, who were required to report to the Yard, foremen could order laborers to report to the Yard to perform work such as loading tools and materials into trucks. (Clarke 79:25-80:6, 81:10-82:4). At that time, Yard workers moved vehicles into the street while Plaintiffs performed their duties included performing the Pre-Trip Inspection, removing debris from the prior day's work if it were not already removed the previous day, loading materials and equipment, transferring tools, and checking various safety features such as headlights and brake lights, as well as oil levels. (Calderon 51:9-53:23, 101:25-102:16; Alves 108:7-109:7; Doyle 18:7-13, 29:10-14, 56:14-59:24; Onofre 20:12-18, 39:3-11, 51:12-52:20, 92:2-15; Fuentes 31:19-24, 47:18-48:12, 90:6-91:13; Kuveke ¶ 14; Ilan ¶ 17; Dunn ¶¶ 16-17). This work typically took between fifteen (15) and forty-five (45) minutes and often involved multiple trips between the Yard and truck parked on the street. (Calderon 53:3-23; Alves 108:16-19; Onofre 55:2-6; Fuentes 91:9-13; Kuveke ¶ 16; Ilan ¶ 18). Plaintiffs reported seeing other coworkers at the Yard performing similar work. (Calderon 105:15-106:5; Alves 117:12-17; Doyle 30:20-31:5, 69:25-70:15; Fuentes

7

49:1-9, 95:8-21; Kuveke ¶¶ 13, 17; Ilan ¶¶ 15, 18; Dunn ¶ 17).

From there, they typically drove to jobsites, leaving ample time for traffic and to arrive at the jobsite in a timely manner. (Calderon 66:5-24; Kuveke ¶ 16). Travel time could be between thirty (30) and ninety (90) minutes in the morning and even longer in the afternoon, between ninety (90) minutes and as two (2) hours or more, due to rush hour traffic. (Calderon 102:21-103:2; Alves 65:14-18, 107:17-21, 114:8-11, 116:22-117:6; Doyle 70:19-71:12, 98:20-24; Onofre 56:5-11; Fuentes 91:14-22; Kuveke ¶¶ 16, 18; Ilan ¶ 18; Dunn ¶ 17). It was common for foremen to instruct workers to arrive to jobsites in advance of the permit-designated start time in order to set up the jobsite, organize materials and equipment, sweep the work area, make any necessary repairs to vehicles or equipment, or run errands to acquire needed materials. (Calderon 104:8-105:14; Alves 57:16-22, 114:12-18; Doyle 30:22-31:3, 60:6-23; Fuentes 36:6-11, 39:8-40:16; Kuveke ¶¶ 7-8; Ilan ¶ 9; Dunn ¶ 10).

When Plaintiffs returned to the Yard after the day's work, they parked the vehicle inside the Yard, locked it, dropped off keys at a designated location, and inspected the vehicle for any damage. (Calderon 53:24-54:13; Alves 67:22-68:18; Kuveke ¶ 19). They unloaded debris from the day's work and, at the end of the week, put away tools in a secure location to prevent theft. (Alves 67:22-68:18, 113:4-114:7; Doyle 41:2-42:17, 56:2-14; Onofre 95:5-11; Clarke 95:23-96:6).

### D.    Defendants' Common Timekeeping and Payroll Practices

Timekeeping for Network Infrastructure's construction workers in the field is performed by foremen, who are provided with tablets where they record each worker's start and finish time, as well as materials and equipment used, work performed, and hazards of a specific jobsite. (Clarke 61:8-20, 110:4-7). Throughout the relevant time period, employee time has always been tracked in this manner, by foremen via tablets or other electronic means. (*Id.* 67:12-25, 120:19-25-121:17).

8

As such, workers do not clock in; start times are recorded by their foremen. (*Id.* 69:4-70:5, 121:18-122:25; Alves 69:17-4; Fuentes 58:16-59:7 87:16-22; Kuveke ¶ 11; Ilan ¶ 13; Dunn ¶ 13). At no time did Network Infrastructure make any efforts to ensure that time worked at the Yard or travel time between the Yard and jobsites was accurately tracked and recorded. (Alves 112:2-11:3; Kuveke ¶¶ 20, 27; Ilan ¶ 20; Dunn ¶ 19).

The information contained in the Ground Control app, which is where foremen record jobsite information including employee start and end times, is used to generate Network Infrastructure's payroll, including certified payroll required by Con Edison. (Clarke 95:5-15). Paychecks were calculated and issued based on the information in the Ground Control app. (*Id.* 95: 14-18). All Plaintiffs and Class Members were paid by check on a weekly basis. (Calderon 74:4-6; Alves 70:16-19; Doyle 74:18-21; Fuentes 57:24-58:1; Kuveke ¶ 33; Ilan ¶ 30; Dunn ¶ 30).

E.    **Defendants' Unlawful and Ongoing Classwide Wage Violations**

Plaintiffs have consistently testified that they were paid for fewer hours than they actually worked as a result of Defendants' policy not to track or pay for hours worked at the Yard or travel time between the Yard and jobsites. (Calderon 87:22-88:1, 114:25-115:21; Alves 112:7-10, 115:3-116:6; Doyle 17:19-18:19; Fuentes 21:4-8; Kuveke ¶¶ 12, 26, 33; Ilan ¶ 26; Dunn ¶ 14). Certain workers, specifically some drivers and foremen, received a small additional payment representing thirty (30) or sixty (60) minutes of work, but this fell short of compensating them for all work performed at the Yard and travel time between the Yard and jobsites, given the extent of the tasks they were required to perform and the travel time, especially at rush hour. (Calderon 85:12-21, 103:11-104:7; Ilan ¶ 12).

Defendants were well aware of the unpaid work performed by workers. Plaintiffs complained about missing Yard and travel time and mandatory unpaid meetings and trainings, but

9

at no time did Defendants' policies change. (Calderon 88:2-21; Doyle 17:19-18:19; Onofre 93:25-94:14; Fuentes 59:22-60:7; Kuveke ¶¶ 29, 30; Dunn ¶¶ 25-26). At no time were construction workers paid for attending safety meetings at the Yard, drug testing, or mandatory trainings. (Calderon 107:2-4, 111:1-4; Alves 121:4-13, Doyle 17:19-18:19; Fuentes 92:8-18; Kuveke ¶ 25; Ilan ¶ 25; Dunn ¶ 24).

Unsurprisingly, Defendants deny that Plaintiffs or other construction workers were required to work time without pay, testifying that all work performed would be included in foremen's reported hours for employees. (Clarke 81:5-9, 83:3-7). Yet Defendant Clarke could not explain significant, repeated discrepancies between GPS records and recorded start times for Plaintiff Calderon. (*Id.*135:25-150:14 [discussing time and GPS records for June 20, 21, and 23, 2022]; Ex. L).[4] He simply asserted that Calderon's time "should have been reported to his foreman." (*Id.* 151:6-14).

Using records time records, GPS records, and vehicle inspection reports produced by Defendants, Plaintiffs have created a preliminary review of GPS records on a vehicle-by-vehicle basis and a comparison of time records, GPS records, and vehicle reports on a person-by-person basis. (Pelton Dec. ¶¶ 17-18; Ex. M; Ex. N; Ex. O). GPS records[5]—which notably do not capture all Yard time but rather primarily travel time—consistently reflected vehicles in operation for more hours than Plaintiffs were paid on a given day, as demonstrated during Defendant Clarke's deposition. (*Id.*). (Pelton Decl. ¶¶ 17-18; Ex. N). Both analyses establish that on average Plaintiffs who drove vehicles worked for over nine (9) hours per day but were paid for fewer hours, resulting in several hours of unpaid work per week. (Ex. M at 1; Ex. N at 1). In sum, Defendants' own

---

[4] Almost all of Network Infrastructure's vehicles, trucks, and mobile equipment have GPS. (Clarke 79:10-13).

[5] As set forth at Pelton Decl. ¶ 17, the GPS calculations exclude the first or last trip of the day if it is likely that such trips were performed by Yard workers.

records reflect that Plaintiffs were consistently paid for fewer hours than they physically operated vehicles—setting aside the mandatory Yard time, meetings, and trainings to which they have attested. Although Defendants' GPS records could have provided a more accurate calculation of hours worked for those Plaintiffs who drove or operated vehicles, Defendants instead chose to pay for jobsite hours only, plus a modest additional payment that did not cover all travel time, let alone all Yard time.

Defendants largely confirmed Plaintiffs' allegations regarding extra pay, testifying that drivers receive an extra thirty (30) minutes of pay and that foremen receive an extra hour of pay. (Clarke 85:2-8; Walsh 25:21-26:7, 57:4-19). Defendants testified as to the additional duties of foremen of reporting to their project manager on a daily basis, picking up and dropping off packages, recording daily worker and jobsite information, filling out paperwork, equipping trucks with the necessary materials and equipment, and being familiar with all the requirements and hazards of a given jobsite. (Clarke 61:13-62:19, 64:7-12, 86:10-88:10; Walsh 16:2-18:8).

Defendant Clarke also explained that Network Infrastructure bills Con Edison for the performance of certain tasks, such as the amount of pipe replaced—tasks which primarily, if not exclusively, occur on the jobsite. (Clarke 91:3-19). He confirmed that Con Edison does not pay Network Infrastructure for time spent at the Yard and rarely pays for drive time except in emergency response situations. (*Id.* 93:12-94:22).

Defendants time and again affirmed that the work performed by Network Infrastructure, the overall size of the workforce of Network Infrastructure, and the timekeeping practices of Network Infrastructure remained consistent throughout the relevant time period. (Clarke 15:15-22, 114:10-115:3, 120:19-121:17; Walsh 12:25-14:3, 37:11-38:19). At no time were workers able to record their own time worked or provided with the means to do so; their hours were always

11

recorded by foremen. (Walsh 13:15-14:3).

**ARGUMENT**

I.    **THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS**

First, it is appropriate to address the Court's jurisdiction over Plaintiffs' NYLL claims. Title 28 U.S.C. § 1367 allows a district court to exercise supplemental jurisdiction over a state law claim where it is "so related [to the federal claims] that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Claims "form part of the same case or controversy" if they "derive from a common nucleus of operative fact," *Shahriar v. Smith & Wollensky Restaurant Group, Inc.,* 659 F.3d 234, 245 (2d Cir. 2011), and "would ordinarily be tried in one judicial proceeding." *MMT Sales, Inc. v. Channel 53 Inc.,* No. 92-cv-7207, 1993 WL 541242, 1993 U.S. Dist. LEXIS 18208, at *4 (S.D.N.Y. Dec. 27, 1993) (*quoting Promisel v. First American Artificial Flowers Inc.,* 943 F.2d 251, 254 (2d Cir. 1991)).

Here, Plaintiffs' NYLL unpaid overtime and gap-time claims challenge the same policy and practice as their federal FLSA claim and rely on the same facts and legal questions pertaining to Defendants' time and pay policies and consistent failure to pay wages for all hours worked. Accordingly, Plaintiffs' state law claims form part of the "same case or controversy" as Plaintiffs' federal claim making the exercise of supplemental jurisdiction appropriate. *See Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 163 (S.D.N.Y. 2008) ("[C]ourts in the Second Circuit routinely certify class actions . . . so that New York State and federal wage and hour claims are considered together.") (collecting cases); *Shahriar*, 659 F.3d at 245 (approving widespread practice in FLSA claims of exercising supplemental jurisdiction over related NYLL claims).

II.    **THIS COURT SHOULD CERTIFY PLAINTIFFS' NYLL CLAIMS AS A RULE 23(b)(3) CLASS ACTION**

A party seeking class certification must establish that Rule 23's requirements are satisfied.

12

*Caridad v. Metro-North Commuter Railroad,* 191 F.3d 283, 291 (2d Cir. 1999). However, Rule 23 should be given a "liberal rather than restrictive construction," and "the Second Circuit's general preference is for granting rather than denying class certification." *Lin v. Benihana N.Y. Corp.*, No. 10-cv-1335, 2012 U.S. Dist. LEXIS 186526, at \*11 (S.D.N.Y. Oct. 23, 2012). Any "doubts about whether Rule 23 has been satisfied should be resolved in favor of certification." *Meyers v. Crouse Health Sys.*, 274 F.R.D. 404, 412 (N.D.N.Y. 2011). While a "rigorous analysis… of the prerequisites of Rule 23(a)" must be conducted, "where a collective action under the FLA that is based on the same set of facts has been an approved, there is an inclination of grant class certification of state labor law claims." *Cinar v. R&B Brenner Income Tax, LLC*, No. 20-cv-1362, 2024 WL 4485331, 2024 U.S. Dist. LEXIS 110045, at \*9 (E.D.N.Y. June 21, 2024) (*adopted at* 2024 WL 4224046, 2024 U.S. Dist. LEXIS 168579 [E.D.N.Y. Sept. 18, 2024]).

The court must accept the allegations in the complaint as true on a motion for class certification. *See*, *e.g.*, *Meyer v. United States Tennis Ass'n*, 297 F.R.D. 75, 82 (S.D.N.Y. 2013). The Court may also "consider material outside the pleadings in determining whether to certify a class," but "must not consider or resolve the merits of the claims of the purported class." *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85 (S.D.N.Y. 2011). On this motion, "the ultimate question is not whether the plaintiffs… will prevail on the merits but rather whether they have met the requirements of Rule 23." *Gortat v. Capala Bros.*, 257 F.R.D. 353, 362 (E.D.N.Y. 2009).

As demonstrated by the facts set forth herein, the Class easily satisfies the requirements of Rule 23(a) and (b)(3).

### A.   Rule 23(a)(1): Numerosity

A class must be "so numerous that joinder of all members is impracticable." F.R.C.P.

13

23(a)(1). In the Second Circuit, "numerosity is presumed at… 40 members." *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995), but the precise number of class members need not be established. *See Lewis v. Alert Ambulette Serv. Corp.*, No. 11-cv-442, 2012 WL 170049, 2012 U.S. Dist. LEXIS 6269, at *23 (E.D.N.Y. Jan. 19, 2012). "Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *In Re Beacon Assocs. Litig.*, 282 F.R.D. 315, 326 (S.D.N.Y. 2012). "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id*.

Network Infrastructure has employed one hundred (100) or more field workers at any given time, including approximately fifteen (15) foremen and ten (10) drivers for each operative Yard, as well as operators for approximately twenty (20) backhoes and excavations in use. (*Supra* at 4). This information is confirmed by the 216(b) collective list provided by Defendants, which shows approximately 238 employees who met the 216(b) collective definition. (Pelton Decl. ¶ 12). As such, numerosity is satisfied. *See, e.g., Poplawski v. Metroplex on the Atlantic, LLC*, No. 11-cv-3765, 2012 U.S. Dist. LEXIS 46408, at *15 (E.D.N.Y. April 2, 2012) ("Precise quantification of class members is not necessary, so long as plaintiffs reasonably estimate the number to be substantial.") (citing *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).

## B.    Rule 23(a)(2): Common Questions

To merit class certification, claims must "depend upon a common contention ... of such a nature that it is capable of class wide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). "Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the

14

members' claims that warrant[s] class treatment." *Garcia v. Pancho Villa's of Huntington Village, Inc.,* 281 F.R.D. 100, 105 (E.D.N.Y. 2011). Even a single common question is sufficient to meet the commonality requirement. *Wal-Mart Stores*, 131 S.Ct. at 2556. Where the question of law involves "standardized conduct of the defendant... a common nucleus of operative fact is typically presented and the commonality requirement... is usually met." *Lewis*, 2012 U.S. Dist. LEXIS 6269, at *25. For this reason, "commonality is usually satisfied in wage cases 'where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." *Chime v. Peak Sec. Plus, Inc.*, 137 F.Supp.3d 183, 208 (E.D.N.Y. 2015). Courts "both inside and outside of this circuit" often find "commonality and typicality in similar cases" alleging unpaid off-the-clock time. *Perez v. Isabella Geriatric Ctr.*, No. 13-cv-7453, 2016 WL 5719802, 136855, at *9-10 (S.D.N.Y. Sept. 30, 2016) (citing cases); *see also Pichardo v. Carmine's Broadway Feast Inc.*, No. 15-cv-3312, 2016 WL 4379421, 2016 U.S. Dist. LEXIS 78276, at *16 (S.D.N.Y. June 13, 2016) *adopted at* 2016 WL 5338551, 2016 U.S. Dist. LEXIS 130658 (S.D.N.Y. Sept. 23, 2016) (unpaid overtime and off-the-clock claims are "generally ideal for class resolution").

Defendants' NYLL violations were common to all Class Members. As set forth *supra* at 9-10 Plaintiffs allege that Defendants failed to pay Class Members wages for all work performed outside the jobsite, resulting in unpaid overtime premiums and unpaid regular (gap-time) wages. These unpaid wages were for work performed at the Yard and travel time between the Yard and jobsites. For drivers, helpers, operators, and foremen, who were required to report to the Yard on a regular basis to perform substantive work before driving to jobsites and to drive back to the Yard to perform additional work, this amounted to several hours per week of unpaid wages. For all other workers and laborers, this amount to approximately one (1) hour per week or more resulting from mandatory safety meetings, drug testing, and required certifications and qualifications they needed

15

to obtain and maintain in order to perform their job assignments. As these events rarely occurred at jobsites but typically occurred at Yards or elsewhere, pursuant to Defendants' policy, they were typically not compensated. Numerous Plaintiffs reported complaining to their foremen but receiving no compensation for unpaid time or other change in policy. Indeed, Defendants confirmed that timekeeping and payroll practices have remained consistent throughout the class period. (*Supra* at 11-12).

As a result, all members of the putative Class raise the same common issues, which are susceptible to common answers: (1) whether Defendants had a policy or practice of requiring or permitting Class Members to perform work at the Yard and other locations before and after working at the jobsite, and (2) whether Defendants had a policy of recording and paying only time worked at the jobsite(s) rather than all hours worked. *See Porter v. MooreGroup Corp.*, No. 17-cv-7405, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187, at \*13-14 (E.D.N.Y. Aug. 11, 2021) (common factual questions including "whether defendants… had a policy of not paying wages at an overtime rate after an employee worked over 40 hours in a given workweek" satisfied commonality and common legal questions as to the legality of such practices established commonality). There are also common legal questions susceptible to common answers regarding whether or not these common policies are illegal under the NYLL. *Id.* The answers to these common questions will be established through common evidence, including Defendants' timekeeping records, vehicle reports, GPS records, and party testimony regarding how time was recorded and for what work Class Members were compensated. Thus, the Class more than satisfies the common question requirement. *See Shahriar*, 659 F.3d at 252 (common questions satisfied where all NYLL claims derived from the same policy of defendants).

The fact that Defendants operated multiple Yards likewise does not defeat commonality.

16

Workers were paid through the same payroll system, their hours were recorded by foremen using the same procedures, and the same timekeeping practices governed whether yard work and travel time were included in payroll. (*Supra* at 8-9, 11-12). Thus, the legality of Defendants' compensation practices does not depend on which yard a worker reported to, which foreman supervised a particular crew, or which construction project a worker was assigned to on a given day. *See Morris v. Affinity Health Plan, Inc.*, 859 F.Supp.2d 611, 615 (S.D.N.Y. 2012) (Carter, D.J.) (Commonality satisfied where "All Class Members raise common issues: (1) whether Defendant had a policy of not paying Marketing Representatives and Specialists overtime premium pay for hours worked over 40 in a workweek; (2) whether Defendant failed to pay Class Members premium overtime wages; and (3) whether Defendant knew or should have known that Class Members were working 'off-the-clock.'").

In sum, commonality is satisfied where, as here, a defendant "testified that the putative class members were subject to the same scheduling and timekeeping practices" and "deposition testimony also confirms that the compensation practices were similar for the potential class members." *Porter*, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187, at *13-14.[6]

### C.    Rule 23(a)(3): Typicality

"Typicality requires that 'the claims of the class representatives be typical of those of the class, and is therefore satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove defendants' liability.'" *Myers v. Hertz Corp.*, No. 02-cv-4235, 2007 WL 2126264, 2007 U.S. Dist. LEXIS 53572, at *18 (E.D.N.Y.

---

[6] The extent of the common questions presented by the class will be addressed in more detail in the discussion of Rule 23(b)(3) "predominance" inquiry. *See Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 106 (E.D.N.Y. 2011) (combining 23(a)(2) commonality and 23(b)(3) predominance requirements into one analysis).

July 24, 2007) (*quoting Marisol A.*, 126 F.3d 372, 376 (2d Cir. 1997)). However, "[t]ypicality 'does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claims as to that of other members of the proposed class.'" *Damassia*, 250 F.R.D. at 158 (quoting *Caridad*, 191 F.3d at 293).

Here, the Plaintiffs and the prospective class "were subject to the same general employment scheme," *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 204 (S.D.N.Y. 2006), and their claims are all based on "the same course of events and legal theory." *Damassia*, 250 F.R.D. at 158. The Plaintiffs performed a wide variety of construction duties, yet worked similar schedules and experienced the same unlawful pay policies. Both Defendant Clarke and Mr. Walsh confirmed that all timekeeping and pay practices were consistent for all construction workers employed by Network Infrastructure throughout the class period. (*Supra* at 11-12). As such, "for substantially the same reasons discussed *supra* in connection with commonality… the typicality requirement is satisfied because the named plaintiffs' claims arise from the same course of conduct under the same legal theory as the rest of the class." *Porter*, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187, at *19. If these challenged payroll practices were unlawful as to Plaintiff, they were unlawful as to all members of the Class, making Plaintiff's claims typical of the class. If, as Defendants claim, the policies were lawful, they were lawful as to all Class Members.

### D.    Rule 23(a)(4): Adequacy of Representation

The Rule 23(a)(4) adequacy requirement is twofold. First, the class representative must "be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents," *Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007), and "representatives must have no interests conflict

18

with the class." *Lewis*, 2012 U.S. Dist. LEXIS 6269, at *30. "Only a fundamental conflict will defeat the adequacy of representation requirement." *Id*. Second, class counsel must be "qualified, experienced and able to conduct the litigation." *Lin*, 2012 U.S. Dist. LEXIS 186526, at *24.

Here, the Plaintiff is a member of the class he seeks to represent and has the same interests as the Class Members. Plaintiff, like Class Members, performed construction work on Network Infrastructure jobsites, where they typically worked seven (7) to eight (8) hours per day at jobsites, five (5) days per week. (*Supra* at 7, 9). In addition to work performed at jobsites, they were required to perform mandatory work and attend mandatory events at Defendants' Yards and travel from there to jobsites—none of which was paid. (*Supra* at 9). This resulted in the same injury for Plaintiff and all Class Members: they were not paid wages for a number of hours each week. There are no conflicts between Plaintiff and the class that would preclude him from vigorously representing the Class. Any defenses to Plaintiff's legal arguments for unpaid wages would be common to all Class Members because they were all paid pursuant to the same policies. As such, Plaintiff will adequately represent the interests of all Class Members in this action. *Porter*, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187, at *20 (Finding named plaintiffs adequate, as they "provided evidence that [he was] subject to a common illegal compensation practice as the other putative class members; rel[ies] on similar legal theories to prove [his] NYLL claims; and ha[s] the same interest in maximizing the amount of class recovery.").

Finally, as set forth above and in the declaration of Brent E. Pelton filed herewith, class counsel is experienced in handling large, multi-party actions and is fully qualified to pursue this action. (Pelton Decl. ¶¶ 2-9). Therefore, both prongs of the adequacy inquiry – qualification of the class representatives and qualification of class counsel – are easily met.

19

### E.    Rule 23(b)(3):  Common Questions Predominate

The requirement that common questions predominate tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Predominance is satisfied when "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. Paine Webber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002); *see also In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006). Class members aggrieved by a single policy of the defendant who rely on a legal theory common to all victims of that policy necessarily satisfy the predominance requirement. *See Porter*, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187, at *28 (predominance satisfied as to class of construction workers where "plaintiffs have submitted sufficient evidence at this stage in the litigation that the defendants had a common practice of failing to pay their employees overtime").

### 1.    Common Questions Predominate With Respect to Liability for Plaintiff's Claims.

Common questions predominate with respect to Plaintiff's claims. Plaintiff's claims are all based on policies of Defendants that applied to all Class Members – *i.e.* that Defendants did not compensate Plaintiff and Class Members for all hours worked, specifically work performed at the Yard and travel time between the Yard and jobsites, resulting in unpaid regular (gap-time) wages and overtime premiums. While Defendants have averred that they do in fact pay Plaintiff and Class Members for all hours worked (*supra* at 10), both Plaintiff and Defendants unambiguously allege that the timekeeping and payroll practices are common for all Class Members.

As such, these uniform policies will be established through generalized proof applicable to the Class as a whole, specifically testimony of Defendants, testimony of Plaintiff and Class

Members, Defendants' time and pay records, and Defendants' GPS and vehicle records. All of these materials provide evidence regarding the true nature of Defendants' time and payroll practices, the accuracy of Defendants' timekeeping, and the extent to which Defendants paid Plaintiff and Class Members for all hours worked. Once those uniform policies are established, the only remaining issue is whether those policies violated the statutory standards established by the State of New York, a legal question common to the entire class. There are no individual questions raised with respect to liability for the NYLL claims. Common questions not only predominate but are the *only* questions presented.

Because common questions predominate in cases, like this one, that challenge the legality of an employer's pay practices under NYLL, courts routinely certify such actions for class treatment. *See e.g., Lewis*, 2012 U.S. Dist. LEXIS 6269, at *36-37 (finding predominance satisfied and certifying class action for unpaid wage claims).

### 2.    Common Questions Predominate With Respect To Damages.

Damages can easily be established through generalized proof.  Defendants have provided time and payroll records for the opt-in plaintiffs as well as GPS records for approximately one hundred (100) vehicles, but have not produced sign-in sheets or other records documenting safety meetings, drug testing, or certifications and trainings. (Pelton Decl. ¶ 19; Exs M-O). As such, damages will be established via both records, particularly GPS records, and party testimony. Depositions already held establish that, while some details of work locations, tasks and duties, pay rates, and the extent of unpaid work vary, Defendants' timekeeping and payroll practices have been consistent for all Class Members throughout the class period.

 The differences among Class Members primarily pertain to damages calculations. *See Porter*, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187 at *16-17 (differences as to union

membership, job functions, and discretion or control over work hours does not defeat commonality but at most "speaks to the individual determination of damages"). Plaintiffs have testified that certain Class Members received a modest additional payment for a portion, but not all, of their extra work at the Yard and travel time. (*Supra* at 9, 11). As these wages are reflected in paystubs, like all other wages paid, it will be straightforward to determine the extent to which such extra payments were made and to adjust unpaid wage calculations accordingly. This does not defeat class certification, as "it is well-settled that individualized damages calculations do not defeat predominance." *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, 2011 U.S. Dist. LEXIS 105775, at *18 (S.D.N.Y. Sept. 16, 2011). Indeed, in "wage-and-hour cases, there will always be individualized questions that relate equally to both liability and damages—how many hours were worked, what wages were paid." *Cinar*, 2024 WL 4224046, 2024 U.S. Dist. LEXIS 168579, at *22-23. Defendants' failure to accurately track Class Members' off-site work does not hinder class certification, as "there is no indication that any [employee] would use some particular kind of evidence specific only to him or her in order to prove what hours they worked" or that "these individualized damages inquiries would predominate over generalized liability issues affecting the whole class." *Lassen v. Hoyt Livery, Inc.*, No. 13-cv-1529, 2014 WL 4638860, 2014 U.S. Dist. LEXIS 129784, at *34 (D. Conn. Sept. 17, 2014). Further, the Court may grant class status as to liability only, should that seem the preferable approach. *In re Nassau County Strip Search*, 461 F.3d at 226-27. Where, as here, "one or more of the central issues in the action are common to the class and can be said to be predominate," class treatment is appropriate even if "other important matters will have to be tried separately, such as damages." *Cinar*, 2024 WL 4224046, 2024 U.S. Dist. LEXIS 168579, at *23.

In sum, "this case turns on common questions relating to whether certain of [defendant's]

compensated-related policies and practices… violate the NYLL on a classwide basis," such that liability will be found on behalf of the entire class or not at all. *Perez*, 2016 WL 5719802, 2016 U.S. Dist. LEXIS 136855, at \*11.

      **F.**      **Rule 23(b)(3): Superiority**

Rule 23(b)(3) sets out four factors bearing on the question of superiority: (1) the extent to which the class members have an interest in individually controlling the prosecution of their claims; (2) the extent and nature of any litigation concerning the controversy already begun by class members; (3) the desirability of concentrating the litigation in one forum; and (4) the likely difficulties in managing the class action. All four of these factors favor certification of the Class.

(1) The class members have no interest in individually controlling the prosecution of their claims. In many cases, the amount of damages at issue is not large enough to make individual actions feasible, and "the costs of maintaining separate actions would be prohibitive." *Meyers*, 274 F.R.D. at 418. Pursuing individual actions may also be difficult for the class members because some of them are immigrants who may lack familiarity with the American legal system. *Ansoumana*, 201 F.R.D. at 85-86. Also, since many putative Class Members are current employees of Defendants, a determination of superiority is warranted due to the "possibility that employees would be dissuaded from pursuing individual claims by fear of reprisal." *Guzman v. VLM, Inc.*, No. 07-cv-1126, 2008 WL 597186, 2008 U.S. Dist. LEXIS 15821, at \*25 (E.D.N.Y. Mar. 2, 2008).

(2) There is another pending unpaid wage action against Defendants, *Cruz v. Network Infrastructure Inc., et al.*, No. 25-cv-832 (S.D.N.Y.). PACER reveals that this action has not been certified as a collective or class. As such, it is appropriate for Plaintiffs to seek class certification at this time to achieve judicial economy.

(3) Given that the evidence necessary to establish liability (*i.e.*, Defendants' time and

23

payroll records, GPS and vehicle records, and party testimony) is the same whether this action is tried as an individual or class action, it is clearly desirable for efficiency and judicial economy to concentrate all of the claims in one forum. Class adjudication is far superior to the filing of dozens of separate actions all raising the same questions and offering the same evidence regarding the nature and legality of Defendants' pay policies. The superiority of class treatment is particularly great here because the claims of many of the class members all arise in the Southern District of New York, as Defendants operated a Yard in Bronx, New York and Pelham, New York, and performed services on jobs throughout New York City. (*Supra* at 4; Clarke 14:4-6, 47:22-48:4; Doyle 65:14-21). As a result, class treatment will avoid the filing of dozens of identical claims in the same court and conversely will not result in this court adjudicating claims that could have been filed in a different jurisdiction.

(4) Courts in the Second Circuit "routinely hold that a class action is superior where… potential class members are aggrieved by the same policies, the damages suffered are small relative to the expense and burden of individual litigation, and some potential class members are currently employed by the Defendants" and moreover "routinely certify class actions in FLSA matters so that New York State and federal wage and hour claims are considered together." *Pichardo*, 2016 WL 4379421, 2016 U.S. Dist. LEXIS 78276, at *36 (citing cases). Class actions relying on a single state's law are particularly well-suited to class treatment. *See Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 658 (S.D.N.Y. 2013) (no manageability concerns for approximately 300 class members in New York). Denying certification on manageability grounds is "disfavored" and "should be the exception rather than the rule." *Willix v. Healthfirst, Inc.*, No. 07-cv-1143, 2009 WL 6490087, 2009 U.S. Dist. LEXIS 114818, at *13 (E.D.N.Y. Dec. 3, 2009) (*quoting In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)).

Finally, as "the proposed NYLL class is defined by objective criteria: the period in which the employees for defendants and the names, titles, and nature of the work of the NYLL class members," the class is ascertainable, such that "it is administratively feasible for the court to determine whether a particular individual is a member." *Porter*, 2021 WL 3524159, 2021 U.S. Dist. LEXIS 151187 (quoting *In re Petrobras Sec. Litig.*, 862 F.3d 250, 26 [2d Cir. 2017]).

Accordingly, a class action is a superior method of adjudicating this case.

## III.    PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL

Plaintiff's counsel, Pelton Graham LLC, meets all the relevant criteria under Fed. R. Civ. P. 23(g)(A). (*Supra* § Arg. II(D)). Pelton Graham LLC is highly experienced in complex wage and hour litigation, and specifically litigation defending the rights of New York construction employees. (*See* Pelton Decl. ¶¶ 2-5). Additionally, Plaintiff's counsel is willing and able to commit the necessary resources to represent the Class, and has already done substantial work identifying, investigating, and litigating Plaintiff's claims. (*See id*. ¶¶ 6-7). Courts in this Circuit have found Plaintiff's counsel to be adequate class counsel in wage and hour class actions in similar cases. (*See id*. ¶¶ 8-9). Consequently, the Rule 23(g) requirements are satisfied by the appointment of Pelton Graham as class counsel.

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that this Court issue an Order certifying Plaintiffs' proposed class pursuant to Rule 23 of the Federal Rules of Civil Procedure with respect to Plaintiffs' NYLL claims, together with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      March 23, 2026                    **PELTON GRAHAM LLC**


                                        By:    /s/ Brent E. Pelton
                                        Brent E. Pelton (BP 1055)
                                        Taylor B. Graham (TG 9607)
                                        111 Broadway, Suite 1503
                                        New York, New York 10006
                                        Telephone: (212) 385-9700
                                        Facsimile: (212) 385-0800
                                        Email: pelton@peltongraham.com
                                               graham@peltongraham.com

                                        *Attorneys for Plaintiffs, the FLSA Collective
                                        and putative Class*

26