# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:24-cv-05442 (ACL)
------------------------------------------X

MANUEL ANGEL CALDERON,
Individually and On Behalf
of All Others Similarly
Situated,
Plaintiff,
-against-
NETWORK INFRASTRUCTURE INC.
and PATRICK CLARKE, Jointly
and Severally,
Defendants.
------------------------------------------X
DATE: August 20, 2025
TIME: 10:10 a.m.

EXAMINATION BEFORE TRIAL of the Plaintiff, MANUEL ANGEL CALDERON, taken by the Defendant, pursuant to a Court Order, held at Pelton Graham LLC, 111 Broadway, Suite 1503 New York, New York 10006, before a Notary Public of the State of New York.

Job No. 7542701

PRIORITY-ONE COURT REPORTING SERVICES, INC.
290 West Mt. Pleasant Avenue
Suite 2260
Livingston, New Jersey 07039
(718) 983-1234

A P P E A R A N C E S:

PELTON GRAHAM LLC
111 Broadway Suite 1503
New York, New York 10006
BY: BRENT PELTON, ESQ.
Attorney for the Plaintiff

KAUFMAN DOLOWICH LLP
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
BY: EDWARD GRIMMETT, ESQ.
Attorney for the Defendants

ALSO PRESENT:
Larry Suarez, Interpreter
Patrick Clarke, Defendant
Belinda Herazo

* * *

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS HEREBY STIPULATED AND AGREED that all objections, except as to the form of question, will be reserved to the time of trial;

IT IS HEREBY STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

M A N U E L   A N G E L   C A L D E R O N, 5 Crest Avenue, Elmont, New York 11003, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

LARRY SUAREZ, OFFICIAL SPANISH INTERPRETER, SWORN.

DIRECT EXAMINATION BY MR. GRIMMETT:

Q. Good morning, Mr. Calderon.
A. Good morning.
Q. So my name is Edward Grimmett. I represent the defendants in this action, that's Network Infrastructure Inc. and Patrick Clarke. Sitting next to me today is Patrick Clarke.
Do you know Patrick Clarke?
A. No (in English).
MS. REPORTER: Just answer in Spanish. Wait for him to interpret in

Spanish.

Q. I'm going to repeat that instruction. So because the court reporter is attempting to transcribe everything that we say and we're using a Spanish interpreter, please wait for me to finish asking my question and for the translator to fully complete the translation before you start talking.

A. That is fine.

Q. I'm going to be asking you some questions and you're going to be answering them under oath.

A. Fine.

Q. Do you understand that your testimony will be offered under the penalties of perjury?

A. Yes.

Q. Because this is an oral transcription, the court reporter can't indicate head nods or other nonverbal gestures. So every answer you provide needs to be verbal.

A. Okay.

Q. I'm going to assume that you

understand my question unless you tell me otherwise.

A. That is fine.

Q. If you need to speak to your attorney for any reason, please just answer the question first and then you can speak to your attorney.

A. Okay. That is fine.

Q. And same thing, if you need a break at any time, I just ask that you answer the question before and then we can take a break. Just let me know when.

A. Fine.

Q. If, at any point, I say "defendants," that means Network Infrastructure Inc. and Patrick Clarke collectively; do you understand that?

A. Yes.

Q. If I say "Network" at any point today, I'm referring to Network Infrastructure Inc.; do you understand that?

A. Yes.

Q. I know I laid out some instructions, do you understand all these instructions?

A. Yes.
Q. Do you have any questions before we proceed?
A. No.
Q. So is there any reason that would prevent or limit you today from giving truthful answers to my questions?
A. No.
Q. Are you currently taking any medication that would impact your ability to testify?
A. No.
Q. Have you failed to take any medication that you're ordinarily prescribed to take within the last 48 hours?
A. No.
Q. Have you consumed alcohol within the last 24 hours?
A. No.
Q. Have you ever been deposed before?
A. No.
Q. Have you ever offered testimony in any other proceeding aside from today's deposition?

A. No.
Q. Aside from speaking with your attorney, have you spoken to anyone else either in person or over the phone to prepare for this deposition?
A. Only with my lawyer.
Q. Have you spoken with anyone currently employed by any of the defendants regarding today's deposition?
A. No.
Q. Have you spoken with any former employees of the defendants about today's deposition?
A. No.
Q. Other than your attorneys, have you communicated with absolutely anyone about this deposition via text, instant message, or e-mail?
A. No.
Q. Have you reviewed any documents in preparation for today's deposition?
A. Yes.
Q. What documents did you review?
A. No documents, I have just spoken with my lawyer.

Q. So you previously testified that you did review documents, you're changing your testimony?

A. I misunderstood.

Q. So you have not reviewed any documents in preparation for today's deposition?

A. No documents.

Q. Have you personally prepared any notes or documents in preparation for today's deposition?

A. No.

Q. Other than your attorneys, have you discussed this case with anybody else?

A. No.

Q. Other than this current lawsuit, have you ever been a plaintiff, petitioner, or complainant in another lawsuit or charge before?

A. I did not understand that.

Q. Other than -- you understand that you're a plaintiff in a lawsuit as of today, correct?

A. Yes.

Q. And you understand that you're

bringing that lawsuit against the defendants, correct?

A. Yes.

Q. Have you ever been a plaintiff in another case outside of this one?

A. No.

Q. Have you ever been a defendant in another case?

A. No.

Q. Other than the current lawsuit, have you ever filed any sort of action against any of your former employers?

A. No.

Q. So you've never filed an action with the Equal Employment Opportunity Commission before?

A. No.

Q. You've never filed a complaint with the U.S. Department of Labor before?

A. No.

Q. You've never filed a complaint with New York State Division of Human Rights?

A. No.

Q. You've never filed an action

with New York City Commission on Human Rights before, correct?
A. No.
Q. Have you ever been a witness in a prior lawsuit?
A. No.
Q. Do you have any prior misdemeanor convictions?
A. No, I do not.
Q. Do you have any prior felony convictions?
A. No.
Q. Do you understand that you're bringing a class action in this lawsuit?
A. Yes.
Q. Have you ever participated in a class action brought against one of your former employers before?
A. I did not understand that.
MS. HERAZO: May I? When we talk about a class-action lawsuit, it's (Spanish).
MR. GRIMMETT: I'm not going to be comfortable with correcting the --
MR. PELTON: Okay.

MS. HERAZO: I'm explaining --

MR. GRIMMETT: I understand that --

THE INTERPRETER: If I may --

MS. REPORTER: Wait, one at a time, everyone.

THE INTERPRETER: If I may, it very well be what you're saying, but that's not what he says and I have to interpret verbatim. Now, if he doesn't understand -- you understand and I understand what a class action is, but if he doesn't, he has to say, I did not understand.

MS. HERAZO: No, but it does not translate into Spanish as a class A complaint.

THE INTERPRETER: Well --

MS. HERAZO: Humble opinion.

MR. PELTON: If, for some reason, you don't understand the translation or a question, please let us know.

MR. GRIMMETT: I'm going to scratch -- withdraw the last question.

Q. Have you ever worked for Danella Construction of New York, Inc. before?
A. Yeah (in English).
Q. Just wait.
A. Yes.
Q. Are you aware that a class action was brought against Danella Construction of New York, Inc.?
A. I did not understand.
Q. So you previously testified that you understand what a class action is, correct?
A. Yes, that is correct.
Q. Are you aware that employees and former employees of Danella Construction filed a class action lawsuit against the company?
A. Yes.
Q. Did you participate in that lawsuit in any way?
A. Yes.
Q. How are you involved in that lawsuit?
A. The driving hours regarding overtime.

Q. Did you testify in that proceeding?
A. No.
Q. Were you a plaintiff in that proceeding?
A. Yes.
Q. Did you collect a settlement in that proceeding?
A. Yes.
Q. How much?
A. I do not know.
Q. Do you know approximately how much?
A. I got to check, for about over 6,000.
Q. You are aware that that lawsuit had to do with alleged unpaid travel time?
A. Yes.
Q. Did a Michael Guevara also work with you at Danella?
A. Yes.
Q. Did this Mr. Guevara participate in that lawsuit?
A. Yes.
Q. Do you know if Mr. Guevara also

received a settlement?
A. I do not know.
Q. Based on this lawsuit, you knew that you can bring a lawsuit against another employer for unpaid travel time, correct?
MR. PELTON: Objection.
I may object at times, you still have to answer the question unless I tell him otherwise.
A. I did not know.
Q. In the lawsuit against Danella, you claimed that you weren't paid for time spent traveling to and from the yard; is that correct?
A. Yes.
Q. Based on the lawsuit against Danella, you understood that you could bring a claim against another employer for not being paid for the time spent traveling to and from the yard?
MR. PELTON: Objection.
A. Yes.
Q. Do you go by any names other than Manuel Angel Caldron?
A. No.

Q. You don't have any nicknames?
A. No.
Q. What is your date of birth?
A. July 3, 1969.
Q. Where do you live currently?
A. 5 Crest Avenue, Elmhurst, New York 11003.
THE INTERPRETER: He wants to correct my spelling, may I?
MR. PELTON: Yeah, yeah.
THE INTERPRETER: Let me repeat. Current address is 5 Crest Avenue, Elmont, New York 11003.
Q. Did you live at that location when you worked for Network Infrastructure?
A. Yes.
Q. Did you live at that location for the entire time you worked for Network Infrastructure?
A. Yes.
Q. Are you aware that other individuals have opted into this lawsuit as plaintiffs?
A. I do not know.
Q. What is your highest level of

education?

A. Sixth grade.

Q. Do you possess any professional licenses?

A. No.

Q. Have you taken any other educational courses?

A. No.

Q. Did there come a time that you were hired by Network?

A. Yes.

Q. Who were you hired by?

A. Mike.

Q. Is that the same Mike you worked with at Danella?

A. Yes.

Q. Where did you work before Network?

A. Danella.

Q. So you went immediately from Danella to Network, correct?

A. Yes.

Q. Did Mike go directly from Danella to Network as well?

A. Yes.

Q. What date were you hired by Network?
A. During the month of April.
Q. Of what year?
A. 2022.
Q. How did you learn of the position?
A. Mike took me there.
Q. What did he tell you about it?
A. That they were hiring people, they needed a group.
Q. Did anyone else interview you?
A. No.
Q. What was your job title at Danella?
A. Laborer and I was driving trucks.
Q. So Mike Guevara told you that you would be doing the same time of work at Network Infrastructure?
A. Yes.
Q. Mike Guevara was the only one that offered you the job?
A. Yes, because he was my foreman.
Q. Is that offer in writing or

verbal?

A. Verbally.

Q. Based on that verbal offer, you understood what all your job duties would be at Network, correct?

A. Yes.

Q. At the time you accepted the job, you were told that you would be responsible for driving a truck, right?

A. Yes.

Q. At the time you accepted the job, you were told what your work schedule would be, right?

A. Yes.

Q. You previously testified that you started working for Network in April of 2022, correct?

A. Correct.

Q. Are you sure about that date?

A. Yes.

Q. Is there a reason that Network's payroll records indicate that your first day of work was actually June 6 of 2022?

MR. PELTON: Objection.

A. No. I do have the pay stubs.

Q. You have pay stubs from April of 2022?
A. Yes, I think I do.
MR. GRIMMETT: I'm going to call for the production of that.
Q. I'm going to mark this as Exhibit 1.
(Exhibit 1, Copy of Check, 6-16-22, was received and marked for identification by the reporter.)
I'm referring to a document. In the bottom-right corner, it says, "DEF000165."
Do you recognize this document?
A. Yes.
Q. In the middle of the page over towards the right, it says, "Week Ending, June 12, 2022"?
A. Yes.
Q. Was this the first pay stub you received from Network Infrastructure?
A. No.
Q. Do you know when you stopped working at Network Infrastructure?
A. I'm sure I started in April.

Q. Do you know when you stopped working?
A. In October.
Q. October of what year?
A. 2022.
Q. Is there a reason Network Infrastructure's payroll records indicate that your last day of work was actually September 14th of 2022?
A. I do not know exactly whether September or October, but I did work for six month.
Q. You don't recall when you stopped working at Network?
A. No.
Q. Do you have any pay stubs in October of 2022?
A. I would have to look it up at home.
Q. If you don't know if you had any pay stubs, why would you allege that you worked through October of 2022?
MR. PELTON: Objection.
A. Because it's six months.
Q. Do you understand that Network

Infrastructure's payroll records indicate that you have only worked for a little over three months?

A. No.

Q. How much were you paid when you were employed by Network?

A. It depended on the union what I was being paid for.

Q. What union was that?

A. 731.

Q. Were you referring to the Building, Concrete, Excavating and Common Laborers', Union Local No. 731 of Greater New York Long Island and Vicinity of the Laborers' International Union of North America?

A. Yes.

Q. When I refer -- when I refer to that union, I'm just going to say "Local 731."

A. Yes.

Q. You testified that how much you were paid depended on the union, correct?

A. Yes.

Q. Network didn't pay you an hourly

rate the entire time you were employed?
A. Yes.
Q. What was that hourly rate?
A. Depended on the union. If the union said 42, then they would pay 42, 43. I really do not know. I do not know what that year rate was, but right now, it's about 44.
Q. I'm going to refer you back to Exhibit 1. On the left-hand side, it says "Reg Time." If you go down from "Pay Rates" and line it up with "Reg Time," it says, $43.35, correct?
A. Yes.
Q. Does that refresh your recollection of what your hourly rate was when you were employed by Network?
A. Yes.
Q. You were paid $43.35 per hour while you were employed by Network, right?
A. Yes.
Q. What was your job title when you were hired by Network?
A. I was Mike's pitman with the machine.

Q. What machine would you work with?

A. The excavator.

THE INTERPRETER: And before that, he used the word "baco." I don't know the spelling. I can venture to do it phonetically, B-A-C-O.

MR. PELTON: Backhoe.

Q. I understand that you worked for Mike, but did Network give you an actual job title?

A. No.

Q. You never received the job title of a driver?

A. No.

Q. You never received a job title of a laborer?

A. Laborer, yes.

Q. Are you aware of whether your co-workers had other job titles outside of laborer?

A. Other co-workers?

Q. Yeah. Your co-workers, did they have different job titles?

A. Yes.
Q. What were those job titles?
A. Mechanic, operator.
Q. Do you recall any other job titles?
A. No.
Q. I know you said that you worked with Mike, did Mike have a crew of Network workers that you worked with?
A. Yes.
Q. On this specific crew, what were the different job titles?
A. Excavation.
Q. Was there a mechanic on the crew?
A. No.
Q. You were a laborer on the crew, right?
A. I was a laborer and I drove the truck.
Q. You were a laborer and a driver, correct?
A. Yes.
Q. There were other laborers on the crew, correct?

A. Yes.

Q. Wasn't there also a flagman on the crew?

A. Yes.

Q. Wasn't there also an operating engineer on the crew?

A. Yes.

Q. Wasn't there also a teamster dump truck on the crew?

A. Yes.

Q. Wasn't there also a paver for the asphalt on the crew?

A. No.

Q. Did Network employ pavers?

A. We ourselves did the paving.

Q. When you worked for Network, what was your schedule?

MR. GRIMMETT: Can we go off the record? I'm going to withdraw the question.

(An off-the-record discussion was held at this time.)

MR. GRIMMETT: Back on the record.

Q. You previously testified that

the co-workers on your crew had different job titles, correct?
A. Yes.
Q. Some of those co-workers were members of different unions?
A. Yes.
Q. Not all of those co-workers on your crew were members of Local 731?
A. No.
Q. I just want to clarify. So all of the co-workers on your crew, not all of them were members of Local 731; is that correct?
A. Yes.
Q. Do you know how many different unions represent Network employees?
A. I do not know.
Q. But each different union has a different collective bargaining agreement, correct?
MR. PELTON: Objection.
If you know.
A. The foreman was Local 60.
Q. Network has a collective bargaining agreement with Local 60, correct?

MR. PELTON: Objection.
A. I do not know.
Q. Were there any members of your -- strike that.
Were any of the co-workers on your crew members of Local 1298?
A. I do not know.
Q. Are any of Network's employees members of Local 1298?
MR. PELTON: Objection.
A. I do not know.
Q. Were any of the members on your crew members of Local 1010?
A. Yes.
Q. Who does Local 1010 represent?
A. I did not understand.
Q. What job titles are members of Local 1010?
A. Laborers.
Q. So even though you're a laborer, other laborers could be members of Local 1010, correct?
A. That is correct.
Q. Are there any other job titles that are members of Local 1010?

A. No.
Q. Were any of the co-workers on your crew members of Local 15?
A. Yes.
Q. What job titles were members of Local 15?
A. Operators and mechanics.
Q. Does Local 15 have a collective bargaining agreement with Network?
A. I do not know.
Q. You previously testified about Local 1010, does Local 1010 have a collective bargaining agreement with Network?
A. I do not know.
Q. Were any of your co-workers on the crew members of Local 14?
A. No.
Q. Were any of Network employees members of Local 14?
A. I do not know.
Q. Were any of your co-workers members of Local 1536?
A. I do not know that either.
Q. Were any of Network's employees

members of Local 1536?
A. I do not know.
Q. Were any of the co-workers on your crew members of Local 137?
A. I do not know that either.
Q. Were any of Network's employees members Local 137?
A. I do not know that either.
Q. You're aware that other employees were members of Local 15, Local 1010, and Local 60, correct?
A. Yes.
Q. You previously testified that Local 731 had control over your wages, correct?
MR. PELTON: Objection.
A. No. The union would pay us as it is shown there, 43.
Q. What schedule did you work when you were employed by Network?
A. My schedule was from six a.m. until 4:30.
Q. You worked that schedule every day?
A. Yes.

Q. You typically worked Monday through Friday?
A. Yes.
Q. Occasionally worked on Saturdays?
A. Yes.
Q. It's your testimony that on any day you worked, your schedule was from six a.m. to 4:30 p.m.?
A. We would leave the job at 4:30.
Q. When did you become a member of Local 731?
A. I believe it was in 2016.
Q. Local 731 had a collective bargaining agreement with Network, correct?
MR. PELTON: Objection.
A. I do not believe that they had engaged in a contract. Whenever they need people, they got people.
Q. How did you join Local 731?
A. The superintendent in 2016 put me on 731.
Q. Where were you working in 2016?
A. I was working without a union.
Q. You just testified that the

superintendent signed you up for Local 731, where were you employed when that superintendent --

A. My super put me on 731.

Q. Who were you employed by in 2016?

A. Danella.

Q. You were aware that when you started working for Network, you would remain a member of Local 731, correct?

A. Yes.

Q. I'm going to mark this as Exhibit 2.

(Exhibit 2, Building, Concrete, Excavating and Common Laborers', Union Local No. 731 of Greater New York Long Island and Vicinity of the Laborers' International Union of North America, was received and marked for identification by the reporter.)

This document is Bates No. DEF000127 through DEF000164. Please take your time to look through the document in front of you.

MR. PELTON: I'm going to object

to the questions regarding the document.

It's in English. To the extent that we don't have a Spanish translation. You certainly can ask questions, but my understanding is that my client does not read English.

MR. GRIMMETT: Okay.

MS. HERAZO: Can you please translate that to him?

Q. Have you ever taken -- this doesn't relate to what's marked as Exhibit 2. Have you ever taken a safety test at Network?

A. What do you mean by pass?

Q. Have you ever taken an onboarding quiz at Network?

A. At the beginning to start, yes.

Q. You typically did well on those quizzes, correct?

A. Yes.

Q. Those quizzes were all written in English, correct?

A. No. I had someone who -- interpreter.

Q. Who interpreted the quiz?
A. A gentleman who was right there.
Q. You don't recall his name?
A. No.
Q. Do you know what his job title was?
A. It has to do with safety, the safety they were providing to us.
Q. Do you know where you were when you received the Spanish translation?
A. At Hempstead.
Q. What office were you in in the Hempstead location?
A. At the Network's office.
Q. Do you know what room you were in?
A. No.
Q. Referring back to Exhibit 2, which is right in front of you, and the first page is Bates-number DEF000127, have you seen this document before?
A. No.
Q. But you are aware that Local 731 has a collective bargaining agreement that's applicable to you, correct?

A. Yes.

Q. Have you received a translated version of that collective bargaining agreement?

A. No.

Q. As a Local 731 member, are you familiar with the rules and requirements of the collective bargaining agreement that's applicable to you, correct?

MR. PELTON: Objection.

A. Yes.

Q. You know that the collective bargaining agreement for Local 731 governed your terms and conditions of employment, correct?

A. Yes.

Q. You testified that some of your co-workers were members of Local 60, Local 1298, and Local 15?

A. Not 1298.

Q. So now you do not recall anyone being a member of 1298?

MR. PELTON: Objection.

A. No.

Q. What about Local 1010?

A. Laborer, yes.
Q. Because the members of Local 60, Local 1010, and Local 15 were members of a different union, they had different terms and conditions of employment, correct?
MR. PELTON: Objection.
A. Yes.
Q. I'm going to refer you to Page 24 of Exhibit 2. It's DEF000141. Section C says, "Heavy construction and engineering work inside and outside property lines or first connection outside of the building penetration and all work in conjunction with all jurisdiction within this category and all other categories of this agreement including, but not limited to."
This section of the collective bargaining agreement lists the specific tasks that a laborer would perform in a workday, correct?
MR. PELTON: Objection.
A. Yes.
Q. You would perform heavy construction and engineering work, correct?

A. Yes.

Q. Now, I'm going to flip to Page 31, which is still under section C. Page 31 is Bates-numbered DEF000145. I'm going to refer you to number 75.

Seventy-five states, The use of pickup trucks and/or vans -- remember what I instructed before. If you need a break, you have to answer the question that's before you.

Is your phone now on silent?

A. Yes.

Q. I'm referring you to number 75, which says "The use of pickup trucks and/or vans for moving men to and from various job sites, for moving out tools, for picking up water and other pick up uses."

The responsibilities that I just read out, you performed those responsibilities for Network, correct?

MR. PELTON: Objection.

A. I was driving the truck.

Q. When you drove the truck, you would move your co-workers from job site to job site, correct?

MR. PELTON: Objection.
A. Not people, but I would do so with materials.
Q. So there was never anybody in your truck?
A. No (in English). No.
Q. But there were tools in the truck, correct?
A. Yes.
Q. Now, I'm going to flip to Page 37, it's Bates-number DEF000148. Article 7, Section 1 states, "Hours of Work." Right under that, it states "Eight continuous hours shall constitute a day's work excluding lunch," and that was your understanding that you were only supposed to work eight hours in a day, correct?
MR. PELTON: Objection.
A. Yes.
Q. Going down to Section 2, which states "Shifts." I'm going to read Paragraph E, which is on Page 38, states "Varying Shift."
"On any Monday through Friday inclusive, the employer can vary the shift

commencement in one-and-a-half-hour increments on any day shift and all work performed during said various shift shall be paid for at the straight time rate in conformity with the terms contained in the agreement. When tide work is involved, the shift time commencement may vary in accordance with the shift times or other trades."

MR. GRIMMETT: If you could just read the rest.

Q. Is it your understanding that this provision governs the shifts that you would potentially be required to work at Network?

MR. PELTON: Objection.

A. I did not understand.

Q. Are you aware that Network could vary the commencement of your shift by two hours?

MR. PELTON: Objection.

A. That, I do not know.

Q. I'm going to read -- Section F states, "The employer can vary the commencement of the normal lunch period one

hour before or after same for any employee and/or group of employees on any day, and all work performed during said varied lunch period shall be paid for at the single time rate in conformity with the terms contained in this agreement."

A. Yes, but they do not give an hour lunch.

Q. But did you understand that Network could vary the length of your lunch break?

A. I did not know.

Q. You typically received a half hour unpaid lunch break, right?

A. It depended on the foreman. If he gave half an hour, yes, not otherwise.

Q. Sometimes you would get more than a half hour of a lunch break?

A. No, never.

Q. But you always received a lunch break, right?

A. Yes.

Q. Now, I'm going to draw your attention to Section 3. On Page 38, it states, "Overtime and Holidays."

Did you understand that your collective bargaining agreement set forth when you would be entitled to overtime?
MR. PELTON: Objection.
A. Yes.
Q. The Local 731 collective bargaining agreement set forth when you would be entitled to overtime, correct?
MR. PELTON: Objection.
A. Yes.
Q. I'm going to refer you to Page 41. In the corner, it's Bate-stamped DEF000150. Section 4 states, "Wages."
When you testified earlier, is this what you were referring to when you testified that Local 731 would determine your wages?
A. Yes.
Q. It's your understanding that your collective bargaining agreement set forth your wages, correct?
MR. PELTON: Objection.
A. Yes.
Q. I'm going to refer you to Page 45, it's Bate-stamped DEF000152. I'm

going to read off Section 5, which says "Conditions," Subsection A, "Shovels, tools, boots, and other implements necessary to perform any kind of labor, including protective gear and equipment for handling hazardous materials must be furnished by the employer suitable exclusive place with heat and electricity where feasible. Wherein, workmen may change their clothes shall be provided by the employer upon commencement only line item contract work and will be of suitable size to measure it with the number of workers on the job site."

Do you know what line item contract work is?

A. No.

Q. I'm going to mark this as Exhibit 3.

(Exhibit 3, Class & Collective Action Complaint, was received and marked for identification by the reporter.)

MR. PELTON: Before we get started, could we take a five-minute break?

MR. GRIMMETT: Of course.
(An off-the-record discussion was held at this time.)
MR. GRIMMETT: Back on the record.
Q. I'm going to direct your attention to what has just been marked as Exhibit 3. Do you recognize this document?
A. Yes.
Q. Is this the class and collective complaint that you filed in this lawsuit?
A. Yes.
Q. You received a translated version of this complaint before it was filed, correct?
A. That, I do not remember.
Q. Is everything contained in the complaint accurate?
A. Yes.
Q. You previously testified that you started working at six a.m. every day, correct?
A. Yes.
Q. I'm going to refer you to Paragraph 15 of the complaint -- I'm sorry,

Paragraph 16 on Page 5, and I'm just going to read out the entire paragraph. It states, "Throughout the Calderon employment period, Plaintiff typically worked five days per week from between approximately six a.m. and 6:30 a.m. through between approximately 5:30 p.m. and seven p.m. for a total of approximately 60 hours per week and sometimes more approximately twice per month. He was also required to work another approximately eight hours on Saturdays. On occasion during instances where the construction sites were closed due to weather, Plaintiff worked fewer days per week."

Based on your complaint, there were times where you would start later at 6:30 a.m., correct?

A. Yes.

Q. So you're changing your testimony that you didn't start at six a.m. every single day, correct?

A. There were days when he started at 6:30, the foreman would call us.

Q. So that wasn't my question.

You're changing your testimony that you previously -- strike that.

You didn't answer my question.

You previously testified that you started work at six a.m. every single day, correct?

A. Correct.

MR. PELTON: Objection.

Q. Now you're changing that testimony, correct?

A. It was not every single day at six. They was 6:30 sometimes.

Q. So my question is: Now you're changing your testimony, correct?

MR. PELTON: Objection.

A. No, I am not changing.

Q. This states that you would arrive at the yard between approximately six a.m. and 6:30 a.m., correct?

A. I would get on the truck. First of all, I remove the trash. There were times when I had to be earlier in order to fill the truck with diesel fuel.

Q. So my question was: You would get to the yard between approximately six

a.m. and 6:30 a.m., correct?
A. I would arrive at the yard at six.
Q. But in your complaint, sometimes you would arrive later than six, correct?
A. At 6:30, I would just leave to do the job already.
Q. So there was -- strike that.
Throughout your entire employment, you never arrived at the yard at 6:30 a.m., it was always earlier?
A. I used to arrive there at six.
Q. There was never an occasion where you arrived there at 6:30 a.m. or later?
A. No.
Q. How long does it take for you to drive from your house to the yard?
A. It depended on the traffic.
Q. If there's no traffic, how long does it take you?
A. About 30, 35 minutes in the morning.
Q. If there is traffic, how long does it take you?

A. An hour and a half.
Q. If the time it takes you to travel from your house to the yard depends on the traffic, how were you able to get there precisely at six a.m. every day?
A. I would leave at four, I was in my car and then go to work.
Q. You would leave for work at four a.m. every day?
A. Yeah (in English).
Q. Please wait for him to finish translating.
A. At four a.m.
Q. To get to the yard, you would have to go over a bridge, correct?
A. Yes.
Q. Do you have an E-ZPass?
A. Sure.
MR. GRIMMETT: I'm going to call for the production of his E-ZPass records.
Q. As a driver, were you allowed to park your personal vehicle in Network's yard for the day?
A. Yes.

Q. Are you aware who else -- strike that.

Do you know the names of any of your co-workers who were drivers?

A. Yes.

Q. What were the names?

A. Juan Luna, Noel Ramirez.

Q. Anyone else?

A. I know another one, his nickname is Pepe. I do not know his last name.

Q. Was Juan Luna permitted to park his personal vehicle at Network's yard for the entire day?

A. I believe so. All those who drove put it inside.

Q. Anybody who was a driver was permitted to park their personal vehicle in Network's yard, correct?

A. Yes.

Q. So that was the case for Noel Ramirez?

A. Yes.

Q. And that was the case for Pepe too?

A. Yes.

Q. You previously testified that you did not drive anybody in your truck to the job site, correct?
A. No.
Q. You did not drive anybody?
A. No (in English). No, I did not.
Q. You're co-workers who are not drivers, they would drive directly to the job site, correct?
A. Yes.
Q. Non-drivers would never report to the yard?
A. No.
Q. They would not report to the yard?
A. No.
Q. None of the other drivers took passengers from the yard to the job site, correct?
A. That, I do not know.
Q. Who assigned you the specific truck that you would be driving for the day?
A. The foreman.
Q. Would that be Mike Guevara?
A. Yes.

Q. Mike Guevara would let you know the specific truck that you would be driving every day; is that correct?
A. Yes.
Q. Mike Guevara would give you the keys for that truck, correct?
A. The first day, yes. Not the rest.
Q. Aren't the keys always left in the truck?
A. Yes.
Q. When you finished -- when you get back to the yard at the conclusion of your workday, you would leave the keys in your truck, correct?
A. No. We would place them in the certain place that we have for it.
Q. Where would that -- where is that?
A. Inside.
Q. Where inside?
A. In the building.
Q. Do you place it on a rack?
A. It was a setup where to place the keys, like a board.

Q. Before you reported to the yard in the morning, someone would move that truck to the street for you, correct?
A. Yes.
Q. When you went to your truck that was in the street, the keys were in the truck, correct?
A. Yes.
Q. You could simply, once you got to the yard, just hop in the truck and leave and go to the job site, correct?
A. No. I had to remove the trash and then load things.
Q. You load -- you just testified that the truck was moved onto the street?
A. Yes.
Q. You would move work equipment from Network's yard all the way to the street?
A. Yes.
Q. How far was that?
A. Clarify that, please.
Q. How far is it from Network's yard where you're taking equipment from the street where the truck is parked in the

morning?
A. Hundred feet.
Q. The person that moved the truck never loaded equipment?
MR. PELTON: Objection.
A. What equipment?
Q. You just testified that you would move equipment from the yard to the truck, correct?
A. Garbage. The valves, I would place on the truck valves. Plus end caps, I would remove end caps from the truck and place at the yard.
Q. The person who moved the truck to the street, would they ever load that truck with tools and equipment?
A. Yes, because it had to be taken out.
Q. All you had to do with the truck was remove trash, and end caps, and a few other smaller tools, correct?
MR. PELTON: Objection.
A. Yes. Look for things.
Q. That takes approximately five to ten minutes, correct?

MR. PELTON: Objection.
A. More.
Q. Just to move -- how long does it take to move a few pieces of garbage, end caps, and other small pieces of equipment?
A. Between half an hour and 40 minutes.
Q. In the morning, how many trips back and forth from the truck in the street to the yard would you make to move this trash and equipment?
A. Several.
Q. Several, like, two?
A. No, five or six daily.
Q. You're only walking a hundred feet, correct?
A. Yes. From the inside to the outside.
Q. Each trip takes about two minutes, right?
MR. PELTON: Objection.
A. No. I have to go and look it up, place it in the truck.
Q. When you drop the truck off at the end of the day, you don't have to do

anything, correct, other than drop the keys off?

A. Lock the doors, it had several doors.

Q. Just lock the truck doors?

A. And park it. If there was any scratches, I had to report it to the foreman.

Q. At the end of the workday when you dropped the truck off, all you had to do was lock the truck doors and put the keys back up on the board, correct?

A. Correct.

Q. You previously testified that you took a lunch break each day, did you take any other breaks throughout the workday?

A. That depended on the foreman.

Q. Did you ever make any -- did you ever take any breaks in between picking up the truck and reporting to the work site?

A. Driving it.

Q. Did you ever take any stops in the morning -- strike that.

In the morning, did you ever

take any stops in between the yard and the work site?

A. Yes, because the foreman would tell us to wait.

Q. Would you ever stop for breakfast?

A. Yes.

Q. How long would you usually take to eat breakfast?

A. Five to ten minutes.

Q. Are you aware of whether Network tracked the location of its trucks?

A. Yes.

Q. I'm going to mark this as Exhibit 4.

(Exhibit 4, Truck Tracking Record, was received and marked for identification by the reporter.)

MR. GRIMMETT: Off the record.

(An off-the-record discussion was held at this time.)

MR. GRIMMETT: Back on the record.

Q. So I am going to refer you to what I'm about to mark as Exhibit 4. This

is an enlarged version of a document that was previously Bate-stamped DEF000237.

Do you see how in the column to the left of A, there are numbers, it starts with 2377?

A. Yes.

Q. First of all, have you seen this document before?

A. No.

Q. But you are aware that Network maintained tracking records of its trucks, right?

A. Yes.

Q. Looking at that column, I directed your attention before starting with 2377. I want you to go all the way down to Number 2415, we're going to be looking at that row.

Do you have that?

A. Yes.

Q. Were you assigned a specific truck number each day?

A. I do not know.

Q. We're going to come back to what's been marked as Exhibit 4.

I'm going to mark this as Exhibit 5.

(Exhibit 5, Time Card, 6-30-22, was received and marked for identification by the reporter.)

It says, "Time Card" at the top of the first page and they're Bate-stamped DEF000033 and DEF000034.

Have you seen this document before?

A. No.

Q. Have you ever seen any of your time records from Network before?

A. No.

Q. I'm going to refer you to the second page of the document, where it says your name, Manuel Calderon?

A. Yes.

Q. It says you started working on June 30, 2022, at 7:30 a.m.; is that correct?

A. I do not remember.

Q. But that's what it says in the document, correct?

A. Yes.

Q. It says you ended your workday on June 30, 2022, at 4:30; is that correct?
A. I do not remember that either.
Q. But that's what the document says, correct?
A. Yes.
Q. If you go down to "Equipment Information," it states, "349 Utility Truck," correct?
A. Yes.
Q. Does this document refresh your recollection as to whether you were assigned Truck No. 349 on June 30, 2022?
A. I do not remember.
Q. Do you recall ever driving Truck No. 349 for Network?
A. Yes.
Q. Is that typically the number of the truck that you would drive for Network?
A. Yes, but it was changed at times.
Q. Going back to Exhibit 4, which is the enlarged spreadsheet I referenced earlier. We'll go back to Number 2415.
Column A says, "Number 349,"

correct?
A. Yes.
Q. Column C says, "5:39:40 a.m." on June 30, 2022, correct?
A. Yes.
Q. Column D says, "1055 Bronx River Avenue, Bronx, New York 10472 U.S.A.," correct?
A. Yes.
Q. Is that the location of Network Infrastructure Bronx yard?
A. No, I do not know.
Q. What's the address of Network Infrastructure's Bronx yard?
A. Close Street [sic] in the Bronx.
Q. It's on a street that's close to that in the Bronx; is that your testimony?
A. No. The name of the street is Close. I do not know how to explain it.
Q. If you look at -- now going down one row to 2416. Column C says, "6:26:32 a.m." on June 30, 2022, correct?
A. I do not know what that is talking about it.
Q. But it says that, correct?

A. Yes.
Q. The Column D, again, it says a similar address, but it's 1040 Bronx River Avenue, Bronx, New York 10472 U.S.A.; does it say that?
A. Yes.
Q. That location is across the street from Network Infrastructure's yard, correct?
A. I do not know that.
Q. But is that address here Network Infrastructure's Bronx yard?
A. I do not know.
Q. On June 30, 2022, do you recall if you left the yard around 6:26 a.m.?
A. I do not remember.
Q. On June 30, 2022, do you recall working on the Washington Avenue project in New Rochelle, New York?
A. I do not know the street address, but we were working in New Rochelle.
Q. Here, sticking to 2416, if you go over to Column E, it states, June 30, 2022, at 6:51:29 a.m.; do you see that?

A. Yes.
Q. Column F, it says, "211 Union Avenue, New Rochelle, New York 10801 U.S.A."?
A. I do not remember.
Q. You don't recall ever stopping on Union Avenue before starting a project in New Rochelle, New York?
A. No, I do not.
Q. If you go to the next line, 2417, Column E has, June 30, 2022, 8:24:42 a.m.; do you see that?
A. Yes.
Q. Column F, it says, "162 Washington Avenue, New Rochelle, New York 10801 U.S.A.;" do you see that?
So is it fair to say at approximately 8:24 a.m. on June 30, 2022, you arrived at the work site for Washington Avenue?
MR. PELTON: Objection.
A. I do not remember, it's been a long time.
Q. When you worked in New Rochelle, what time did you typically arrive to the

work site?
A. It depended on the traffic.
Q. But typically without traffic, it took around a half an hour to get to New Rochelle from the Bronx yard, correct?
A. From New Rochelle to the Bronx?
Q. From Bronx to New Rochelle.
A. Yes, half an hour.
Q. If you left the yard at 6:30 a.m. in the morning, you would typically have to wait a significant amount of time before starting work, correct?
A. Yeah. The foreman would tell me, fix the truck.
Q. Do you ever recall stopping at a restaurant on Union Avenue before reporting to the job site?
A. No.
Q. You don't recall stopping at a place called El-Trigal, which is a Mexican Bakery?
A. No.
Q. You don't recall ever stopping at a location called Carnitas Los Huesos?
A. No, I do not.

Q. You don't recall ever stopping at a location called El Sabor De Michoacan?
A. No, I do not, but the truckman would say to me, stop the truck -- fix the truck and then when it's time, I call you.
Q. What would you have to fix on the truck?
A. Sweeping the things that I had there to fix the things in the back, because otherwise, the shop steward would come over and see that it was disorganized.
Q. You ever stop at a location called Lupe's Mexican Deli?
A. I do not remember.
Q. After you left the yard in the morning, how often did you typically stop for breakfast?
A. In the morning, I would take my breakfast.
Q. You would take your breakfast before you got to work?
A. Yes.
Q. You would take your breakfast from home?
A. Yes. My wife would prepare it.

Q. What time does your wife get up in the morning?
A. You won't believe, she always gets up at three in the morning.
Q. And she cooks breakfast for you at three in the morning?
A. Yes. Also the lunch.
Q. But there would be some times after you left the yard in the morning that you would stop for breakfast, correct?
A. No.
Q. If Network Infrastructure's GPS tracking information has you stopped at a breakfast location for more than an hour, is it your testimony that you never went into that breakfast location?
MR. PELTON: Objection.
A. It is not incorrect, but I do not know. It was not the fact that I was having breakfast, but the fact that the foreman would tell me, stop the truck there.
Q. The foreman would tell you to stop at a breakfast location?
A. No.
Q. How many blocks away from the

job site would the foreman tell you to stop the truck?

A. I did not understand that.

Q. I'll try to rephrase.

How many blocks away from the job site did the foreman tell you to stop your truck?

A. I do not know what business exactly. He would tell me, wait there, the permit is at nine o'clock, you cannot go to the working site, you have to wait there.

Q. There was a permit that said you could not start working before nine a.m., correct?

A. Con Edison provides that permit.

Q. Because you did not have to report to the job site until nine a.m., you were not required to leave the yard at a specific time each morning; is that correct?

MR. PELTON: Objection.

A. He would call up and say you have to pick up that valves, claydo [sic], which is something that's placed on top of the valves. You have to get either five or six. You have to arrive early in order to

pick up some ice, the valves claydo.
Q. But that's what you do when you arrive to the yard, correct?
A. Yes.
Q. But you don't have to actually leave the yard at a specific time each morning, correct?
A. I would arrive at six after getting all the things, then I had to leave.
Q. But you don't have to be to the job site until nine a.m., correct?
MR. PELTON: Objection.
A. Yes, but I had to leave because of the traffic.
Q. But you could leave later than 6:30 a.m.; is that correct?
A. In the morning?
Q. Yeah.
A. Yes.
Q. If there's no traffic, you could leave the yard at 8:30 a.m., correct?
A. He did not want at that time.
Q. Who are you referring to?
A. The foreman.
Q. And that is Mike Guevara?

A. Yes.
Q. I'm marking this as Exhibit 6.
(Exhibit 6, DPW Permit, was received and marked for identification by the reporter.)
This is a two-page document. It's Bate-stamped DEF0000279 and DEF000280.
Have you seen a permit before while working at Network?
A. No.
Q. While working at Network, you had an understanding what the permits said though, that's correct?
A. Yes.
Q. Have you seen this document before?
A. No.
Q. Was it your understanding that the New Rochelle project, you could only work between the hours of nine a.m. and three p.m.?
A. No.
Q. When you worked on the New Rochelle project, did the permit provide

that you couldn't work any later than three p.m.?

A. No.

Q. Based on your understanding of the work permits, did they include a specific time that you had to stop working on the project?

A. The foreman would say nine to 4:30.

Q. And you recall working on the New Rochelle project after three p.m.?

A. No.

Q. In your complaint, which is Exhibit 3, you claim that you typically completed your workday between approximately 5:30 p.m. and seven p.m., correct?

A. Yes.

Q. And that time is approximately when you would drop the truck off at the yard, correct?

A. Yes.

Q. The day you -- the time you ended your shift each day would vary then, correct?

A. Yes.

Q. So there was circumstances where you ended your day before 5:30, correct?
A. No.
Q. The earliest you ever completed your shift was at 5:30 p.m.?
A. Yes.
Q. I'm going to mark this as Exhibit 7.
(Exhibit 7, Declaration, was received and marked for identification by the reporter.)
This is Bate-stamped P-17 through P-22. It's titled "Declaration of Plaintiff Manuel Angel Calderon."
Have you seen this document before?
A. Yes.
Q. You received a translated version of this document, correct?
A. Yes.
Q. Please refer to Page 6. That's your signature above, correct?
A. Yes.
Q. You're attesting under the

penalty of perjury that everything contained in this declaration is accurate; is that correct?

A. Yes.

Q. I'm going to refer you to Paragraph 19. It says, "I and the other laborers, drivers, operators typically arrived at the yard at the end of the day between 5:30 p.m. and six p.m. Once I reached the yard, I spent between ten and 15 minutes organizing the truck at the yard and giving back the keys to the person in charge. The other laborers, drivers, and operators performed this task as well. At the beginning of my employment, I was required to wait longer outside the yard, because I was not provided with the key fob to open the doors and must wait for another employee to give me access to the yard."

A. That is correct.

Q. Based on your declaration, the latest you would possibly work in the day was 6:15, correct?

MR. PELTON: Objection.

A. I believe so.

Q. In Paragraph 16 of your complaint, you claim that on occasion, you would work until seven p.m.?
A. Working, no, but I had to drive the truck.
Q. But the latest you would drop the truck based on your was between 5:30 p.m. and six p.m., correct?
A. Depended on the days.
Q. I don't think that fully answered my question.
The latest you would ever possibly drop off the truck was six p.m., correct?
A. Yes.
Q. You already testified that all you had to do after you dropped off the truck was lock the truck and put the keys back up on the board?
A. Yes.
Q. And that would take no more than ten minutes, correct?
A. Yes, between ten and 15.
Q. So is it fair to say you never worked until seven p.m.?

MR. PELTON: Objection.
A. Some days, yes.
Q. What days did you work until seven p.m.?
A. One day that I was in Yonkers.
Q. So this was only one day that you worked until seven p.m.?
A. Or more, because I do not remember. I will arrive at the yard and I was told to bring a generator to a mechanic and come back afterwards, and then I told the foreman, indicate my hours, and he said, yes, I will do that, but never showed up in my check.
Q. This was the one day that you worked in Yonkers?
A. Always.
Q. You always worked until seven p.m. now?
A. Not always -- yes, until seven.
Q. So I just want to make sure I understand your testimony.
Now you're saying that you always worked until seven p.m.; is that correct?

A. I'm saying that it was not always. When I was working in Yonkers.
Q. So the one time you worked in Yonkers is when you worked until seven p.m.?
MR. PELTON: Objection.
A. Yes.
Q. Did you ever take any days off when you worked for Network?
A. No.
Q. How often did you work on Saturdays?
A. Whenever the foreman told me.
Q. You were paid overtime for all hours worked on every Saturday, correct?
MR. PELTON: Objection.
A. Yes.
Q. Were there any days that Network was closed and you did not report to work?
A. No.
Q. Did you work on Memorial Day?
A. I do not remember.
Q. Did you work on the 4th of July?
A. Not the 4th of July.
Q. Did you work on Labor Day?
A. No.

Q. Do you recall working on any holidays?
A. No.
Q. Did you receive a paycheck each week that you worked for Network?
A. Yes.
Q. Do you know if there was anything that occurred between April of 2022 and June of 2022 that required you to delay your start date?
A. I do not remember.
Q. I'm going to mark this as Exhibit 8.
(Exhibit 8, Copy of Check, 6-23-22, was received and marked for identification by the reporter.)
I'm referring to the document that's Bates-stamped DEF000169.
Have you seen this document before?
A. No.
Q. You don't recall getting a pay stub for the week ending in June 19, 2022?
A. Maybe I did, but I do not remember.

Q. If you look where it says "Pay Rates" on the left-hand side and it says "Hours," it says eight hours in double time, 15 hours overtime, 40 hours reg time; does it say that?

A. Yes.

Q. Does that refresh your recollection as to the hours that you worked for the week of June 13th to June 19th of 2022?

A. Yes.

Q. You were paid 15 hours of overtime in that week, correct?

A. Yes.

Q. You were paid eight hours of double time, correct?

A. Yes.

Q. Did all of your pay stubs accurately reflect the hours that you worked each week?

MR. PELTON: Objection.

A. No.

Q. This week, June 13, 2022, through June 19th of 2022, how many hours did you work that week?

A. I do not remember.
Q. When you received this pay stub, did you feel that you were entitled to more money?
A. No.
Q. So you were fine with this pay stub?
MR. PELTON: Objection.
A. I do not know about this, I do not remember.
Q. On occasion, you would be paid double time, correct?
A. On Saturdays.
Q. You received a pay stub that resembled this document each week you were employed by Network, correct?
A. Yes.
Q. While working at Network, did you ever perform work on a government project?
A. No.
Q. I'm going to refer you back to your declaration. Paragraph 5 states, "Throughout my employment period, I performed manual construction labor for the

company on both private and government projects on job sites throughout the Bronx, Manhattan, Queens, and Westchester County."
A. Yes.
Q. That's what you wrote in your declaration, correct?
A. Yes.
Q. So the portion where you state that you worked on government projects is not accurate; is that correct?
A. Yes.
Q. So not everything in your declaration is true then?
MR. PELTON: Objection.
A. Yes.
Q. I'm going to refer you to the complaint. Paragraph 2 of the complaint says, "In the New York City area through the relevant time period, Network Infrastructure has contracted either as a general contractor and/or as a subcontractor with private companies and with multiple government agencies to provide construction, repair, replacement, relocation, and maintenance of gas lines, electric lines,

telecommunication, water, and sewer lines, and other public utility systems;" do you see that?

A. Yes.

Q. The allegation in your complaint isn't accurate either?

MR. PELTON: Objection.

A. I do not know.

Q. The portion of this allegation that says that Network contracted with government agencies, that's not correct?

A. I do not know that.

Q. Are you aware of any government agency that Network contracted with?

A. I do not know.

Q. I'm going to go back to your declaration. In your declaration, you claim that Defendants tracked the time you work through timesheets that were in the possession and control of supervisors and/or foremen, correct?

MR. GRIMMETT: If you can withdraw my last question.

Q. Paragraph 2 states, "Throughout my employment, Defendants tracked employees'

hours through timesheets that were in possession and control of supervisors and/or foremen at the job sites. I, like other employees, was required to sign the timesheets in the morning when we arrived at the job sites. We did not sign the timesheets when we left and we were provided with no means for tracking hours we worked at the yard or travel time between the yard and the job sites."

A. Yes.

Q. In this paragraph, you claim that Defendants tracked your time worked through timesheets that were in the possession and control of supervisors and/or foremen, correct?

A. Yes.

Q. On these timesheets, would you report the time that you reported to the yard?

A. No.

Q. What time would you report on the timesheets in the morning?

A. I did not report anything, I just sign.

Q. What time would the timesheets say?

MR. PELTON: Objection.

Q. I'll rephrase. You don't have to answer.

The timesheets that you would sign in the morning, did they reflect the time that you reported to the yard?

A. No.

Q. The timesheets that you signed in the morning, did they reflect the time that you started working on the job site?

A. No.

MS. HERAZO: The --

MR. GRIMMETT: Do you want to have an off-the-record conversation?

MS. HERAZO: He said job site and --

MR. GRIMMETT: I don't want -- I don't want this on the record, because I don't -- I don't speak Spanish. I just don't feel comfortable --

MS. HERAZO: I completely understand.

MR. GRIMMETT: -- with you

providing a translation that I don't know whether it's accurate.

MS. HERAZO: Absolutely, absolutely.

THE INTERPRETER: I mean, unless --

MS. HERAZO: I know that you are doing an exceptional job.

THE INTERPRETER: No, but I mean, unless it's detrimental, what I have --

MS. HERAZO: Yeah, because it's the incorrect --

MS. REPORTER: One at a time.

THE INTERPRETER: Okay. Unless it's detrimental, as Counsel suggested, you ask for that and then you consult with me --

MS. HERAZO: Yeah. In this case -- in this case --

THE INTERPRETER: If it's not --

MS. HERAZO: You said "job site" and he translated "yard."

MR. GRIMMETT: Yeah. Okay. I'm asking, please don't -- I don't know

what he translated or not. That's why we hired an interpreter --

MS. HERAZO: Absolutely, and he's doing an exceptional job.

MR. GRIMMETT: No. I'm saying, if you have an issue with the translation going forward, tap me on the shoulder and we'll go outside.

MS. HERAZO: Perfect.

MR. GRIMMETT: It should not be done this way.

MS. HERAZO: Understand.

THE INTERPRETER: And not to brag, you know, your accuracy may be better than me. I'm not on a legal trip. However --

MS. HERAZO: I deal with this on a regular basis and at every hour.

THE INTERPRETER: No, no, please. Legally, your testimony, however more accurate than me or mine being inaccurate, could never be part of the record.

MS. HERAZO: Absolutely.

THE INTERPRETER: Because you're

not certified.

MS. HERAZO: Yeah, I know.

THE INTERPRETER: And, you know, I'm not on a legal trip, but --

MS. HERAZO: No, no, no. I completely understand, and I --

MR. PELTON: We just want to have an accurate record.

MS. HERAZO: Yeah --

THE INTERPRETER: Exactly --

MR. GRIMMETT: So if there's --

MS. REPORTER: Just one at a time, please. I can't take down four people.

MS. HERAZO: In this case, it changes the answer, because he said "the job site" and he translated as "the yard."

MR. GRIMMETT: I got to stop before -- you can't say that he changed the answer based on the translation, like, I get the --

MR. PELTON: He missed the translation by one word.

MR. GRIMMETT: Then we --

MR. PELTON: Let's redo it.
MR. GRIMMETT: Yeah. Then we will step out.
MR. PELTON: That's fine.
THE INTERPRETER: What I suggest is that. I mean, you disagree or you have some issues. So we go back to the question and I --
MS. HERAZO: Absolutely. Let's do it that way.
THE INTERPRETER: Because it's just that in the heat of the back and forth, it's easy to misplace --
MS. HERAZO: I know.
MR. GRIMMETT: We don't need to have anymore back and forth.
If you could just reread the question.
(The requested question was read back by the reporter.)
A. No.
Q. What time did the timesheets that you signed in the morning reflect?
A. I did not look at anything, I just signed it.

Q. How are you able to tell that the timesheets weren't accurate?
A. The foreman would tell me.
Q. Mike Guevara told you that your timesheets were inaccurate?
A. The permit was from nine to 4:30.
Q. How did you learn that your timesheets were inaccurate?
A. Because it would not indicate my driving hours.
Q. Weren't you paid an additional 30 minutes per day for diving?
A. You mean 30 minutes from New Rochelle to the Bronx?
Q. Weren't you paid an additional half hour per day for your time spent --
A. Only half an hour.
Q. So you were paid for that additional half hour per day, correct?
A. Yes.
Q. You claim that you were informed that it was Defendants' policy not to pay for the time spent at the yard, correct?
A. I did not understand that.

Q. I'm going to try to rephrase.

You claim that you were informed it was Network's policy to not pay for the time that you spent in the yard; is that correct?

A. No.

Q. You claim that you were informed that it was Network's policy to not pay for the time spent traveling from the yard to the job site; is that correct?

A. No, it's not.

MR. GRIMMETT: You want to step outside or do you need to voice an objection?

MR. PELTON: I'm just afraid that we're getting an unclear record here.

MR. GRIMMETT: In what regard?

MR. PELTON: There's a number of different negatives, and I think the negatives are canceling out each other.

MR. GRIMMETT: Okay. If you think that my questions are confusing, I don't mind if you bring it up, but

again, just because he answers a question a certain way, you know, we can't change that.

MR. PELTON: Okay.

MR. GRIMMETT: I'm just trying to understand his allegations, that's all I'm trying to do. I'm not trying to trick anyone here.

MR. PELTON: I'm not trying to change his testimony, but I don't think that he understood or answered the question the way that the negative --

MR. GRIMMETT: Okay.

Q. Were you informed that it was Network's policy to not pay for the time spent traveling from the yard to the location -- to the job site?

A. No.

MR. GRIMMETT: I think that was fine.

Q. You're bringing this lawsuit because you think you should have been paid more, correct?

A. Yes, due to the driving hours of

overtime.

Q. Did you ever complain to Network about this?

A. No, only with my foreman.

Q. Did you put that complaint in writing?

A. No, we only talk.

Q. The foreman you spoke to was Mike Guevara?

A. Yes.

Q. What did -- did Mike Guevara ever inform you what he did in response to your complaint?

A. He said, next week, I will put on those hours, but he never did.

Q. Did you go back to him and ask him again to put the hours into your paycheck?

A. Yes. I told him about on two other occasions more, but afterwards, I did not say anymore.

Q. Based on the lawsuit that you were involved with in Danella, you knew that you had a claim for potential travel time, correct?

A. Yes.

Q. Mike Guevara also knew that you had a potential claim for travel time, correct?

A. Yes.

Q. Why do you think he did nothing about it?

MR. PELTON: Objection.

A. I do not know.

Q. Are you working now?

A. Yes.

Q. Who do you work for?

MR. PELTON: Objection.

A. I cannot say that.

MR. GRIMMETT: I think he has to answer the question.

MR. PELTON: I'm not instructing him not to answer.

Q. There's a question before you, you are a plaintiff in this action, you have to answer the question.

MR. PELTON: There are strong anti-retaliation rules here in New York and we will make sure that Defendants be held accountable if

there are any instances of retaliation.
Q. To make everyone comfortable, there is a claim in your declaration about your current employer. So the purpose of my question is to get more information about what's included in the declaration. Nobody is intending to retaliate against you, understand?
A. I understand. Why do you want to know where I'm working?
Q. Because you referenced your employer in your declaration.
A. What are you talking to me about, Mike Guevara?
Q. Where do you work right now?
A. Grace.
Q. Is that the full name just, Grace?
A. Yes.
Q. Is it Grace Construction?
A. Yes, Grace Construction.
Q. What do you do at Grace Construction?
A. The same thing.

Q. Does Mike Guevara work at Grace Construction?
A. No.
Q. You drive a truck at Grace Construction?
A. Yes.
Q. At Grace Construction, are you paid for the time spent traveling from the yard to the job site?
A. Once I turn on the truck, then the hour is running -- the time is running.
Q. Are you aware that your Local 731 collective bargaining agreement includes a grievance procedure for work-related disputes?
A. I do not know.
Q. Since you've been a member of Local 731, have you ever voiced any complaints to the union --
A. No.
Q. If you thought you should have been paid by Network, why didn't you complain to the union?
A. I did not know.
Q. Does the Local 731 union shop

steward ever talk to you about the collective bargaining agreement?
A. No.
Q. Does the Local 731 union shop steward ever talk to you about how the union could help you with work-related issues?
A. No.
Q. Did the Local 731 delegate ever talk to you about how the union could help with work-related issues?
A. No.
Q. You received deductions from your paychecks that go to the union, correct?
A. I do not receive -- I did not understand.
Q. Let me try to rephrase.
So your paycheck includes certain deductions that go to the union?
A. Yes.
Q. What do you think those deductions are for?
A. For the Social Security.
Q. Are you aware that the deductions are not for Social Security?

A. It was for Social Security.
Q. I'm going to refer you back to the paycheck with the week ending in June 19, 2022. Where it says "Fringes and Benefits" on the left-hand side, there's five columns that say -- or five rows that start with 731; do you see that?
A. Yes.
Q. Do you understand that these are deductions that went to the union?
MR. PELTON: Objection.
A. Yes.
Q. Let me rephrase that.
The five rows that start with "731" in the left-hand column, those go to the union for your fringe benefits, correct?
A. Yes.
Q. Moving over to "Taxes and Deductions." In the top right, where it says "731SUPD," is it your understanding that these were deductions for union dues?
A. I do not know.
Q. You never tried to submit a complaint to anyone other than Mike Guevara regarding your wages?

A. No.
Q. If you thought that there was an issue with your wages, why did you wait until July of 2024 to file a complaint?
A. I did not understand that.
Q. You didn't file a lawsuit against Network until July of 2024, correct?
A. I do not understand.
Q. You filed a complaint against Network claiming unpaid wages, correct?
A. I'm claiming my overtime.
Q. You brought a complaint in Federal Court against Network?
A. Yes.
Q. And you brought that complaint on July 18, 2024; is that correct?
A. Yes.
Q. If you knew there was an issue in 2022, why did you wait until July of 2024 to file a complaint?
MR. PELTON: Objection.
A. I do not know.
Q. I'm going to mark this as Exhibit 9.
(Exhibit 9, Text Message, was

received and marked for identification by the reporter.)

Have you seen this document before?

A. Yes. I sent it.

Q. What is this document?

A. That's the text he would send.

Q. Who sent the text to you in this document?

A. Mike.

Q. Mike Guevara?

A. Yes.

Q. Looking at the document, where it says -- sorry if I mispronounce anything, but "Ago 14, 2022, 8:41 p.m.," the blue bubble underneath that, did you send that text message?

A. Yes.

Q. Does this mean you sent this text message at approximately 8:41 p.m. on August 14, 2022?

A. Yes.

Q. Could you please read what you texted Mike at that day and time?

A. "Good evening, Mike. Tomorrow,

what time, please?"
Q. Could you please read how Mike replied to this text message?
A. "At the patio at 6:30."
Q. So based on this text message, you were expected to report to the yard at 6:30 a.m. on August 14, 2022?
A. Yes.
Q. We'll mark this as Exhibit 10.
(Exhibit 10, Time Card, 8-15-22, was received and marked for identification by the reporter.)
I'm referring to -- at the top of the first page, it says, "Time Card." It's Bates-stamped DEF000083, second page being DEF000084.
Did you sign a timesheet on August 15th of 2022?
MR. PELTON: Objection.
A. I do not remember.
Q. Did you report your time to Mike Guevara on August 15, 2022?
A. I do not remember.
Q. If you refer to the second page, it says on the column, it says, "Start," it

says "August 15, 2022, 6:30;" do you see that?

A. Yes.

Q. Is it fair to say that if this is your timesheet from August 15, 2022, it accurately reflected the time you started working on that date?

MR. PELTON: Objection.

A. Yes.

MR. GRIMMETT: I just need, like, a five-minute break.

(An off-the-record discussion was held at this time.)

MR. GRIMMETT: Back on the record.

Q. Did Mike Guevara ordinarily text you the time you would start work each day?

A. Sometimes he did, sometimes he did not.

Q. Would Mike Guevara call you --

A. Yes.

Q. Would Mike Guevara call you to tell you the time you should start work the following day?

A. Yes.

Q. You learned what time you would start from Mike Guevara on a daily basis?
A. Yes.
MR. GRIMMETT: I'm going to call for the production of all Mr. Calderon's text messages with Mike Guevara, as well as his phone logs evidencing those calls.
Q. Did Mike Guevara text you the time you would complete your shift each day?
A. Yes. Sometimes he did, sometimes he did not.
Q. Would Mike Guevara call you to tell you when your shift would end?
MR. PELTON: Objection.
A. No.
Q. Did you ever receive training from the union?
A. Yes.
Q. That training was provided by the union hall?
A. Yes.
Q. Who paid for your time for training at the union hall -- I'll rephrase.
Who paid for the time that you

spent training at the union hall?

MR. PELTON: Objection.

A. Are you telling me while I was working for Network or with another company?

Q. Yes, while you were working for Network.

A. Only received training only when I started the first day.

Q. Did Network ever charge you for that training?

A. No.

Q. Did you attend safety meetings while employed by Network?

A. Yes.

Q. How many safety meetings did you attend?

A. It was either every Wednesday or every Thursday.

Q. What office location were the safety meetings held?

A. Sometimes in the Bronx, sometimes in Pelham.

Q. What time did your safety meetings start?

A. I do not know exactly. I think

it was either six, 6:30.

Q. Who conducted the safety meetings?

A. The owner.

Q. How long were the safety meetings?

A. Depends, half an hour, 45 minutes.

Q. Were you required to sign a sheet whenever you attended a safety meeting?

A. Yes.

Q. Did you ever miss a safety meeting?

A. No.

Q. Do you recall any of your co-workers missing safety meetings?

A. I do not know.

Q. I have nothing further.

MR. PELTON: I've got a few follow-up questions.

CROSS-EXAMINATION BY MR. PELTON:

Q. Mr. Calderon, you understand that you're a named plaintiff in a lawsuit seeking unpaid overtime, correct?
MR. GRIMMETT: Objection.
A. Yes.
Q. What time is it that you believe you should have been paid for while working at Network Infrastructure?
MR. GRIMMETT: Objection.
A. The hours that pertain to me regarding the overtime driving.
Q. What time did you typically arrive at the Network Infrastructure yard each day?
MR. GRIMMETT: Objection.
A. I would arrive at the patio at the yard at quarter to six, six a.m.
Q. Did Network Infrastructure maintain a time clock at the yard where you would then punch in?
A. No.
Q. When you got to the yard, what

would you do?

MR. GRIMMETT: Objection.

A. In the morning?

Q. Yes.

MR. GRIMMETT: Objection.

A. I would go to the truck, remove the garbage, then the materials that I have to place inside, and load new material.

Q. How long would that typically take?

MR. GRIMMETT: Objection.

A. Depended.

Q. Provide me your best estimate or the range.

MR. GRIMMETT: Objection.

A. Forty minutes to an hour.

Q. What time would you typically leave the yard to go out to the job sites?

MR. GRIMMETT: Objection.

A. I did not understand.

Q. At what time in the morning would you typically start the truck and drive to the job sites?

MR. GRIMMETT: Objection.

A. It depends. If it was in New

Rochelle, it was 45, half an hour. Yonkers was more, you have to be at 95, 87.

Q. My question is: At what time would you leave to go to the job sites?

MR. GRIMMETT: Objection.

A. 6:30 to seven.

Q. Did Network Infrastructure pay you for the time you spent at the yard in the morning?

A. No.

Q. Did Network Infrastructure pay you for the drive time from the yard to the job site?

MR. GRIMMETT: Objection.

A. Only half an hour.

Q. At what time did jobs typically start as per the stipulations?

MR. GRIMMETT: Objection.

A. It depended on the foreman. In New Rochelle, it was from nine to 4:30. The rest, I do not remember.

Q. Is it your understanding that your time slips were based on the time of the work stipulations?

MR. GRIMMETT: Objection.

A. I did not understand.
Q. What was the time that you were paid?
MR. GRIMMETT: Objection.
A. Eight hours and a half an hour overtime, nothing else. Nothing else for driving.
Q. When you arrived at the job site, did the other laborers also arrive before the start of the stipulated times?
A. Where?
Q. In New Rochelle.
A. Yes.
Q. How much in advance would the laborers typically show up at the job site?
MR. GRIMMETT: Objection.
A. It depends. Some will arrive eight, 8:30.
Q. That was a nine a.m. start job?
A. Yes.
Q. Is it your understanding that they received compensation from the time between eight or 8:30 and nine?
MR. GRIMMETT: Objection.
A. I do not know.

Q. What work was done between eight, 8:30 and nine?
A. Nothing. Sometimes they did nothing, but we had to take out the things that were in the truck.
Q. What do you mean you had to take out the things that were in the truck?
A. The tools, hoses, jackhammers, the material that I was bringing in.
Q. The laborers and other people in the crew would help to bring out the materials and equipment?
MR. GRIMMETT: Objection.
A. Yes.
Q. When you went to the yard in the morning to get the truck, were you the only driver or did other drivers go and also pick up trucks?
MR. GRIMMETT: Objection.
A. Yes, there were others.
Q. It wasn't just Mike Guevara who had his drivers do this -- I'll withdraw that.
Other drivers other than yourself on Mike Guevara's team also had to

pick up their trucks at six or 6:30?
MR. GRIMMETT: Objection.
A. Not the foreman, Michael did not.
Q. Yes, but the other drivers.
A. Yes.
Q. Is it your understanding that they were paid for that time?
MR. GRIMMETT: Objection.
A. I do not know.
Q. What can you tell me about safety meetings?
MR. GRIMMETT: Objection.
Q. Did everybody have to attend --
MR. GRIMMETT: I think there's a pending question.
MR. PELTON: I'm sorry. Let's switch focus to safety meetings.
A. The owner did not want us to have an accident, to wear the goggles, shacks to be placed on the boots, heavy gloves, had to do with ladders placed improperly. All those things were explained, and if you have an accident, they would reprimand you and say, why did you do

this or why did you not do that.

Q. Were you compensated for the time at the safety meetings?

A. No, never.

Q. Were any of the other employees compensated for the time spent at the safety meetings?

MR. GRIMMETT: Objection.

A. No.

Q. Do you recall Defense Counsel showing you Exhibit No. 2, the 731 bargaining agreement?

A. Yes.

Q. Do you remember Defense Counsel asking you if you knew what line item work was?

A. Yes, I do remember that, but I did not understand.

Q. While working for Network Infrastructure, you never worked with hazardous materials, did you?

MR. GRIMMETT: Objection.

A. No.

Q. You never needed to change into different safety uniforms?

MR. GRIMMETT: Objection.
A. No.
Q. You remember Defense Counsel asking you about the wage rates contained in the bargaining agreement?
A. What do you mean by that?
Q. Do you recall Defense Counsel asking you about wage rates earlier today in the deposition?
A. Yes.
Q. Other than in Exhibit 2, you also received a copy of Exhibit 8, which is a copy of your check, right?
A. Yes.
Q. Your check has your regular rate of 43.45?
A. Yes.
Q. And the overtime rate of 65.025, yes.
A. Yes.
Q. Along with the double time rate?
A. Yes.
Q. In this lawsuit, are you seeking to enforce your rights to unpaid overtime under New York State law and the federal

law?
MR. GRIMMETT: Objection.
A. Yes.
Q. We could just look at the pay rates contained on your pay stubs to find the rates, right?
MR. GRIMMETT: Objection.
A. Yes.
Q. Looking at a copy of your paycheck, while the pay stub has the correct rates, it does not have the correct number of hours, correct?
MR. GRIMMETT: Objection.
A. Yes.
Q. How frequently were safety meetings held?
MR. GRIMMETT: Objection.
A. The owner will set up the dates of the meeting.
Q. Did it happen weekly, did it happen monthly, how frequently was it?
MR. GRIMMETT: Objection.
A. Weekly.
Q. Is traffic sometimes bad at 3:30 when you're driving back to the yard?

A. Yes.
Q. How long did it typically take to drive back to the yard?
MR. GRIMMETT: Objection.
A. It depends, it depends on accidents.
Q. Is it your understanding that you were paid for all the time spent driving back to the yard?
A. No. I was only paid half an hour.
Q. Is it your understanding that was the Network Infrastructure policy as to drivers?
A. I believe so.
Q. Is it your understanding that Network Infrastructure paid other laborers and crew members who did not drive just eight hours?
MR. GRIMMETT: Objection.
A. I do not know.
Q. Do you ever have to get drug tested while working at Network Infrastructure?
A. Yes.

Q. Were you paid for the time spent getting drug tested?
MR. GRIMMETT: Objection.
A. No.
Q. Is it your understanding that Network Infrastructure doesn't pay any of the drivers the full time spent at the yard and driving?
MR. GRIMMETT: Objection.
A. Did I know about that?
Q. Yeah. Did they have a policy of not paying for this?
MR. GRIMMETT: Objection.
A. I believe so.
Q. Defense Counsel asked if you were paid overtime for all the time you spent working on Saturdays; do you recall that?
A. Yes.
Q. Were you paid -- did you work off the time clock on Saturdays as well?
MR. GRIMMETT: Objection.
A. Sometimes I did, sometimes I did not.
Q. Did you still have to drive the

truck?
MR. GRIMMETT: Objection.
A. Yes.
Q. Were you paid for all yard and drive times on Saturdays?
MR. GRIMMETT: Objection.
A. Only for the driving, not at the yard.
Q. Looking at Exhibit 8, when you look at the "Fringes and Benefits," do you know if fringes and benefits were paid to the union for the yard time and drive time for which you were not compensated?
A. I don't think so.
Q. In the complaint and in your declaration, you had referenced governmental as well as private jobs; do you recall that?
MR. GRIMMETT: Objection.
A. Yes.
Q. Was the work that you performed for Network Infrastructure primarily Con Edison and other utility work?
A. No, only with Con Edison.
Q. The work that you performed is actually for the private utility company,

Con Edison?
A. Yes.
Q. But that work was on New York City and other governmental streets?
MR. GRIMMETT: Objection.
A. I do not know.
Q. If we could look back at Exhibit 4. We're looking at June 30, 2022, do you see the time the truck first moved on June 30, 2022?
A. Yes.
Q. What time did your truck first move on June 30th?
A. I cannot see that. 5:40 and 45 seconds.
Q. That would have been the time that somebody else moved the truck out into the street?
A. Yes.
Q. What is the next time down?
A. 6:51.
Q. Looking at June 30, 2022, the first time the vehicle moved and the second time the vehicle moved, what's the -- I think you were looking at the end time,

what's the first time the vehicle moved?
A. 5:39.
Q. And the second time the vehicle moved?
A. 6:26.
Q. What is the last time the vehicle moved on June 30th?
A. 4:26.
Q. I'm showing you what was previously marked as Defendant's Exhibit 5. If you look at the corresponding time records for June 30, 2022, what time were you credited with working for Network Infrastructure on June 30th?
MR. GRIMMETT: Objection.
Q. At what time did they mark you down as having worked?
A. I see here 7:30.
Q. Does it appear -- if the truck was moving at 6:26, how much time would you typically spend working at the yard before starting the truck?
MR. GRIMMETT: Objection.
A. It must have been about an hour.
Q. Were you paid for the time spent

driving the vehicle having left the yard at 6:26?

MR. GRIMMETT: Objection.

A. No.

Q. Wouldn't you have actually had to have done additional work before 6:26, emptying trash and getting the truck ready?

THE INTERPRETER: Can you repeat that?

Q. If the truck started and departed the yard at 6:26 --

MR. GRIMMETT: Objection.

Q. -- would you have had to have performed some additional work before that time?

A. Correct.

Q. Do you think it would be fair to say you weren't paid for an hour, 15 minutes on this day?

MR. GRIMMETT: Objection.

A. Yes.

Q. I'm going to show you what was previously marked as Defendant's Exhibit 9. You searched your phone and provided that document to us for purposes of this

litigation, right?
A. Yes.
Q. Defense Counsel asked how frequently you texted with your foreman, do you recall that, regarding start time?
A. Yes.
Q. You searched your records for texts of start times already?
A. Yes.
Q. Was it typical or occasional that he would text you a start time?
MR. GRIMMETT: Objection.
A. Sometimes he would send us, sometimes we would talk.
Q. Do you know if you were changing locations that day or was there any reason why you would need to talk with him beforehand?
A. In order to learn if we were to go to the same place.
MR. PELTON: Let's take two minutes.
(An off-the-record discussion was held at this time.)
MR. PELTON: Back on the record.

Q. During questioning, he asked you about the different positions on the crew; do you remember that?
A. Yes.
Q. Do you remember he asked you about excavators, operators, foremen, mechanics, operators, laborers, flaggers operators, engineers, did all these individuals have to go to safety meetings?
A. Yes.
Q. Is it your understanding none of them were paid for it?
MR. GRIMMETT: Objection.
A. I think so, I think they were not.
Q. You think all these individuals had to go to the safety meeting and none of them were paid for that time?
MR. GRIMMETT: Objection.
A. Yes.
Q. These individuals had to do drug testing and they were not paid for that time?
MR. GRIMMETT: Objection.
A. I do not know about that.

Q. Thank you very much. Nothing further.

MR. GRIMMETT: I don't have anything further.

MS. REPORTER: Mr. Pelton, would you like a copy of the transcript?

MR. PELTON: Yes, please.

(Deposition concluded at 3:53 p.m.)

WITNESS CERTIFICATION

I have read the foregoing transcript of my testimony and find it to be true and accurate to the best of my knowledge and belief.

______________________________

MANUEL ANGEL CALDERON

Subscribed and sworn to before me on this _____ day of ________ 2025.

______________________________

NOTARY PUBLIC

I N D E X


| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MANUEL ANGEL CALDERON | | | | |
| By Mr. Grimmett | 4 | | | |
| By Mr. Pelton | | 101 | | |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Copy of Check, 6-16-22 | 20 |
| Exhibit 2 | Building, Concrete, Excavating and Common Laborers', Union Local No. 731 of Greater New York Long Island and Vicinity of the Laborers' International Union of North America | 32 |
| Exhibit 3 | Class & Collective Action Complaint | 42 |
| Exhibit 4 | Truck Tracking Record | 55 |
| Exhibit 5 | Time Card, 6-30-22 | 57 |
| Exhibit 6 | DPW Permit | 67 |
| Exhibit 7 | Declaration | 69 |
| Exhibit 8 | Copy of Check, 6-23-22 | 74 |
| Exhibit 9 | Text Message | 94 |
| Exhibit 10 | Time Card, 8-15-22 | 96 |


INFORMATION AND/OR DOCUMENTS REQUESTED

PAGE LINE

20 5
98 8

QUESTIONS MARKED FOR RULINGS
(none)

(Exhibit(s) attached)

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NEW YORK )

I, ALEXIS ZINCKGRAF, a Court Reporter and Notary Public, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of September 2025.



ALEXIS N. ZINCKGRAF

ERRATA SHEET
Priority-One Court Reporting/Veritext
718-983-1234

ASSIGNMENT NO. P1-7542701
CASE NAME: Calderon , Manuel Angel v. Network Infrastructure, INC. And Patrick Clarke
DATE OF DEPOSITION: 8/20/2025
WITNESS' NAME: Manuel Angel Calderon

PAGE/LINE(S)/ CHANGE REASON
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________
____/________/__________________/__________

__________________________
Manuel Angel Calderon

SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF_______________, 20__.

________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES__________________

**&**

**&** 42:19 120:15

**0**

**05442** 1:2
**07039** 1:25

**1**

**1** 20:7,8 23:10 38:12 120:9
**10** 96:9,10 120:22
**10006** 1:15 2:4
**101** 120:4
**1010** 28:13,15 28:18,22,25 29:12,12 30:11 35:25 36:3
**1040** 60:3
**10472** 59:7 60:4
**1055** 59:6
**10801** 61:3,16
**10:10** 1:12
**11003** 4:2 16:7 16:13
**111** 1:15 2:3
**11797** 2:8
**11th** 122:17
**12** 20:18
**1298** 28:6,9 35:19,20,22
**13** 75:23
**135** 2:7
**137** 30:4,7
**13th** 75:9
**14** 29:17,20 95:15,21 96:7
**14th** 21:9
**15** 29:3,6,8 30:10 35:19 36:3 43:25 70:11 71:23 75:4,12 96:22 97:1,5 115:18
**1503** 1:15 2:3
**1536** 29:23 30:1
**15th** 96:18
**16** 44:1 71:1
**162** 61:14
**17** 69:12
**18** 94:16
**19** 70:6 74:23 93:4
**1969** 16:4
**19th** 75:9,24
**1:24** 1:2

**2**

**2** 32:13,14 33:13 34:18 36:9 38:20 77:17 78:24 107:11 108:11 120:10
**20** 1:11 120:9 121:1 123:22
**201** 2:7
**2016** 31:13,21 31:23 32:6
**2022** 18:5 19:17,23 20:2 20:18 21:5,9 21:17,22 57:20 58:2,13 59:4 59:22 60:14,17 60:25 61:11,18 74:8,9,23 75:10,23,24 93:4 94:19 95:15,21 96:7 96:18,22 97:1 97:5 113:8,10 113:22 114:12
**2024** 94:4,7,16 94:19
**2025** 1:11 119:18 122:17
**211** 61:2
**22** 69:13
**2260** 1:24
**2377** 56:5,16
**24** 7:18 36:9
**2415** 56:17 58:24
**2416** 59:21 60:23
**2417** 61:11
**28733** 122:20
**290** 1:24

**3**

**3** 16:4 40:24 42:18,19 43:8 68:14 120:15
**30** 46:22 57:20 58:2,13 59:4 59:22 60:14,17 60:24 61:11,18 85:13,14 113:8 113:10,22 114:12
**30th** 113:13 114:7,14
**31** 37:3,4
**32** 120:10
**349** 58:8,13,16 58:25
**35** 46:22
**37** 38:11
**38** 38:22 40:24
**3:53** 118:9

**4**

**4** 41:13 55:15 55:16,25 56:25 58:22 113:8 120:4,16
**40** 53:7 75:4
**41** 41:12
**42** 23:5,5 120:15

**43** 23:5 30:18
**43.35** 23:13,19
**43.45** 108:16
**44** 23:8
**45** 41:25 100:8 103:1 113:15
**48** 7:15
**4:26** 114:8
**4:30** 30:22 31:9 31:10 58:2 68:9 85:7 103:20
**4th** 73:22,23

**5**

**5** 4:1 16:6,12 42:1 44:1 57:2 57:3 76:23 114:10 120:17 121:1
**55** 120:16
**57** 120:17
**5:39** 114:2
**5:39:40** 59:3
**5:40** 113:14

**6**

**6** 19:23 67:2,3 69:22 120:18
**6,000** 14:15
**6-16-22** 20:9 120:9
**6-23-22** 74:15 120:20
**6-30-22** 57:3 120:17
**60** 27:23,25 30:11 35:18 36:2 44:8
**65.025** 108:18
**67** 120:18
**69** 120:19
**6:15** 70:23
**6:26** 60:15 114:5,20 115:2 115:6,11
**6:26:32** 59:22
**6:51** 113:21
**6:51:29** 60:25

**7**

**7** 38:12 69:8,9 120:19
**718** 1:25
**718-983-1234** 123:2
**731** 22:10,13,20 27:8,12 30:14 31:12,14,20,22 32:1,4,10,16 34:23 35:6,13 41:6,16 91:13 91:18,25 92:4 92:8 93:7,15 107:11 120:12
**731supd** 93:20
**74** 120:20
**75** 37:5,13
**7542701** 1:22
**7:30** 57:20 114:18

**8**

**8** 74:13,14 108:12 112:9 120:20 121:2
**8-15-22** 96:10 120:22
**8/20/2025** 123:3
**87** 103:2
**8:24** 61:18
**8:24:42** 61:12
**8:30** 66:21 104:18,23 105:2
**8:41** 95:15,20

**9**

**9** 94:24,25 115:23 120:21
**94** 120:21
**95** 103:2
**96** 120:22
**98** 121:2
**983-1234** 1:25

**a**

**a.m.** 1:12 30:21 31:9 43:21 44:5,6,18,21 45:5,19,19 46:1,1,11,14 47:5,9,13 57:20 59:3,22 60:15,25 61:12 61:18 62:10 65:13,17 66:11 66:16,21 67:21 96:7 101:20 104:19
**ability** 7:10
**able** 47:4 85:1
**above** 69:23
**absolutely** 8:16 81:3,4 82:3,24 84:9
**accepted** 19:7 19:11
**access** 70:19
**accident** 106:20,24
**accidents** 110:6
**accordance** 39:8
**accountable** 89:25
**accuracy** 82:14
**accurate** 43:18 70:2 77:10 78:6 81:2 82:21 83:8 85:2 119:5
**accurately** 75:19 97:6

**acl** 1:2
**action** 4:18 10:11,14,25 11:14,17,21 12:12 13:7,11 13:16 42:20 89:20 120:15 122:13
**actual** 24:11
**actually** 19:23 21:8 66:5 112:25 115:5
**additional** 85:12,16,20 115:6,14
**address** 16:12 59:13 60:3,11 60:21
**advance** 104:14
**afraid** 86:15
**agencies** 77:23 78:11
**agency** 78:14
**ago** 95:15
**agreed** 3:2,8,12
**agreement** 27:19,25 29:9 29:13 31:15 34:24 35:4,8 35:13 36:16,19 39:6 40:6 41:2 41:7,20 91:13 92:2 107:12 108:5
**alcohol** 7:17
**alexis** 122:5,21
**allegation** 78:5 78:9
**allegations** 87:6
**allege** 21:21
**alleged** 14:17
**allowed** 47:22
**america** 22:16 32:18 120:14
**amount** 62:11
**angel** 1:3,14 15:24 69:14 119:12 120:3 123:3,4,20
**answer** 4:24 5:22 6:5,11 15:8 37:9 45:3 80:5 83:16,21 89:16,18,21
**answered** 71:11 87:11
**answering** 5:12
**answers** 7:7 87:1
**anti** 89:23
**anybody** 9:14 38:4 48:16 49:2,5
**anymore** 84:16 88:21
**appear** 114:19
**applicable** 34:25 35:9
**approximately** 14:12 44:5,6,8 44:9,11 45:18 45:25 52:24 61:18 68:15,18 95:20
**april** 18:3 19:16 20:1,25 74:8
**area** 77:18
**arrive** 45:18 46:2,5,12 61:25 65:25 66:3,8 72:9 101:16,19 104:9,17
**arrived** 46:10 46:14 61:19 70:8 79:5 104:8
**article** 38:12
**aside** 7:24 8:2
**asked** 111:15 116:3 117:1,5
**asking** 5:7,11 81:25 107:15 108:4,8
**asphalt** 26:12
**assigned** 49:21 56:21 58:12
**assignment** 123:2
**assume** 5:25
**attached** 121:9
**attempting** 5:4
**attend** 99:12,16 106:14
**attended** 100:10
**attention** 40:24 43:7 56:15
**attesting** 69:25
**attorney** 2:5,9 6:5,7 8:3
**attorneys** 8:15 9:13
**august** 1:11 95:21 96:7,18 96:22 97:1,5
**avenue** 1:24 4:2 16:6,12 59:7 60:4,18 61:3,7 61:15,20 62:16
**aware** 13:6,14 14:16 16:21 24:20 30:9 32:8 34:23 39:18 48:1 55:11 56:10 78:13 91:12 92:24

**b**

**b** 24:8 120:7
**back** 23:9 26:23 34:18

43:4 50:13 53:9 54:12 55:22 56:24 58:22,24 63:9 70:12 71:19 72:11 76:22 78:16 84:7,12 84:16,20 88:16 93:2 97:14 109:25 110:3,9 113:7 116:25
**backhoe** 24:9
**baco** 24:5
**bad** 109:24
**bakery** 62:21
**bargaining** 27:19,25 29:9 29:13 31:15 34:24 35:3,8 35:13 36:19 41:2,7,20 91:13 92:2 107:12 108:5
**based** 15:3,16 19:3 44:16 68:4 70:21 71:7 83:21 88:22 96:5 103:23
**basis** 82:18 98:2
**bate** 41:12,25 56:2 57:8 67:7 69:12
**bates** 32:21 34:20 37:4 38:11 74:18 96:15
**beginning** 33:18 70:15
**behalf** 1:4
**belief** 119:6
**believe** 31:13 31:17 48:14 64:3 70:25 101:9 110:15 111:14
**belinda** 2:15
**benefits** 93:5 93:16 112:10 112:11
**best** 102:13 119:5
**better** 82:15
**birth** 16:3
**blocks** 64:25 65:5
**blood** 122:14
**blue** 95:15
**board** 50:25 54:12 71:19
**boots** 42:3 106:21
**bottom** 20:12
**brag** 82:14
**break** 6:10,12 37:8 40:11,14 40:18,21 42:25 54:15 97:11
**breakfast** 55:6 55:9 63:17,19 63:20,23 64:5 64:10,14,16,20 64:23
**breaks** 54:16 54:20
**brent** 2:4
**bridge** 47:15
**bring** 15:4,17 72:10 86:25 105:11
**bringing** 10:1 11:14 87:22 105:9
**broadway** 1:15 2:3
**bronx** 59:6,7 59:11,14,15,17 60:3,4,12 62:5 62:6,7 77:2 85:15 99:21
**brought** 11:17 13:7 94:12,15
**bubble** 95:16
**building** 22:12 32:14 36:13 50:22 120:10
**business** 65:8

**c**

**c** 2:1 4:1 24:8 36:10 37:3 59:3,21 122:1 122:1
**calderon** 1:3,14 4:15 44:3 57:17 69:15 101:4 119:12 120:3 123:3,4 123:20
**calderon's** 98:6
**caldron** 15:24
**call** 20:4 44:24 47:19 63:5 65:21 97:20,22 98:4,13
**called** 4:2 62:20 62:24 63:2,13
**calls** 98:8
**canceling** 86:21
**caps** 52:11,12 52:20 53:5
**car** 47:7
**card** 57:3,6 96:10,15 120:17,22
**carnitas** 62:24
**case** 1:2 9:14 10:5,8 48:20 48:23 81:20,20 83:15 123:3
**categories** 36:15
**category** 36:15
**certain** 50:17 87:2 92:19

**certainly** 33:5
**certification** 3:5 119:1
**certified** 83:1
**certify** 122:7,12
**change** 42:9 87:3,10 107:24 123:5
**changed** 58:20 83:21
**changes** 83:16
**changing** 9:2 44:20 45:1,9 45:14,16 116:15
**charge** 9:18 70:13 99:9
**check** 14:14 20:8 72:14 74:14 108:13 108:15 120:9 120:20
**circumstances** 69:1
**city** 11:1 77:18 113:4
**claim** 15:18 68:14 71:2 78:17 79:12 85:22 86:2,7 88:24 89:3 90:4
**claimed** 15:12
**claiming** 94:10 94:11
**clarify** 27:10 51:22
**clarke** 1:8 2:14 4:20,21,22 6:16 123:3
**class** 11:14,17 11:21 12:12,16 13:6,11,16 42:19 43:10 120:15
**claydo** 65:22 66:1
**client** 33:7
**clock** 101:22 111:21
**close** 59:15,16 59:19
**closed** 44:13 73:18
**clothes** 42:9
**collect** 14:7
**collective** 27:19 27:24 29:8,13 31:14 34:24 35:3,8,12 36:18 41:2,6 41:20 42:19 43:10 91:13 92:2 120:15
**collectively** 6:17
**column** 56:3,14 58:25 59:3,6 59:21 60:2,24 61:2,11,14 93:15 96:25
**columns** 93:6
**come** 17:9 56:24 63:10 72:11
**comfortable** 11:24 80:22 90:3
**commencem...** 39:1,7,19,25 42:10
**commission** 10:16 11:1 123:25
**common** 22:12 32:15 120:11
**communicated** 8:16
**companies** 77:22
**company** 13:17 77:1 99:4 112:25
**compensated** 107:2,6 112:13
**compensation** 104:22
**complain** 88:2 91:23
**complainant** 9:18
**complaint** 10:18,21 12:17 42:20 43:11,14 43:18,25 44:16 46:4 68:13 71:2 77:17,17 78:5 88:5,13 93:24 94:4,9 94:12,15,20 112:15 120:15
**complaints** 91:19
**complete** 5:8 98:10
**completed** 68:15 69:4
**completely** 80:23 83:6
**con** 65:15 112:21,23 113:1
**concluded** 118:8
**conclusion** 50:13
**concrete** 22:12 32:14 120:10
**conditions** 35:14 36:5 42:2
**conducted** 100:2

**conformity** 39:5 40:5
**confusing** 86:24
**conjunction** 36:14
**connection** 36:12
**constitute** 38:14
**construction** 13:2,8,15 36:10,25 44:13 76:25 77:23 90:21,22,24 91:2,5,7
**consult** 81:18
**consumed** 7:17
**contained** 39:5 40:5 43:17 70:1 108:4 109:5
**continuous** 38:14
**contract** 31:18 42:11,15
**contracted** 77:20 78:10,14
**contractor** 77:21
**control** 30:14 78:20 79:2,15
**conversation** 80:16
**convictions** 11:8,11
**cooks** 64:5
**copy** 20:8 74:14 108:12 108:13 109:9 118:6 120:9,20
**corner** 20:12 41:12
**correct** 9:23 10:2 11:2 13:12,13 15:5 15:14 16:9 17:21 19:5,17 19:18 22:23 23:13 25:22,25 27:2,13,20,25 28:22,23 30:11 30:15 31:15 32:10 33:20,23 34:25 35:9,15 36:5,21,25 37:20,25 38:8 38:17 41:8,21 43:15,22 44:18 44:22 45:6,7 45:10,14,19 46:1,5 47:15 48:18 49:3,9 49:19 50:3,6 50:15 51:3,7 51:11 52:9,21 52:25 53:16 54:1,12,13 57:21,24 58:2 58:5,9 59:1,4,8 59:22,25 60:9 62:5,12 64:10 65:14,19 66:3 66:7,11,16,21 67:14 68:16,20 68:24 69:2,20 69:23 70:3,20 70:23 71:8,14 71:22 72:25 73:14 75:13,16 76:12,16 77:6 77:10 78:11,21 79:16 85:20,24 86:5,10 87:24 88:25 89:4 92:14 93:16 94:7,10,16 101:6 109:10 109:11,12 115:16
**correcting** 11:24
**corresponding** 114:11
**counsel** 3:4 81:16 107:10 107:14 108:3,7 111:15 116:3
**county** 77:3 122:3
**course** 43:1
**courses** 17:7
**court** 1:1,14,23 3:16 5:3,20 94:13 122:5 123:1
**credited** 114:13
**crest** 4:2 16:6 16:12
**crew** 25:8,11 25:15,17,25 26:3,6,9,12 27:1,8,11 28:6 28:13 29:3,17 30:4 105:11 110:18 117:2
**cross** 101:1 120:2
**crossways** 2:7
**current** 9:16 10:10 16:12 90:5
**currently** 7:9 8:8 16:5
**cv** 1:2

**d**

**d** 4:1 59:6 60:2 120:1
**daily** 53:14 98:2
**danella** 13:1,7 13:15 14:20 15:11,17 17:15 17:19,21,24

18:15 32:7 88:23
**date** 1:11 16:3 18:1 19:19 74:10 97:7 123:3
**dates** 109:18
**day** 19:22 21:8 30:24 31:8 38:17 39:2 40:2 43:21 44:22 45:6,11 47:5,9,24 48:13 49:22 50:3,7 53:25 54:15 56:22 68:22,23 69:2 70:8,22 72:5,6 72:15 73:20,24 85:13,17,20 95:24 97:17,24 98:10 99:8 101:17 115:19 116:16 119:18 122:17 123:22
**day's** 38:14
**days** 44:4,14,23 71:9 72:2,3 73:7,17
**de** 63:2
**deal** 82:17
**declaration** 69:9,14 70:2 70:21 76:23 77:6,13 78:17 78:17 90:4,7 90:13 112:16 120:19
**deductions** 92:12,19,22,25 93:10,19,21
**def0000279** 67:7
**def000033** 57:8
**def000034** 57:8
**def000083** 96:15
**def000084** 96:16
**def000127** 32:22 34:20
**def000141** 36:9
**def000145** 37:4
**def000148** 38:11
**def000150** 41:13
**def000152** 41:25
**def000164** 32:22
**def000165** 20:13
**def000169** 74:18
**def000237** 56:2
**def000280** 67:8
**defendant** 1:14 2:14 10:7
**defendant's** 114:10 115:23
**defendants** 1:10 2:9 4:18 6:15 8:8,12 10:2 78:18,25 79:13 85:23 89:25
**defense** 107:10 107:14 108:3,7 111:15 116:3
**delay** 74:9
**delegate** 92:8
**deli** 63:13
**departed** 115:11
**department** 10:19
**depended** 22:7 22:23 23:4 40:15 46:19 54:18 62:2 71:9 102:12 103:19
**depends** 47:3 100:7 102:25 104:17 110:5,5
**deposed** 7:20
**deposition** 7:25 8:5,9,13,17,21 9:7,11 108:9 118:8 123:3
**description** 120:8
**determine** 41:16
**detrimental** 81:10,16
**diesel** 45:23
**different** 24:25 25:12 27:1,5 27:15,18,19 36:4,4 86:20 107:25 117:2
**direct** 4:12 43:6 120:2
**directed** 56:15
**directly** 17:23 49:8
**disagree** 84:6
**discussed** 9:14
**discussion** 26:21 43:2 55:20 97:12 116:23
**disorganized** 63:11
**disputes** 91:15
**district** 1:1,1
**diving** 85:13
**division** 10:22
**document** 20:11,14 32:21 32:24 33:2 34:21 43:8 56:1,8 57:9,16

57:24 58:4,11 67:6,16 69:16 69:20 74:17,19 76:15 95:3,6,9 95:13 115:25
**documents** 8:20,23,24 9:2 9:6,8,10 120:24
**doing** 18:19 81:8 82:4
**dolowich** 2:7
**doors** 54:3,4,5 54:11 70:18
**double** 75:3,16 76:12 108:21
**dpw** 67:3 120:18
**draw** 40:23
**drive** 2:7 46:18 49:2,5,8 58:19 71:4 91:4 102:23 103:12 110:3,18 111:25 112:5 112:12
**driver** 24:15 25:21 47:22 48:16 105:17
**drivers** 48:4 49:8,11,17 70:7,13 105:17 105:22,24 106:5 110:14 111:7
**driving** 13:24 18:16 19:9 37:22 49:22 50:2 54:22 58:15 85:11 87:25 101:14 104:7 109:25 110:8 111:8 112:7 115:1
**drop** 53:24 54:1 68:19 71:6,13
**dropped** 54:10 71:17
**drove** 25:19 37:23 48:15
**drug** 110:22 111:2 117:21
**due** 44:13 87:25
**dues** 93:21
**duly** 4:3 122:9
**dump** 26:9
**duties** 19:4

**e**

**e** 2:1,1 4:1,1,1 8:18 38:22 47:17,20 60:24 61:11 120:1,7 122:1,1
**earlier** 41:14 45:22 46:11 58:24 108:8
**earliest** 69:4
**early** 65:25
**easy** 84:13
**eat** 55:9
**edison** 65:15 112:22,23 113:1
**education** 17:1
**educational** 17:7
**edward** 2:8 4:17
**effect** 3:15
**eight** 38:13,17 44:11 75:3,15 104:5,18,23 105:2 110:19
**either** 8:4 29:24 30:5,8 58:3 65:24 77:20 78:6 99:17 100:1
**el** 62:20 63:2
**electric** 77:25
**electricity** 42:8
**elmhurst** 16:6
**elmont** 4:2 16:13
**employ** 26:14
**employed** 8:8 22:6 23:1,17 23:20 30:20 32:2,5 76:16 99:13
**employee** 40:1 70:19
**employees** 8:12 13:14,15 27:16 28:8 29:19,25 30:6,10 40:2 78:25 79:4 107:5
**employer** 15:5 15:18 38:25 39:24 42:7,10 90:5,13
**employers** 10:12 11:18
**employment** 10:15 35:14 36:5 44:3 46:10 70:15 76:24 78:25
**emptying** 115:7
**ended** 58:1 68:23 69:2
**enforce** 108:24
**engaged** 31:18
**engineer** 26:6
**engineering** 36:11,25
**engineers** 117:8
**english** 4:23 13:3 33:3,7,23 38:6 47:10 49:6

**enlarged** 56:1 58:23
**entire** 16:18 23:1 44:2 46:9 48:13
**entitled** 41:3,8 76:3
**equal** 10:15
**equipment** 42:5 51:17,24 52:4,6,8,16 53:5,11 58:7 105:12
**errata** 123:1
**esq** 2:4,8
**estimate** 102:13
**evening** 95:25
**everybody** 106:14
**evidencing** 98:8
**exactly** 21:10 65:9 83:10 99:25
**examination** 1:13 3:6,13 4:12 101:1 122:8,10
**examined** 4:5
**excavating** 22:12 32:15 120:11
**excavation** 25:13
**excavator** 24:3
**excavators** 117:6
**except** 3:9
**exceptional** 81:8 82:4
**excluding** 38:15
**exclusive** 42:7
**exhibit** 20:7,8 23:10 32:13,14 33:12 34:18 36:9 42:18,19 43:8 55:15,16 55:25 56:25 57:2,3 58:22 67:2,3 68:14 69:8,9 74:13 74:14 94:24,25 96:9,10 107:11 108:11,12 112:9 113:8 114:10 115:23 120:9,10,15,16 120:17,18,19 120:20,21,22 121:9
**expected** 96:6
**expires** 123:25
**explain** 59:19
**explained** 106:24
**explaining** 12:1
**extent** 33:3

**f**

**f** 39:23 61:2,14 122:1
**fact** 64:19,20
**failed** 7:13
**fair** 61:17 71:24 97:4 115:17
**familiar** 35:7
**far** 51:21,23
**feasible** 42:8
**federal** 94:13 108:25
**feel** 76:3 80:22
**feet** 52:2 53:16
**felony** 11:10
**fewer** 44:14
**file** 94:4,6,20
**filed** 10:11,14 10:18,21,25 13:16 43:11,15 94:9
**filing** 3:5
**fill** 45:23
**find** 109:5 119:4
**fine** 5:10,14 6:3 6:8,13 76:6 84:4 87:21
**finish** 5:6 47:11
**finished** 50:12
**first** 4:3 6:6 19:22 20:20 34:20 36:12 45:20 50:7 56:7 57:7 96:14 99:8 113:9,12,23 114:1
**five** 37:6 42:24 44:4 52:24 53:14 55:10 65:24 93:6,6 93:14 97:11
**fix** 62:14 63:4,6 63:9
**flaggers** 117:7
**flagman** 26:2
**flip** 37:2 38:10
**fob** 70:17
**focus** 106:18
**follow** 100:21
**following** 97:24
**follows** 4:5
**force** 3:14
**foregoing** 119:3
**foreman** 18:24 27:23 40:15 44:24 49:23 54:8,18 55:3 62:13 64:21,22 65:1,6 66:24 68:8 72:12

73:12 85:3 88:4,8 103:19 106:3 116:4
**foremen** 78:21 79:3,16 117:6
**form** 3:9
**former** 8:11 10:12 11:18 13:15
**forth** 41:2,7,21 53:9 84:13,16 122:9
**forty** 102:16
**forward** 82:7
**four** 47:6,8,13 83:13
**frequently** 109:15,21 116:4
**friday** 31:2 38:24
**fringe** 93:16
**fringes** 93:4 112:10,11
**front** 32:24 34:19
**fuel** 45:23
**full** 90:18 111:7
**fully** 5:8 71:10
**furnished** 42:6
**further** 100:19 118:2,4 122:12

**g**

**g** 4:1
**garbage** 52:10 53:4 102:7
**gas** 77:25
**gear** 42:5
**general** 77:20
**generator** 72:10
**gentleman** 34:2
**gestures** 5:22
**getting** 66:9 74:22 86:16 111:2 115:7
**give** 24:11 40:7 50:5 70:19
**given** 122:11
**giving** 7:6 70:12
**gloves** 106:22
**go** 15:23 17:23 23:11 26:18 47:7,15 51:11 53:22 56:16 58:7,24 60:24 61:10 65:10 78:16 82:8 84:7 88:16 92:13,19 93:15 102:6,18 103:4 105:17 116:20 117:9,17
**goggles** 106:20
**going** 5:2,11,12 5:25 11:23 12:24 20:4,6 22:19 23:9 26:19 32:12,25 36:8 37:2,5 38:10,20,21 39:23 40:23 41:11,24 42:1 42:17 43:6,24 44:1 47:19 55:14,24 56:17 56:24 57:1,15 58:22 59:20 69:7 70:5 74:12 76:22 77:16 78:16 82:7 86:1 93:2 94:23 98:4 115:22
**good** 4:15,16 95:25
**governed** 35:13
**government** 76:19 77:1,9 77:23 78:11,13
**governmental** 112:16 113:4
**governs** 39:13
**gps** 64:12
**grace** 90:17,19 90:21,22,23 91:1,4,7
**grade** 17:2
**graham** 1:15 2:3
**greater** 22:13 32:16 120:12
**grievance** 91:14
**grimmett** 2:8 4:12,17 11:23 12:2,24 20:4 26:18,23 33:8 39:10 43:1,4 47:19 55:19,22 78:22 80:15,19 80:25 81:24 82:5,10 83:11 83:19,25 84:2 84:15 86:12,18 86:23 87:5,14 87:20 89:15 97:10,14 98:4 101:7,12,18 102:2,5,11,15 102:19,24 103:5,14,18,25 104:4,16,24 105:13,19 106:2,9,13,15 107:8,22 108:1 109:2,7,13,17 109:22 110:4 110:20 111:3,9 111:13,22 112:2,6,18

113:5 114:15 114:23 115:3 115:12,20 116:12 117:13 117:19,24 118:3 120:4
**group** 18:11 40:2
**guevara** 14:19 14:22,25 18:18 18:22 49:24 50:1,5 66:25 85:4 88:9,11 89:2 90:15 91:1 93:24 95:11 96:22 97:16,20,22 98:2,7,9,13 105:21
**guevara's** 105:25

**h**

**h** 120:7
**half** 39:1 40:13 40:16,18 47:1 53:6 62:4,8 85:17,18,20 100:7 103:1,15 104:5 110:10
**hall** 98:21,24 99:1
**hand** 23:10 75:2 93:5,15
122:17
**handling** 42:5
**happen** 109:20 109:21
**hazardous** 42:6 107:21
**head** 5:21
**heat** 42:7 84:12
**heavy** 36:10,24 106:21
**held** 1:15 26:22 43:3 55:21 89:25 97:13 99:20 109:16 116:24
**help** 92:6,9 105:11
**hempstead** 34:11,13
**herazo** 2:15 11:20 12:1,15 12:19 33:9 80:14,17,23 81:3,7,12,19,22 82:3,9,12,17,24 83:2,5,9,15 84:9,14
**hereinbefore** 122:9
**hereto** 3:3
**hereunto** 122:16
**highest** 16:25
**hired** 17:10,12 18:1 23:23 82:2
**hiring** 18:10
**holidays** 40:25 74:2
**home** 21:19 63:24
**hop** 51:10
**hoses** 105:8
**hour** 23:19 39:1 40:1,8,14 40:16,18 47:1 53:6 62:4,8 64:14 82:18 85:17,18,20 91:11 100:7 102:16 103:1 103:15 104:5 110:11 114:24 115:18
**hourly** 22:25 23:3,16
**hours** 7:15,18 13:24 38:12,14 38:17 39:20 44:8,11 67:21 72:12 73:14 75:3,3,4,4,8,12 75:15,19,24 79:1,8 85:11 87:25 88:15,17 101:13 104:5 109:12 110:19
**house** 46:18 47:3
**huesos** 62:24
**human** 10:22 11:1
**humble** 12:19
**hundred** 52:2 53:15

**i**

**ice** 66:1
**identification** 20:10 32:20 42:21 55:18 57:5 67:4 69:10 74:16 95:1 96:12
**immediately** 17:20
**impact** 7:10
**implements** 42:3
**improperly** 106:23
**inaccurate** 82:22 85:5,9
**include** 68:5
**included** 90:7
**includes** 91:14 92:18
**including** 36:16 42:4
**inclusive** 38:25

**incorrect** 64:18 81:13
**increments** 39:2
**indicate** 5:21 19:22 21:7 22:1 72:12 85:10
**individually** 1:4
**individuals** 16:22 117:9,16 117:21
**inform** 88:12
**information** 58:8 64:13 90:6 120:24
**informed** 85:22 86:2,7 87:15
**infrastructure** 1:8 4:19 6:16 6:21 16:15,19 18:20 20:21,24 59:11 77:19 101:11,16,21 103:7,11 107:20 110:13 110:17,24 111:6 112:21 114:14 123:3
**infrastructure's** 21:7 22:1 59:14 60:8,12 64:12
**inside** 36:11 48:15 50:20,21 53:17 102:8
**instances** 44:12 90:1
**instant** 8:17
**instructed** 37:8
**instructing** 89:17
**instruction** 5:3
**instructions** 6:24,25
**intending** 90:8
**interested** 122:15
**international** 22:15 32:18 120:13
**interpret** 4:25 12:10
**interpreted** 34:1
**interpreter** 2:13 4:8 5:6 12:4,7,18 16:8 16:11 24:4 33:25 81:5,9 81:15,21 82:2 82:13,19,25 83:3,10 84:5 84:11 115:8
**interview** 18:12
**involved** 13:22 39:6 88:23
**island** 22:14 32:17 120:12
**issue** 82:6 94:3 94:18
**issues** 84:7 92:6 92:10
**item** 42:11,14 107:15

**j**

**jackhammers** 105:8
**jersey** 1:25
**job** 1:22 18:14 18:23 19:4,8 19:12 23:22 24:11,14,17,21 24:25 25:2,4 25:12 27:2 28:17,24 29:5 31:10 34:5 37:15,24,25 42:13 46:7 49:3,9,18 51:11 62:17 65:1,6,17 66:11 77:2 79:3,6,10 80:12,17 81:8 81:22 82:4 83:17 86:10 87:18 91:9 102:18,23 103:4,13 104:8 104:15,19
**jobs** 103:16 112:17
**join** 31:20
**jointly** 1:8
**juan** 48:7,11
**july** 16:4 73:22 73:23 94:4,7 94:16,19
**june** 19:23 20:18 57:20 58:2,13 59:4 59:22 60:14,17 60:24 61:11,18 74:9,23 75:9,9 75:23,24 93:3 113:8,10,13,22 114:7,12,14
**jurisdiction** 36:14

**k**

**kaufman** 2:7
**key** 70:17
**keys** 50:6,9,14 50:25 51:6 54:1,11 70:12 71:18
**kind** 42:4
**knew** 15:3 88:23 89:2 94:18 107:15
**know** 4:22 6:12 6:23 12:23

14:11,12,25 15:2,10 16:24 20:23 21:1,10 21:20 23:6,6 24:6 25:7 27:15,17,22 28:2,7,11 29:10,15,21,24 30:2,5,8 34:5,9 34:15 35:12 39:22 40:12 42:14 48:3,9 48:10 49:20 50:1 56:23 59:12,19,23 60:10,13,20 64:19 65:8 74:7 76:9 78:8 78:12,15 81:2 81:7,25 82:14 83:2,3 84:14 87:2 89:9 90:11 91:16,24 93:22 94:22 99:25 100:18 104:25 106:10 110:21 111:10 112:11 113:6 116:15 117:25
**knowledge** 119:5

**l**

**l** 3:1 4:1,1,1
**labor** 10:19 42:4 73:24 76:25
**laborer** 18:16 24:18,19,22 25:17,19,21 28:20 36:1,20
**laborers** 22:13 22:15 25:24 28:19,21 32:15 32:17 70:7,13 104:9,15 105:10 110:17 117:7 120:11 120:13
**ladders** 106:22
**laid** 6:23
**larry** 2:13 4:8
**latest** 70:22 71:6,12
**law** 108:25 109:1
**lawsuit** 9:16,18 9:22 10:1,10 11:5,14,21 13:16,20,23 14:16,23 15:3 15:4,11,16 16:22 43:11 87:22 88:22 94:6 101:5
108:23
**lawyer** 8:6,25
**learn** 18:6 85:8 116:19
**learned** 98:1
**leave** 31:10 46:6 47:6,8 50:14 51:10 65:18 66:6,9 66:13,15,21 102:18 103:4
**left** 23:10 50:9 56:4 60:15 62:9 63:15 64:9 75:2 79:7 93:5,15 115:1
**legal** 82:15 83:4
**legally** 82:20
**length** 40:10
**level** 16:25
**licenses** 17:4
**limit** 7:6
**limited** 36:16
**line** 23:12 42:11,14 61:10 107:15 120:25 123:5
**lines** 36:12 77:25,25 78:1
**lists** 36:19
**litigation** 116:1
**little** 22:2
**live** 16:5,14,17
**livingston** 1:25
**llc** 1:15 2:3
**llp** 2:7
**load** 51:13,14 52:15 102:8
**loaded** 52:4
**local** 22:13,20 27:8,12,23,25 28:6,9,13,15,18 28:22,25 29:3 29:6,8,12,12,17 29:20,23 30:1 30:4,7,10,11,11 30:14 31:12,14 31:20 32:1,10 32:16 34:23 35:6,13,18,19 35:19,25 36:2 36:3,3 41:6,16 91:13,18,25 92:4,8 120:11
**location** 16:14 16:17 34:13 55:12 59:10 60:7 62:24 63:2,12 64:14 64:16,23 87:18 99:19
**locations** 116:16
**lock** 54:3,5,11 71:18

**logs** 98:8
**long** 22:14 32:16 46:17,20 46:24 53:3 55:8 61:23 100:5 102:9 110:2 120:12
**longer** 70:16
**look** 21:18 32:23 52:23 53:22 59:20 75:1 84:24 109:4 112:10 113:7 114:11
**looking** 56:14 56:17 95:13 109:9 112:9 113:8,22,25
**los** 62:24
**luna** 48:7,11
**lunch** 38:15 39:25 40:3,8 40:10,14,18,20 54:15 64:7
**lupe's** 63:13

**m**

**m** 4:1
**machine** 23:25 24:1
**mail** 8:18
**maintain** 101:22
**maintained** 56:11
**maintenance** 77:25
**make** 53:10 54:19 72:21 89:24 90:3
**manhattan** 77:3
**manual** 76:25
**manuel** 1:3,14 15:24 57:17 69:14 119:12 120:3 123:3,4 123:20
**mark** 20:6 32:12 42:17 55:14,25 57:1 69:7 74:12 94:23 96:9 114:16
**marked** 20:9 32:19 33:12 42:21 43:7 55:17 56:25 57:4 67:4 69:10 74:15 95:1 96:11 114:10 115:23 121:4
**marking** 67:2
**marriage** 122:14
**material** 102:8 105:9
**materials** 38:3 42:6 102:7 105:12 107:21
**matter** 122:15
**mean** 33:15 81:5,10 84:6 85:14 95:19 105:6 108:6
**means** 6:15 79:8
**measure** 42:12
**mechanic** 25:3 25:14 72:10
**mechanics** 29:7 117:7
**medication** 7:10,14
**meeting** 100:11 100:14 109:19 117:17
**meetings** 99:12 99:15,20,24 100:3,6,17 106:12,18 107:3,7 109:16 117:9
**member** 31:11 32:10 35:6,22 91:17
**members** 27:5 27:8,12 28:3,6 28:9,12,13,17 28:21,25 29:3 29:5,17,20,23 30:1,4,7,10 35:18 36:2,3 110:18
**memorial** 73:20
**men** 37:15
**message** 8:18 94:25 95:17,20 96:3,5 120:21
**messages** 98:6
**mexican** 62:20 63:13
**michael** 14:19 106:3
**michoacan** 63:2
**middle** 20:16
**mike** 17:13,14 17:23 18:8,18 18:22 24:11 25:8,8 49:24 50:1,5 66:25 85:4 88:9,11 89:2 90:15 91:1 93:24 95:10,11,24,25 96:2,22 97:16 97:20,22 98:2 98:7,9,13 105:21,25
**mike's** 23:24

**mind** 86:25
**mine** 82:21
**minute** 42:24 97:11
**minutes** 46:22 52:25 53:7,20 55:10 70:11 71:22 85:13,14 100:8 102:16 115:18 116:22
**misdemeanor** 11:8
**misplace** 84:13
**mispronounce** 95:14
**missed** 83:23
**missing** 100:17
**misunderstood** 9:4
**monday** 31:1 38:24
**money** 76:4
**month** 18:3 21:12 44:10
**monthly** 109:21
**months** 21:24 22:3
**morning** 4:15 4:16 46:23 51:2 52:1 53:8 54:24,25 62:10 63:16,18 64:2 64:4,6,9 65:19 66:7,17 79:5 79:23 80:7,11 84:23 102:3,21 103:9 105:16
**move** 37:24 51:2,17 52:8 53:3,4,10 113:13
**moved** 51:15 52:3,14 113:9 113:17,23,24 114:1,4,7
**moving** 37:15 37:16 93:18 114:20
**mt** 1:24
**multiple** 77:22

**n**

**n** 2:1 3:1 4:1,1 4:1 120:1 122:21
**name** 4:17 34:3 48:10 57:17 59:18 90:18 123:3,4
**named** 101:5
**names** 15:23 48:3,6
**necessary** 42:3
**need** 6:4,9 31:18 37:8 84:15 86:13 97:10 116:17
**needed** 18:11 107:24
**needs** 5:22
**negative** 87:13
**negatives** 86:20 86:21
**network** 1:8 4:19 6:15,19 6:20 16:15,18 17:10,18,21,24 18:2,20 19:5 19:16 20:21,24 21:6,14,25 22:6,25 23:17 23:20,23 24:11 25:9 26:14,16 27:16,24 29:9 29:14,19 30:20 31:15 32:9 33:14,17 37:20 39:15,18 40:10 55:11 56:10 57:13 58:16,19 59:10,13 60:8 60:11 64:12 67:10,12 73:8 73:17 74:5 76:16,18 77:19 78:10,14 88:2 91:22 94:7,10 94:13 99:4,6,9 99:13 101:11 101:16,21 103:7,11 107:19 110:13 110:17,23 111:6 112:21 114:13 123:3
**network's** 19:21 28:8 29:25 30:6 34:14 47:23 48:12,18 51:18 51:23 86:3,8 87:16
**never** 10:14,18 10:21,25 24:14 24:17 38:4 40:19 46:10,13 49:11 52:4 64:15 71:24 72:13 82:22 88:15 93:23 107:4,20,24
**new** 1:1,15,15 1:16,25 2:4,4,8 4:2,4 10:22 11:1 13:2,8 16:6,13 22:14 32:16 59:7 60:4,19,19,21 61:3,3,8,8,15 61:15,24 62:4 62:6,7 67:20 67:24 68:11 77:18 85:14 89:23 102:8,25 103:20 104:12

108:25 113:3 120:12 122:2,3
**nickname** 48:9
**nicknames** 16:1
**nine** 65:10,13 65:17 66:11 67:21 68:8 85:6 103:20 104:19,23 105:2
**nods** 5:21
**noel** 48:7,21
**non** 49:11
**nonverbal** 5:21
**normal** 39:25
**north** 22:15 32:18 120:14
**notary** 1:16 3:14 4:4 119:22 122:6 123:24
**notes** 9:10
**number** 34:20 37:5,13 38:11 42:12 56:17,22 58:18,24,25 86:19 109:11 120:8
**numbered** 37:4
**numbers** 56:4

**o**

**o** 3:1 4:1 24:8
**o'clock** 65:10
**oath** 5:13
**object** 15:7 32:25
**objection** 15:6 15:21 19:24 21:23 27:21 28:1,10 30:16 31:16 35:10,23 36:6,22 37:21 38:1,18 39:16 39:21 41:4,9 41:22 45:8,15 52:5,22 53:1 53:21 61:21 64:17 65:20 66:12 70:24 72:1 73:5,15 75:21 76:8 77:14 78:7 80:3 86:14 89:8,13 93:11 94:21 96:19 97:8 98:15 99:2 101:7,12 101:18 102:2,5 102:11,15,19 102:24 103:5 103:14,18,25 104:4,16,24 105:13,19 106:2,9,13 107:8,22 108:1 109:2,7,13,17 109:22 110:4 110:20 111:3,9 111:13,22 112:2,6,18 113:5 114:15 114:23 115:3 115:12,20 116:12 117:13 117:19,24
**objections** 3:9
**occasion** 44:12 46:13 71:2 76:11
**occasional** 116:10
**occasionally** 31:4
**occasions** 88:20
**occurred** 74:8
**october** 21:3,4 21:11,17,22
**offer** 18:25 19:3
**offered** 5:16 7:23 18:23
**office** 34:12,14 99:19
**official** 4:8
**okay** 5:24 6:8 11:25 33:8 81:15,24 86:23 87:4,14
**onboarding** 33:17
**once** 51:9 70:9 91:10
**open** 70:18
**operating** 26:5
**operator** 25:3
**operators** 29:7 70:7,14 117:6 117:7,8
**opinion** 12:19
**opportunity** 10:15
**opted** 16:22
**oral** 5:19
**order** 1:14 45:22 65:25 116:19
**ordinarily** 7:14 97:16
**organizing** 70:11
**outcome** 122:15
**outside** 10:5 24:21 36:11,12 53:18 70:16 82:8 86:13
**overtime** 13:25 40:25 41:3,8 73:13 75:4,13 88:1 94:11 101:6,14 104:6 108:18,24 111:16

**owner** 100:4 106:19 109:18

**p**

**p** 2:1,1 3:1 69:12,13
**p.m.** 31:9 44:7 44:7 67:22 68:2,11,16,16 69:5 70:9,9 71:3,8,8,13,25 72:4,7,19,24 73:4 95:15,20 118:9
**p1-7542701** 123:2
**page** 20:16 34:20 36:9 37:3,4 38:11 38:22 40:24 41:12,25 44:1 57:7,16 67:6 69:22 96:14,16 96:24 120:8,25 123:5
**paid** 15:12,19 22:5,8,23 23:19 39:4 40:4 73:13 75:12,15 76:11 85:12,16,19 87:23 91:8,22 98:23,25 101:10 104:3 106:8 110:8,10 110:17 111:1 111:16,20 112:4,11 114:25 115:18 117:12,18,22
**paragraph** 38:22 43:25 44:1,2 70:6 71:1 76:23 77:17 78:24 79:12
**park** 2:7 47:23 48:11,17 54:6
**parked** 51:25
**part** 82:22
**participate** 13:19 14:22
**participated** 11:16
**parties** 3:3 122:13
**pass** 33:15
**passengers** 49:18
**patio** 96:4 101:19
**patrick** 1:8 2:14 4:20,21 4:22 6:16 123:3
**paver** 26:11
**pavers** 26:14
**paving** 26:15
**pay** 19:25 20:1 20:20 21:16,21 22:25 23:5,11 30:17 74:22 75:1,18 76:2,6 76:14 85:23 86:3,8 87:16 103:7,11 109:4 109:5,10 111:6
**paycheck** 74:4 88:18 92:18 93:3 109:10
**paychecks** 92:13
**paying** 111:12
**payroll** 19:22 21:7 22:1
**pelham** 99:22
**pelton** 1:15 2:3 2:4 11:25 12:20 15:6,21 16:10 19:24 21:23 24:9 27:21 28:1,10 30:16 31:16 32:25 35:10,23 36:6,22 37:21 38:1,18 39:16 39:21 41:4,9 41:22 42:23 45:8,15 52:5 52:22 53:1,21 61:21 64:17 65:20 66:12 70:24 72:1 73:5,15 75:21 76:8 77:14 78:7 80:3 83:7 83:23 84:1,4 86:15,19 87:4 87:9 89:8,13 89:17,22 93:11 94:21 96:19 97:8 98:15 99:2 100:20 101:1 106:17 116:21,25 118:5,7 120:4
**penalties** 5:17
**penalty** 70:1
**pending** 106:16
**penetration** 36:13
**people** 18:10 31:19,19 38:2 83:14 105:10
**pepe** 48:10,23
**perfect** 82:9
**perform** 36:20 36:24 42:4 76:19
**performed** 37:19 39:3 40:3 70:14 76:25 112:20 112:24 115:14

**period** 39:25 40:4 44:4 76:24 77:19
**perjury** 5:17 70:1
**permit** 65:10 65:12,15 67:3 67:9,25 85:6 120:18
**permits** 67:13 68:5
**permitted** 48:11,17
**person** 8:4 52:3 52:14 70:12
**personal** 47:23 48:12,17
**personally** 9:9
**pertain** 101:13
**petitioner** 9:17
**phone** 8:4 37:11 98:7 115:24
**phonetically** 24:7
**pick** 37:17 65:22 66:1 105:17 106:1
**picking** 37:16 54:20
**pickup** 37:7,14
**pieces** 53:4,5
**pitman** 23:24
**place** 42:7 50:16,17,23,24 52:11,13 53:23 62:20 102:8 116:20
**placed** 65:23 106:21,22
**plaintiff** 1:6,14 2:5 9:17,22 10:4 14:4 44:4 44:14 69:14 89:20 101:5
**plaintiffs** 16:23
**pleasant** 1:24
**please** 5:6 6:5 12:22 32:22 33:9 47:11 51:22 69:22 81:25 82:20 83:13 95:23 96:1,2 118:7
**plus** 52:11
**point** 6:14,19
**policy** 85:23 86:3,8 87:16 110:13 111:11
**portion** 77:8 78:9
**position** 18:7
**positions** 117:2
**possess** 17:3
**possession** 78:20 79:2,15
**possibly** 70:22 71:13
**potential** 88:24 89:3
**potentially** 39:14
**precisely** 47:5
**preparation** 8:21 9:6,10
**prepare** 8:5 63:25
**prepared** 9:9
**prescribed** 7:14
**present** 2:12
**prevent** 7:6
**previously** 9:1 13:10 19:15 26:25 29:11 30:13 43:20 45:2,4 49:1 54:14 56:2 114:10 115:23
**primarily** 112:21
**prior** 11:5,7,10
**priority** 1:23 123:1
**private** 77:1,22 112:17,25
**procedure** 91:14
**proceed** 7:3
**proceeding** 7:24 14:2,5,8
**production** 20:5 47:20 98:5
**professional** 17:3
**project** 60:18 61:7 67:20,25 68:7,11 76:20
**projects** 77:2,9
**property** 36:11
**protective** 42:5
**provide** 5:22 67:25 77:23 102:13
**provided** 42:10 70:17 79:7 98:20 115:24
**provides** 65:15
**providing** 34:8 81:1
**provision** 39:13
**public** 1:16 3:14 4:4 78:2 119:22 122:6 123:24
**punch** 101:23
**purpose** 90:5
**purposes** 115:25
**pursuant** 1:14
**put** 31:21 32:4 48:15 54:11

71:18 88:5,14 88:17

**q**

**quarter** 101:20
**queens** 77:3
**question** 3:10 5:7 6:1,6,11 12:22,25 15:8 26:20 37:9 44:25 45:3,13 45:24 71:11 78:23 84:8,18 84:19 87:2,12 89:16,19,21 90:6 103:3 106:16
**questioning** 117:1
**questions** 5:12 7:2,7 33:1,6 86:24 100:21 121:4
**quiz** 33:17 34:1
**quizzes** 33:20 33:22

**r**

**r** 2:1 4:1 122:1
**rack** 50:23
**ramirez** 48:7 48:21
**range** 102:14
**rate** 23:1,3,7,16 39:4 40:5 108:15,18,21
**rates** 23:11 75:2 108:4,8 109:5,6,11
**reached** 70:10
**read** 33:7 37:19 38:21 39:11,23 42:1 44:2 84:19 95:23 96:2 119:3
**ready** 115:7
**really** 23:6
**reason** 6:5 7:5 12:21 19:21 21:6 116:16 123:5
**recall** 21:13 25:4 34:3 35:21 58:15 60:14,17 61:6 62:15,19,23 63:1 68:10 74:1,22 100:16 107:10 108:7 111:17 112:17 116:5
**receive** 74:4 92:15 98:17
**received** 15:1 20:9,21 24:14 24:17 32:19 34:10 35:2 40:13,20 42:20 43:13 55:17 57:4 67:4 69:10,19 74:15 76:2,14 92:12 95:1 96:11 99:7 104:22 108:12
**recognize** 20:14 43:8
**recollection** 23:16 58:12 75:8
**record** 26:19 26:21,24 43:2 43:5 55:17,19 55:20,23 80:16 80:20 82:23 83:8 86:16 97:12,15 116:23,25 120:16 122:10
**records** 19:22 21:7 22:1 47:21 56:11 57:13 114:12 116:7
**recross** 120:2
**redirect** 120:2
**redo** 84:1
**refer** 22:18,18 23:9 36:8 37:5 41:11,24 43:24 55:24 57:15 69:22 70:5 76:22 77:16 93:2 96:24
**referenced** 58:23 90:12 112:16
**referring** 6:20 20:11 22:11 34:18 37:13 41:15 66:23 74:17 96:13
**reflect** 75:19 80:7,11 84:23
**reflected** 97:6
**refresh** 23:15 58:11 75:7
**reg** 23:11,12 75:4
**regard** 86:18
**regarding** 8:9 13:24 33:1 93:25 101:14 116:5
**regular** 82:18 108:15
**relate** 33:12
**related** 91:15 92:6,10 122:13
**relevant** 77:19
**relocation** 77:24
**remain** 32:10
**remember** 37:7 43:16 57:22 58:3,14 60:16 61:5,22 63:14

72:9 73:21 74:11,25 76:1 76:10 96:20,23 103:21 107:14 107:17 108:3 117:3,5
**remove** 45:21 51:12 52:12,20 102:6
**repair** 77:24
**repeat** 5:2 16:11 115:8
**rephrase** 65:4 80:4 86:1 92:17 93:13 98:24
**replacement** 77:24
**replied** 96:3
**report** 49:11,14 54:7 65:17 73:18 79:19,22 79:24 96:6,21
**reported** 51:1 79:19 80:8
**reporter** 4:24 5:3,20 12:5 20:10 32:20 42:22 55:18 57:5 67:5 69:11 74:16 81:14 83:12 84:20 95:2 96:12 118:5
122:6
**reporting** 1:23 54:21 62:16 123:1
**represent** 4:18 27:16 28:15
**reprimand** 106:25
**requested** 84:19 120:24
**required** 39:14 44:10 65:18 70:16 74:9 79:4 100:9
**requirements** 35:7
**reread** 84:17
**resembled** 76:15
**reserved** 3:10
**respective** 3:4
**response** 88:12
**responsibilities** 37:18,20
**responsible** 19:9
**rest** 39:11 50:8 103:21
**restaurant** 62:16
**retaliate** 90:8
**retaliation** 89:23 90:2
**review** 8:23 9:2
**reviewed** 8:20 9:5
**right** 19:9,13 20:12,17 23:7 23:20 25:18 34:2,19 38:13 40:14,21 53:20 56:12 90:16 93:19 108:13 109:6 116:1
**rights** 10:23 11:2 108:24
**river** 59:7 60:4
**rochelle** 60:19 60:22 61:3,8 61:15,24 62:5 62:6,7 67:20 67:25 68:11 85:15 103:1,20 104:12
**room** 34:15
**row** 56:18 59:21
**rows** 93:6,14
**rules** 35:7 89:23
**rulings** 121:4
**running** 91:11 91:11

**s**

**s** 2:1 3:1,1 120:7 121:9
123:5
**sabor** 63:2
**safety** 33:13 34:7,8 99:12 99:15,20,23 100:2,5,10,13 100:17 106:12 106:18 107:3,6 107:25 109:15 117:9,17
**saturday** 73:14
**saturdays** 31:5 44:11 73:11 76:13 111:17 111:21 112:5
**saying** 12:8 72:23 73:1 82:5
**says** 12:9 20:12 20:17 23:10,12 36:10 37:14 42:1 57:6,16 57:19,23 58:1 58:5,25 59:3,6 59:21,25 60:2 61:2,14 70:6 75:1,2,3 77:18 78:10 93:4,20 95:14 96:14,25 96:25 97:1
**schedule** 19:12 26:17 30:19,21 30:23 31:8

**scratch** 12:25
**scratches** 54:7
**sealing** 3:5
**searched** 115:24 116:7
**second** 57:16 96:16,24 113:23 114:3
**seconds** 113:15
**section** 36:10 36:18 37:3 38:12,20 39:23 40:24 41:13 42:1
**security** 92:23 92:25 93:1
**see** 56:3 60:25 61:12,16 63:11 78:3 93:7 97:1 113:9,14 114:18
**seeking** 101:6 108:23
**seen** 34:21 56:7 57:9,12 67:9 67:16 69:16 74:19 95:3
**send** 95:7,16 116:13
**sent** 95:5,8,19
**september** 21:9 21:11 122:17
**services** 1:23
**set** 41:2,7,20 109:18 122:9 122:17
**settlement** 14:7 15:1
**setup** 50:24
**seven** 44:7 68:16 71:3,25 72:4,7,18,20,24 73:4 103:6
**seventy** 37:6
**several** 53:12 53:13 54:3
**severally** 1:9
**sewer** 78:1
**shacks** 106:21
**sheet** 100:10 123:1
**shift** 38:23,25 39:2,3,7,8,19 68:23 69:5 98:10,14
**shifts** 38:21 39:13
**shop** 63:10 91:25 92:4
**shoulder** 82:8
**shovels** 42:2
**show** 104:15 115:22
**showed** 72:13
**showing** 107:11 114:9
**shown** 30:18
**sic** 59:15 65:22
**side** 23:10 75:2 93:5
**sign** 79:4,6,25 80:7 96:17 100:9
**signature** 69:23 122:20
**signed** 3:13,15 32:1 80:10 84:23,25
**significant** 62:11
**silent** 37:11
**similar** 60:3
**similarly** 1:4
**simply** 51:9
**single** 40:4 44:22 45:5,11
**site** 37:24,25 42:13 49:3,9 49:18 51:11 54:21 55:2 61:19 62:1,17 65:1,6,11,17 66:11 80:12,17 81:22 83:17 86:10 87:18 91:9 103:13 104:9,15
**sites** 37:16 44:13 77:2 79:3,6,10
102:18,23 103:4
**sitting** 4:20
**situated** 1:5
**six** 21:11,24 30:21 31:8 43:21 44:5,21 45:5,12,18,25 46:3,5,12 47:5 53:14 65:25 66:8 70:9 71:8 71:13 100:1 101:20,20 106:1
**sixth** 17:2
**size** 42:12
**slips** 103:23
**small** 53:5
**smaller** 52:21
**social** 92:23,25 93:1
**somebody** 113:17
**sorry** 43:25 95:14 106:17
**sort** 10:11
**southern** 1:1
**spanish** 4:8,25 5:1,5 11:22 12:16 33:4 34:10 80:21
**speak** 6:4,6 80:21

**speaking** 8:2
**specific** 25:11 36:19 49:21 50:2 56:21 65:19 66:6 68:6
**spelling** 16:9 24:6
**spend** 114:21
**spent** 15:13,19 70:10 85:17,24 86:4,9 87:17 91:8 99:1 103:8 107:6 110:8 111:1,7 111:17 114:25
**spoke** 88:8
**spoken** 8:3,7,11 8:24
**spreadsheet** 58:23
**ss** 122:2
**stamped** 41:12 41:25 56:2 57:8 67:7 69:12 74:18 96:15
**start** 5:9 33:18 44:17,21 65:13 74:10 93:7,14 96:25 97:17,23 98:2 99:24 102:22 103:17 104:10,19 116:5,8,11
**started** 19:16 20:25 32:9 42:24 43:21 44:23 45:5 57:19 80:12 97:6 99:8 115:10
**starting** 56:15 61:7 62:12 114:22
**starts** 56:4
**state** 1:16 4:4 10:22 77:8 108:25 122:2
**states** 1:1 37:6 38:12,13,21,22 39:24 40:25 41:13 44:3 45:17 58:8 60:24 76:23 78:24
**step** 84:3 86:12
**steward** 63:10 92:1,5
**sticking** 60:23
**stipulated** 3:2,8 3:12 104:10
**stipulations** 103:17,24
**stop** 55:5 63:4 63:12,16 64:10 64:21,23 65:1 65:6 68:6 83:19
**stopped** 20:23 21:1,14 64:13
**stopping** 61:6 62:15,19,23 63:1
**stops** 54:23 55:1
**straight** 39:4
**street** 51:3,6,15 51:19,25 52:15 53:9 59:15,16 59:18 60:8,20 113:18
**streets** 113:4
**strike** 28:4 45:2 46:8 48:1 54:24
**strong** 89:22
**stub** 20:20 74:23 76:2,7 76:14 109:10
**stubs** 19:25 20:1 21:16,21 75:18 109:5
**suarez** 2:13 4:8
**subcontractor** 77:21
**submit** 93:23
**subscribed** 119:17 123:21
**subsection** 42:2
**suggest** 84:5
**suggested** 81:17
**suitable** 42:7 42:12
**suite** 1:15,24 2:3,7
**super** 32:4
**superintendent** 31:21 32:1,3
**supervisors** 78:20 79:2,15
**supposed** 38:16
**sure** 19:19 20:25 47:18 72:21 89:24
**sweeping** 63:8
**switch** 106:18
**sworn** 3:15 4:3 4:9 119:17 122:9 123:21
**systems** 78:2

**t**

**t** 3:1,1 120:7 122:1,1
**take** 6:12 7:13 7:15 32:23 42:24 46:17,21 46:25 53:4 54:16,20,23 55:1,8 63:18 63:20,23 71:21 73:7 83:13 102:10 105:4,6

110:2 116:21
**taken** 1:14 17:6 33:11,13,16 52:17
**takes** 47:2 52:24 53:19
**talk** 11:21 88:7 92:1,5,9 116:14,17
**talking** 5:9 59:24 90:14
**tap** 82:7
**task** 70:14
**tasks** 36:20
**taxes** 93:18
**team** 105:25
**teamster** 26:8
**telecommuni...** 78:1
**tell** 6:1 15:9 18:9 55:4 62:13 64:21,22 65:1,6,9 85:1,3 97:23 98:14 106:11
**telling** 99:3
**ten** 52:25 55:10 70:10 71:22,23
**terms** 35:14 36:4 39:5 40:5
**test** 33:13
**tested** 110:23 111:2
**testified** 4:5 9:1 13:10 19:15 22:22 26:25 29:11 30:13 31:25 35:17 41:14,16 43:20 45:4 49:1 51:14 52:7 54:14 71:16
**testify** 7:11 14:1
**testimony** 5:16 7:23 9:3 31:7 44:21 45:1,10 45:14 59:17 64:15 72:22 82:20 87:10 119:4 122:11
**testing** 117:22
**text** 8:17 94:25 95:7,8,17,20 96:3,5 97:16 98:6,9 116:11 120:21
**texted** 95:24 116:4
**texts** 116:8
**thank** 118:1
**thing** 6:9 90:25
**things** 51:13 52:23 63:8,9 66:9 105:4,7 106:23
**think** 20:3 71:10 86:20,24 87:11,20,23 89:6,15 92:21 99:25 106:15 112:14 113:25 115:17 117:14 117:14,16
**thought** 91:21 94:2
**three** 22:3 64:4 64:6 67:22 68:1,11
**thursday** 99:18
**tide** 39:6
**time** 1:12 3:10 6:10 12:6 14:17 15:5,12 15:19 16:18 17:9 18:19 19:7,11 23:1 23:11,12 26:22 32:23 39:4,7 40:4 43:3 47:2 55:21 57:3,6 57:13 61:23,25 62:11 63:5 64:1 65:19 66:6,22 68:6 68:18,22 73:3 75:3,4,16 76:12 77:19 78:18 79:9,13 79:19,22 80:1 80:8,11 81:14 83:13 84:22 85:17,24 86:4 86:9 87:16 88:24 89:3 91:8,11 95:24 96:1,10,14,21 97:6,13,17,23 98:1,10,23,25 99:23 101:9,15 101:22 102:17 102:21 103:3,8 103:12,16,23 103:23 104:2 104:22 106:8 107:3,6 108:21 110:8 111:1,7 111:16,21 112:12,12 113:9,12,16,20 113:23,24,25 114:1,3,6,11,12 114:16,20,25 115:15 116:5 116:11,24 117:18,23 120:17,22
**times** 15:7 39:8 44:17 45:22 58:21 64:8 104:10 112:5 116:8
**timesheet** 96:17 97:5

**timesheets** 78:19 79:1,5,7 79:14,18,23 80:1,6,10 84:22 85:2,5,9
**title** 18:14 23:22 24:12,14 24:17 34:5
**titled** 69:13
**titles** 24:21,25 25:2,5,12 27:2 28:17,24 29:5
**today** 4:20 6:20 7:6 9:23 108:8
**today's** 7:24 8:9,12,21 9:6 9:11
**told** 18:18 19:8 19:12 72:10,11 73:12 85:4 88:19
**tomorrow** 95:25
**took** 18:8 49:17 54:15 62:4
**tools** 37:16 38:7 42:2 52:16,21 105:8
**top** 57:6 65:23 93:19 96:13
**total** 44:7
**towards** 20:17
**tracked** 55:12 78:18,25 79:13
**tracking** 55:16 56:11 64:13 79:8 120:16
**trades** 39:9
**traffic** 46:19,20 46:24 47:4 62:2,3 66:14 66:20 109:24
**training** 98:17 98:20,24 99:1 99:7,10
**transcribe** 5:4
**transcript** 118:6 119:3
**transcription** 5:20
**translate** 12:16 33:10
**translated** 35:2 43:13 69:19 81:23 82:1 83:17
**translating** 47:12
**translation** 5:8 12:22 33:5 34:10 81:1 82:7 83:22,24
**translator** 5:7
**trash** 45:21 51:12 52:20 53:11 115:7
**travel** 14:17 15:5 47:3 79:9 88:24 89:3
**traveling** 15:13 15:19 86:9 87:17 91:8
**trial** 1:13 3:11
**trick** 87:8
**tried** 93:23
**trigal** 62:20
**trip** 53:19 82:16 83:4
**trips** 53:8
**truck** 19:9 25:20 26:9 37:22,23 38:5 38:8 45:20,23 49:2,22 50:2,6 50:10,15 51:3 51:5,7,10,15,25 52:3,9,11,12,14 52:16,19 53:9 53:23,24 54:5 54:10,11,21 55:16 56:22 58:9,13,15,19 62:14 63:4,5,7 64:21 65:2,7 68:19 70:11 71:5,7,13,18,18 91:4,10 102:6 102:22 105:5,7 105:16 112:1 113:9,12,17 114:19,22 115:7,10 120:16
**truckman** 63:3
**trucks** 18:17 37:7,14 55:12 56:11 105:18 106:1
**true** 77:13 119:4 122:10
**truthful** 7:7
**try** 65:4 86:1 92:17
**trying** 87:5,7,7 87:9
**turn** 91:10
**twice** 44:9
**two** 39:19 53:13,19 67:6 88:19 116:21
**typical** 116:10
**typically** 31:1 33:19 40:13 44:4 58:18 61:25 62:3,10 63:16 68:14 70:7 101:15 102:9,17,22 103:16 104:15 110:2 114:21

**u**

**u** 3:1 4:1
**u.s.** 10:19
**u.s.a.** 59:7 60:4 61:4,16

**unclear** 86:16
**under** 5:13,16 37:3 38:13 69:25 108:25
**underneath** 95:16
**understand** 5:15 6:1,17,21 6:24 9:20,21 9:25 11:13,19 12:2,11,11,12 12:14,21 13:9 13:11 21:25 24:10 28:16 39:17 40:9 41:1 65:3 72:22 80:24 82:12 83:6 85:25 87:6 90:9,10 92:16 93:9 94:5,8 101:4 102:20 104:1 107:18
**understanding** 33:6 38:16 39:12 41:19 67:13,19 68:4 93:20 103:22 104:21 106:7 110:7,12,16 111:5 117:11
**understood** 15:17 19:4 87:11
**uniforms** 107:25
**union** 22:7,9,13 22:15,19,23 23:4,5 27:18 30:17 31:24 32:15,18 36:4 61:2,7 62:16 91:19,23,25 92:4,5,9,13,19 93:10,16,21 98:18,21,24 99:1 112:12 120:11,14
**unions** 27:5,16
**united** 1:1
**unpaid** 14:17 15:5 40:14 94:10 101:6 108:24
**use** 37:6,14
**used** 24:5 46:12
**uses** 37:17
**using** 5:5
**usually** 55:8
**utility** 58:8 78:2 112:22,25

**v**

**v** 123:3
**valves** 52:10,11 65:22,24 66:1
**vans** 37:7,15
**varied** 40:3
**various** 37:15 39:3
**vary** 38:25 39:7 39:19,24 40:10 68:23
**varying** 38:23
**vehicle** 47:23 48:12,17 113:23,24 114:1,3,7 115:1
**venture** 24:7
**verbal** 5:23 19:1,3
**verbally** 19:2
**verbatim** 12:10
**veritext** 123:1
**version** 35:3 43:14 56:1 69:20
**vicinity** 22:14 32:17 120:13
**voice** 86:13
**voiced** 91:18

**w**

**wage** 108:4,8
**wages** 30:14 41:13,17,21 93:25 94:3,10
**wait** 4:25 5:6 12:5 13:4 47:11 55:4 62:11 65:9,11 70:16,18 94:3 94:19
**waived** 3:7
**walking** 53:15
**want** 27:10 56:16 66:22 72:21 80:15,19 80:20 83:7 86:12 90:10 106:19
**wants** 16:8
**washington** 60:18 61:15,20
**water** 37:17 78:1
**way** 13:20 51:18 56:16 82:11 84:10 87:2,12 122:15
**wear** 106:20
**weather** 44:14
**wednesday** 99:17
**week** 20:17 44:5,8,15 74:5 74:23 75:9,13 75:20,23,25 76:15 88:14 93:3
**weekly** 109:20 109:23
**went** 17:20 51:5 64:15

93:10 105:15
**west** 1:24
**westchester** 77:3
**whereof** 122:16
**wife** 63:25 64:1
**withdraw** 12:25 26:19 78:23 105:22
**witness** 4:3 11:4 119:1 120:2 122:8,11 122:16 123:4
**woodbury** 2:8
**word** 24:5 83:24
**work** 14:19 17:17 18:19 19:12,23 21:8 21:11 24:1 30:19 36:11,13 36:25 38:13,15 38:17 39:2,6 39:14 40:3 42:11,15 44:10 45:5 47:7,8 51:17 54:21 55:2 61:19 62:1,12 63:21 67:21 68:1,5 70:22 71:3 72:3 73:10,18 73:20,22,24 75:25 76:19 78:18 89:12 90:16 91:1,15 92:6,10 97:17 97:23 103:24 105:1 107:15 111:20 112:20 112:22,24 113:3 115:6,14
**workday** 36:21 50:14 54:9,17 58:1 68:15
**worked** 13:1 16:15,18 17:14 21:22 22:2 24:10 25:7,9 26:16 30:23 31:1,4,8 44:4 44:14 61:24 67:24 71:25 72:7,16,18,24 73:3,4,8,14 74:5 75:8,19 77:9 79:8,13 107:20 114:17
**workers** 24:21 24:23,24 25:9 27:1,4,7,11 28:5 29:2,16 29:22 30:3 35:18 37:24 42:13 48:4 49:7 100:17
**working** 19:16 20:24 21:2,14 31:23,24 32:9 43:21 57:19 60:18,21 65:11 65:13 67:10,12 68:6,10 71:4 73:2 74:1 76:18 80:12 89:10 90:11 97:7 99:4,5 101:10 107:19 110:23 111:17 114:13,21
**workmen** 42:9
**writing** 18:25 88:6
**written** 33:22
**wrote** 77:5

**x**

**x** 1:2,11 120:1 120:7

**y**

**yard** 15:13,20 45:18,25 46:2 46:10,18 47:3 47:14,23 48:12 48:18 49:12,15 49:18 50:13 51:1,10,18,24 52:8,13 53:10 55:1 59:11,14 60:8,12,15 62:5,9 63:15 64:9 65:18 66:3,6,21 68:20 70:8,10 70:11,16,19 72:9 79:9,9,20 80:8 81:23 83:18 85:24 86:4,9 87:17 91:9 96:6 101:16,20,22 101:25 102:18 103:8,12 105:15 109:25 110:3,9 111:7 112:4,8,12 114:21 115:1 115:11
**yeah** 13:3 16:10,10 24:24 47:10 62:13 66:18 81:12,19 81:24 83:2,9 84:2 111:11
**year** 18:4 21:4 23:7
**yonkers** 72:5 72:16 73:2,4 103:1
**york** 1:1,15,15 1:16 2:4,4,8 4:2,4 10:22 11:1 13:2,8 16:7,13 22:14 32:16 59:7 60:4,19 61:3,8

61:15 77:18
89:24 108:25
113:3 120:12
122:2,3

**z**

**zinckgraf**
122:5,21
**zpass** 47:17,20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.