# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
MANUEL ANGEL CALDERON, individually and on behalf of all others similarly situated,
PLAINTIFF,

-against- Case No.: 24-cv-05442(ALC)

NETWORK INFRASTRUCTURE, INC., and PATRICK CLARKE, jointly and severally,
DEFENDANTS.
-----------------------------------------X

DATE: January 7, 2026
TIME: 10:12 A.M

DEPOSITION of a Opted In Plaintiff, LOURENCO ALVES, taken by the Defendants, pursuant to a Court Order and to the Federal Rules of Civil Procedure, held at the offices of Kaufman Dolowich, 135 Crossways Park Drive, Suite 201, Woodbury, New York 11797, before Kim Draper, a Notary Public of the State of New York.

Job No. P1-7820894

A P P E A R A N C E S:

PELTON GRAHAM LLC
Attorneys for the Plaintiff
111 Broadway, Suite 1503
New York, New York 10006
BY: ALEXANDRA AGUILAR, ESQ.

KAUFMAN DOLOWICH
Attorneys for the Defendants
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
BY: EDWARD GRIMMETT, ESQ.

ALSO PRESENT:
Patrick Clarke

* * *

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *

L. ALVES

L O U R E N C O A L V E S, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. GRIMMETT:

Q. Please state your name for the record.
A. Lourenco Alves.
Q. What is your address?
A. 140 Rich Avenue, Mount Vernon, New York 10550.
Q. Good morning, Mr. Alves.
A. Good morning.
Q. My name is Edward Grommett. I represent Network Infrastructure Inc and Patrick Clarke in this matter.
Sitting next to me today is Patrick Clarke. Do you know Patrick Clarke?
A. Yes, I do.
Q. I'm gonna be asking you some questions and you're gonna be answering them under oath.

Do you understand that your testimony will be offered under the penalty of perjury?

A. Yes, I do.

Q. Because the court reporter's trying to transcribe everything, please wait for me to finish asking my question before you answer it, and I'll give you the same courtesy.

A. Okay.

Q. Also, because this is an oral transcription, the court reporter cannot indicate head nods or other nonverbal gestures. I just ask that you provide an actual verbal answer to all my questions.

A. Correct.

Q. I'm also gonna assume that you understand my question, unless you tell me otherwise. If you need to speak to you your attorney at any point you can, but I just ask that you do that after the question presented to you is answered.

A. Okay.

Q. If you need a break, at any

point, just let me know. But, if there's a question pending, you have to answer that question, before we take that break.

If I refer to the defendants at any, point I'm referring to Network Infrastructure, Inc and Patrick Clarke collectively; do you understand that?

A. Yes, I do.

Q. If I refer to Network at any point, I'm just abbreviating Network Infrastructure Inc; do you understand that?

A. Yes, I do.

Q. I just gave you a list of all of instructions, do you understand all of the instructions that I presented to you?

A. Yes, I do.

Q. Before we get started do you have any questions for me?

A. No, I don't have any questions.

Q. Is there a reason today that would prevent or limit you from giving truthful answers to my questions?

A. No.

Q. Are you currently taking any

medication that would impact your ability to testify truthfully?

A. No, I'm not.

Q. Did you fail to take any medication within the last 48 hours that you are ordinarily prescribed?

A. No, I didn't.

Q. Have you consumed alcohol in the last 24 hours?

A. No.

Q. Aside from speaking with your attorney, have you spoken to anyone else, either in person or by the phone, to prepare for your deposition?

A. No, I didn't. I've only spoken to my lawyers.

Q. At any point, have you ever spoken to anyone currently employed by any of the defendants regarding this lawsuit?

A. No, I haven't.

Q. Have you spoken to any former employees of the defendants about this lawsuit?

A. No, I haven't.

L. ALVES
Q. Have you communicated with anyone about this deposition via text message?
A. No, I didn't.
Q. Have you communicated with anyone about this deposition via e-mail?
A. No.
Q. Have you reviewed any documents to prepare for today's deposition?
A. Yes, I did.
Q. What documents did you review?
A. Based on that, all the information that I had sent to my lawyers, reviewed it.
Q. What's the information that you sent to your lawyers?
A. That was regarding this case.
Q. I need you to be more specific please, what specific documents?
A. Not working for traveling time during the period of time that I worked for Network.
Q. Is that a document?
A. Not a document.

L. ALVES

Q. What documents did you review to prepare for today's deposition?

A. All of the information based on the hours that I got paid for.

Q. Did you review any sort of text messages?

A. No, I didn't.

Q. Did you review any sort of time sheets?

A. No, I didn't.

Q. Did you review any sort of pay stubs?

A. No, I didn't.

Q. You testified that you have reviewed a document to prepare for today's deposition, but you haven't specifically referenced any document yet.

What documents --

MS. AGUILAR: Objection. I'm going to object sometimes, but you still have to answer the question, unless I tell you otherwise.

MR. GROMMETT: I didn't even have a question there yet.

L. ALVES

Q. What specific documents have you reviewed to prepare for today's deposition?
A. Working hours, pay stubs.
Q. So you did review pay stubs?
A. Yes, I did.
Q. What period in time were the pay stubs that you reviewed?
A. I reviewed for that whole period of time that I worked for them.
Q. You were in possession of pay stubs for the entire period of time you worked for Network?
A. Yes.
MR. GROMMETT: I'm going to call for the production of those documents.
Q. Did you review anything else?
A. No.
Q. So, in preparation for today's deposition all you reviewed is pay stubs?
A. Yes, pay stubs.
Q. Have you prepared any notes or documents to prepare for today's

L. ALVES

deposition?

A. No, I did not.

Q. Have you discussed this litigation at all with anyone else?

A. No, I haven't.

Q. Do you go by any names other than Lourenco Alves?

A. That's the only name I have.

Q. Do you have any nicknames?

A. No nicknames.

Q. You've never been known by another name?

A. No.

Q. What's your date of birth?

A. August 10, 1967.

Q. Do you currently lived at 140 Rich Avenue, Mount Vernon, New York; is that fair, correct?

A. Correct.

Q. How long have you lived there?

A. I live there for the past nine years.

Q. Since approximately 2016?

A. Yes.

L. ALVES

Q. Do you own or do you rent?
A. Rent.
Q. Who do you live?
A. I live on my own.
Q. Have you ever lived with anybody else?
A. No.
Q. Do you have any other residences?
A. No, I don't.
Q. So, the entirety of your employment with Network Infrastructure, you resided at this address at 140 Rich Avenue; is that correct?
A. Correct.
Q. Do you know the address of Network Infrastructures Pelham yard?
A. I can't precisely tell you exactly that, but it's right behind of K-Mart.
Q. How far away is this Pelham yard from your residence?
A. About a mile and a half.
Q. If you were to walk, how long

would that take you?
A. No, I always drove.
Q. You always drove?
A. Yes.
Q. You never rode a bike there?
A. No.
Q. You never walked you?
A. Never.
Q. Always drove a car?
A. Yeah, I always drove a car.
Q. What kind of car do you drive?
A. Honda Civic.
Q. What year?
A. 2006.
Q. Is that car registered to you?
A. No.
Q. How was it registered to?
A. It was registered to my uncle.
Q. Did your uncle know that you were driving the car?
A. Yeah, I have.
Q. Did you ever have a discussion with your uncle about you registering the car under your name?

L. ALVES

MS. AGUILAR: Objection.

A. No.

Q. Why not?

A. It wasn't necessary.

Q. Have you ever had a car registered under your name?

A. Yes, I did.

Q. What car?

A. I had a Lincoln 2008.

Q. This was in 2008 you had that car?

A. Yes.

Q. How long did you have that car for?

A. I had it for about a year.

Q. For the entirety of your employment at Network Infrastructure, you drove this 2006 Honda Civic?

A. Yes, I did.

Q. How long was the drive from your residence to the Pelham yard?

A. It is about, I would say about two miles away from my house, maybe 15 minutes, if I got no traffic.

L. ALVES

Q. To drive a mile and a half is 15 minutes?

A. Yes.

Q. Do you have any prior misdemeanor or felony convictions?

A. No.

Q. So, you've never been convicted of a crime?

A. I've been arrested for DUI.

Q. When were you arrested for DUI?

A. That was in 2009.

Q. Do you have any other arrests?

A. No, only for DUI.

Q. When you were arrested, were you incarcerated?

A. Pardon?

Q. Did you have to spend any time in jail or prison after you were arrested?

A. Yes.

Q. How long?

A. I was arrested for a couple of hours and my uncle came and bailed me out.

Q. You never had to spend any more time in jail?

L. ALVES

A. No.

Q. After you were arrested for DWI in 2009, you had to go through court proceedings?

A. Yes, I have to go for some process that they required before you reapply for your license again.

Q. Did you enter any sort of plea agreement?

A. No, my case was denied because it was refusal of breathalyzer.

Q. After you were arrested that case was dismissed, is that what you are saying?

A. No, I was convicted.

Q. So, you were convicted of a crime?

A. Yes.

Q. That conviction was driving while intoxicated?

A. Exactly.

Q. You testified that you did not submit to a breathalyzer test?

A. Correct.

L. ALVES
MS. AGUILAR: Objection.
BY MR. GROMMETT:
Q. When you were arrested for DWI, did they conduct any other sort of other analysis, regarding your blood alcohol content?
A. No.
Q. Was your license revoked as a result of your DWI conviction?
A. Yes, my license was revoked.
Q. For how long?
A. I think it's still revoked.
Q. Since 2009 you have not had a valid New York state driver's license?
A. No.
Q. You drove this 2006 Honda Civic to work, despite the fact that you have the revoked driver's license?
MS. AGUILAR: Objection.
A. I drove on the job site.
Q. The only time that you ever drove with a revoked driver's license was when you're going from your house to the job site?

L. ALVES

A. Exactly.

Q. You would drive directly to the job site from your house?

A. Yes.

Q. You never drove to the yard, correct?

A. Uh-um.

Q. What was the answer?

A. No.

Q. I just wanna make sure the record is clear.

You never drove directly from your residence to any of Network Infrastructure yards, you only --

MS. AQUILAR: Objection.

MR. GROMMETT: Can you please let me finish my question? I'll start over.

Q. I just wanna make sure that the record is clear. Is it fair to say that you never drove your vehicle from your residence to Network Infrastructure's yards, you only drove it directly to the job site?

L. ALVES

MS. AQUILAR: Objection.

A. No.

Q. You previously testified that you only drove this vehicle to the job site, is that --

MS. AGUILAR: Objection.

Q. -- correct?

A. No.

Q. Did you drive the vehicle ever directly to the job site?

A. I drove to the yard.

Q. We will get more into that. Have you ever been deposed in a civil case before?

A. No.

Q. Have you ever offered testimony in any other forum or proceeding, aside from a deposition?

A. I have both, Denali and CAC Infrastructure.

Q. There was a matter with Denali Construction; is that correct?

A. Correct.

Q. Were you a plaintiff in that

matter with Denali Construction?

A. No.

Q. What was your role in that matter with Denali Construction?

A. Working extra hours and then I was not getting paid for traveling time, but at that point I was not driving.

Q. So, we're talking about the lawsuit with Denali Construction.

The claims in that matter were the fact that you weren't paid for travel time?

A. I don't really know what the lawyers have applied for that occasion.

Q. Do you know anything about the lawsuit with Denali Construction?

A. I know they were not paying rates for people -- for their rates properly.

Q. Can you clarify what you mean by they weren't properly paying their rates?

A. They were working extra hours, more hours than they were supposed, and

L. ALVES

they weren't getting paid the right amount of money.

Q. Were you an Opt In plaintiff in that case against Denali Construction?

A. Yeah, I signed it.

Q. What did you sign?

A. I signed information that I got from the lawyers.

Q. Did you receive any sort of settlement in the matter with Denali Construction?

A. Yes, I did.

Q. How much do you receive?

A. It was about $500 and something, something like that.

Q. How much?

A. $500 or $600.

Q. $600 dollars?

A. Yeah.

Q. CAC, were you a plaintiff in the case against CAC?

A. Yes, I am.

Q. What were the claims that you brought against CAC?

L. ALVES

A. CAC was pay for traveling and a lot of OT, what's added to the paychecks.

Q. Both the cases, Denali Construction and CAC, dealt with claims of unpaid travel time; is that correct?

A. Correct.

Q. You were involved in both of those cases?

A. Correct.

Q. Were you deposed in the case against Denali Construction, kinda in the similar same manner you are being deposed today?

A. I didn't work how much long for Denali, probably six or eight months.

Q. I get that sometimes I speak in legalese and my questions may be a little confusing, but you have to pay attention because you're not really answering my questions.

Did you sit for a deposition in a case against Denali Construction?

A. No, I didn't.

Q. Did you sit for a deposition in

L. ALVES

a case against CAC?

A. No, I didn't.

Q. What involvement did you have in the case against CAC?

A. CAC hasn't just paid the right amount.

Q. Did you have to produce any sort of documents to the attorneys in the CAC case?

A. Yes, I had already provided that.

Q. I'm sorry, I didn't understand that.

A. I have already provided.

Q. Did you receive any sort of settlement in the case against CAC?

A. No.

Q. Is that case still pending?

A. It is still pending.

Q. When did you work for Denali Construction?

A. Dating back to 2016.

Q. 2016 to when?

A. That was a brief couple of

months there.

Q. You only worked for Denali Construction for a couple of months; is that correct?

A. Yes, I went back and forth working on a year -- or I think that I came in on a late year, so end of the year. You get paid for relief and coming back the next following year, work for a couple of weeks before I went to CAC.

Q. How long did you work at CAC for?

A. CAC, I worked for a year and a half.

Q. When did you start working for CAC, what year?

A. The end of 2016 and 2017.

Q. When did you stop working at CAC?

A. That was the end of '17.

Q. Have you ever had a lawsuit brought against you?

A. No.

Q. Other than Denali Construction

L. ALVES

and CAC, have you brought a lawsuit against any of your other former employers?

A. No, I didn't.

Q. You understand that you're bringing an action against Network Infrastructure and Patrick Clarke?

A. Yeah.

Q. Are you aware of what the claims are in this matter?

A. Yes, I do.

Q. What are your claims?

A. For unpaid traveling time.

Q. Anything else?

A. No.

Q. Do you understand that this case is what's called, a class and collective action?

A. Yes, I do.

Q. Do you understand what a collective action is?

A. Yes.

Q. What is a collective action?

A. It's an action that moves and pays on the information that you related.

L. ALVES

Q. Can you repeat that?

A. Information based on the information, that the information that you provided.

Q. I'm not sure I understood the response. But, do you know what a class action is?

A. No.

Q. Are you aware that is there other individuals that are plaintiffs in this lawsuit?

A. No.

Q. So, you don't know the names of any of the individuals who have opted into this lawsuit?

MS. AQUILAR: Objection.

A. No, I don't.

Q. Why do you believe that you have a claim for unpaid travel time?

MS. AGUILAR: Objection.

A. Well, I knew that my license was not good, revoking, but I was asked to drive it anyway.

Q. You were asked to drive with a

L. ALVES

revoked driver's license?

A. Right.

Q. Network Infrastructure knew that you had a revoked driver's license?

A. He had a copy of my driver's license that they knew about.

Q. So, Network allowed you to drive a vehicle, even though they knew that your driver's license was revoked; is that correct?

MS. AGUILAR: Objection.

A. I was told by my foreman, I just follow instructions.

Q. Who was your foreman that told you to drive a vehicle?

A. Angelo Visconti.

Q. So, if we deposed Angelo Visconti, he would testify that you drove a vehicle, despite having a revoked driver's license, is that --

MS. AQUILAR: Objection.

Q. -- is that fair to say?

A. No.

Q. No, Angelo would not testify to

L. ALVES

that, because the truth is, you actually never drove a Network Infrastructure vehicle; is that accurate?

MS. AQUILAR: Objection.

A. No.

Q. It's not accurate?

MS. AQUILAR: Objection.

BY MR. GROMMETT:

Q. Tell me, how many times did he drive a Network Infrastructure vehicle?

A. A good amount of time.

Q. Specifically, how many times; is it once, was it once, twice?

A. Probably, at least three months.

Q. Three months, but not every single day, right?

MS. AGUILAR: Objection.

A. No.

Q. If you did drive it was sporadic, maybe once or twice over those three months; is that fair to say?

MS. AQUILAR: Objection.

A. No.

L. ALVES

Q. How many specific times over that three month period?

A. Depends on the working area that we were doing excavation, pretty much most of the time in the Astoria area.

Q. Can you repeat the answer, pretty much the end of the time what?

A. Most of the driving that I have done was in the Astoria area.

Q. Can you tell me approximately how many days you drove a truck for Network Infrastructure in total?

A. We were working different locations, but there were some locations that we needed to have two trucks on the working job site. That was when I was told to move the truck to the job site.

Q. You were only asked to drive a vehicle when the specific project needed more than one truck; is that fair to say?

MS. AQUILAR: Objection.

A. Yes.

Q. Your answer is yes?

A. Correct.

L. ALVES

Q. You're not aware of any other individuals who opted into this lawsuit; is that fair to say?

MS. AGUILAR: Objection.

A. No.

Q. When you say, no, it means you're not aware of any of the other individuals?

A. Yes, correct. I don't know about the other individuals.

Q. In the case against Denali Construction, do you know if that was a class action?

A. I don't know much about it.

Q. Do you know that to maintain a class action, there needs to be a class representative?

A. Yes.

Q. What do you know about maintaining a class action?

A. I don't know.

Q. So, you're correct in your testimony you don't know anything about maintaining --

MS. AGUILAR: Objection.

A. I don't know.

Q. Where did you work after CAC Industries?

A. I work for a bunch of companies. Not all work operated in the City pretty much work in the Westchester area, I work for maybe three different companies.

Q. What are the names of those companies?

A. The last one Frontier.

Q. Frontier is the name?

A. Correct, Frontier.

Q. When did you work for Frontier, what months and years?

A. I'm still working for them.

Q. When did you start working for Frontier?

A. I started three months ago.

Q. What do you do for Frontier?

A. They are involved in a tunnel operation, I work in the Westchester area.

Q. Do you drive a vehicle for

L. ALVES

Frontier?

A. No, I don't.

Q. Why not?

A. I already told him that I'm not qualified to drive.

Q. Did you tell Network that you're not qualified to drive?

MS. AQUILAR: Objection.

A. I provided a copy of my ID for them.

Q. When someone asked you to drive a Network vehicle, did you respond and say, I'm not qualified to drive that vehicle?

MS. AGUILAR: Objection.

A. I told him that.

Q. Who did you tell that to?

A. Angelo.

Q. Angelo said, you still have to drive this vehicle anyway?

MS. AQUILAR: Objection.

A. They had other people to drive, but an emergency, they would have asked me to drive.

Q. So you only drove when there

L. ALVES

was an emergency?

MS. AGUILAR: Objection.

A. I drove for about three months straight.

Q. There was emergencies for three months straight?

MS. AGUILAR: Objection.

A. There was.

Q. What were the other two companies that you worked for?

A. Grace working on gas.

Q. Grace, G-R-A-C-E?

A. Correct.

Q. What did you do for Grace?

A. Excavation, working around gas lines.

Q. When did you start working for Grace?

A. The end of 2023, 2024.

Q. When did you stop working for Grace?

A. I stopped working for Grace the end of September 2023.

Q. September, what year?

A. 2023.

Q. Were you working for Grace at the same time as working for Network?

A. No, as soon as I finished with the Network, I joined Grace.

Q. After you stopped working at Grace, did you work anywhere else before working at Frontier?

A. No.

Q. I just wanna get an idea of your employment history.

A. Right.

Q. It seems that there's a gap in between the time that you worked, you finished working at CAC and started working for Network, did you work for any other companies after you're done working at CAC Industries?

A. I took a break and that was work on my own.

Q. Did you drive a vehicle for Grace?

A. No, I didn't.

Q. Why not?

L. ALVES

A. He had a copy of my driver's license.
Q. What did you do when you were working on your own?
A. Pretty much work around cement and sidewalks and stuff like that.
Q. Like personal residential jobs, is that accurate?
A. Yes.
Q. How would you get to those residential jobs?
A. I had a friend of mine that was a contractor and then he was passing me those side jobs.
Q. Would you drive to the residential locations?
A. No, pretty much he drove me around.
Q. He would pick you up at your house?
A. Exactly.
Q. What was the name of your friend?
A. Cassio Olivera.

L. ALVES

Q. Can you spell that?
A. O-L-I-V-E-R-A.
Q. Did you ever sue this friend for unpaid travel time?
A. No, I didn't.
Q. Did you ever sue Grace for unpaid travel time?
A. No, I never drove.
Q. Did you ever sue for unpaid travel time?
A. I never drove for them.
Q. When you left Network and went to Grace, did you go there and work as a local 60 employee?
A. Yes, I did.
Q. What about Frontier, did you go there and work as a local 60 employee?
A. Yes, I did.
Q. You are still currently a local 60 employee?
A. Yes, I am.
Q. You have a local 60 membership card?
A. Yes, I do.

Q. You maintained that card when you worked for Network?

A. Yes, there was an agreement with them, I worked for them at that period of time, coming from the city there was a deal for me to transfer my book to local 60 and this way that I can work in Westchester, and I worked in Scarsdale where they had a big excavation.

Q. What date did you become a local 60 member?

A. I transferred to Local 60.

Q. What date did that occur?

A. I started to work for Network, August 10, 2021.

MR. GROMMETT: I'm going to call for the production of the local 60 union membership card.

MS. AQUILAR: Okay.

BY MR. GROMMETT:

Q. For Frontier, what's your current hourly wage?

A. 52 something.

Q. Approximately $52 an hour?

L. ALVES

A. Yes.
Q. What's your job title at Frontier?
A. Laborer.
Q. Do you have to report to the yard at the start of your day for Frontier?
A. Yeah.
Q. What's your highest level of education?
A. High school.
Q. You graduated from high school?
A. Yes, I did.
Q. Do you have any other licenses or certifications?
A. I have a certifications for excavations.
Q. You have an excavation certification?
A. Yeah, 731.
Q. Anything else?
A. Laborer plus flagger.
Q. When you were hired by Network Infrastructure?
A. That was in 2016, I came to

L. ALVES

work for this.

Q. No, Network, when did you start working at Network?

A. Network, I started in August 10, 2021.

Q. Who hired you to work at Network?

A. Johnny Onkus.

Q. Do you know how to spell his last name?

A. Y-O-N-K-U-S.

Q. How did you learn of the job at Network Infrastructure?

A. It was a very good company at that point.

Q. You found out about it, just through word of mouth, no one specifically told you?

A. I don't know.

Q. Did anyone help you get hired?

A. No.

Q. You simply just submitted an application?

A. Yes, there's another firm that

L. ALVES

works there John Cortelli. I work with him at CAC, and he brought other crew members to Network when he quit working for CAC. I saw him at work on the street and I stopped by to say hello, and he was telling me about the Network, that they had a good amount of work to do in Westchester.

That the point I was doing side jobs, so I asked him if could contact me and it was then that he called John, which was the superintendent and he hired me from there.

Q. Going back because you mentioned CAC, so that lawsuit with CAC is still pending?

A. Correct.

Q. Who were your attorneys in that CAC matter?

A. Um Graham.

Q. Is that Pelton and Graham?

A. Correct.

Q. Then the Denali matter, who were your attorneys?

A. The same.

L. ALVES

Q. Pelton and Graham are your attorneys in Denali?

A. Yeah.

MR. GROMMETT: Off the record.

(Whereupon, a brief recess was taken.)

Q. We just took a brief break, during that break did you talk to anybody about your testimony?

A. No, I didn't.

Q. When you were hired at Network Infrastructure, you were hired just as a laborer, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Did your coworkers have any other different job titles?

A. No, I don't think.

Q. It is your understanding that everyone that was employed by Network was a laborer?

MS. AGUILAR: Objection.

A. I don't know.

Q. So, you're not aware of the

L. ALVES

other job titles at Network; is that fair to say?

MS. AGUILAR: Objection.

A. I don't know.

Q. When you were hired by Network, you would what your job schedule would be, right?

MS. AGUILAR: Objection.

A. Yes.

Q. When you were first hired by Network, you were not responsible for driving a truck, correct?

A. Correct.

MS. AGUILAR: Objection.

Q. You testified that your first day of work at Network was August 10, 2021, correct?

A. Correct.

Q. Do you know the date that you stopped working at Network Infrastructure?

A. The day that I stopped, I took a vacation, I think October of 2023. I went to South America for about a month.

Then, when I came back there

L. ALVES

was not much going on, as far as the work, they told me wait around to see if anything would pop up. But, it was not much going on, so I got laid off.

Q. So, your last day of work was approximately in October of 2023?

A. Correct.

Q. I am going to refer you to a document. To give you more time, I'm going to point you to specific areas of the document, so you know if you need to read the full document, by all means, but I can speed this up.

A. If you have.

MR. GROMMETT: I've marked this document as Alves Exhibit 1.

(Whereupon, Alves Exhibit 1, Document, was marked as for identification as of this date by the Reporter.)

It is titled, Opt in plaintiff, Lourenco Alves' amended objections and responses to defendant's first set of interrogatories.

L. ALVES

Q. Does this document look familiar to you?

A. Yes.

Q. If you go to the second to last page, please. I think the page before that.

A. Yes.

Q. Is that your signature on the bottom right?

A. Yes, it is.

Q. Above your signature, it states, "I Lourenco Alves hereby declare under penalty of perjury that I've read the foregoing plaintiff Lourenco Alves' amended objections and responses to defendant's first set of interrogatories and believe it to be true to the best of my knowledge and belief"; is that correct?

A. Correct.

Q. So, you understand that these are your amended interrogatory responses, correct?

A. Yeah.

Q. You understand that your

L. ALVES

responses in this document are being offered under the penalties of perjury, correct?

A. Yeah, correct.

Q. If you can go to paragraph number 17. It is not numbered. In the middle of the page, if you go back a few pages, it'll say interrogatory number 17.

At the bottom of the page it states, "notwithstanding without waiver of the general and foregoing objections plaintiff responds that he worked for defendants as laborer and labor driver during the last eight months of employment at Network Infrastructure performing manual construction labor from in or around October of 2021 to in or around October of 2023"; is that correct?

A. Correct.

Q. I want to ask a few questions about your statement there.

First, I wanna ask about your time as a laborer. When you were a laborer you weren't driving a truck for Network

L. ALVES

Infrastructure, correct?

A. Correct.

Q. When you were a laborer, you drove your personal vehicle directly to the job site, correct?

MS. AGUILAR: Objection.

A. Correct.

Q. All of your co-workers were who laborers, they drove their personal vehicles directly to the job site, correct?

MS. AGUILAR: Objection.

A. Correct.

Q. At the time you were a laborer driver, so in this statement you state that you were a laborer driver during the last eight months of your employment.

But, that's not accurate based on your testimony, correct?

MS. AGUILAR: Objection.

A. Correct.

Q. This statement in this interrogatory response isn't accurate?

MS. AGUILAR: Objection.

A. Correct.

Q. Your testimony is that you only drove a vehicle for Network Infrastructure during a three month period, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. During that three month period, you only drove that vehicle in emergency situations, correct?

MS. AGUILAR: Objection.

A. Correct.

Q. When you were required to drive a Network Infrastructure vehicle, were you required to submit any sort of inspection report through your phone?

A. No, I didn't.

Q. You don't recall ever submitting a inspection report while you were you employed by Network Infrastructure?

A. No, I didn't.

Q. Do you know how many days in total you drove a Network Infrastructure vehicle during that three month period?

A. No, I can't tell you. I don't

know.

Q. If I told you that we have, if I told you that there were inspection reports you submitted on four occasions; would that refresh your recollection?

A. There was somebody else bringing it for inspections, the vehicle.

Q. Was there ever a time that someone at Network Infrastructure learned that you were driving a vehicle without authorization?

A. Correct.

Q. You were immediately told that you could no longer drive that vehicle?

MS. AQUILAR: Objection.

A. Correct.

Q. So, you only drove a vehicle two to three times, correct?

MS. AGUILAR: Objection.

A. More than that.

Q. Four times?

MS. AGUILAR: Objection.

A. More.

Q. Approximately how many times?

L. ALVES

A. I will say to two to three months.

Q. Every day over a two to three months period?

A. It wasn't everyday, but like two or three days.

Q. You previously testified that you drove a vehicle for three months, now it is two to three months, so --

MS. AGUILAR: Objection.

MR. GROMMETT: Again, I have questions, I've been giving you leeway the entire time, but I need to finish asking my questions for a clear record here.

MS. AQUILAR: Okay.

MR. GROMMETT: I'm gonna strike the last question.

Q. You previously testified that you only drove a Network vehicle for a three month period, now you're saying it was two to three months?

A. Three months.

MS. AGUILAR: Objection.

A. For three months.
Q. Are you sure that it was for a three month period?
MS. AGUILAR: Objection.
A. I'm not sure.
Q. During that three month period, it wasn't every single day, correct?
MS. AGUILAR: Objection.
A. Correct.
Q. During that three month period, it was only during emergency situations, correct?
MS. AGUILAR: Objection.
A. Correct.
Q. When you drove a vehicle, were there any passengers in the vehicle?
A. I picked up my foreman.
Q. Who was your foreman?
A. Angelo Visconti?
Q. So, if we depose Angelo, he would testify that you drove a vehicle for a three month period?
MS. AGUILAR: Objection.
A. I can't tell you that.

L. ALVES

Q. Were there any other passengers in the vehicle when you drove?

A. That was a laborer, Ernesto Rodriguez.

Q. Anyone else?

A. No.

Q. What specific vehicle did you drive?

A. A box truck and there was another small truck.

Q. Do you know what type of small truck it was?

A. It was like a van, something.

Q. Are you aware that Network Infrastructure assigns vehicle numbers to all its vehicles?

A. Yes, I do.

Q. Do you know the vehicle number for the box truck that you drove?

A. I don't remember.

Q. Do you know the vehicle number for the small truck or the van that you drove?

A. No. They had a sticker on the

L. ALVES

right side of the vehicle, before I start it, you have to scan a QR code and place the license number, vehicle number and the vehicle number, there was many different ways to remember numbers from those labels.

Q. You submitted those reports?

A. Correct.

Q. On how many occasions did you submit those reports?

A. Many, like three. The three months that I drove, it is a few amounts of times.

Q. When were you told that you can no longer drive?

A. Basically, I was not getting paid to drive, so I mentioned out to somebody else that my license was no good.

I think that they informed the safety boss that I was not qualified to drive, but at that point, I didn't want to drive.

Q. Why didn't you say that when you first started driving?

A. I told them from the beginning,

but from the beginning they had a copy from -- of my driver's license and they knew. It was over a year later, they hold out some confidence and trust in me, that's when they started to ask for those favors.

Q. I'm referring to the first time you were asked to drive a vehicle, why didn't you say, I am not able to drive that vehicle because my driver's license is revoked?

MS. AGUILAR: Objection.

A. Because I wanted to keep my job.

Q. You are claiming that you weren't paid for the time that you spent driving?

A. Correct.

Q. Did you ever complain to anyone that you weren't being paid for that time?

A. No, I didn't.

Q. Why not?

A. I wanted to keep my job.

Q. Did you ever tell Pelton and Graham that you weren't being paid?

L. ALVES

MS. AGUILAR: Objection.

A. No.

Q. Why not, you previously had lawsuits against Denali Construction and CAC Industries for unpaid travel time, you were represented by counsel, and you did not feel the need to notify them about your claims for unpaid travel time?

MS. AGUILAR: Objection.

A. Didn't wanna.

Q. Did you know that after you were let go or decided to resign, that's when you were gonna bring a lawsuit?

MS. AGUILAR: Objection.

A. I have been away from -- I worked for two years, so I went different ways, different companies.

Q. But, this would be the third employer that you sued for unpaid travel time, correct?

A. I never go for Denali.

Q. The settlement you received in Denali, what was that for then?

A. Extra time on the road, going

to the job site, and unpaid overtime.

Q. So, there was a component of unpaid travel time in the Denali matter, correct?

A. Correct.

Q. Did you tell your foreman that your driver's license was revoked?

A. Yes, I did.

Q. When did you tell him that?

A. It was late, not the first year, I think it's the -- after the second year I told him.

Q. This was after you drove the vehicle?

A. No, before I started.

Q. After you started driving the vehicle, who did you tell that your driver's license was revoked?

A. One of the neighbors.

Q. Who was that?

A. I think Carlos. I don't know his last name, but he is the driver. He used to drive the truck, he got a kind of pissed off that the foreman used to take a

lot of stuff going from the yard, I used to be told to get stuff from the yard to bring to the job site. At that point Carlos used to take a lot of time, so they changed his driver and I was told to take the truck and go to the yard, and do things like that. Then they asked me to permanent -- you know, take the truck.

Q. But, it's your testimony that you stopped driving the vehicle after you informed somebody that your driver's license was revoked, correct?

A. This person informed Brian, which is safety for us -- for Network. He called Angelo, Angelo said I was no longer good to take the truck.

Q. You told Carlos, who then told Brian about your revoked driver's license?

A. Right.

Q. Do you know the date that this occurred?

A. No, I can't remember.

Q. Was it in the middle of your employment?

L. ALVES
A. Yeah, in 2023.
Q. Sometime in 2023?
A. Yeah.
Q. Early 2023?
A. Yeah.
Q. So, you stopped driving a vehicle in early of 2023?
A. Yeah.
Q. Is it possible that you stopped driving a vehicle in the middle of 2022?
MS. AGUILAR: Objection.
A. I don't know.
Q. What was your work schedule when you worked for Network?
A. Working for Network I had to be at the job site at 7:00, and even though we started at 9:00, because there was always a Con Ed inspector running around and make -- checking making sure that specific group that was supposed take the job, in that area was there at that time.
Q. When you were a laborer and you drove directly to the job site, you would you get there at 7:00 a.m., correct?

L. ALVES

A. Correct.

Q. When you were a driver, what time did you get to the yard in the morning?

A. 6:00 in the morning.

Q. Did that time vary?

A. Sometimes, it depends on the traffic.

Q. No, I'm referring to the time you got to the yard?

A. I get at 6:30, sometimes.

Q. It was flexible?

A. Yeah.

Q. You could get to the yard?

A. Correct.

Q. At any time, as long as you get to the job site --

MS. AGUILAR: Objection.

MR. GROMMETT: Please. I know you don't mean it, because I pause sometimes. But, please.

THE REPORTER: Counsel, can you start the question over?

MR. GROMMETT: Yes.

L. ALVES

Q. So, your start time when you were a driver would vary?

A. It would vary between 6:00 and 6:30.

Q. But sometimes it could even be later than 6:30, correct?

MS. AGUILAR: Objection.

A. No, had to be at that time. Otherwise, I won't make it to the job site before 7:00.

Q. If a job started at 9:00 --

A. Right.

Q. Let me finish my question.

If a job started at 9:00 a.m., and you got to the yard, you know, anywhere between 7:00 and 7:30 in the morning, you wouldn't be able to get there on time?

MS. AGUILAR: Objection.

A. I would be able to get there on time.

Q. You would be able to?

A. There was always -- I had to pick up the foreman.

Q. Where would you pick up the

L. ALVES

foreman?

A. Pelham Bay, not far from the yard, but he always took his time.

Q. This was Angelo that you would pick up?

A. Correct.

Q. Did Angelo have his own personal vehicle?

A. I think at that point he had a problem with his vehicle and he was riding in the truck.

Q. So, it was only a few times that you picked up Angelo then?

MS. AGUILAR: Objection.

A. No, a pretty good amount of time.

Q. So, if you go back to Alves Exhibit 1, I believe you have in front of you.

Towards the middle of the page, on that same page that you were on. If you go down seven lines or eight lines down.

Do you see where it says, "plaintiff further responds"?

L. ALVES

A. Yeah.

Q. "Plaintiff further responds that as part of his obligations at the company he was required to be at defendants Pelham yard and or the Bronx yard between approximately 6:00 a.m. and 7:00 a.m., depending on the job assigned and the permits issued for the job." Do you see that?

A. Yes.

Q. There were times that you would get to the yard at approximately 7:00 a.m., correct?

MS. AGUILAR: Objection.

A. Correct.

Q. When you say, approximately, it means there was flexibility with the time you'd get to the yard, correct?

MS. AGUILAR: Objection.

A. Between 6:00 and 7:00.

Q. There were times that you got to the yard after 7:00 a.m., correct?

MS. AGUILAR: Objection.

A. No.

L. ALVES

Q. Never?

MS. AGUILAR: Objection.

A. Never.

Q. Did you know what shift you were expected to work each day?

A. Work in the area -- some areas was allowed to start a littler earlier, and some areas we couldn't, so we had to be on time, sometimes we started at 8:00, depends the areas.

Q. That was not exactly my question.

But, the time you had to be on the job often varied depending on the permits, correct?

A. 7:00 to 3:30.

Q. The time that you had to be at the job site --

A. Yeah.

Q. Please let me finish my question. The time you had to be it at the job site, often varied by the permits, correct?

A. Correct.

L. ALVES

Q. That could be, the job could start anywhere from 8:00 a.m. to 10:00 a.m., correct?
A. Correct.
Q. Some jobs were at night, correct?
A. Correct.
Q. So, there was never really a consistent schedule that you had, correct?
A. Correct.
MS. AGUILAR: Objection.
Q. You were required to go to a bunch of different job sites throughout your employment, correct?
A. That's correct.
Q. How did you know the specific job site you had to go to each day?
A. We were told by the foreman.
Q. How did the foreman tell you?
A. Text messages.
Q. Have you produced all of the text messages that you have with your foreman?
A. Yes, I did.

L. ALVES

Q. When you were a driver and you reported to Network's yards, the truck that you drive was typically just staged for in the street, correct?

MS. AGUILAR: Objection.

A. Come again.

Q. These questions, my line of questioning only relates to when you were a driver and you went to the yard.

When you went to the yard Network's yard employees drove the truck out to the street for the drivers to take to the job site, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. When you got to the truck, there were no tasks that you had to complete, you just drove directly to the job site, correct?

MS. AQUILAR: Objection.

A. Scan in the QR code before it got done.

Q. All you had to do was scan the QR code and then drive off to the job site,

L. ALVES

correct?

MS. AQUILAR: Objection.

A. Correct.

Q. What time did you typically leave the job site in the day?

A. It always depends how far we have to go on excavation. Sometimes it was extra -- we work late. Pretty much after 3:30 in the afternoon.

Q. You typically end your day at 3:30 in the afternoon, correct?

A. Yes.

Q. At 3:30 p.m., if you were driving a truck, how long would it take you to get back to the yard?

A. Between one and a half and two hours.

Q. You typically ended your day at 3:30 p.m., but you finished your work day on the job site whenever the job was completed, correct?

A. Correct.

Q. That time often varied, correct?

L. ALVES

MS. AQUILAR: Objection.

A. Correct.

Q. There were times when you could finish your day after before 3:30 p.m.?

MS. AQUILAR: Objection.

A. We used to leave -- get into the yard late.

Q. So, it is your testimony that there was never a time where you finished your work at the job site before 3:30?

MS. AQUILAR: Objection.

A. 3:30 was most of the hours that we worked, sometimes we work overtime.

Q. You're not answering my question.

Was there ever an occasion where you finished working at the job site before 3:30 p.m.?

A. Yes.

Q. In fact it is quite frequent where you finished your work at the job site before 3:30 p.m., correct?

MS. AQUILAR: Objection.

L. ALVES

A. Correct.

Q. There were times where you probably were done by 1:00 p.m., correct?

MS. AQUILAR: Objection.

A. We could not leave the job site. The Con Ed inspector was always around the area, so we couldn't leave the job site before the right hours that we were supposed stay there.

Q. Who was the Con Ed inspector?

A. Pretty much at the time I worked Angelo, it was Peter. I think it was. So, I don't know his last name.

Q. Did you only work on Con Ed jobs?

A. Yeah, most Con Ed jobs. And Mike, sorry.

Q. Do you know Mike's last name?

A. Mike is the first name, I don't know.

Q. So, when you were done working at the job site, you drive back to the yard, right?

A. Yes.

L. ALVES

Q. Then you just drop off the keys and done for the day, correct?

MS. AQUILAR: Objection.

A. Sometimes we have to unload the garbage that we accumulated on the job site.

Q. How long does that take; two to three minutes?

MS. AQUILAR: Objection.

A. It always depends on how much garbage we had.

Q. So, the only task that you did when you got back to the yard was remove any garbage you had in the back of the truck, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. You were required to tell your foreman the time you started and ended your shift, correct?

A. Which time, we all signed time sheets before we started work, and he just the put the hours when we finished.

Q. So, your foreman kept track of

L. ALVES

your time, correct?

A. Correct.

Q. You had a good relationship with your foreman?

A. Yeah, we were close friends, the people that worked in the group.

Q. You felt that you could go to him with any concerns that you had about your employment, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. You even went fishing with your foreman sometimes, correct?

A. Yeah, I go fishing with him, sometimes.

Q. You would tell your foreman the time you started working each day, correct?

A. Correct.

Q. Your foreman knew the time that you stopped working at the conclusion of the work day?

A. Correct.

Q. You were paid based on the amount of time that you told your foreman

you worked?

MS. AQUILAR: Objection.

A. Correct.

Q. When you drove a vehicle you told your foreman the time you reported at the yard, correct?

A. Correct.

MR. GROMMETT: Off the record.

(Whereupon, a brief recess was taken.)

Q. We just took a five or ten minute break. Did you speak to anyone about your testimony during that break?

A. No, we did not.

Q. Did you receive a pay check every week that you worked for Network Infrastructure?

A. Yes, I did.

MR. GROMMETT: Let's mark this as Alves Exhibit 2.

(Whereupon, Alves Exhibit 2, Pay stubs, was marked as for identification as of this date by the Reporter.)

L. ALVES

Q. Please take a look at this document in the bottom right corner.

A. Okay.

Q. It states, DEF 011633. Have you seen this document before?

A. Yes.

Q. Is this a true and accurate copy of the pay stub that you received for the week ending in October 22, 2023?

A. Correct.

Q. This is pay stub states that you worked 32 hours in straight time for that week, correct?

A. Correct.

Q. The pay stub also states that you worked 3.5 hours in overtime for that week, correct?

A. Correct.

Q. This pay stub accurately reflects all the hours that you worked in that week, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Do you recall whether you were

L. ALVES

you driving during this week?

A. No.

Q. Do you recall what time you started each day this week?

A. No.

Q. You previously testified that, you know, when you were a driver your day could start anywhere from 6:00 a.m. to 7:00 a.m., correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Even when you were a laborer, correct?

MS. AQUILAR: Objection.

A. Correct.

MR. GROMMETT: Please mark this document as Alves Exhibit 3.

I just marked a document, Alves Exhibit 3. It is three pages, DEF 01 2887 through DEF 012889.

(Whereupon, Alves Exhibit 3, Time records, was marked as for identification as of this date by the Reporter.)

L. ALVES

Q. Have you seen this document before?

A. Yes.

Q. Does this document include the time that you reported to your foreman?

MS. AQUILAR: Objection.

A. Yes.

Q. On the second page it says your start time on October 28, 2023 at 6:00 a.m., correct?

A. Correct.

Q. So, that accurately reflects the time you started work that day, correct?

A. Correct.

Q. That accurately reflects the time that you stopped working that day, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Do you believe that the time records that you submitted to your foreman were all accurate?

MS. AQUILAR: Objection.

L. ALVES

A. I don't know.

Q. I don't have any more questions about that document.

I want to go back. You said the only task that you performed when you drove a trucks was you scan a QR code on the truck, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. That QR code that you scanned, was that a truck inspection report?

A. There was, they had that QR code in every single working box truck. Everyone that was supposed to drive, that they were mandated to do that before they sent information.

Q. That was a requirement, to scan that QR code and submit that report, correct?

A. Correct.

Q. The purpose of that report, it was called a truck inspection report, correct?

MS. AQUILAR: Objection.

L. ALVES

A. I don't know.

Q. But, it generated some sort of report for Network Infrastructure, correct?

A. Correct, to identify who was driving.

Q. You submitted that report every single time you drove, correct?

A. During the period of time that I drove, yes.

MR. GROMMETT: I'm going to mark this was Alves Exhibit 4.

(Whereupon, Alves Exhibit 4, New York State ID card, was marked as for identification as of this date by the Reporter.)

This is a document that I just marked as also Exhibit 4, the bottom right corner it states DEF 017895.

Q. Mr. Alves, the New York state identification card in the top right corner of this document, do you recognize that document?

A. Yes, I do.

Q. What is that document?

L. ALVES

A. This is ID New York State ID.

Q. This is not a valid driver's license, correct?

A. Correct.

Q. You provided this identification card to Network, prior to your employment?

A. Correct. Yeah, that's the document I provided, prior to work.

Q. Is that the same document you provided to Grace?

A. Yes, it is.

Q. Because you provided that document to Grace, they knew that you weren't authorized to drive a vehicle for them, correct?

MS. AQUILAR: Objection.

A. I did not drive for Grace.

Q. Grace knew that you were not authorized to drive a vehicle, based on the submission of this identification card, right?

A. Correct.

Q. Network also knew that you were

L. ALVES

not authorized to drive a vehicle, based on the submission of this identification card, correct?

A. Yes, correct.

Q. While you were employed by Network, were you required to attend safety meetings?

A. Yes, I do.

Q. Those safety meetings, they were held on the job site, correct?

MS. AQUILAR: Objection.

A. Some were on the job sites and some would be at the yard.

Q. Whenever you attended a safety meeting, you were compensated for that time, correct?

MS. AQUILAR: Objection.

A. No, I didn't.

Q. How often were the safety meetings held at the job site?

A. Once a week.

Q. Over the course of your employment, a majority of the safety meetings were held at the job site,

L. ALVES

correct?

MS. AQUILAR: Objection.

A. Correct.

Q. When you attended the safety meetings that were at the job site, you were compensated for the time spent at that safety meeting, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. When a safety meeting was at the yard, who conducted those safety meetings?

A. Usually Kenny, most of the time, and Brian so.

Q. Kenny or Brian would conduct the safety meetings at the yard?

A. Correct.

Q. Only on occasion you would go to the yard for the safety meetings, correct?

MS. AQUILAR: Objection.

A. Every time that I was working on this area Westchester Avenue.

Q. You only went to the yard for

L. ALVES

safety meetings when you were working in Westchester?

A. Yes, correct.

Q. How long were these safety meetings?

A. It always depends, sometimes half an hour, 45 minutes.

Q. Did you ever miss a safety meeting?

A. No, never missed one.

Q. Are you aware that Network keeps data as to whether an employee misses a safety meeting; are you aware of that?

MS. AQUILAR: Objection.

A. I don't know.

Q. If the data indicates that you missed approximately 30 percent of the safety meetings, would that be accurate?

MS. AQUILAR: Objection.

A. I don't know.

Q. You don't recall there ever being one occasion where you missed the safety meeting?

A. Yeah. It wasn't -- maybe once

L. ALVES

or twice happened, because the weather.

Q. Because the weather?

A. Yes.

Q. Did you ever miss a safety meeting for personal circumstances?

A. Never.

Q. Did you ever miss a safety meeting because you were sick?

A. No.

Q. When you missed a safety meeting because of the weather, isn't it true that other Network employees were able to attend those safety meetings?

A. Yes, we were working at different job sites, you know, some people were taken, some people were late, and some people never showed up.

Q. Were you ever disciplined for missing a safety meeting?

A. No.

Q. Were you ever docked any sort of pay for missing a safety meeting?

A. No.

Q. Did you ever complain to anyone

L. ALVES

that you weren't being paid for safety meetings?

A. No, I didn't.

Q. These safety meetings, they were not mandatory were?

MS. AQUILAR: Objection.

A. They were mandatory.

Q. Were you ever instructed that you couldn't work a day that you missed a safety meeting?

A. I heard rumors that if you miss a certain amount, maybe they could have lay you off.

Q. But, you're not aware of that happening to anyone, correct?

A. No.

Q. They were just simply rumors, correct?

MS. AQUILAR: Objection.

A. Yeah.

Q. Where did you hear that rumor?

A. The job site.

Q. Who told you?

A. You know, laborers they talk.

L. ALVES

Q. Who specifically told you?

A. No.

Q. You can't recall?

A. No, I can't recall.

Q. Are you aware of any other employees who were disciplined for not attending a safety meeting?

A. No.

MR. GROMMETT: Please mark Alves Exhibit 5.

(Whereupon, Alves Exhibit 5, Text messages, was marked as for identification as of this date by the Reporter.)

I just marked as Alves Exhibit 5 at the top Angelo former. It appears to be a text message, which was just produced to me approximately ten minutes before this deposition.

Q. Mr. Alves, do you recognize this document?

A. Yes, I do.

Q. Is it fair to say that this is a text message exchange you had with your

L. ALVES

foreman?

A. It's looks like it is the same one I send.

Q. On October 17, 2022 you said, "good morning Angelo sorry that I can't make today. Last night I left the lights on in my car and I just can't start it I try to get to work when I finished with the problem, TKU", correct?

A. Correct.

Q. So, you missed work on October 17, 2022, correct?

A. Correct.

Q. Are you aware of whether there assistant was a safety meeting on October 17, 2022?

A. No, I don't know.

Q. If I told you, you were compensated for that day, would that be accurate?

MS. AQUILAR: Objection.

A. I don't know.

Q. Were there instances where you called out sick or for personal

L. ALVES

circumstances and you were still compensated for that day?

A. I don't know.

Q. You get a pay stub every week, correct?

A. Correct.

Q. It says the amount of hours that you worked in that week, correct?

A. Correct.

Q. There have been a handful of times where you're not able to make it to work, whether you were sick or here you had a personal circumstance, correct?

A. Correct.

Q. Times where you missed work due to those circumstances, your pay stub included additional time that you actually didn't work, correct?

MS. AQUILAR: Objection.

A. I only got paid for the hours I worked.

Q. You don't ever recall a circumstance in which you were you paid for a day that you were out, due to personal

circumstances?

A. No.

MR. GROMMETT: Please mark Alves Exhibit 6.

It's another screen shot of a text message.

(Whereupon, Alves Exhibit 6, Text message, was marked as for identification as of this date by the Reporter.)

Q. That says, Angelo former at the top. Do you recognize this document?

A. Yes, I do.

Q. If you jump to the middle of the page, January 3, 2023. It says, "safety meeting on job TOM", correct?

A. Correct.

Q. Was this Angelo telling you that the safety meeting was at the job site tomorrow, January 4 2023?

A. Correct.

Q. You were compensated for your time spent at that safety meeting, correct?

MS. AQUILAR: Objection.

L. ALVES
A. Correct.
MR. GROMMETT: Mark this as Alves Exhibit 7.
This is another text message screen shot.
(Whereupon, Alves Exhibit 7, Text message, was marked as for identification as of this date by the Reporter.)
Q. This states, Angelo former at the top. Mr. Alves, do you recognize this document?
A. Yes, I do.
Q. Jumping to the middle where it says, January 10, 2023 at 7:45 p.m., you text Angelo and say, "sorry brother is there a safety meeting tomorrow at Pelham yard, correct?
A. Correct.
Q. Angelo responds, "no, on the job", correct?
A. Yes.
Q. So, the safety meeting that was held on January 11, 2023, based on this

L. ALVES

text message was at the job site, correct?

A. Correct.

Q. Because it was at the job site, you were compensated for time spent at that safety meeting, correct?

MS. AQUILAR: Objection.

A. Correct.

MR. GROMMETT: This is another text message screen shot that says Angelo former at the top of the page.

Mark this as Exhibit 8.

(Whereupon, Alves Exhibit 8, Text message, was marked as for identification as of this date by the Reporter.)

Q. Do you recognize this document?

A. Yes, I do.

Q. At the top of the document in white, this is a text message from Angelo, correct?

A. Correct.

Q. It says, "no worries, I'll try to get you in half or full day if nobody notices, correct?

L. ALVES

A. Correct.

Q. This means you were compensated for time that you were not spent at the job site, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Your testimony earlier, where you were paid for time that you did not make it to the job isn't actually accurate, there were circumstances where Angelo made sure you were paid for that time?

MS. AQUILAR: Objection.

A. Correct.

Q. Do you recall how many times you were paid for days that you didn't make it into work?

A. I don't know.

Q. Approximately five times?

MS. AQUILAR: Objection.

A. I don't know.

Q. More than five?

MS. AQUILAR: Objection.

A. I don't know.

MR. GROMMETT: This is another

L. ALVES

screen shot that states Angelo former at the top.

Mark this as Exhibit 9.

(Whereupon, Alves Exhibit 9, Text message, was marked as for identification as of this date by the Reporter.)

Q. Do you recognize this text message?

A. Yes, I do.

Q. This is a text message exchange you had with Angelo, your foreman?

A. Yes.

Q. In the middle of the page March 21, 2023. "We have a safer stand down W meeting tomorrow on Hoyt Street under the bridge", correct?

A. Correct.

Q. Is this referring to the safety meeting?

A. Yes.

Q. When he is saying the meeting is on Hoyt and 19th Street, under the bridge. That is the job site, correct?

L. ALVES

A. Correct.

Q. Because this was at the job site you were compensated for time spent, correct?

MS. AQUILAR: Objection.

A. Yeah.

Q. Correct?

A. Yes.

MR. GROMMETT: Mark this as Alves Exhibit 10.

(Whereupon, Alves Exhibit 10, Text message, was marked as for identification as of this date by the Reporter.)

Q. Again, this is another text message screen shot at the top, it states, Angelo former. Do you recognize this document?

A. Yes, I do.

Q. Is this a text message exchange you had with your foreman Angelo?

A. Yes.

Q. Near the bottom of the page, there's a picture, correct?

L. ALVES

A. Correct.

Q. This is a picture of you on a fishing charter, correct?

A. Correct.

Q. At the bottom of the picture that's you, correct?

A. Correct.

Q. The person right above you wearing a Levi shirt, that's Angelo, correct?

A. Correct.

Q. The person above him in a red sweat shirt, who is that?

A. That's Rolando.

Q. Can you spell that?

A. R-O-L-A-N-D-O.

Q. Rolando, he is a Network employee?

A. Yes, he is.

Q. He is still employed?

A. Still.

Q. Have you discussed this lawsuit with Rolando?

A. No.

L. ALVES

Q. Do you have any text messages with Rolando?

A. No, pretty much, I don't have much of any -- What's up and stuff like that, it doesn't work.

Q. You testified that you would learn the job site, that you were working on every day, based on text messages from Angelo, correct?

A. Correct.

Q. There appears to be gaps in the time of the text messages that you produced.

Are there any other text messages that we should be aware of?

A. No, that's pretty much what I have. I deleted most of the stuff when I left.

Q. When did you delete the text messages?

A. I was just trying to clean my phone.

Q. Did you go in and delete it?

A. Yes.

L. ALVES

Q. Just specific messages or entire e-mail or entire chains?

A. No, certain amount I've done.

Q. You deleted text messages you had with Angelo?

A. Some, yes.

Q. What period of time did you delete your text messages with Angelo?

A. I think the first year or the second year, I want to start saving for the last year, the 23rd I think. Most of the message that was deleted.

Q. If I represent to you the first text message that you produced was September 29, 2022?

A. Right.

Q. You don't have any text messages prior to that?

A. No, prior to that, I don't have any.

Q. You deleted all of those text messages, correct?

A. Yes.

Q. What date did you delete all

L. ALVES

those text messages?

A. I can't tell you, I don't remember.

Q. Did you delete them after this lawsuit was commenced?

A. No, I didn't.

Q. It appears that the last text message you produced with Angelo is from August 2, 2023.

Do you have any text messages with Angelo after that date?

A. No, I don't have.

Q. But, you worked until October of 2023?

A. Correct.

Q. Angelo would have had to text you between August and October of 2023 to tell you the job site that you were working on, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Why don't you have those text messages?

MS. AQUILAR: Objection.

L. ALVES

A. Because it was prior -- I took like a month vacation. That was my last day on October 20 or whatever. I took a month vacation, when I came back, I called direct to try to talk with no text message.

Q. Your vacation was in October of 2023, right?

MS. AQUILAR: Objection.

A. Sometime around that, yeah.

Q. You worked for Network Infrastructure between August 2, 2023 and let's say October 1, 2023, correct?

A. Yeah, let's say that.

Q. You're not in possession of any text messages during that period of time with Angelo?

A. No.

Q. Why not?

MS. AQUILAR: Objection.

A. There was a rejection when I came back. Somebody else was running the crew, and they put me on hold.

Q. Who was running the crew after Angelo?

L. ALVES

A. A certain guy named Ernesto.
Q. Did you ever text with Ernesto?
A. I deleted.
Q. All of your text messages with Ernesto have been deleted?
A. Yes.
Q. Why didn't you delete all your text messages with Angelo?
MS. AQUILAR: Objection.
A. He was not an important person for me, so I didn't consider it.
Q. So, you were a member of Local 60 while you were employed by Network, correct?
A. Correct.
Q. Local 60, that's the Laborers International Union of North America, Local Number 60, correct?
A. Correct.
Q. So I'm gonna refer to that union as Local 60; do you understand that?
A. Yes.
Q. Did you ever work for Network as a member of Local 731?

L. ALVES

A. No, I didn't. I provided them documentation from 731, but moving to Westchester they made me change -- transferred both to Local 60 to work on that area.

Q. You never produced Network with the Local 60 documents?

A. Now the documents I provided was after, initially I provided 731 documentation.

Q. But, as of your first day at Network, you were a local 60 member?

A. I was Local 60. I have as Local 60.

Q. Local 60 has a collective bargaining agreement with Network, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. As a member you're familiar with the rules and requirements of that collective bargaining agreement, correct?

MS. AQUILAR: Objection.

A. Correct.

MR. GROMMETT: Alves Exhibit

11.

(Whereupon, Alves Exhibit 11, Collective Bargaining agreement, was marked as for identification as of this date by the Reporter.)

I just marked as Exhibit 11, the document says in the top left corner, Laborers International Union of North America Local 60.

Bate's stamped DEF 017092, it goes all of the way through bate's stamp DEF 017919.

Q. Mr. Alves, do you recognize this document?

A. Yes, I do.

Q. This is a copy of the collective bargaining agreement between Network Infrastructure and Local 60, correct?

A. Correct.

Q. This is the collective bargaining agreement was that in effect while you were employed by Network, correct?

L. ALVES

A. Correct.

Q. If you refer to article four which is in the bottom right, no page nine.

It states, middle of the page states, working rules; do you see that?

A. Yes.

Q. Isn't it true that the Local 60 collective bargaining agreement governs the hours that you worked in a day?

MS. AQUILAR: Objection.

A. I don't know.

Q. You don't know whether the collective bargaining agreement set forth the specific hours that you're supposed to work in a day?

MS. AQUILAR: Objection.

A. I don't know.

Q. Article four, if you go down to C. It says, "new employees sent to an employer are required to report as directed to the work site one half hour before scheduled start time for required safety and document instruction", correct?

A. Correct.

L. ALVES

Q. Is that referring to the safety meetings on the job site?

MS. AQUILAR: Objection.

A. Don't know.

Q. So, if you go to Article 7, which in the bottom right, it'll say page 11.

Do you see where it says Article 7, hours of work, premium pay, shifts?

A. Yes, I do.

Q. So, based on this article, the local 60 collective bargaining agreement governed the hours that you worked in the day, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Based on this article, the Local 60 collective bargaining agreement governed when you were entitled to premium pay, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Based on this article the Local

L. ALVES

60 collective bargaining agreement governed the shifts that you would work, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. You were compensated in accordance with the terms of this collective bargaining agreement, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. You never submitted a written complaint about unpaid wages to Local 60, correct?

A. No, I never did.

Q. Isn't it true that the Local 60 collective bargaining agreement includes a grievance procedure where you can advise the union of complaints you have in the workplace?

MS. AQUILAR: Objection.

A. I don't know.

Q. Did you ever communicate with Local 60 shop stewards?

A. Every different job is different shop stewards. Some of them have

L. ALVES

a good knowledge about it and some doesn't.

Q. You said you were a Local 60 member when you worked for various different employers.

When you were a Local 60 member, did you ever communicate concerns that you had to a shop steward?

A. Yeah, all of time.

Q. But, in this instance, you never had any discussion with your shop steward about alleged unpaid wages from Network, correct?

A. We didn't have -- actually, yes, we did have a shop steward, but I never mentioned anything about it.

Q. Some of your coworkers were members of different unions, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. What were the other unions that Network employees are members of?

A. Laborers I know, Local 731, Local 60 and I think Local 1010.

Q. Are you aware of Local 1298?

L. ALVES

A. No.
Q. Are you aware of local 1010?
A. Yes.
Q. Who does local 1010 represent?
A. Cement work, stone work, but they kind of get involved at different areas, pretty much what every one does.
Q. Local 1010 has a different collective bargaining agreement with Network, correct?
A. Correct.
Q. What about Local 15?
A. Local 15 is pretty much machinery excavators.
Q. Local 15 has a different collective bargaining agreement with Network, correct?
A. Correct.
Q. What about Local 14?
A. I don't really know.
Q. What about Local 1536?
A. I don't know.
Q. Are there any other unions that you're aware of?

L. ALVES

A. No.
Q. What about Local 731?
A. Yes, I was a member.
Q. Local 731 has a different collective bargaining agreement with Network, correct?
A. Correct.
Q. The terms and conditions of employment for each of your co-workers would differ, based on the terms of their specific collective bargaining agreement, correct?
MS. AQUILAR: Objection.
A. Correct.
MR. GROMMETT: I may have some more questions. Off the record.
(Whereupon, a brief recess was taken.)
EXAMINATION BY
MS. AQUILAR:
Q. Mr. Alves, do you know that you are a Opt in plaintiff in this Network lawsuit?
MR. GROMMETT: Objection.

L. ALVES

A. Yes.

Q. Do you know what are the claims that we are bringing?

A. Yes, I do.

Q. What are the claims?

MR. GROMMETT: Objection.

A. For unpaid hours for the driving.

Q. Is that something else that brings this lawsuit?

MR. GROMMETT: Objection.

A. Yes.

MR. GROMMETT: Are you looking at something under the table?

THE WITNESS: No.

MR. GROMMETT: I just wanted to the make sure.

BY MS. AQUILAR:

Q. There is something else that we are bringing this lawsuit?

THE REPORTER: I'm sorry.

Q. Is there something else that we are bringing in this lawsuit?

MR. GROMMETT: Objection.

L. ALVES

A. Yes, just the working unpaid hours.
Q. What was your position at Network?
A. I was a laborer.
Q. Did you have any other position?
A. No, I did not have any other position.
Q. Were you required to drive when you were working for Network?
MR. GROMMETT: Objection.
A. Not in the beginning, I was asked to drive after the second year, when they start needing extra trucks to bring to the job. Yes, I had to drive to bring an extra truck to the job site.
Q. For how long were you required to drive the truck?
A. For about three months.
Q. Which type of truck were you required to drive?
A. It was a dump truck.
Q. Who told you to drive the

L. ALVES

truck?

MR. GROMMETT: Objection.

A. Angelo, who was my foreman.

Q. It is fair to say that you were instructed by one of the employees of Network to drive a truck?

MR. GROMMETT: Objection.

A. Correct.

Q. During the time that you were required to drive the truck, how was your schedule?

A. My scheduled hours was at the job site from 7:00 to 3:30, but when we are not working overtime. Working overtime was different -- could have been two hours extra, and leaving the yard at 6:00 and coming back whatever time it took. Probably around and hour and a half to cross the bridge to drive back to the yard, an hour and a half.

Q. At some point were you required to arrive at the yard?

A. I had to be there at 6:00 in the morning.

L. ALVES

Q. What was the location of the yard?

A. The yard is located at -- real close to BJ's in Pelham and Mount Vernon area.

Q. Once you arrived at the yard, what would you do there?

MR. GROMMETT: Objection.

A. I had to unload the garbage, left from the day before.

Q. Would you do something else?

MR. GROMMETT: Objection.

A. Checking the oil, that maintain databases, everyone was operating trucks.

Q. How long will that take?

A. Between dumping the garbage and checking the -- I would say 15 to 30 minutes.

Q. Do you use any materials on the job site?

A. Sometimes we used to load stuff that we were missing at the job site, painting for plates and stuff like that. Chisels for the jack hammers and picking it

up, stuff like that.

Q. It is fair to say that you were required to get materials from the yard to the job site?

MR. GROMMETT: Objection.

A. Yes, a couple of times, yes.

Q. I just want to refer to exhibit 9. If you can look at the Exhibit 9?

MR. GROMMETT: Just for clarity it is Alves Exhibit 9. I was not naming them in previous depositions, based on the Opt in plaintiff's name.

I just want to be clear, everything is marked as Alves.

MS. AQUILAR: Okay.

Q. Let me know when you find Exhibit 9.

A. Okay.

Q. You previously testified that those text messages, are text messages between you and Angelo, your foreman; is that correct?

A. Correct.

Q. If you see on the bottom page,

L. ALVES

he says, "Hey, can you grab yellow paint tomorrow please"; was that a text message from Angelo?

A. Yes, it is.

MR. GROMMETT: Can you give me a moment?

MS. AQUILAR: Sure.

Q. You answered, "from Pelham yard"; is that correct?

A. Correct.

Q. Is it fair to say that you were required to bring materials from the yard to the job site?

A. Correct.

Q. It is fair to say that those orders were from a Network employee?

A. Correct.

Q. So, you previously testified you arrived at the yard, you checked the car, and then you loaded the truck. Did you do something else?

MR. GROMMETT: Objection.

A. No, I used to pick up my foreman at his house and Pelham Bay.

L. ALVES

Q. Who told you to pick up the foreman?

A. At that point he had a problem with his car, and he wants the ride with the truck, so I used to drive up to his place and pick him up.

Q. It is fair to say that was an order made by one of Network's employees?

MR. GROMMETT: Objection.

A. Ernesto Rodriguez also, he used to ride with us.

Q. What was position of Ernesto?

A. He was also laborer.

Q. Did he tell you to load the trucks in the morning at the yard?

A. Yes, he used to help me.

Q. Did Network track the hours when you arrived to the yard?

MR. GROMMETT: Objection.

A. No.

Q. Did you have to sign any time sheet when you arrived at the yard?

MR. GROMMETT: Objection.

A. No, we did not.

L. ALVES

Q. Is it fair to say that Network Infrastructure did not track your hours when you arrived to the yard?

MR. GROMMETT: Objection.

A. No.

Q. Do you know if you were compensated for the time that you arrived at the yard?

A. I was not compensated for that.

Q. When you arrived to the job site, did you have to sign any timesheet?

A. No, I didn't.

MR. GROMMETT: Objection.

Q. Did the Network Infrastructure track the hours when you arrived to the job site?

MR. GROMMETT: Objection.

A. To the job site, yes, before I started working. I had to sign a timesheet.

Q. When you finished working at the job site, did you have to sign anything?

MR. GROMMETT: Objection.

L. ALVES

A. No, I did not have to sign anything.

Q. When you finished working at the yard, what would you do?

MR. GROMMETT: Objection.

A. I used to go to and sometimes when you have garbage you unload it and go home.

Q. You just have to go to where?

A. From the yard to my house.

Q. Okay, so when you finished working at the job site, would you come back to your house?

A. To deliver my foreman, and then drive to the yard, and then go to my house.

Q. You would have to drop off your foreman at the house and then go straight to the yard?

A. Correct.

Q. Once you arrived to the yard in the afternoon, what would you have to do?

MR. GROMMETT: Objection.

A. To the yard in the afternoon, I had to unload the garbage.

L. ALVES

Q. How long would it take?

MR. GROMMETT: Objection.

A. It depends on the amount garbage that I have loaded in the back of the truck. Sometimes half an hour, some times less than that.

Q. Could you describe the traffic from the job site to the yard?

A. Between hour and a half to two hours.

Q. What was your normal schedule when you were working at the job site?

MR. GROMMETT: Objection.

A. Be at the job site at 7:00 a.m., in the morning. Depends on the area as to start at 9:00, some areas 8:00, but I had to be there at 7:00 a.m.

Q. Were you compensated before starting working at the job site?

MR. GROMMETT: Objection.

A. We were paid eight hours, from 7:00 to 3:30.

Q. I just want to refer you to Exhibit 2, that is the pay stub.

L. ALVES

A. Yes.
Q. Looking at the copy of the paycheck, is that the rate that you used to get from Network?
A. Yes, it is.
Q. Is it fair to say that the pay stub shows the correct rate, but it doesn't show the correct number of hours?
MR. GROMMETT: Objection.
A. Correct.
Q. This time, the regular time and overtime, does this time correspond to the time working only at the job site?
MR. GROMMETT: Objection.
A. Yes, that is only for the job site.
Q. At any time do the times reflect the time that you worked at the yard or traveling time?
MR. GROMMETT: Objection.
A. No, that does not have any hours for that work at the yard and traveling time.
Q. Is it fair to say that this pay

L. ALVES

stub does not reflect accurately the time that you worked at the yard and travel time?

MR. GROMMETT: Objection.

A. Correct.

Q. I want to go to Exhibit 3, that is the time card. If you go to the second page.

When you finish working at the job site, what time it will be, what time did you usually finish working at the job site?

MR. GROMMETT: Objection.

A. At the job site, usually 3:30 in the afternoon.

Q. You previously testified that it would take between an hour and two hours to get back to the yard, correct?

MR. GROMMETT: Objection.

A. Correct.

Q. If you look at the top, it says that the record shows that you finished work at 4:30 p.m., does this reflect the time that you have to take from the job

L. ALVES

site to the yard?

MR. GROMMETT: Objection.

A. After that time 4:30, plus another hour, hour and a half to get to the yard.

Q. That is the reflected time that you have to spend cleaning and taking out of the trash?

MR. GROMMETT: Objection.

A. Correct.

Q. Were you the only one required to arrive at the yard?

MR. GROMMETT: Objection.

A. No, they had a bunch of different workers, excavators, teamsters, machine operators, also they had welders.

Q. At any time, did Network Infrastructure pay you for the time that you spend at the yard?

MR. GROMMETT: Objection.

A. No.

Q. At any time, did Network Infrastructure pay you for the travel time between the yards and the job sites?

L. ALVES

MR. GROMMETT: Objection. How many times are you going to ask the same questions?

MS. AQUILAR: I just wanted to clarify.

MR. GROMMETT: The thing is, you can't just keep asking the same questions over and over.

I've given you leeway in terms of the leading questions, but you're not able to lead your own witness either.

I feel like we could cut back on a lot of the same repetitive questions here.

MS. AQUILAR: Okay. I just wanted to clarify that.

Q. Do you know if there is any policy that Network Infrastructure did not pay for all of the hours worked?

MR. GROMMETT: Objection.

A. I don't know.

Q. Did you know this policy also applies to other employees of Network

L. ALVES

Infrastructure?

MR. GROMMETT: Objection.

A. I don't know.

Q. You previously testified that you were required to attend safety meetings; is that correct?

A. Correct.

Q. How often was that requirement?

A. Once a week.

Q. Did you know those safety meetings were mandatory?

MR. GROMMETT: Objection.

A. Yes, I knew it.

Q. Who told you to attend the safety meetings?

A. The foreman and safety, they had a manager for the safety on the job site. It was mandatory.

Q. Where do the safety meetings take place?

MR. GROMMETT: Objection.

A. During the period of time that I worked in Westchester, it took place in a yard by in Pelham nearby BJ's, and during

L. ALVES

the period of time that we were working in -- sorry, it had a different location it depends how advanced the excavation was, sometimes a block or two blocks, but, two or three blocks away, but out in Astoria.

Q. I just want to show you Exhibit 7, that is another text message.

In the middle of the page you said, "Hi Angelo, sorry to bother, is there any safety meeting tomorrow at Pelham yard."

You were asking these questions because the safety meetings, at times were held at the yards?

MR. GROMMETT: Objection.

A. Correct.

Q. Do you know if any other Network employees were required to arrive to the safety meetings?

MR. GROMMETT: Objection.

A. Every single one.

Q. What other positions?

A. Laborers, flaggers, machine operators, truck drivers, everybody

L. ALVES

involved in the excavation, laying out pipes, welders.

Q. When the safety meeting was held at the yard, what time do you usually start?

A. Around 7:00, I had to be there early to get a sure parking spot, but it usually took place around 6:30 or 7:00.

Q. Were you compensated for that time?

MR. GROMMETT: Objection.

A. No.

Q. Is it fair to say that Network Infrastructure employees were required to safety meetings without compensation?

MR. GROMMETT: Objection.

A. We took safety meetings, different areas, different place, different hours. Sometimes a job site start from 7:00 -- depends it could vary depending on the area we were working.

MS. AQUILAR: I don't have any further questions.

EXAMINATION BY

L. ALVES

MR. GROMMETT:

Q. Mr. Alves just so I'm clear, your claims only relate to the times that were you driving a truck, correct?

A. Correct.

Q. When you were a laborer, you feel like you were compensated appropriately throughout the duration of your employment, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. You were just asked several questions by your counsel, did you in any way rehearse that with your attorneys?

A. Sorry, I didn't understand.

Q. You were just asked questions by your attorneys, were you ever asked those questions before?

MS. AQUILAR: Objection.

A. No.

Q. So, you testified that you were unloading garbage when you arrived at the yard when you were questioned by your attorney, correct?

L. ALVES

A. Correct.

Q. Which one is it, because you previously testified that you would unload the garbage when you would get back to the yard, not when you'd arrive to the yard?

MS. AQUILAR: Objection.

A. I get back to the yard.

Q. So, you only unloaded garbage when you got back to the yard, correct?

A. Correct.

Q. You previously testified that the only task you performed when you arrived to the yard as a driver was to scan the QR code?

MS. AQUILAR: Objection.

A. What's that?

Q. At no time did you load the truck with equipment, because the truck was parked in the street for you, correct?

MS. AQUILAR: Objection.

A. The truck was parked in the yard.

Q. But, Network Infrastructure, they had specific employees that only work

L. ALVES

at the yard, correct?

MS. AQUILAR: Objection.

A. Correct, they have a yard person.

Q. That yard person does various tasks around the yard, they don't go to the job site, correct?

A. No, they don't go to the job site.

Q. That yard person, one of their responsibilities is making sure all the trucks are properly loaded, correct?

A. Correct.

Q. That yard person, one of their responsibilities is also to take the truck and park in a position where you can drive it off to the job site, correct?

MS. AQUILAR: Objection.

A. Sometimes.

Q. The truck, when you arrived to the yard is always preloaded by yard employees, correct?

MS. AQUILAR: Objection.

A. No, we had to load ourselves.

L. ALVES

Q. Well, which one is it, you just testified that there were yard personnel that loaded the truck, now you're saying that you had to load the truck personally?

MS. AQUILAR: Objection.

A. I had to load the truck myself.

Q. What did you load the truck with then?

A. Whatever material needed, required on the job site.

Q. Give me the name of one piece of material?

A. Sometimes, running paint for the plates, chisels.

Q. What's that?

A. Chisels for jack hammers, whatever we need on a job site.

Q. These would be like minor odds and ends that would not be on the truck already?

MS. AQUILAR: Objection.

A. Correct.

Q. For the most part the yard employee loaded all of big equipment that

L. ALVES

needed to go to the job site, correct?

MS. AQUILAR: Objection.

A. They had a machine operated that operated there, if it was soft they put it in the back of the other trucks to carry it out to the job site.

Q. I am going to go back to what was previously marked.

You previously testified about also Alves Exhibit 9.

Do you recall answering questions about Alves Exhibit 9 when questioned by your attorney?

A. Yes.

Q. You testified that this was a text message where you were asked to pick up paint, correct?

A. Correct.

Q. But, you weren't actually asked to pick up paint, right?

A. I had to pick up.

Q. Now is your chance to explain that this was a miscommunication.

MS. AQUILAR: Objection.

L. ALVES

A. No, that was, I had to bring a certain amount of paint to the job site.

Q. This specific text message you weren't being asked to pick up paint, correct?

A. Yeah, I was being asked to pick up paint.

MR. GROMMETT: Mark Alves Exhibit 12.

(Whereupon, Alves Exhibit 12, Text message, was marked as for identification as of this date by the Reporter.)

Q. This is another text message screen shot that says, Angelo former, do you recognize this document?

A. Yes, I do.

Q. At the top it says, "hi, can you grab yellow paint tomorrow, please?"

A. Yes, I recognize that.

Q. So, this is a continuation of what you read off in Alves Exhibit 9, correct. Feel free to refer to the exhibit.

L. ALVES

What has just been marked as Alves Exhibit 12, appears to be a continuation of the text message that's been marked as Alves 9, correct?

A. This is another pickup for paint.

Q. If you look at Alves 8. It says, "hey, can you grab yellow paint?" With a paint emoji, and it says, "tomorrow please"?

A. Yes.

Q. Then you respond, from Pelham yard, correct?

A. Correct.

Q. Then, in Alves Exhibit 8, Angelo states, "from Hempstead if they have any", correct?

A. Correct.

Q. Then, in Alves Exhibit 8 you say, "this is Lourenco", correct?

A. Correct.

Q. If you compare that to Alves Exhibit 12, at the top it says, hey, with the same double space, "can you grab yellow

L. ALVES

paint" with a paint emoji, "tomorrow please", correct?

A. Correct.

Q. Do you see how Alves exhibit 12 is a continuation of what's already in Alves 8?

A. I think it is different. It says a date, 22 and here is 21.

Q. Mr. Alves, what is marked as also Alves 9, the date of that text message string, it states in the middle of the page, March 21, 2023; do you see that?

A. I see that.

Q. Then, the last text that you have is, "this is Lourenco", right?

A. Correct.

Q. Look at Alves 12. The middle of the page, the next text message occurs on March 22, 2023, correct?

A. Correct.

Q. This is an entire text message chain of what you and Angelo texted about on March 21, 2023; do you see that?

A. I see that.

L. ALVES

Q. You understand that Alves 12 is a continuation of the text message in Alves 9?

A. Yes.

Q. I'm glad we're able to clear that up.

So, Alves 9 got cut off where it says this is Lourenco, correct?

A. Correct.

Q. Then, Angelo responds ohhhhh, with five Hs, sorry, correct?

A. Correct.

Q. So, this is a text message that was sent to the wrong person, right?

MS. AQUILAR: Objection.

A. Yeah, probably.

Q. So, Angelo wasn't giving you an instruction to pick up paint, correct?

MS. AQUILAR: Objection.

A. I don't really know, I can't tell, I don't know.

Q. When he says, sorry, he didn't mean to send you the text message, correct?

MS. AQUILAR: Objection.

L. ALVES

A. No, I don't know, I don't know.

Q. You don't know what he meant by that?

A. No.

Q. You responded to that text message and you said, K, it seems like you did know what he meant by that?

MS. AQUILAR: Objection.

A. Okay, yes.

Q. So, he sent that text message to the wrong person, correct?

A. No, this message was for me.

Q. I understand that he was texting you, but when he asked you to pick up paint, he sent that text message to you, but intended to send it to somebody else, right?

MS. AQUILAR: Objection.

A. No.

Q. No, look at the top of the page. So, you clarify from Pelham yard, right, you ask a question if I'm picking up the paint from Pelham yard, right?

A. Yes.

L. ALVES

Q. Then, he says, "from Hempstead if they have any", right?

A. Correct.

Q. What's your response to that?

A. This is Lourenco.

Q. Why did you feel the need to respond in that manner?

A. I guess he probably texted wrong.

Q. So, you acknowledge that did he not mean to text you this instruction, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. When you were questioned by your attorney you said Ernesto helped at the yard, correct?

A. Yes.

Q. What did Ernesto do at the yard?

A. Ernesto, he didn't work at the yard, he was a laborer at the job site, but he used to ride with us.

Q. So, Ernesto just simply went to

L. ALVES

the yard to get a ride, correct?
A. Correct.
Q. When you were questioned by your attorney, you said that you were always paid for eight hours, correct?
A. Correct.
Q. There were times that you were paid for more than eight hours in a day?
A. When I worked overtime at the job site, yes.
Q. You were paid for that overtime, correct?
A. For the overtime, yes.
Q. You said that you were only paid for eight hours from 7:00 a.m. to 3:30 p.m., correct?
A. Correct.
Q. I'm gonna refer you back. I'm gonna refer you back to Alves Exhibit 3.
The second page. This time card states that your start time is 6:00 a.m., correct?
A. Correct.
Q. It states that your end time is

L. ALVES

4:30 p.m.?

A. Yes.

Q. You were compensated for more than eight hours that day, correct?

A. Correct.

Q. You previously testified that you ordinarily finished work at 3:30 p.m., correct?

A. Correct.

Q. You also testified that to get back to the yard, it could take anywhere from one hour to two hours, correct?

A. This is showing at 4:30, the days that would have to work overtime.

Q. How do you know that?

MS. AQUILAR: Objection.

A. They never given us credit free for an actual hour.

Q. It says right here you were paid for ten hours, so that is overtime, right?

A. Yes, overtime included.

Q. You testified that you'd always start your day anywhere from 6:00 a.m. to

7:00 a.m., correct?
A. Correct.
Q. Here it states that you were compensated for the work starting at 6:00 a.m., correct?
A. For this specific day, yes.
Q. You usually end at the job site at 3:30 p.m.?
A. 3:30, 4:30.
Q. It is possible that this time sheet includes all the time that you worked, including the travel time that day, correct?
MS. AQUILAR: Objection.
A. Not for travel time.
Q. How do you know that?
A. Travel time was never paid. Very few people working for the company were getting paid for traveling time.
Q. Who were those people that got paid for travel time?
A. People that worked there that used to -- it was machine operators were.
Q. Machine operators were paid for

L. ALVES

travel time?

A. Yes.

Q. Operating engineers were paid for travel time, correct?

MS. AQUILAR: Objection.

A. Correct.

Q. Do you know whether any of this had to do with the collective bargaining agreement?

A. No.

Q. When you were questioned by your attorney you testified that there was a specific location, Astoria that you attended safety meetings, correct?

A. Correct.

Q. That was right near the job site, correct?

A. Correct.

Q. Because you were going to the job site, you were compensated for the time spent at safety meetings in Astoria, correct?

MS. AQUILAR: Objection.

A. Correct.

L. ALVES

MR. GROMMETT I have further questions.

MS. AQUILAR: Can you give me ten minutes?

MR. GROMMETT: Yes. Off the record.

(Whereupon, a brief recess was taken.)

EXAMINATION BY

MS. AQUILAR:

Q. Just to clarify, were you required to bring materials from the yard to the job site?

MR. GROMMETT: Objection.

A. Yes.

Q. Just referring to Exhibit 9 again today, text message. At the bottom there is a part that says, hey, can you get yellow paint, you answered from Pelham yard; why did you answer in that way?

MR. GROMMETT: Objection.

A. Because sometimes I was asked to go pick it up from Hunt's point yard.

Q. Does Network Infrastructure

L. ALVES

have more than one yard?

A. Yes, they do.

Q. Is it fair to say that you answered in that way, because you were required to bring materials from the yard to the job site?

MR. GROMMETT: Objection. It's leading.

A. Yes.

MS. AQUILAR: I don't have further questions.

MR. GROMMETT: Thank you.

(Whereupon, at 1:53 P.M., the Examination of this witness was concluded.)

° ° ° °

L. ALVES

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

______________________________

LOURENCO ALVES

Subscribed and sworn to before me

this _____ day of ________________ 20___.

______________________________

NOTARY PUBLIC

L. ALVES

E X H I B I T S

ALVES EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 1 | Document | 43 |
| 2 | Pay stubs | 70 |
| 3 | Time records | 72 |
| 4 | NY State ID card | 75 |
| 5 | Text message | 82 |
| 6 | Text message | 85 |
| 7 | Text message | 86 |
| 8 | Text message | 87 |
| 9 | Text message | 89 |
| 10 | Text message | 90 |
| 11 | Collective Bargaining agreement | 98 |
| 12 | Text message | 127 |

(Exhibits retained by Counsel.)

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. GROMMETT | 4,122 |
| MS. AQUILAR | 104, 137 |

L. ALVES

INFORMATION AND/OR DOCUMENTS REQUESTED

| INFORMATION AND/OR DOCUMENTS | PAGE |
| --- | --- |
| Pay stubs for the entire period of time you worked for Network | 10 |
| Production of the Local 60 union membership card | 37 |

QUESTIONS MARKED FOR RULINGS

| QUESTION | PAGE | LINE |
| --- | --- | --- |
| (NONE) | | |

L. ALVES

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NEW YORK )

I, Kim Draper, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of January 2026.



_____________________________

Kim Draper

ERRATA SHEET
Priority-One Court Reporting/Veritext
718-983-1234

ASSIGNMENT NO. P1-7820894
CASE NAME: Calderon , Manuel Angel v. Network Infrastructure, INC. And Patrick Clarke
DATE OF DEPOSITION: 1/7/2026
WITNESS' NAME: Lourenco Alves

PAGE/LINE(S)/ CHANGE REASON
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________
____/________/__________________/___________

__________________________
Lourenco Alves

SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF________________, 20__.

_________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES__________________

**&**

**&** 3:17

**0**

**01** 72:20
**011633** 71:5
**012889** 72:21
**017092** 98:11
**017895** 75:19
**017919** 98:13
**05442** 1:7

**1**

**1** 3:17 43:17,18 60:19 95:13 140:5
**1/7/2026** 143:3
**10** 11:16 37:16 39:6 42:17 86:16 90:11,12 140:14 141:4
**10006** 2:5
**1010** 102:24 103:3,5,9
**104** 140:23
**10550** 4:13
**10:12** 1:13
**11** 86:25 98:2,3 98:7 100:8 140:15
**111** 2:5
**11797** 1:22 2:9
**12** 127:10,11 128:3,24 129:5 129:18 130:2 140:16
**127** 140:16
**1298** 102:25
**12th** 142:21
**135** 1:21 2:9
**137** 140:23
**14** 103:20
**140** 4:12 11:17 12:14
**15** 14:24 15:3 103:13,14,16 108:18
**1503** 2:5
**1536** 103:22
**17** 24:21 45:7,9 83:5,13,17
**1967** 11:16
**19th** 89:24
**1:00** 67:4
**1:53** 138:14

**2**

**2** 70:21,22 94:10 95:12 114:25 140:6
**20** 95:4 139:19 143:22
**2006** 13:15 14:19 17:17
**2008** 14:10,11
**2009** 15:12 16:4 17:14
**201** 1:21 2:9
**2016** 11:24 23:23,24 24:18 38:25
**2017** 24:18
**2021** 37:16 39:6 42:17 45:18
**2022** 57:11 83:5,13,17 93:16
**2023** 33:20,24 34:2 42:23 43:7 45:19 57:2,3,5,8 71:10 73:10 85:16,21 86:16 86:25 89:16 94:10,15,18 95:8,12,13 129:13,20,24
**2024** 33:20
**2026** 1:12 142:21
**21** 89:16 129:9 129:13,24
**22** 71:10 129:9 129:20
**23rd** 93:12
**24** 1:7 7:10
**28** 73:10
**28598** 142:23
**2887** 72:21
**29** 93:16

**3**

**3** 72:18,20,22 85:16 116:7 133:20 140:7
**3.5** 71:17
**30** 3:16 79:18 108:18
**32** 71:13
**37** 141:6

**4**

**4** 75:12,13,18 85:21 140:8
**4,122** 140:22
**43** 140:5
**45** 79:8
**48** 7:6
**4:30** 116:24 117:4 134:2,14 135:10

**5**

**5** 82:11,12,17 140:9
**500** 21:15,18
**52** 37:24,25

**6**

**6** 85:5,8 140:10
**60** 36:15,18,21 36:23 37:7,12 37:13,19 96:14 96:17,19,22 97:5,8,13,14,15

97:16 98:10,19 99:8 100:14,20 101:2,12,15,23 102:3,6,24 141:6
**600** 21:18,19
**6:30** 58:12 59:5 59:7 121:9

**7**

**7** 1:12 86:4,7 100:6,10 120:8 140:11
**70** 140:6
**718-983-1234** 143:2
**72** 140:7
**731** 38:20 96:25 97:3,10 102:23 104:3,5
**75** 140:8
**7:30** 59:17
**7:45** 86:16

**8**

**8** 87:12,13 128:8,16,20 129:7 140:12
**82** 140:9
**85** 140:10
**86** 140:11
**87** 140:12
**89** 140:13
**8:00** 62:10 63:3 114:17

**9**

**9** 89:4,5 109:9 109:9,11,18 126:11,13 127:23 128:5 129:11 130:4,8 137:17 140:13
**90** 140:14
**98** 140:15
**9:00** 57:18 59:12,15 114:17

**a**

**a.m** 1:13
**a.m.** 57:25 59:15 61:7,7 61:13,23 63:3 63:4 72:9,10 73:11 114:16 114:18 133:16 133:23 134:25 135:2,6
**abbreviating** 6:11
**ability** 7:2
**able** 53:9 59:18 59:20,22 80:13 84:12 118:12 130:6
**above** 44:12 91:9,13 139:6
**accordance** 101:7
**accumulated** 68:6
**accurate** 28:4,7 35:9 46:18,23 71:8 73:24 79:19 83:21 88:10
**accurately** 71:20 73:13,17 116:2
**acknowledge** 132:11
**action** 25:6,18 25:21,23,24 26:8 30:14,17 30:21 142:17
**actual** 5:16 134:19
**actually** 28:2 84:18 88:10 102:14 126:20
**added** 22:3
**additional** 84:18
**address** 4:11 12:14,17
**administer** 3:11
**advanced** 120:4
**advise** 101:17
**afternoon** 65:10,12 113:22,24 116:16
**ago** 31:21
**agreed** 3:5,20
**agreement** 16:10 37:4 97:17,22 98:4 98:18,23 99:9 99:14 100:14 100:20 101:2,8 101:16 103:10 103:17 104:6 104:12 136:10 140:15
**aguilar** 2:6 9:20 14:2 17:2 17:20 19:7 26:21 27:12 28:19 30:5 31:2 32:15 33:3,8 41:23 42:4,9,15 46:7 46:12,20,24 47:10 48:20,23 49:11,25 50:5 50:9,14,24 53:12 54:2,10 54:15 57:12 58:19 59:8,19 60:15 61:15,20 61:24 62:3 63:12 64:6
**alc** 1:7
**alcohol** 7:9 17:6

**alexandra** 2:6
**alleged** 102:12
**allowed** 27:8 62:8
**alves** 1:17 4:1 4:10,14 5:1 6:1 7:1 8:1 9:1 10:1 11:1,8 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1,17 43:18,23 44:1 44:13,15 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 60:18 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 70:21,22 71:1 72:1,18,19,22 73:1 74:1 75:1 75:12,13,20 76:1 77:1 78:1 79:1 80:1 81:1 82:1,11,12,16 82:21 83:1 84:1 85:1,5,8 86:1,4,7,12 87:1,13 88:1 89:1,5 90:1,11 90:12 91:1 92:1 93:1 94:1 95:1 96:1 97:1 97:25 98:1,3 98:14 99:1 100:1 101:1 102:1 103:1 104:1,22 105:1 106:1 107:1 108:1 109:1,11 109:15 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1,3 123:1 124:1 125:1 126:1,11 126:13 127:1,9 127:11,23 128:1,3,5,8,16 128:20,23 129:1,5,7,10,11 129:18 130:1,2 130:3,8 131:1 132:1 133:1,20 134:1 135:1 136:1 137:1 138:1 139:1,15 140:1,3 141:1 142:1 143:4,20
**amended** 43:23 44:15,22
**america** 42:24 96:18 98:10
**amount** 21:2 23:7 28:12 40:8 60:16 69:25 81:13 84:8 93:4 114:4 127:3
**amounts** 52:12
**analysis** 17:6
**angel** 1:3 143:3
**angelo** 27:17 27:18,25 32:18 32:19 50:20,21 56:16,16 60:5 60:8,14 67:13 82:17 83:6 85:12,19 86:11 86:17,21 87:11 87:20 88:11 89:2,13 90:18 90:22 91:10 92:10 93:6,9 94:9,12,17 95:17,25 96:9 107:4 109:22 110:4 120:10 127:16 128:17 129:23 130:11 130:18
**answer** 5:9,16 6:3 9:22 18:9 29:7,24 137:21
**answered** 5:23 110:9 137:20 138:5
**answering** 4:24 22:20 66:16 126:12
**answers** 6:23
**anybody** 12:7 41:9
**anyway** 26:24 32:20
**appears** 82:18 92:12 94:8 128:3
**application** 39:24
**applied** 20:15
**applies** 118:25
**appropriately** 122:9
**approximately** 11:24 29:11 37:25 43:7 48:25 61:7,13 61:17 79:18 82:19 88:19

**aquilar** 18:16 19:2 26:17 27:22 28:5,8 28:24 29:22 32:9,21 37:20 41:15 47:5 48:16 49:17 64:15,21 65:3 66:3,7,13,25 67:5 68:4,10 68:17 69:11 70:3 71:23 72:11,15 73:7 73:20,25 74:9 74:25 76:18 77:12,18 78:3 78:9,22 79:15 79:20 81:7,20 83:22 84:20 85:25 87:7 88:6,13,20,23 90:6 94:21,25 95:9,20 96:10 97:18,23 99:11 99:17 100:4,17 100:23 101:4,9 101:20 102:19 104:14,21 105:19 109:16 110:8 118:5,17 121:23 122:11 122:20 123:7 123:16,21 124:3,19,24 125:6,22 126:3 126:25 130:16 130:20,25 131:9,19 132:14 134:17 135:15 136:6 136:24 137:4 137:11 138:11 140:23

**area** 29:4,6,10 31:9,24 57:22 62:7 67:8 78:24 97:6 108:6 114:16 121:22

**areas** 43:11 62:7,9,11 103:8 114:17 121:19

**arrested** 15:10 15:11,15,19,22 16:3,13 17:4

**arrests** 15:13

**arrive** 107:23 117:13 120:19 123:6

**arrived** 108:7 110:20 111:19 111:23 112:4,8 112:11,16 113:21 122:23 123:14 124:21

**article** 99:3,19 100:6,10,13,19 100:25

**aside** 7:12 19:18

**asked** 26:23,25 29:19 32:12,23 40:10 53:8 56:8 106:15 122:13,17,18 126:17,20 127:5,7 131:15 137:23

**asking** 4:23 5:8 49:15 118:8 120:13

**assigned** 61:8

**assignment** 143:2

**assigns** 51:16

**assistant** 83:16

**assume** 5:18

**astoria** 29:6,10 120:6 136:14 136:22

**attend** 77:7 80:14 119:6,15

**attended** 77:15 78:5 136:15

**attending** 82:8

**attention** 22:19

**attorney** 5:21 7:13 122:25 126:14 132:17 133:5 136:13

**attorneys** 2:4,8 23:9 40:18,24 41:3 122:15,18

**august** 11:16 37:16 39:5 42:17 94:10,18 95:12

**authorization** 48:12

**authorized** 3:11 76:16,21 77:2

**avenue** 4:12 11:18 12:14 78:24

**aware** 25:9 26:10 30:2,8 41:25 51:15 79:12,14 81:15 82:6 83:15 92:16 102:25 103:3,25

**b**

**b** 140:2

**back** 23:23 24:6,9 40:14 42:25 45:8 60:18 65:16 67:23 68:14,15 74:5 95:5,22 107:18,20 113:14 114:5 116:19 118:14

123:5,8,10 126:6,8 133:19 133:20 134:12
**bailed** 15:23
**bargaining** 97:17,22 98:4 98:18,23 99:9 99:14 100:14 100:20 101:2,8 101:16 103:10 103:17 104:6 104:12 136:9 140:15
**based** 8:13 9:4 26:3 46:18 69:24 76:21 77:2 86:25 92:9 100:13,19 100:25 104:11 109:13
**basically** 52:16
**bate's** 98:11,12
**bay** 60:3 110:25
**beginning** 52:25 53:2 106:14
**behalf** 1:4
**belief** 44:19
**believe** 26:19 44:17 60:19 73:22
**best** 44:18
**big** 37:10 125:25
**bike** 13:6
**birth** 11:15
**bj's** 108:5 119:25
**block** 120:5
**blocks** 120:5,6
**blood** 17:6 142:17
**book** 37:7
**boss** 52:20
**bother** 120:10
**bottom** 44:10 45:10 71:3 75:18 90:24 91:6 99:4 100:7 109:25 137:18
**box** 51:10,20 74:14
**break** 5:25 6:4 34:20 41:8,9 70:13,14
**breathalyzer** 16:12,24
**brian** 56:14,19 78:15,16
**bridge** 89:18,25 107:20
**brief** 23:25 41:6,8 70:10 104:18 137:8
**bring** 54:14 56:3 106:16,17 110:13 127:2 137:13 138:6
**bringing** 25:6 48:8 105:4,21 105:24
**brings** 105:11
**broadway** 2:5
**bronx** 61:6
**brother** 86:17
**brought** 21:25 24:23 25:2 40:3
**bunch** 31:6 63:14 117:15

**c**

**c** 2:2 4:2 33:13 99:20 139:2 142:2,2
**cac** 19:20 21:21 21:22,25 22:2 22:5 23:2,5,6 23:10,17 24:11 24:12,14,17,20 25:2 31:4 34:16,18 40:3 40:4,15,15,19 54:6
**calderon** 1:3 143:3
**call** 10:17 37:18
**called** 4:2 25:17 40:11 56:16 74:23 83:25 95:5
**car** 13:10,11,12 13:16,21,25 14:6,9,12,14 83:8 110:21 111:5
**card** 36:24 37:2 37:19 75:14,21 76:7,22 77:3 116:8 133:22 140:8 141:6
**carlos** 55:22 56:4,18
**carry** 126:7
**case** 1:6 8:18 16:11,14 19:14 21:5,22 22:11 22:23 23:2,5 23:10,17,19 25:17 30:12 143:3
**cases** 22:4,9
**cassio** 35:25
**cement** 35:6 103:6
**certain** 81:13 93:4 96:2 127:3
**certification** 3:8 38:19

**certifications** 38:15,16
**certify** 139:4,8 142:10,15
**chain** 129:23
**chains** 93:3
**chance** 126:23
**change** 97:4 143:5
**changed** 56:5
**charter** 91:4
**check** 70:16
**checked** 110:20
**checking** 57:20 108:14,18
**chisels** 108:25 125:15,17
**circumstance** 84:14,24
**circumstances** 80:6 84:2,17 85:2 88:11
**city** 31:8 37:6
**civic** 13:13 14:19 17:17
**civil** 1:19 19:14
**claim** 26:20
**claiming** 53:15
**claims** 20:11 21:24 22:5 25:10,12 54:9 105:3,6 122:4
**clarify** 20:21 118:6,18
131:22 137:12
**clarity** 109:10
**clarke** 1:9 2:13 4:18,20,21 6:7 25:7 143:3
**class** 25:17 26:7 30:14,17 30:17,21
**clean** 92:22
**cleaning** 117:8
**clear** 18:12,21 49:16 109:14 122:3 130:6
**close** 69:6 108:5
**code** 52:3 64:22 64:25 74:7,11 74:14,19 123:15
**collective** 25:18 25:21,23 97:16 97:22 98:4,18 98:22 99:9,14 100:14,20 101:2,8,16 103:10,17 104:6,12 136:9 140:15
**collectively** 6:8
**come** 64:7 113:13
**coming** 24:9 37:6 107:18
**commenced** 94:6
**commission** 143:25
**communicate** 101:22 102:7
**communicated** 8:2,6
**companies** 31:7 31:10,12 33:11 34:18 54:18
**company** 39:15 61:5 135:19
**compare** 128:23
**compensated** 77:16 78:7 83:20 84:3 85:23 87:5 88:3 90:4 101:6 112:8,10 114:19 121:10 122:8 134:4 135:5 136:21
**compensation** 121:16
**complain** 53:19 80:25
**complaint** 101:12
**complaints** 101:18
**complete** 64:19
**completed** 65:22
**component** 55:3
**con** 57:19 67:7 67:11,15,17
**concerns** 69:9 102:7
**concluded** 138:16
**conclusion** 69:21
**conditions** 104:9
**conduct** 17:5 78:16
**conducted** 78:12
**confidence** 53:5
**confusing** 22:19
**consider** 96:12
**consistent** 63:10
**construction** 19:23 20:2,5 20:10,17 21:5 21:12 22:5,12 22:23 23:22 24:4,25 30:13 45:17 54:5
**consumed** 7:9

**contact** 40:10
**content** 17:7
**continuation** 127:22 128:4 129:6 130:3
**contractor** 35:14
**convicted** 15:8 16:16,17
**conviction** 16:20 17:10
**convictions** 15:6
**copy** 3:14,17 27:6 32:10 35:2 53:2 71:9 98:17 115:3
**corner** 71:3 75:19,21 98:9
**correct** 5:17 11:19,20 12:15 12:16 16:25 18:7 19:8,23 19:24 22:6,7 22:10 24:5 27:11 29:25 30:10,23 31:15 33:14 40:17,22 41:14,16 42:13 42:14,18,19 43:8 44:19,20 44:23 45:4,5 45:19,20 46:2 46:3,6,8,11,13 46:19,21,25 47:4,6,9,11 48:13,17,19 50:8,10,13,15 52:8 53:18 54:21 55:5,6 56:13 57:25 58:2,16 59:7 60:7 61:14,16 61:19,23 62:16 62:24,25 63:4 63:5,7,8,10,11 63:15,16 64:5 64:14,16,20 65:2,4,12,22,23 65:25 66:4,24 67:2,4 68:3,16 68:18,21 69:2 69:3,10,12,14 69:18,19,23 70:4,7,8 71:11 71:14,15,18,19 71:22,24 72:10 72:12,14,16 73:11,12,15,16 73:19,21 74:8 74:10,20,21,24 75:4,5,8 76:4,5 76:9,17,24 77:4,5,11,17 78:2,4,8,10,18 78:21 79:4 81:16,19 83:10 83:11,13,14 84:6,7,9,10,14 84:15,19 85:17 85:18,22,24 86:2,19,20,22 87:2,3,6,8,21 87:22,25 88:2 88:5,7,14 89:18,19,25 90:2,5,8,25 91:2,4,5,7,8,11 91:12 92:10,11 93:23 94:16,20 94:22 95:13 96:15,16,19,20 97:17,19,22,24 98:20,21,25 99:2,24,25 100:16,18,22 100:24 101:3,5 101:8,10,13 102:13,18,20 103:11,12,18 103:19 104:7,8 104:13,15 107:9 109:23 109:24 110:10 110:11,15,18 113:20 115:8,9 115:11 116:6 116:19,21 117:11 119:7,8 120:17 122:5,6 122:10,12,25 123:2,10,11,20 124:2,4,8,13,14 124:18,23 125:23 126:2 126:18,19 127:6,24 128:5 128:14,15,18 128:19,21,22 129:3,4,17,20 129:21 130:9 130:10,12,13 130:19,24 131:12 132:4 132:13,15,18 133:2,3,6,7,13 133:17,18,23 133:24 134:5,6 134:9,10,13 135:2,3,6,14 136:5,7,15,16 136:18,19,23 136:25 139:9
**correspond** 115:13
**cortelli** 40:2
**counsel** 3:6,17 54:7 58:23 122:14 140:19
**county** 142:5
**couple** 15:22 23:25 24:4,10 109:7
**course** 77:23
**court** 1:2,18 3:13 5:6,13

16:4 143:1
**courtesy** 5:10
**coworkers** 41:17 102:17
**credit** 134:18
**crew** 40:3 95:23,24
**crime** 15:9 16:18
**cross** 107:20
**crossways** 1:21 2:9
**current** 37:23
**currently** 6:25 7:19 11:17 36:20
**cut** 118:14 130:8
**cv** 1:7

**d**

**d** 3:2 91:17 139:2 140:20
**data** 79:13,17
**databases** 108:15
**date** 1:12 11:15 37:11,14 42:20 43:20 56:21 70:24 72:24 75:15 82:14 85:10 86:9 87:15 89:7 90:14 93:25 94:12 98:6 127:13 129:9 129:11 143:3
**dating** 23:23
**day** 28:18 38:7 42:17,22 43:6 49:4 50:8 62:6 63:18 65:6,11 65:19,20 66:6 68:3 69:18,22 72:5,8 73:14 73:18 81:10 83:20 84:3,25 87:24 92:9 95:4 97:12 99:10,16 100:16 108:11 133:9 134:5,25 135:7,13 139:19 142:21 143:22
**days** 3:16 29:12 47:22 49:7 88:16 134:15
**deal** 37:7
**dealt** 22:5
**decided** 54:13
**declare** 44:13
**def** 71:5 72:20 72:21 75:19 98:11,13
**defendant's** 43:24 44:16
**defendants** 1:10,18 2:8 6:5 7:20,23 45:14 61:5
**delete** 92:20,24 93:9,25 94:5 96:8
**deleted** 92:18 93:5,13,22 96:4,6
**deliver** 113:15
**denali** 19:20,22 20:2,5,10,17 21:5,11 22:4 22:12,16,23 23:21 24:3,25 30:12 40:23 41:3 54:5,22 54:24 55:4
**denied** 16:11
**depending** 61:8 62:15 121:21
**depends** 29:4 58:8 62:10 65:7 68:11 79:7 114:4,16 120:4 121:21
**depose** 50:21
**deposed** 19:14 22:11,13 27:18
**deposition** 1:16 3:8,9,14 7:15 8:3,7,10 9:3,17 10:4,22 11:2 19:19 22:22,25 82:20 143:3
**depositions** 109:12
**describe** 114:8
**description** 140:4
**despite** 17:18 27:20
**differ** 104:11
**different** 29:14 31:9 41:18 52:5 54:17,18 63:14 80:16 101:24,25 102:5,18 103:7 103:9,16 104:5 107:16 117:16 120:3 121:19 121:19,19 129:8
**direct** 95:6
**directed** 99:21
**directly** 18:3,13 18:24 19:11 46:5,11 57:24 64:19
**disciplined** 80:19 82:7
**discussed** 11:4 91:23
**discussion** 13:23 102:11

**dismissed** 16:14
**district** 1:2,2
**docked** 80:22
**document** 8:24 8:25 9:16,18 43:10,12,13,17 43:19 44:2 45:2 71:3,6 72:18,19 73:2 73:5 74:4 75:17,22,23,25 76:10,11,15 82:22 85:13 86:13 87:17,19 90:19 98:8,15 99:24 127:17 140:5
**documentation** 97:3,11
**documents** 8:9 8:12,20 9:2,19 10:2,18,25 23:9 97:8,9 141:3,4
**doing** 29:5 40:9
**dollars** 21:19
**dolowich** 1:20 2:8
**double** 128:25
**draper** 1:23 142:8,24
**drive** 1:21 2:9 13:12 14:21 15:2 18:3 19:10 26:24,25 27:9,16 28:11 28:21 29:19 31:25 32:6,8 32:12,14,20,22 32:24 34:22 35:16 47:12 48:15 51:9 52:15,17,21,22 53:8,9 55:24 64:4,25 67:23 74:15 76:16,19 76:21 77:2 106:11,15,17 106:20,23,25 107:7,11,20 111:6 113:16 124:17
**driver** 45:14 46:15,16 55:23 56:6 58:3 59:3 64:2,10 72:8 123:14
**driver's** 17:15 17:19,23 27:2 27:5,6,10,20 35:2 53:3,10 55:8,19 56:12 56:19 76:3
**drivers** 64:13 120:25
**driving** 13:21 16:20 20:8 29:9 42:13 45:25 48:11 52:24 53:17 55:17 56:11 57:7,11 65:15 72:2 75:6 105:9 122:5
**drop** 68:2 113:17
**drove** 13:3,4,10 13:11 14:19 17:17,21,23 18:6,13,22,24 19:5,12 27:19 28:3 29:12 32:25 33:4 35:18 36:9,12 46:5,10 47:3,8 47:23 48:18 49:9,21 50:16 50:22 51:3,20 51:24 52:12 55:14 57:24 64:12,19 70:5 74:7 75:8,10
**due** 84:16,25
**dui** 15:10,11,14
**duly** 4:3 139:5 142:12
**dump** 106:24
**dumping** 108:17
**duration** 122:9
**dwi** 16:3 17:4 17:10

**e**

**e** 2:2,2 3:2,2 4:2 4:2 8:7 33:13 36:3 93:3 139:2 140:2,20 142:2,2
**earlier** 62:8 88:8
**early** 57:5,8 121:8
**ed** 57:19 67:7 67:11,15,17
**education** 38:10
**edward** 2:10 4:16
**effect** 3:12,15 98:23
**eight** 22:16 45:15 46:17 60:23 114:22 133:6,9,16 134:5
**either** 7:14 118:13
**emergencies** 33:6
**emergency** 32:23 33:2 47:8 50:12

**emoji** 128:10 129:2
**employed** 7:19 41:21 47:19 77:6 91:21 96:14 98:24
**employee** 36:15 36:18,21 79:13 91:19 110:17 125:25
**employees** 7:23 64:12 80:13 82:7 99:20 102:22 107:6 111:9 118:25 120:19 121:15 123:25 124:23
**employer** 54:20 99:21
**employers** 25:3 102:5
**employment** 12:13 14:18 34:12 45:15 46:17 56:25 63:15 69:10 76:8 77:24 104:10 122:10
**ended** 65:19 68:20
**ends** 125:20
**engineers** 136:4
**enter** 16:9
**entire** 10:13 49:14 93:3,3 129:22 141:4
**entirety** 12:12 14:17
**entitled** 100:21
**equipment** 123:19 125:25
**ernesto** 51:4 96:2,3,6 111:11,13 132:17,20,22 132:25
**errata** 143:1
**esq** 2:6,10
**everybody** 120:25
**everyday** 49:6
**exactly** 12:20 16:22 18:2 35:22 62:12
**examination** 4:6 104:20 121:25 137:10 138:15 140:21 142:11,13
**examined** 4:5
**excavation** 29:5 33:16 37:10 38:18 65:8 120:4 121:2
**excavations** 38:17
**excavators** 103:15 117:16
**except** 3:21
**exchange** 82:25 89:12 90:21
**exhibit** 43:17 43:18 60:19 70:21,22 72:18 72:20,22 75:12 75:13,18 82:11 82:12,16 85:5 85:8 86:4,7 87:12,13 89:4 89:5 90:11,12 97:25 98:3,7 109:8,9,11,18 114:25 116:7 120:7 126:11 126:13 127:10 127:11,23,25 128:3,16,20,24 129:5 133:20 137:17 140:4,4
**exhibits** 140:3 140:19
**expected** 62:6
**expires** 143:25
**explain** 126:23
**extra** 20:6,24 54:25 65:9 106:16,18 107:17

**f**

**f** 3:2 142:2
**fact** 17:18 20:12 66:22
**fail** 7:5
**fair** 11:19 18:21 27:23 28:23 29:21 30:4 42:2 82:24 107:5 109:3 110:12 110:16 111:8 112:2 115:7,25 121:14 138:4
**familiar** 44:3 97:20
**far** 12:22 43:2 60:3 65:7
**favors** 53:6
**federal** 1:19
**feel** 54:8 118:14 122:8 127:24 132:7
**felony** 15:6
**felt** 69:8
**filing** 3:7
**find** 109:17
**finish** 5:8 18:18 49:15 59:14 62:21 66:6 116:10,12
**finished** 34:5 34:16 65:20

66:11,19,23 68:24 83:9 112:22 113:4 113:12 116:23 134:8
**firm** 39:25
**first** 4:3 42:11 42:16 43:24 44:17 45:23 52:24 53:7 55:11 67:20 93:10,14 97:12 139:5
**fishing** 69:13 69:15 91:4
**five** 70:12 88:19,22 130:12
**flagger** 38:22
**flaggers** 120:24
**flexibility** 61:18
**flexible** 58:13
**follow** 27:14
**following** 24:10
**follows** 4:5
**force** 3:15
**foregoing** 44:15 45:12 139:8
**foreman** 27:13 27:15 50:18,19 55:7,25 59:24 60:2 63:19,20 63:24 68:20,25 69:5,14,17,20 69:25 70:6 73:6,23 83:2 89:13 90:22 107:4 109:22 110:25 111:3 113:15,18 119:17
**form** 3:21
**former** 7:22 25:3 82:17 85:12 86:11 87:11 89:2 90:18 127:16
**forth** 24:6 99:14 142:12
**forum** 19:18
**found** 39:17
**four** 48:5,22 99:3,19
**free** 127:24 134:18
**frequent** 66:22
**friend** 35:13,24 36:4
**friends** 69:6
**front** 60:19
**frontier** 31:13 31:14,15,16,20 31:22 32:2 34:9 36:17 37:22 38:4,7
**full** 43:13 87:24
**further** 3:20 60:25 61:3 121:24 137:2 138:12 139:8 142:15

**g**

**g** 33:13
**gap** 34:14
**gaps** 92:12
**garbage** 68:6 68:12,15 108:10,17 113:8,25 114:5 122:23 123:5,9
**gas** 33:12,16
**general** 45:12
**generated** 75:3
**gestures** 5:15
**getting** 20:7 21:2 52:16 135:20
**give** 5:9 43:10 110:6 125:12 137:4
**given** 118:10 134:18 139:10 142:14
**giving** 6:22 49:13 130:18
**glad** 130:6
**go** 11:7 16:4,6 36:14,17 44:5 45:6,8 54:13 54:22 56:7 60:18,23 63:13 63:18 65:8 69:8,15 74:5 78:19 92:24 99:19 100:6 113:7,8,10,16 113:18 116:7,8 124:7,9 126:2 126:8 137:24
**goes** 98:12
**going** 9:21 10:16 17:24 37:17 40:14 43:2,4,9,10 54:25 56:2 75:11 118:3 126:8 136:20
**gonna** 4:23,24 5:18 49:18 54:14 96:21 133:19,20
**good** 4:14,15 26:23 28:12 39:15 40:7 52:18 56:17 60:16 69:4 83:6 102:2
**governed** 100:15,21 101:2
**governs** 99:9

**grab** 110:2 127:20 128:9 128:25
**grace** 33:12,13 33:15,19,22,23 34:3,6,8,23 36:7,14 76:12 76:15,19,20
**graduated** 38:12
**graham** 2:4 40:20,21 41:2 53:25
**grievance** 101:17
**grimmett** 2:10 4:7
**grommett** 4:16 9:24 10:16 17:3 18:17 28:9 37:17,21 41:5 43:16 49:12,18 58:20 58:25 70:9,20 72:17 75:11 82:10 85:4 86:3 87:9 88:25 90:10 97:25 104:16 104:25 105:7 105:12,14,17 105:25 106:13 107:3,8 108:9 108:13 109:6 109:10 110:6 110:23 111:10 111:20,24 112:5,14,18,25 113:6,23 114:3 114:14,21 115:10,15,21 116:5,14,20 117:3,10,14,21 118:2,7,22 119:3,13,22 120:16,21 121:12,17 122:2 127:9 137:2,6,15,22 138:8,13 140:22
**group** 57:20 69:7
**guess** 132:9
**guy** 96:2

**h**

**h** 140:2
**half** 12:24 15:2 24:15 65:17 79:8 87:24 99:22 107:19 107:21 114:6 114:10 117:5
**hammers** 108:25 125:17
**hand** 142:21
**handful** 84:11
**happened** 80:2
**happening** 81:16
**head** 5:14
**hear** 81:22
**heard** 81:12
**held** 1:20 77:11 77:21,25 86:25 120:15 121:5
**hello** 40:6
**help** 39:21 111:17
**helped** 132:17
**hempstead** 128:17 132:2
**hereinbefore** 139:11 142:12
**hereunto** 142:20
**hey** 110:2 128:9,24 137:19
**hi** 120:10 127:19
**high** 38:11,12
**highest** 38:9
**hired** 38:23 39:7,21 40:12 41:12,13 42:6 42:11
**history** 34:12
**hold** 53:4 95:23
**home** 113:9
**honda** 13:13 14:19 17:17
**hour** 37:25 79:8 99:22 107:19,21 114:6,10 116:18 117:5,5 134:13,19
**hourly** 37:23
**hours** 7:6,10 9:5 10:5 15:23 20:6,24,25 65:18 66:14 67:9 68:24 71:13,17,21 84:8,21 99:10 99:15 100:10 100:15 105:8 106:3 107:13 107:16 111:18 112:3,16 114:11,22 115:9,23 116:18 118:21 121:20 133:6,9 133:16 134:5 134:13,21
**house** 14:24 17:24 18:4 35:21 110:25 113:11,14,16 113:18

**hoyt** 89:17,24
**hs** 130:12
**hunt's** 137:24

**i**

**idea** 34:11
**identification** 43:20 70:24 72:24 75:15,21 76:7,22 77:3 82:14 85:10 86:9 87:15 89:7 90:14 98:5 127:13
**identify** 75:5
**immediately** 48:14
**impact** 7:2
**important** 96:11
**incarcerated** 15:16
**include** 73:5
**included** 84:18 134:23
**includes** 101:16 135:12
**including** 135:13
**indicate** 5:14
**indicates** 79:17
**individually** 1:3
**individuals** 26:11,15 30:3 30:9,11
**industries** 31:5 34:19 54:6
**information** 8:14,16 9:4 21:8 25:25 26:3,4,4 74:17 141:3,4
**informed** 52:19 56:12,14
**infrastructure** 1:8 4:17 6:7,12 12:13 14:18 18:15 19:21 25:7 27:4 28:3 28:11 29:13 38:24 39:14 41:13 42:21 45:16 46:2 47:3,13,20,23 48:10 51:16 70:18 75:4 95:12 98:19 112:3,15 117:19,24 118:20 119:2 121:15 123:24 137:25 143:3
**infrastructure's** 18:23
**infrastructures** 12:18
**initially** 97:10
**inspection** 47:14,18 48:4 74:12,23
**inspections** 48:8
**inspector** 57:19 67:7,11
**instance** 102:10
**instances** 83:24
**instructed** 81:9 107:6
**instruction** 99:24 130:19 132:12
**instructions** 6:15,16 27:14
**intended** 131:17
**interested** 142:18
**international** 96:18 98:9
**interrogatories** 43:25 44:17
**interrogatory** 44:22 45:9 46:23
**intoxicated** 16:21
**involved** 22:8 31:23 103:7 121:2
**involvement** 23:4
**issued** 61:9
**it'll** 45:9 100:7

**j**

**jack** 108:25 125:17
**jail** 15:19,25
**january** 1:12 85:16,21 86:16 86:25 142:21
**job** 1:25 17:21 17:25 18:4,25 19:5,11 29:17 29:18 38:3 39:13 41:18 42:2,7 46:6,11 53:14,23 55:2 56:4 57:17,21 57:24 58:18 59:10,12,15 61:8,9 62:15 62:19,23 63:2 63:14,18 64:14 64:20,25 65:6 65:21,21 66:12 66:19,23 67:6 67:9,23 68:6 77:11,13,21,25 78:6 80:16 81:23 85:17,20 86:22 87:2,4 88:4,10 89:25

90:3 92:8 94:19 100:3 101:24 106:17 106:18 107:14 108:21,23 109:5 110:14 112:11,16,19 112:23 113:13 114:9,13,15,20 115:14,16 116:11,12,15 116:25 117:25 119:18 121:20 124:8,9,18 125:11,18 126:2,7 127:3 132:23 133:11 135:8 136:17 136:21 137:14 138:7

**jobs** 35:8,12,15 40:10 63:6 67:16,17

**john** 40:2,11

**johnny** 39:9

**joined** 34:6

**jointly** 1:9

**judge** 3:13

**jump** 85:15

**jumping** 86:15

**k**

**k** 12:21 39:12 131:7

**kaufman** 1:20 2:8

**keep** 53:13,23 118:8

**keeps** 79:13

**kenny** 78:14,16

**kept** 68:25

**keys** 68:2

**kim** 1:22 142:8 142:24

**kind** 13:12 55:24 103:7

**kinda** 22:12

**knew** 26:22 27:4,7,9 53:3 69:20 76:15,20 76:25 119:14

**know** 4:20 6:2 12:17 13:20 20:14,16,18 26:7,14 30:10 30:13,15,16,20 30:22,24 31:3 39:10,20 41:24 42:5,20 43:12 47:22 48:2 51:12,19,22 54:12 55:22 56:9,21 57:13 58:20 59:16 62:5 63:17 67:14,19,21 72:8 74:2 75:2 79:16,21 80:16 81:25 83:18,23 84:4 88:18,21 88:24 99:12,13 99:18 100:5 101:21 102:23 103:21,23 104:22 105:3 109:17 112:7 118:19,23,24 119:4,11 120:18 130:21 130:22 131:2,2 131:3,8 134:16 135:17 136:8

**knowledge** 44:18 102:2

**known** 11:12

**l**

**l** 3:2,2 4:1,2,2 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,3 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 91:17 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1

131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1,2 140:1 141:1 142:1
**labels** 52:6
**labor** 45:14,17
**laborer** 38:5,22 41:14,22 45:14 45:24,24 46:4 46:14,16 51:4 57:23 72:13 106:6 111:14 122:7 132:23
**laborers** 46:10 81:25 96:17 98:9 102:23 120:24
**laid** 43:5
**late** 24:8 55:11 65:9 66:9 80:17
**lawsuit** 7:20,24 20:10,17 24:22 25:2 26:12,16 30:3 40:15 54:14 91:23 94:6 104:24 105:11,21,24
**lawsuits** 54:5
**lawyers** 7:17 8:14,17 20:15 21:9
**lay** 81:13
**laying** 121:2
**lead** 118:12
**leading** 118:11 138:9
**learn** 39:13 92:8
**learned** 48:10
**leave** 65:6 66:8 67:6,8
**leaving** 107:17
**leeway** 49:14 118:10
**left** 36:13 83:7 92:19 98:8 108:11
**legalese** 22:18
**level** 38:9
**levi** 91:10
**license** 16:8 17:9,11,15,19 17:23 26:22 27:2,5,7,10,21 35:3 52:4,18 53:3,10 55:8 55:19 56:13,19 76:4
**licenses** 38:14
**lights** 83:7
**limit** 6:22
**lincoln** 14:10
**line** 64:8 141:8 143:5
**lines** 33:17 60:23,23
**list** 6:14
**litigation** 11:5
**little** 22:18
**littler** 62:8
**live** 11:22 12:4 12:5
**lived** 11:17,21 12:6
**llc** 2:4
**load** 108:22 111:15 123:18 124:25 125:5,7 125:8
**loaded** 110:21 114:5 124:13 125:4,25
**local** 36:15,18 36:20,23 37:7 37:12,13,18 96:13,17,18,22 96:25 97:5,8 97:13,14,15,16 98:10,19 99:8 100:14,20,25 101:12,15,23 102:3,6,23,24 102:24,25 103:3,5,9,13,14 103:16,20,22 104:3,5 141:6
**located** 108:4
**location** 108:2 120:3 136:14
**locations** 29:15 29:15 35:17
**long** 11:21 12:25 14:14,21 15:21 17:12 22:15 24:12 58:17 65:15 68:8 79:5 106:19 108:16 114:2
**longer** 48:15 52:15 56:16
**look** 44:2 71:2 109:9 116:22 128:8 129:18 131:21
**looking** 105:14 115:3
**looks** 83:3
**lot** 22:3 56:2,5 118:15
**lourenco** 1:17 4:10 11:8 43:23 44:13,15 128:21 129:16 130:9 132:6 139:15 143:4 143:20

**m**

**machine** 117:17 120:24

126:4 135:24 135:25
**machinery** 103:15
**made** 88:11 97:4 111:9
**mail** 8:7 93:3
**maintain** 30:16 108:14
**maintained** 37:2
**maintaining** 30:21,25
**majority** 77:24
**make** 18:11,20 57:19 59:10 83:7 84:12 88:10,16 105:18
**making** 57:20 124:12
**manager** 119:18
**mandated** 74:16
**mandatory** 81:6,8 119:12 119:19
**manner** 22:13 132:8
**manual** 45:16
**manuel** 1:3 143:3
**march** 89:15 129:13,20,24
**mark** 70:20 72:17 75:12 82:10 85:4 86:3 87:12 89:4 90:10 127:9
**marked** 43:16 43:19 70:23 72:19,23 75:14 75:18 82:13,16 85:9 86:8 87:14 89:6 90:13 98:5,7 109:15 126:9 127:12 128:2,5 129:10 141:7
**marriage** 142:17
**mart** 12:21
**material** 125:10,13
**materials** 108:20 109:4 110:13 137:13 138:6
**matter** 4:18 19:22 20:2,5 20:11 21:11 25:10 40:19,23 55:4 142:19
**mean** 20:21 58:21 130:24
132:12
**means** 30:7 43:13 61:18 88:3
**meant** 131:3,8
**medication** 7:2 7:6
**meeting** 77:16 78:8,11 79:10 79:14,24 80:6 80:9,12,20,23 81:11 82:8 83:16 85:17,20 85:24 86:18,24 87:6 89:17,21 89:23 120:11 121:4
**meetings** 77:8 77:10,21,25 78:6,13,17,20 79:2,6,19 80:14 81:3,5 100:3 119:7,12 119:16,20 120:14,20 121:16,18 136:15,22
**member** 37:12 96:13,25 97:13 97:20 102:4,7 104:4
**members** 40:3 102:18,22
**membership** 36:23 37:19 141:6
**mentioned** 40:15 52:17 102:16
**message** 8:4 82:18,25 85:7 85:9 86:5,8 87:2,10,14,20 89:6,10,12 90:13,17,21 93:13,15 94:9 95:6 110:3 120:8 126:17 127:4,12,15 128:4 129:11 129:19,22 130:3,14,24 131:7,11,13,16 137:18 140:9 140:10,11,12 140:13,14,16
**messages** 9:7 63:21,23 82:13 92:2,9,13,16,21 93:2,5,9,19,23 94:2,11,24 95:16 96:5,9 109:21,21
**middle** 45:8 56:24 57:11 60:21 85:15 86:15 89:15

99:5 120:9 129:12,18
**mike** 67:18,20
**mike's** 67:19
**mile** 12:24 15:2
**miles** 14:24
**mine** 35:13
**minor** 125:19
**minute** 70:13
**minutes** 14:25 15:3 68:9 79:8 82:20 108:19 137:5
**miscommuni...** 126:24
**misdemeanor** 15:6
**missed** 79:11 79:18,23 80:11 81:10 83:12 84:16
**misses** 79:13
**missing** 80:20 80:23 108:23
**moment** 110:7
**money** 21:3
**month** 29:3 42:24 47:4,7 47:24 49:22 50:4,7,11,23 95:3,5
**months** 22:16 24:2,4 28:16 28:17,23 31:17 31:21 33:4,7 45:15 46:17 49:3,5,9,10,23 49:24 50:2 52:12 106:21
**morning** 4:14 4:15 58:5,6 59:17 83:6 107:25 111:16 114:16
**mount** 4:12 11:18 108:5
**mouth** 39:18
**move** 29:18
**moves** 25:24
**moving** 97:3

**n**

**n** 2:2 3:2 4:2 39:12 91:17 139:2 140:20
**name** 4:8,16 11:9,13 13:25 14:7 31:14 35:23 39:11 55:23 67:14,19 67:20 109:13 125:12 143:3,4
**named** 96:2
**names** 11:7 26:14 31:11
**naming** 109:12
**near** 90:24 136:17
**nearby** 119:25
**necessary** 14:5
**need** 5:20,25 8:19 43:12 49:14 54:8 125:18 132:7
**needed** 29:16 29:20 125:10 126:2
**needing** 106:16
**needs** 30:17
**neighbors** 55:20
**network** 1:8 4:17 6:6,10,11 8:23 10:14 12:13,18 14:18 18:14,23 25:6 27:4,8 28:3,11 29:12 32:7,13 34:4,6,17 36:13 37:3,15 38:23 39:3,4,5 39:8,14 40:4,7 41:12,21 42:2 42:6,12,17,21 45:16,25 47:3 47:13,19,23 48:10 49:21 51:15 56:15 57:15,16 70:17 75:4 76:7,25 77:7 79:12 80:13 91:18 95:11 96:14,24 97:7,13,17 98:19,24 102:13,22 103:11,18 104:7,23 106:5 106:12 107:7 110:17 111:18 112:2,15 115:5 117:18,23 118:20,25 120:19 121:14 123:24 137:25 141:5 143:3
**network's** 64:3 64:12 111:9
**never** 11:12 13:6,8,9 15:8 15:24 18:6,13 18:22 28:3 36:9,12 54:22 62:2,4 63:9 66:11 79:11 80:7,18 97:7 101:11,14 102:11,16 134:18 135:18
**new** 1:2,22,23 2:5,5,9 4:4,13 11:18 17:15 75:14,20 76:2 99:20 142:4,5 142:9

**nicknames** 11:10,11
**night** 63:6 83:7
**nine** 11:22 99:4
**nods** 5:14
**nonverbal** 5:14
**normal** 114:12
**north** 96:18 98:10
**notary** 1:23 4:4 139:22 142:8 143:24
**notes** 10:24
**notices** 87:25
**notify** 54:8
**notwithstandi...** 45:11
**number** 45:7,9 51:19,22 52:4 52:4,5 96:19 115:9 140:4
**numbered** 45:7
**numbers** 51:16 52:6
**ny** 140:8

**o**

**o** 3:2 4:2,2 36:3 39:12 91:17,17 139:2
**oath** 3:12 4:25
**object** 9:21
**objection** 9:20 14:2 17:2,20 18:16 19:2,7 26:17,21 27:12 27:22 28:5,8 28:19,24 29:22 30:5 31:2 32:9 32:15,21 33:3 33:8 41:15,23 42:4,9,15 46:7 46:12,20,24 47:5,10 48:16 48:20,23 49:11 49:25 50:5,9 50:14,24 53:12 54:2,10,15 57:12 58:19 59:8,19 60:15 61:15,20,24 62:3 63:12 64:6,15,21 65:3 66:3,7,13 66:25 67:5 68:4,10,17 69:11 70:3 71:23 72:11,15 73:7,20,25 74:9,25 76:18 77:12,18 78:3 78:9,22 79:15 79:20 81:7,20 83:22 84:20 85:25 87:7 88:6,13,20,23 90:6 94:21,25 95:9,20 96:10 97:18,23 99:11 99:17 100:4,17 100:23 101:4,9 101:20 102:19 104:14,25 105:7,12,25 106:13 107:3,8 108:9,13 109:6 110:23 111:10 111:20,24 112:5,14,18,25 113:6,23 114:3 114:14,21 115:10,15,21 116:5,14,20 117:3,10,14,21 118:2,22 119:3 119:13,22 120:16,21 121:12,17 122:11,20 123:7,16,21 124:3,19,24 125:6,22 126:3 126:25 130:16 130:20,25 131:9,19 132:14 134:17 135:15 136:6 136:24 137:15 137:22 138:8
**objections** 3:21 43:23 44:16 45:12
**obligations** 61:4
**occasion** 20:15 66:18 78:19 79:23
**occasions** 48:5 52:9
**occur** 37:14
**occurred** 56:22
**occurs** 129:19
**october** 42:23 43:7 45:18,18 71:10 73:10 83:5,12,16 94:14,18 95:4 95:7,13
**odds** 125:19
**offered** 5:3 19:17 45:3
**offices** 1:20
**ohhhhh** 130:11
**oil** 108:14
**okay** 5:11,24 37:20 49:17 71:4 109:16,19 113:12 118:17 131:10
**olivera** 35:25
**once** 28:14,14 28:22 77:22 79:25 108:7 113:21 119:10
**onkus** 39:9

**operated** 31:7 126:4,5
**operating** 108:15 136:4
**operation** 31:24
**operators** 117:17 120:25 135:24,25
**opt** 21:4 43:22 104:23 109:13
**opted** 1:16 26:15 30:3
**oral** 5:12
**order** 1:18 111:9
**orders** 110:17
**ordinarily** 7:7 134:8
**original** 3:9,17
**ot** 22:3
**outcome** 142:18
**overtime** 55:2 66:15 71:17 107:15,15 115:13 133:10 133:13,14 134:15,21,23
**own** 12:2,5 34:21 35:5 60:8 118:12

**p**

**p** 2:2,2 3:2
**p.m.** 65:14,20 66:6,20,24 67:4 86:16 116:24 133:17 134:2,8 135:9 138:14
**p1-7820894** 1:25 143:2
**page** 44:6,6 45:8,10 60:21 60:22 73:9 85:16 87:11 89:15 90:24 99:4,5 100:7 109:25 116:9 120:9 129:13 129:19 131:22 133:21 140:4 140:21 141:4,8 143:5
**pages** 45:9 72:20
**paid** 9:5 20:7 20:12 21:2 23:6 24:9 52:17 53:16,20 53:25 69:24 81:2 84:21,24 88:9,12,16 114:22 133:6,9 133:12,16 134:21 135:18 135:20,22,25 136:4
**paint** 110:2 125:14 126:18 126:21 127:3,5 127:8,20 128:7 128:9,10 129:2 129:2 130:19 131:16,24 137:20
**painting** 108:24
**paragraph** 45:6
**pardon** 15:17
**park** 1:21 2:9 124:17
**parked** 123:20 123:22
**parking** 121:8
**part** 61:4 125:24 137:19
**parties** 3:7 142:16
**passengers** 50:17 51:2
**passing** 35:14
**past** 11:22
**patrick** 1:8 2:13 4:18,20 4:20 6:7 25:7 143:3
**pause** 58:21
**pay** 9:12 10:5,6 10:9,12,22,23 22:2,19 70:16 70:23 71:9,12 71:16,20 80:23 84:5,17 100:10 100:22 114:25 115:7,25 117:19,24 118:21 140:6 141:4
**paycheck** 115:4
**paychecks** 22:3
**paying** 20:18 20:22
**pays** 25:25
**pelham** 12:18 12:22 14:22 60:3 61:6 86:18 108:5 110:9,25 119:25 120:11 128:13 131:22 131:24 137:20
**pelton** 2:4 40:21 41:2 53:24
**penalties** 45:3
**penalty** 5:3 44:14
**pending** 6:3 23:19,20 40:16

**people** 20:19 32:22 69:7 80:16,17,18 135:19,21,23
**percent** 79:18
**performed** 74:6 123:13
**performing** 45:16
**period** 8:22 10:8,11,13 29:3 37:5 47:4 47:7,24 49:5 49:22 50:4,7 50:11,23 75:9 93:8 95:16 119:23 120:2 141:4
**perjury** 5:4 44:14 45:3
**permanent** 56:8
**permits** 61:9 62:16,23
**person** 7:14 56:14 91:9,13 96:11 124:5,6 124:11,15 130:15 131:12
**personal** 35:8 46:5,10 60:9 80:6 83:25 84:14,25
**personally** 125:5
**personnel** 125:3
**peter** 67:13
**phone** 7:14 47:15 92:23
**pick** 35:20 59:24,25 60:6 110:24 111:2,7 126:17,21,22 127:5,7 130:19 131:15 137:24
**picked** 50:18 60:14
**picking** 108:25 131:23
**pickup** 128:6
**picture** 90:25 91:3,6
**piece** 125:12
**pipes** 121:3
**pissed** 55:25
**place** 52:3 111:7 119:21 119:24 121:9 121:19 139:11
**plaintiff** 1:5,17 2:4 19:25 21:4 21:21 43:22 44:15 45:13 60:25 61:3 104:23
**plaintiff's** 109:13
**plaintiffs** 26:11
**plates** 108:24 125:15
**plea** 16:9
**please** 4:8 5:7 8:20 18:17 44:6 58:20,22 62:21 71:2 72:17 82:10 85:4 110:3 127:20 128:11 129:3
**plus** 38:22 117:4
**point** 5:21 6:2,6 6:11 7:18 20:8 39:16 40:9 43:11 52:21 56:4 60:10 107:22 111:4 137:24
**policy** 118:20 118:24
**pop** 43:4
**position** 106:4 106:8,10 111:13 124:17
**positions** 120:23
**possession** 10:12 95:15
**possible** 57:10 135:11
**precisely** 12:19
**preloaded** 124:22
**premium** 100:10,21
**preparation** 10:21
**prepare** 7:15 8:10 9:3,16 10:3,25
**prepared** 10:24
**prescribed** 7:7
**present** 2:12
**presented** 5:23 6:16
**pretty** 29:5,8 31:8 35:6,18 60:16 65:9 67:12 92:4,17 103:8,14
**prevent** 6:22
**previous** 109:12
**previously** 19:4 49:8,20 54:4 72:7 109:20 110:19 116:17 119:5 123:4,12 126:9,10 134:7
**prior** 15:5 76:7 76:10 93:19,20 95:2

**priority** 143:1
**prison** 15:19
**probably** 22:16 28:15 67:4 107:19 130:17 132:9
**problem** 60:11 83:10 111:4
**procedure** 1:19 101:17
**proceeding** 19:18
**proceedings** 16:5
**process** 16:7
**produce** 23:8
**produced** 63:22 82:19 92:14 93:15 94:9 97:7
**production** 10:17 37:18 141:6
**project** 29:20
**properly** 20:20 20:22 124:13
**provide** 5:15
**provided** 23:11 23:15 26:5 32:10 76:6,10 76:12,14 97:2 97:9,10
**public** 1:23 4:4 139:22 142:8 143:24
**purpose** 74:22
**pursuant** 1:18
**put** 68:24 95:23 126:6

**q**

**qr** 52:3 64:22 64:25 74:7,11 74:13,19 123:15
**qualified** 32:6 32:8,14 52:20
**question** 5:8,19 5:23 6:3,4 9:22 9:25 18:18 49:19 58:24 59:14 62:13,22 66:17 131:23 141:8
**questioned** 122:24 126:14 132:16 133:4 136:12
**questioning** 64:9
**questions** 4:24 5:16 6:19,20 6:23 22:18,21 45:21 49:13,15 64:8 74:3 104:17 118:4,9 118:11,16 120:13 121:24 122:14,17,19 126:13 137:3 138:12 141:7
**quit** 40:4
**quite** 66:22

**r**

**r** 2:2 3:2 4:2 33:13 36:3 91:17 139:2 142:2
**rate** 115:4,8
**rates** 20:19,19 20:23
**read** 43:12 44:14 127:23
**real** 108:4
**really** 20:14 22:20 63:9 103:21 130:21
**reapply** 16:8
**reason** 6:21 143:5
**recall** 47:17 71:25 72:4 79:22 82:4,5 84:23 88:15 126:12
**receive** 21:10 21:14 23:16 70:16
**received** 54:23 71:9
**recess** 41:6 70:10 104:18 137:8
**recognize** 75:22 82:21 85:13 86:12 87:17 89:9 90:18 98:14 127:17,21
**recollection** 48:6
**record** 4:9 18:12,21 41:5 49:16 70:9 104:17 116:23 137:7 142:13
**records** 72:23 73:23 140:7
**red** 91:13
**refer** 6:5,10 43:9 96:21 99:3 109:8 114:24 127:24 133:19,20
**referenced** 9:18
**referring** 6:6 53:7 58:10 89:20 100:2 137:17
**reflect** 115:19 116:2,24
**reflected** 117:7
**reflects** 71:21 73:13,17

**refresh** 48:6
**refusal** 16:12
**regarding** 7:20 8:18 17:6
**registered** 13:16,18,19 14:7
**registering** 13:24
**regular** 115:12
**rehearse** 122:15
**rejection** 95:21
**relate** 122:4
**related** 25:25 142:16
**relates** 64:9
**relationship** 69:4
**relief** 24:9
**remember** 51:21 52:6 56:23 94:4
**remove** 68:14
**rent** 12:2,3
**repeat** 26:2 29:7
**repetitive** 118:15
**report** 38:6 47:15,18 74:12 74:19,22,23 75:4,7 99:21
**reported** 64:3 70:6 73:6
**reporter** 5:13 43:21 58:23 70:25 72:25 75:16 82:15 85:11 86:10 87:16 89:8 90:15 98:6 105:22 127:14
**reporter's** 5:6
**reporting** 143:1
**reports** 48:5 52:7,10
**represent** 4:17 93:14 103:5
**representative** 30:18
**represented** 54:7
**requested** 141:3
**required** 16:7 47:12,14 61:5 63:13 68:19 77:7 99:21,23 106:11,19,23 107:11,22 109:4 110:13 117:12 119:6 120:19 121:15 125:11 137:13 138:6
**requirement** 74:18 119:9
**requirements** 97:21
**reserved** 3:22
**resided** 12:14
**residence** 12:23 14:22 18:14,23
**residences** 12:10
**residential** 35:8 35:12,17
**resign** 54:13
**respective** 3:6
**respond** 32:13 128:13 132:8
**responded** 131:6
**responds** 45:13 60:25 61:3 86:21 130:11
**response** 26:7 46:23 132:5
**responses** 43:24 44:16,22 45:2
**responsibilities** 124:12,16
**responsible** 42:12
**result** 17:10
**retained** 140:19
**review** 8:12 9:2 9:6,9,12 10:6 10:19
**reviewed** 8:9 8:15 9:16 10:3 10:9,10,22
**revoked** 17:9 17:11,13,19,23 27:2,5,10,20 53:11 55:8,19 56:13,19
**revoking** 26:23
**rich** 4:12 11:18 12:14
**ride** 111:5,12 132:24 133:2
**riding** 60:11
**right** 12:20 21:2 23:6 27:3 28:18 34:13 42:8 44:10 52:2 56:20 59:13 67:9,24 71:3 75:19,21 76:23 91:9 93:17 95:8 99:4 100:7 126:21 129:16 130:15 131:18 131:23,24 132:3 134:20 134:22 136:17
**road** 54:25

**rode** 13:6
**rodriguez** 51:5 111:11
**rolando** 91:15 91:18,24 92:3
**role** 20:4
**rules** 1:19 97:21 99:6
**rulings** 141:7
**rumor** 81:22
**rumors** 81:12 81:18
**running** 57:19 95:22,24 125:14

**s**

**s** 2:2 3:2,2 4:2 39:12 140:2 143:5
**safer** 89:16
**safety** 52:20 56:15 77:7,10 77:15,20,24 78:5,8,11,12,17 78:20 79:2,5,9 79:14,19,24 80:5,8,11,14,20 80:23 81:2,5 81:11 82:8 83:16 85:17,20 85:24 86:18,24 87:6 89:20 99:23 100:2 119:6,11,16,17 119:18,20 120:11,14,20 121:4,16,18 136:15,22
**saving** 93:11
**saw** 40:5
**saying** 16:15 49:22 89:23 125:4
**says** 60:24 73:9 84:8 85:12,16 86:16 87:10,23 98:8 99:20 100:9 110:2 116:22 127:16 127:19 128:9 128:10,24 129:9 130:9,23 132:2 134:20 137:19
**scan** 52:3 64:22 64:24 74:7,18 123:14
**scanned** 74:11
**scarsdale** 37:9
**schedule** 42:7 57:14 63:10 107:12 114:12
**scheduled** 99:23 107:13
**school** 38:11,12
**screen** 85:6 86:6 87:10 89:2 90:17 127:16
**sealing** 3:7
**second** 44:5 55:12 73:9 93:11 106:15 116:8 133:21
**see** 43:3 60:24 61:9 99:6 100:9 109:25 129:5,13,14,24 129:25
**seems** 34:14 131:7
**seen** 71:6 73:2
**send** 83:4 130:24 131:17
**sent** 8:14,17 74:17 99:20 130:15 131:11 131:16
**september** 33:24,25 93:16
**service** 3:16
**set** 43:25 44:17 99:14 142:12 142:21
**settlement** 21:11 23:17 54:23
**seven** 60:23
**several** 122:13
**severally** 1:9
**sheet** 111:23 135:12 143:1
**sheets** 9:10 68:23
**shift** 62:5 68:21
**shifts** 100:11 101:3
**shirt** 91:10,14
**shop** 101:23,25 102:8,11,15
**shot** 85:6 86:6 87:10 89:2 90:17 127:16
**show** 115:9 120:7
**showed** 80:18
**showing** 134:14
**shows** 115:8 116:23
**sick** 80:9 83:25 84:13
**side** 35:15 40:9 52:2
**sidewalks** 35:7
**sign** 21:7 111:22 112:12 112:20,23 113:2
**signature** 44:9 44:12 142:23
**signed** 3:10,12 3:15 21:6,8 68:22

**similar** 22:13
**similarly** 1:4
**simply** 39:23 81:18 132:25
**single** 28:18 50:8 74:14 75:8 120:22
**sit** 22:22,25
**site** 17:21,25 18:4,25 19:6 19:11 29:17,18 46:6,11 55:2 56:4 57:17,24 58:18 59:10 62:19,23 63:18 64:14,20,25 65:6,21 66:12 66:19,24 67:7 67:9,23 68:7 77:11,21,25 78:6 81:23 85:20 87:2,4 88:5 89:25 90:4 92:8 94:19 99:22 100:3 106:18 107:14 108:21 108:23 109:5 110:14 112:12 112:17,19,23 113:13 114:9 114:13,15,20 115:14,17 116:11,13,15 117:2 119:19 121:20 124:8 124:10,18 125:11,18 126:2,7 127:3 132:23 133:11 135:8 136:18 136:21 137:14 138:7
**sites** 63:14 77:13 80:16 117:25
**sitting** 4:19
**situated** 1:4
**situations** 47:9 50:12
**six** 22:16
**small** 51:11,12 51:23
**soft** 126:5
**somebody** 48:7 52:18 56:12 95:22 131:17
**soon** 34:5
**sorry** 23:13 67:18 83:6 86:17 105:22 120:3,10 122:16 130:12 130:23
**sort** 9:6,9,12 16:9 17:5 21:10 23:9,16 47:14 75:3 80:22
**south** 42:24
**southern** 1:2
**space** 128:25
**speak** 5:20 22:17 70:13
**speaking** 7:12
**specific** 8:19,20 10:2 29:2,20 43:11 51:8 57:20 63:17 93:2 99:15 104:12 123:25 127:4 135:7 136:14
**specifically** 9:17 28:13 39:18 82:2
**specified** 139:11
**speed** 43:14
**spell** 36:2 39:10 91:16
**spend** 15:18,24 117:8,20
**spent** 53:16 78:7 85:24 87:5 88:4 90:4 136:22
**spoken** 7:13,16 7:19,22
**sporadic** 28:22
**spot** 121:8
**ss** 142:4
**staged** 64:4
**stamp** 98:13
**stamped** 98:11
**stand** 89:16
**start** 18:19 24:16 31:19 33:18 38:7 39:3 52:2 58:24 59:2 62:8 63:3 72:9 73:10 83:8 93:11 99:23 106:16 114:17 121:6,20 133:22 134:25
**started** 6:18 31:21 34:16 37:15 39:5 52:24 53:6 55:16,17 57:18 59:12,15 62:10 68:20,23 69:18 72:5 73:14 112:20
**starting** 114:20 135:5
**state** 1:23 4:4,8 17:15 46:15 75:14,20 76:2 140:8 142:4,9
**statement** 45:22 46:15,22

**states** 1:2 44:13 45:11 71:5,12 71:16 75:19 86:11 89:2 90:17 99:5,6 128:17 129:12 133:22,25 135:4
**stay** 67:10
**steward** 102:8 102:12,15
**stewards** 101:23,25
**sticker** 51:25
**stipulated** 3:5 3:20
**stone** 103:6
**stop** 24:19 33:21
**stopped** 33:23 34:7 40:5 42:21,22 56:11 57:7,10 69:21 73:18
**straight** 33:5,7 71:13 113:18
**street** 40:5 64:5 64:13 89:17,24 123:20
**strike** 49:18
**string** 129:12
**stub** 71:9,12,16 71:20 84:5,17 114:25 115:8 116:2
**stubs** 9:13 10:5 10:6,9,13,22,23 70:23 140:6 141:4
**stuff** 35:7 56:2 56:3 92:5,18 108:22,24 109:2
**submission** 76:22 77:3
**submit** 16:24 47:14 52:10 74:19
**submitted** 39:23 48:5 52:7 73:23 75:7 101:11
**submitting** 47:18
**subscribed** 139:18 143:21
**sue** 36:4,7,10
**sued** 54:20
**suite** 1:21 2:5,9
**superintendent** 40:12
**supposed** 20:25 57:21 67:10 74:15 99:15
**sure** 18:11,20 26:6 50:3,6 57:20 88:12 105:18 110:8 121:8 124:12
**sweat** 91:14
**sworn** 3:10 4:3 139:5,18 142:12 143:21

**t**

**t** 3:2,2 139:2 140:2 142:2,2
**table** 105:15
**take** 6:4 7:5 13:2 55:25 56:5,6,9,17 57:21 64:13 65:15 68:8 71:2 108:16 114:2 116:18 116:25 119:21 124:16 134:12
**taken** 1:17 41:7 70:11 80:17 104:19 137:9
**talk** 41:9 81:25 95:6
**talking** 20:9
**task** 68:13 74:6 123:13
**tasks** 64:18 124:7
**teamsters** 117:16
**tell** 5:19 9:23 12:19 28:10 29:11 32:7,17 47:25 50:25 53:24 55:7,10 55:18 63:20 68:19 69:17 94:3,19 111:15 130:22
**telling** 40:6 85:19
**ten** 70:12 82:20 134:21 137:5
**terms** 101:7 104:9,11 118:10
**test** 16:24
**testified** 4:5 9:15 16:23 19:4 42:16 49:8,20 72:7 92:7 109:20 110:19 116:17 119:5 122:22 123:4,12 125:3 126:10,16 134:7,11,24 136:13
**testify** 7:3 27:19,25 50:22 139:5
**testimony** 5:3 19:17 30:24 41:10 46:19 47:2 56:10 66:10 70:14 88:8 139:6,10

142:14
**text** 8:3 9:6 63:21,23 82:13 82:18,25 85:7 85:9 86:5,8,17 87:2,10,14,20 89:6,9,12 90:13,16,21 92:2,9,13,15,20 93:5,9,15,18,22 94:2,8,11,17,23 95:6,16 96:3,5 96:9 109:21,21 110:3 120:8 126:17 127:4 127:12,15 128:4 129:11 129:15,19,22 130:3,14,24 131:6,11,16 132:12 137:18 140:9,10,11,12 140:13,14,16
**texted** 129:23 132:9
**texting** 131:15
**thank** 138:13
**thing** 118:7
**things** 56:7
**think** 17:13 24:7 41:19 42:23 44:6 52:19 55:12,22 60:10 67:13 93:10,12 102:24 129:8
**third** 54:19
**three** 28:15,17 28:23 29:3 31:9,21 33:4,6 47:4,7,24 48:19 49:2,4,7 49:9,10,22,23 49:24 50:2,4,7 50:11,23 52:11 52:11 68:9 72:20 106:21 120:6
**time** 1:13 3:22 8:21,22 9:9 10:8,11,13 15:18,25 17:22 20:7,13 22:6 25:13 26:20 28:12 29:6,8 34:4,15 36:5,8 36:11 37:6 43:10 45:24 46:14 48:9 49:14 53:7,16 53:20 54:6,9 54:21,25 55:4 56:5 57:22 58:4,7,10,17 59:2,9,18,21 60:4,17 61:18 62:10,14,18,22 65:5,24 66:11 67:12 68:20,22 68:22 69:2,18 69:20,25 70:6 71:13 72:4,23 73:6,10,14,18 73:22 75:8,9 77:17 78:7,15 78:23 84:18 85:24 87:5 88:4,9,12 90:4 92:13 93:8 95:16 99:23 102:9 107:10 107:18 111:22 112:8 115:12 115:12,13,14 115:18,19,20 115:24 116:2,4 116:8,11,11,25 117:4,7,18,19 117:23,24 119:23 120:2 121:5,11 123:18 133:21 133:22,25 135:11,12,13 135:16,18,20 135:22 136:2,5 136:21 139:10 140:7 141:5
**times** 28:10,13 29:2 48:19,22 48:25 52:13 60:13 61:12,22 66:5 67:3 84:12,16 88:15 88:19 109:7 114:7 115:18 118:3 120:14 122:4 133:8
**timesheet** 112:12,21
**title** 38:3
**titled** 43:22
**titles** 41:18 42:2
**tku** 83:10
**today** 4:19 6:21 22:14 83:7 137:18
**today's** 8:10 9:3,16 10:3,21 10:25
**told** 27:13,15 29:17 32:5,16 39:19 43:3 48:3,4,14 52:14,25 55:13 56:3,6,18,18 63:19 69:25 70:6 81:24 82:2 83:19 106:25 111:2 119:15
**tom** 85:17
**tomorrow** 85:21 86:18 89:17 110:3

120:11 127:20 128:10 129:2
**took** 34:20 41:8 42:22 60:4 70:12 95:2,4 107:18 119:24 121:9,18
**top** 75:21 82:17 85:13 86:12 87:11,19 89:3 90:17 98:8 116:22 127:19 128:24 131:21
**total** 29:13 47:23
**towards** 60:21
**track** 68:25 111:18 112:3 112:16
**traffic** 14:25 58:9 114:8
**transcribe** 5:7
**transcript** 139:9,9
**transcription** 5:13
**transfer** 37:7
**transferred** 37:13 97:5
**trash** 117:9
**travel** 20:12 22:6 26:20 36:5,8,11 54:6 54:9,20 55:4 116:3 117:24 135:13,16,18 135:22 136:2,5
**traveling** 8:21 20:7 22:2 25:13 115:20 115:24 135:20
**trial** 3:22
**truck** 29:12,18 29:21 42:13 45:25 51:10,11 51:13,20,23 55:24 56:6,9 56:17 60:12 64:3,12,17 65:15 68:16 74:8,12,14,23 106:18,20,22 106:24 107:2,7 107:11 110:21 111:6 114:6 120:25 122:5 123:19,19,22 124:16,21 125:4,5,7,8,20
**trucks** 29:16 74:7 106:16 108:15 111:16 124:13 126:6
**true** 44:18 71:8 80:13 99:8 101:15 139:9 142:13
**trust** 53:5
**truth** 28:2 139:5
**truthful** 6:23
**truthfully** 7:3
**try** 83:9 87:23 95:6
**trying** 5:7 92:22
**tunnel** 31:23
**twice** 28:14,22 80:2
**two** 14:24 29:16 33:10 48:19 49:2,4,7 49:10,23 54:17 65:17 68:8 107:16 114:10 116:18 120:5,5 134:13
**type** 51:12 106:22
**typically** 64:4 65:5,11,19

**u**

**u** 3:2 4:2 39:12
**uh** 18:8
**um** 18:8 40:20
**uncle** 13:19,20 13:24 15:23
**under** 4:25 5:3 13:25 14:7 44:14 45:3 89:17,24 105:15
**understand** 5:2 5:19 6:8,12,15 23:13 25:5,16 25:20 44:21,25 96:22 122:16 130:2 131:14
**understanding** 41:20
**understood** 26:6
**union** 37:19 96:18,22 98:9 101:18 141:6
**unions** 102:18 102:21 103:24
**united** 1:2
**unload** 68:5 108:10 113:8 113:25 123:4
**unloaded** 123:9
**unloading** 122:23
**unpaid** 22:6 25:13 26:20 36:5,8,10 54:6 54:9,20 55:2,4 101:12 102:12 105:8 106:2
**unsigned** 3:14
**use** 108:20
**used** 3:14 55:24 55:25 56:2,4

66:8 108:22 110:24 111:6 111:11,17 113:7 115:4 132:24 135:24
**usually** 78:14 116:12,15 121:5,9 135:8

**v**

**v** 4:2 36:3 143:3
**vacation** 42:23 95:3,5,7
**valid** 17:15 76:3
**van** 51:14,23
**varied** 62:15,23 65:24
**various** 102:4 124:6
**vary** 58:7 59:3 59:4 121:21
**vehicle** 18:22 19:5,10 27:9 27:16,20 28:4 28:11 29:20 31:25 32:13,14 32:20 34:22 46:5 47:3,8,13 47:24 48:8,11 48:15,18 49:9 49:21 50:16,17 50:22 51:3,8 51:16,19,22 52:2,4,5 53:8 53:10 55:15,18 56:11 57:8,11 60:9,11 70:5 76:16,21 77:2
**vehicles** 46:11 51:17
**verbal** 5:16
**veritext** 143:1
**vernon** 4:12 11:18 108:5
**visconti** 27:17 27:19 50:20

**w**

**w** 89:16
**wage** 37:23
**wages** 101:12 102:12
**wait** 5:8 43:3
**waived** 3:9
**waiver** 45:11
**walk** 12:25
**walked** 13:8
**wanna** 18:11 18:20 34:11 45:23 54:11
**want** 45:21 52:21 74:5 93:11 109:8,14 114:24 116:7 120:7
**wanted** 53:13 53:23 105:17 118:5,18
**wants** 111:5
**way** 37:8 98:12 122:15 137:21 138:5 142:18
**ways** 52:6 54:18
**wearing** 91:10
**weather** 80:2,3 80:12
**week** 70:17 71:10,14,18,22 72:2,5 77:22 84:5,9 119:10
**weeks** 24:11
**welders** 117:17 121:3
**went** 24:6,11 36:13 42:24 54:17 64:10,11 69:13 78:25 132:25
**westchester** 31:8,24 37:9 40:8 78:24 79:3 97:4 119:24
**whereof** 142:20
**white** 87:20
**witness** 3:10,16 3:18 4:3 105:16 118:12 138:15 142:11 142:14,20 143:4
**woodbury** 1:22 2:9
**word** 39:18
**work** 17:18 22:15 23:21 24:10,12 31:4 31:6,7,8,9,16 31:24 34:8,17 34:21 35:6 36:14,18 37:8 37:15 39:2,7 40:2,5,8 42:17 43:2,6 57:14 62:6,7 65:9,20 66:12,15,23 67:15 68:23 69:22 73:14 76:10 81:10 83:9,12 84:13 84:16,19 88:17 92:6 96:24 97:5 99:16,22 100:10 101:3 103:6,6 115:23 116:24 123:25 132:22 134:8 134:15 135:5
**worked** 8:22 10:11,14 24:3 24:14 33:11 34:15 37:3,5,9

45:13 54:17 57:15 66:15 67:13 69:7 70:2,17 71:13 71:17,21 84:9 84:22 94:14 95:11 99:10 100:15 102:4 115:19 116:3 118:21 119:24 133:10 135:13 135:23 141:5
**workers** 46:9 104:10 117:16
**working** 8:21 10:5 20:6,24 24:7,16,19 29:4,14,17 31:18,19 33:12 33:16,18,21,23 34:3,4,7,9,16 34:16,18 35:5 39:4 40:4 42:21 57:16 66:19 67:22 69:18,21 73:18 74:14 78:23 79:2 80:15 92:8 94:19 99:6 106:2,12 107:15,15 112:20,22 113:4,13 114:13,20 115:14 116:10 116:12 120:2 121:22 135:19
**workplace** 101:19
**works** 40:2
**worries** 87:23
**written** 101:11
**wrong** 130:15 131:12 132:10

**x**

**x** 1:3,10 140:2 140:20

**y**

**y** 39:12
**yard** 12:18,23 14:22 18:6 19:12 38:7 56:2,3,7 58:4 58:11,15 59:16 60:4 61:6,6,13 61:19,23 64:10 64:11,12 65:16 66:9 67:24 68:14 70:7 77:14 78:12,17 78:20,25 86:19 107:17,20,23 108:3,4,7 109:4 110:10 110:13,20 111:16,19,23 112:4,9 113:5 113:11,16,19 113:21,24 114:9 115:20 115:23 116:3 116:19 117:2,6 117:13,20 119:25 120:12 121:5 122:24 123:6,6,8,10,14 123:23 124:2,4 124:6,7,11,15 124:22,22 125:3,24 128:14 131:22 131:24 132:18 132:21,23 133:2 134:12 137:13,21,24 138:2,6
**yards** 18:15,24 64:3 117:25 120:15
**yeah** 13:11,22 21:6,20 25:8 38:8,20 41:4 44:24 45:5 57:2,4,6,9 58:14 61:2 62:20 67:17 69:6,15 76:9 79:25 81:21 90:7 95:10,14 102:9 127:7 130:17
**year** 13:14 14:16 24:7,8,8 24:10,14,17 33:25 53:4 55:12,13 93:10 93:11,12 106:15
**years** 11:23 31:17 54:17
**yellow** 110:2 127:20 128:9 128:25 137:20
**york** 1:2,22,24 2:5,5,9 4:4,13 11:18 17:15 75:14,20 76:2 142:4,5,9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.