# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
1:24-CV-05442(ALC)(BCM)

- - - - - - - - - - - - - - - - - - - - -x

MANUEL ANGEL CALDERON, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

-against-

NETWORK INFRASTRUCTURE INC. And PATRICK CLARKE, Jointly and Severally,

Defendants.

- - - - - - - - - - - - - - - - - - - - -x

Virtual Proceeding

November 20, 2025
2:44 p.m.
Job No. P1-7750338

DEPOSITION of THOMAS DOYLE, a Plaintiff in the above-entitled action, held at the above time and place, taken before LEE K. AUSLANDER, a Notary Public of the State of New York, pursuant to the Federal Rules of Civil Procedure, Order and stipulations between Counsel.

* * *

A P P E A R A N C E S:

PELTON GRAHAM LLC
Attorneys for Plaintiffs
111 Broadway, Suite 1503
New York, New York 10006
BY: BRENT PELTON, ESQ.
BELINDA HERAZO, ESQ.

KAUFMAN DOLOWICH, LLP
Attorneys for Defendants
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
BY: EDWARD H. GRIMMETT, ESQ.

ALSO PRESENT:

PATRICK CLARKE

* * *

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

T H O M A S D O Y L E, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. GRIMMETT:

Q. What is your name?
A. Thomas Doyle.
Q. Where do you reside?
A. 253 Moxley Street, Jefferson, New York 12093.
Q. Good afternoon, Mr. Doyle.
A. How are you?
Q. Good. Can you hear me all right?
A. Yes.
Q. My name is Edward Grimmett. I represent Network and Patrick Clarke, who is sitting right behind me. I'm just going to start out with some general instructions but I'm going to be asking you questions and you're going to be answering them under oath. Do you understand that your testimony today is

T. DOYLE

going to be offered under the penalty of perjury?

A. Yes.

Q. Because of the court reporter is attempting to transcribe everything we stay, please wait for me to finish asking my question and I'll offer you the same courtesy.

A. No problem.

Q. Also, we're taking an oral transcript here so the court reporter can't acknowledge head nods or other non-verbal gestures like mm-hmm. So everything needs to be a verbal response, okay?

A. Yes, sir.

Q. I'm also going to assume that you understand my questions unless you tell me otherwise. If you need to speak to your attorney at any point, feel free to do so but you just have to answer the question that's been asked before you speak to the attorney.

A. Okay.

T. DOYLE

Q. If you need a break at any point, just let me know. But same thing; if a question is presented to you, that question needs to be answered before we take that break.

A. Okay.

Q. Throughout -- sorry, what was that?

A. You froze for a second. I heard something about a break.

Q. Hopefully, that doesn't happen often, but if it does, let me know. If you need a break at any point, you're entitled to a break but if there's a question presented to you, you need to answer that answer before you take the break. You got that.

A. Yes.

Q. I'm going to be using some terms throughout the deposition. If I refer to defendants, that means Network Infrastructure, Inc. and Patrick Clarke collectively; do you understand that?

A. Yes.

T. DOYLE

Q. If I refer to -- if I just say Network, I'm referring to Network Infrastructure, Inc. Do you understand that?

A. Yes.

Q. If I refer to the union or Local 731, this means the Building Concrete, Excavating, and Common Laborers Union Local 731 of Greater New York, Long Island, and vicinity of Laborers International Union of North America. That would be Local 731. Do you understand that?

A. Yes.

Q. I gave you some general instructions there. Do you understand all these instructions?

A. Yes.

Q. Do you have any questions before we proceed?

A. No.

Q. Is there any reason that would prevent or limit you today from giving truthful answers to my questions?

T. DOYLE

A. No.

Q. Are you currently taking any medication that would impact your ability to testify?

A. No.

Q. Have you failed to take any medication in the last 48 hours that would affect your ability to testify?

A. No.

Q. Have you consumed alcohol in the last 24 hours?

A. No.

Q. Where were you taking this deposition from?

A. From my home in Upstate New York.

Q. What room are you in?

A. In my living room.

Q. Is there anyone else in the living room?

A. No.

Q. Does that living room have doors?

A. Front door.

T. DOYLE

Q. Is there anyone else in the house?

A. No.

Q. Do you have any documents in front of you right now?

A. No.

Q. Do you have anything open on your computer other than this Zoom screen?

A. No.

Q. Are you on your phone or computer?

A. Phone.

Q. Do you have a computer behind you or are you only using a phone?

A. I don't have a computer. I only have a phone.

Q. And this Zoom screen is taking up the entire phone, correct?

A. Yes.

Q. You're not looking at text messages or the Internet?

A. No.

Q. Have you been deposed before?

A. Yes.

T. DOYLE

Q. How many times?

A. A few times.

Q. We'll take it one by one. When was the first time you were deposed?

A. Just to clarify, you mean going through this?

Q. Yes. Exactly what we're doing today. Have you gone through this before?

A. Yes.

Q. When was the first time?

A. Years ago.

Q. Do you have the approximate year?

A. No.

Q. What was the nature of that case?

A. I was a police officer so I attended many depositions.

Q. Have you ever attended a deposition as a plaintiff before?

A. No.

Q. So all these depositions were related to your police work?

A. Yes.

T. DOYLE

Q. Were these actions that were either brought against the police department or you were serving as a witness in a prosecution?

A. Yes.

Q. Were you ever a party to any of these cases?

A. I was the arresting officer.

Q. When I say were you a party, were you ever specifically named as a defendant?

A. No.

Q. So nobody has ever sued you before?

A. No.

Q. Have you ever offered testimony in another form, whether it be before a governmental agency or another tribunal?

A. I don't recall.

Q. Aside from speaking with your attorney, did you speak to anyone else either in person or by the phone to prepare for today's deposition?

A. No.

T. DOYLE

Q. Have you spoken with anyone currently employed by any of the defendants about today's deposition?

A. No.

Q. Have you spoken with any former employees of defendants about today's deposition?

A. No.

Q. Have you communicated with anybody about this deposition via text, e-mail?

A. No.

Q. Have you reviewed any documents to prepare for this deposition?

A. Excuse me?

Q. Have you reviewed any documents to prepare for today's deposition?

A. No.

Q. Did you prepare any notes or any sort of documents for today's deposition?

A. Just some notes. My own, what I remembered.

MR. GRIMMETT: I'll call for the production of those notes.

T. DOYLE

A. It's just basically different things that I remember from the incident from years ago.

Q. Were those notes in front of you right now?

A. Yes.

Q. I'm going to ask that those notes be put away because this is a deposition and you can only testify as to your personal knowledge and should not be reviewing any documents unless I put them in front of you.

A. No problem.

Q. Those notes are no longer around you?

A. They are on the other side of the couch.

Q. I asked you earlier whether you had anything in front of you and you indicated that was nothing. So is there anything else that I should be aware of?

A. No. I scribbled some notes earlier just to remind myself.

Q. The notes are away? There's

T. DOYLE

nothing else in front of you now?
A. Correct.
Q. Have you discussed this case at all with anyone else?
A. No. I don't have any contact with Network.
Q. I think you froze there. I'm just going to repeat the question. Have you spoken to anyone else about this case?
A. No.
Q. I think you kind of answered this but you've never been a plaintiff, petitioner or complainant in a lawsuit before?
A. No. Plaintiff?
Q. Yes, have you ever commenced a personal injury action?
A. Years ago I had a lawyer when I had a knee injury. But I was 16 years old.
Q. You filed a lawsuit when you were 16 years old about an injury?
A. Yes.
Q. Have you ever filed any other

lawsuits or someone filed a lawsuit on your behalf?

A. Not that I remember.

Q. You don't remember --

A. I was plaintiff against Danella Construction and Felton, who was my employer.

Q. When that lawsuit?

A. Probably about 2017, 2016.

Q. That was a class action?

A. Yes.

Q. Were you deposed in that case?

A. Yes.

Q. Mr. Doyle, I just asked you earlier whether you've been deposed before and you left that one out. I ask you to fully answer my questions. When was that deposition held?

A. I guess I had to do a deposition. I was just a name in a lawsuit.

Q. I just asked whether you were deposed in that case against Danella Construction.

T. DOYLE

A. I never testified in that case. I never appeared like this in case. I was just a name on a sheet.
Q. Understood. So there was never a deposition?
A. Correct.
Q. To what extent did you participate in that case?
A. I was just -- somebody in the office put me on the list and I was notified. I was just signed a form and that was it.
Q. Did you ever provide a declaration like you did in this matter?
A. No.
Q. That -- all you did was you received a notice in the mail?
A. Correct.
Q. And you returned that notice?
A. Yes.
Q. What did that notice state?
A. Just that I -- my name was entered into a lawsuit against Danella Construction for a similar case as this.

T. DOYLE

Q. That lawsuit indicated that the allegations against Danella were for unpaid travel time, correct?

A. Yes.

Q. Then you go onto work for Network and you're raising that same allegation?

A. I started Network in 2007 and I left for Danella when Network had no work and I came back when they gotten the contract from Danella. Came back to Network and finished up my job there.

Q. When you came back, there was nothing that raised a red flag where you said hey, this is what happened at Danella, you guys should not be doing this?

A. We complained at times about the mandatory meetings at 6:00 a.m. that we weren't compensated for. CPR classes on Saturday that we had to give up our day off for. 10-hour OSHA classes that we had to complete on our own; 30-hour OSHA classes that we had to complete on our

T. DOYLE

own. But didn't make any difference.

Q. So your complaints only relate to unpaid safety meetings and trainings?

A. Travel time; I was a driver. We didn't get travel time driving the truck back and forth. We had to get to the yard early to load up the material. We had stay on our own time to unload the garbage and the material. And in the mornings, before we left, we had to check on the truck, the lights, the brake lights, the signals. We had to fill out a form.

Q. We'll get into all of that. That wasn't my question. My question was, you were involved in this lawsuit Danella Construction for unpaid travel time and now --

A. And the safety meetings, also.

Q. And now eight years later, here you are bringing a lawsuit for the same exact things. If you thought that was so wrong, why did you continue with Network for so long?

A. I don't know. It's a job. I

T. DOYLE

have to pay the bills.

Q. You received a settlement payment at Danella. How much did you receive?

A. You can ask the lawyer.

Q. You don't recall?

A. About $1,000 and then another $1,000. I'm not sure.

Q. Around $2,000?

A. I haven't received $2,000 yet, no.

Q. The Danella, you never received a settlement?

A. I got $1,000 from the settlement from Danella.

Q. Understood. All you got was $1,000 from Danella?

A. Yes.

Q. Are there any lawsuits that you were involved in that I should be aware of?

A. Not that I remember.

Q. You said you've never been a defendant or respondent? Nobody has sued

T. DOYLE

you as an individual?

A. No.

Q. Other than this case and the Danella case, have you filed a lawsuit or a complaint with administrative agency against one of your former employers?

A. No.

Q. How did you learn of this lawsuit?

A. Excuse me?

Q. How did you learn of this lawsuit?

A. When I called the law office, they wanted to know if I got the check. I called them up and I was asked if I ever worked anywhere else and they told me they had a case -- I told them Network and they said they had a class action suit on Network.

Q. And because of that, you decided to get involved?

A. Pretty much. They put my name on it.

Q. Do you have any prior

T. DOYLE

misdemeanors or felony convictions?
A. No.
Q. Just going back, when did you receive the settlement check from Danella?
A. Not sure. I can't swear to it. I don't know.
Q. Would it have been prior to 2022?
A. I'm not sure.
Q. Have you ever participated in any other class actions against former employers?
A. No.
Q. Do you go by any names other than Thomas Doyle?
A. No.
Q. Do you have any nicknames?
A. No.
Q. What is your date of birth?
A. April 1, 1962.
Q. Can you repeat your address that you currently live at?
A. 253 Moxley Street, Jefferson, New York 12093.

T. DOYLE

Q. Do you own or rent?

A. I own it.

Q. How long have you lived there?

A. I've been here about four years. I've owned it from 2009.

Q. Who do you live with?

A. My wife comes over the weekend. She's still working and I still have a house in Long Island.

Q. Where is the house in Long Island located?

A. West Hempstead.

Q. What's the address?

A. 237 Marshall Avenue, West Hempstead, New York 11552.

Q. Is that where you resided when you worked for Network?

A. Yes.

Q. That's where you resided for the duration of your employment with Network? There's nowhere else?

A. No, I didn't come up here until after retirement.

Q. When did you retire?

T. DOYLE

A. 2023. I've been back and forth, on the weekends, any days off. I was on unemployment a lot. A Network, it was slow.

Q. You mentioned you retired. Do you do any sort of work or are you completely retired at this point?

A. Completely.

Q. After last day at Network, did you work with anybody else?

A. No.

Q. Are you aware that other individuals have opted into this lawsuit?

A. Yes, I heard from the lawyers.

Q. Do you know the names of the individuals who opted into this lawsuit?

A. No, I just heard Calderon. I didn't really -- they never mentioned any other. They just said people that are involved in Network.

Q. Do you know Manuel Calderon?

A. I don't remember him, to be honest.

Q. What's your highest level of

T. DOYLE

education?

A. Three years of Adelphi. I didn't graduate. I had an associate's from Nassau but then I went to Adelphi.

Q. You broke up at the end there.

A. I said I have an associates with Nassau Community College and transferred to Adelphi.

Q. And I think you were indicating that -- what was the fallout with Adelphi?

A. I left six months before my bachelor's to join the police department.

Q. You worked for Network on three separate occasions, right?

A. I worked for them until I got laid off and then I called to Danella and then I was there about seven months and then work opened up and I went back to Network.

Q. Do you recall the first time that you were hired by Network? When that was?

A. It was in January of 2007.

Q. How did you learn of the job?

T. DOYLE

A. I knew Pat Clarke.

Q. How did you know Pat Clarke?

A. From the neighborhood.

Q. Did Pat say, hey, you should come apply? How did that work out?

A. He asked me to come work for him.

Q. So there was never any formal interview?

A. No.

Q. You worked for Network from approximately -- the first stint in 2007 to December 2016, correct?

A. Correct.

Q. What were your responsibilities during that time period?

A. I was a laborer. I was on the boom truck as a laborer, as the driver. I drove equipment and stuff to job sites under different foremen. I was on a rack truck in the Bronx.

Q. That's it?

A. Yes.

Q. During that period of time --

T. DOYLE

A. A laborer on rack trucks. Different trucks, I drove. I have a CDL.

Q. You left in December 2016, correct?

A. Approximately, yes. I was laid off. I got the call for the other job approximately February, March.

Q. What did you do after you left Network that first time?

A. If I was able to get unemployment -- sometimes I wasn't. And then I just waited to go back.

Q. The connection is a little choppy. Can you repeat your answer? What you did after you worked for Network during the first stint?

A. We were laid off. When I was laid off from Network -- we were laid off most the time in the winter time when things were slow. Always around the holidays when they had restrictions on work in the city for the holidays.

Q. So in between your first and second stint at Network, you never held

T. DOYLE

another job?

A. Yes. I was at Danella.

Q. You started working back in Network approximately September 26, 2017? Does that sound right?

A. No, I think it was -- I'm not sure.

Q. Approximately 2017, 2018, you came back to Network, right?

A. Yes, I was gone for seven months and then work opened up at Network and I ended up going back to Network.

Q. And that was around 2017, 2018, right?

A. I believe so, yes.

Q. And you worked a second stint with Network until approximately February 20, 2022, correct?

A. I think it was '23, November of 2023.

Q. That was your last date of employment, right?

A. Yes.

Q. Wasn't there a break from

T. DOYLE

February 2022 to June of 2022 where you didn't work for Network?

A. Possibly, yes.

Q. Do you know what you did during that period of time?

A. I'm not sure of the year but there was a time -- that might be the year that I worked with Danella. I picked up work with Danella in February or March. I'm not sure of the year.

Q. When you came back to Network, whether it be 2017, 2018, what were your responsibilities when you returned?

A. Working for subcontractors for Verizon.

Q. You were responsible for driving a truck, correct?

A. Yes. I drove a truck for Network when I came back. A six-wheel with a trailer.

Q. That was the only truck you drove?

A. Yes, pretty much because I had the CDL.

T. DOYLE

Q. So you predominately worked on that Verizon project, correct?

A. Until the end, yes.

Q. That project reported out of the Hempstead yard, correct?

A. Yes.

Q. What did a telecom project entail? What were your responsibilities?

A. I loaded up all the materials on the truck. The inner ducts and I went to the job site and then we worked on whatever needed to be done for the day under a Verizon supervisor.

Q. And the work on the job would come to an end whenever you completed your tasks on that day, correct?

A. Excuse me?

Q. So there was no set time that you had to be at the job site? Whenever you completed your tasks, that was end of the day, correct?

MR. PELTON: Objection.

THE WITNESS: I'm sorry?

MR. PELTON: I may object at

times. Please go ahead and answer the question unless I instruct you not to.

THE WITNESS: Okay.

Q. The question is the time you spent on the job depended on how long it took you to complete your tasks. Whenever you completed your tasks, you left the job site, correct?

A. We cleaned job site, the work we had to -- we worked -- we just go the work that we had to do for the day. We finished up. We had a layout and stuff and cleanup at the end of the day.

Q. Understood. There was no set time that you had to be at the job? When you got your stuff done, you got your stuff done?

MR. PELTON: Objection.

A. Drivers had to be there a little early in the morning like 6:00, 6:30 to load up the truck and then we drove to the site and some jobs had restrictions on time. Time restrictions. So we set up all the cones, signs. All the material --

T. DOYLE

we had to use safety equipment and everything for the day. At the end of the day, we had to put all that away and clean up.

Q. That doesn't answer my question. I'm talking about just when you're on the job site. You don't need to be at the job site for a set period of time, correct?

A. We had to be there to leave when the inspector was done.

Q. There was never any times where you completed all your tasks for the day and you were able to leave earlier than you ordinarily would be?

A. Sometimes, we recall the day because of the heat or the whether. Most of the time we did our work, got it done. On the job, we answered to the Verizon inspector. When we got the job for the day done -- we could not -- we had to stay for a while. We could not go back to the yard or whatever.

Q. The Verizon director would dictate how long you'd be at the project,

T. DOYLE

correct?

A. Most of the time, we had to get our job done for the day.

Q. There were times when you said, okay, after four hours, you got your job done and you could leave, correct?

A. No.

Q. Never four?

A. No. First of all, a lot of the jobs were in Brooklyn, Staten Island, Queens where it would take us drivers --

Q. I understand. I don't mean to cut you off, Mr. Doyle. I understand there's different components to this. I'm only referring to the time that you're at the job site. So let's say you get to the job whether it be 9:00 a.m. There are days when you could be on the job from 9:00 a.m. to 5:00 p.m. and then there are days you could be at the job from 9:00 a.m. to 2:00 p.m., correct? It varies.

MR. PELTON: Objection.

A. It varied but yes.

Q. Going forward, unless I state

T. DOYLE

otherwise, my questions are going to be related to the time period of December 2, 2017 to the last date of your employment. Do you understand that?

A. Yes.

Q. During that period of time, you were -- your job title was a laborer or driver?

A. Correct.

Q. And that job title never changed throughout the duration of your employment, correct?

A. Sometimes I was just a laborer but most of the time because I had CDL and clean license, I was the driver.

Q. When you were just a laborer, would you drive directly to the job site?

A. Yes, at times. It wasn't often, though.

Q. But most laborers would drive directly to the job site, right?

A. Yes.

Q. Your coworkers all had different job titles, right?

T. DOYLE

MR. PELTON: Objection. You can answer.

A. Yes. We didn't have too many operators on the telephone.

Q. I hate to do this but is there a place in your house with a better connection? This probably the seventh time you've broken up. There's nothing you can do the improve the connection?

A. I don't think so, to be honest. It's the best spot in the house.

MR. GRIMMETT: Can you read back my question?

(Whereupon, the record was read by the reporter.)

A. Different unions. Everybody was basically laborers. I was a laborer driver and there was another guy, Carlos, who was the labor driver. He drove a different truck, a rodding truck.

Q. Were there some employees that only worked at the yard and they never went to the job site?

A. There was yard employees.

T. DOYLE

Mostly kids working summer jobs. Some full-time yard guys. Most of them were not union. They were just workers there starting out.

Q. When did you stop working at Network?

A. Around November. I don't know if it was 2022 or -- I think it was 2023.

Q. Why do you no longer work for Network?

A. We got let go, the crew.

Q. So your whole entire crew was let go?

A. Yes.

Q. Who was on that crew?

A. Doug Faulkner, Marlon Vallen, Carlos -- not sure of his last name. And there was Pedro Silver.

Q. When you mentioned a Carlos, is that a Carlos Fuentes?

A. Yes.

Q. Do you know where the crew was let us?

A. He calls us in the office, were

T. DOYLE

handed checks. We asked for our next location and he walked away.

Q. You were never given any sort of explanation for your termination?

A. I know he feels yelling at the foreman for using a company van after hours for side jobs.

Q. Did you assist for those side jobs?

A. No. I had no idea.

Q. You feel like the entire crew was terminated because what the foreman was doing?

A. Yes. The foreman -- I found out later from those people that Pat was annoyed that I never said anything about Dougie using the van but I had no idea what he did after work. And Kenny Walsh, we called him, Mike, had Dougie working on his house with the company van. He was the supervisor. He should be the one -- but he was using them to work on his house.

Q. Who told all of this?

T. DOYLE

A. Pat had said something to me but I didn't know. I didn't know -- I don't know what anybody does when they leave. They don't know what I do when they leave.

Q. I thought you said you got no explanation for your termination and now Pat is the one telling you?

A. It was months later. He brought it up to me when I called to see if I could come back to work.

Q. So Pat offered you your job back?

A. No.

Q. You called to see if you could go back to work?

A. Yes.

Q. What did Pat say?

A. He was annoyed about -- because the van. He said something to Dougie day. He yelled. He was annoyed at all of us. We didn't understand. We were considered the A team. The supervisor that worked out of Network put us on all the hard jobs. We always got our jobs done.

T. DOYLE

Q. This termination all had to do with Doug's conduct? It had nothing to do with you?

A. Not that I know of. I mean, he never really gave -- he told us we don't have to get an explanation. He would not give us an explanation.

Q. Would it refresh your recollection that you were terminated for not driving directly to the job site?

A. No. If I stopped anywhere -- my house is less than a mile and I stopped there to go to bathroom.

Q. How long --

A. Nobody outside would use the bathroom. Like, you know, to go -- you know.

Q. How long would you typically stop at your house for?

A. I don't know. Half hour.

Q. Half hour to use the bathroom?

A. 15 minutes.

Q. To use the bathroom?

A. Sometimes, yes.

T. DOYLE

Q. Both before and after your shift?

A. Sometimes I had to go on the way home and sometimes I had to unload the truck. I wasn't going to run to the bathroom. You can take care of number one. You can't take care of number two out there.

Q. Understood. There was never -- you never stopped at your house for more than a half hour a day; is that accurate?

A. Something like that. I'm not sure.

Q. Do you know if any of the other members of your crew were stopping at their houses?

A. I have no idea what the other crew members to do.

Q. Were you still compensated for the time you spent at your house?

A. Yes.

Q. Even though you stopped your house, you would report the amount of time you were at your house to the foreman for

T. DOYLE

the hours worked in the day?

A. No because me and Carlos had to come back at the end of the day and unload our truck and on our own time. We had to unload it our own time. So I don't know what the other members did or what they didn't do but if I had to go to bathroom, I had to go to the bathroom.

Q. You would leave the job site, go home --

A. It's not every time. It's not a daily occurrence.

Q. Occasionally -- is it fair to say, occasionally, you would leave the job site, stop your house to go to the bathroom with Carlos?

A. No. He had his own truck.

Q. Tell me if this is fair to say; you would leave the job site occasionally, stop at your house to use the bathroom and then go back to the yard with a truck?

A. It wasn't a daily thing.

Q. Occasionally, that occurred?

A. Occasionally, yes.

T. DOYLE

Q. When you got back to the yard, what responsibilities did you need to take care of?

A. I had to get rid of all the empty rolls, all the materials that we -- the things that pulled out, put everything in dumpsters. Fridays, we had to put the tools away. We had to stay extra on Fridays without compensation. We had to put all the tools away because people were stealing them out of the truck -- they were climbing the fence. Responsibility of the drivers on Fridays, we had to put all the tools away -- that were expensive tools. Lock them up in the shop.

Q. And that only happened on Friday with the tools?

A. Basically, yes. After they started getting break-ins.

Q. Every other day, the tools were typically left on the truck; is that fair to say?

A. Yes, on weekends nobody was in the yard -- that came in the yard.

T. DOYLE

Q. But Monday through Friday morning, the tools remained on the truck? Is that accurate?

A. Yes, the foreman kept the generators and the other tools, the chainsaw or whatever. We had a lot of stuff going on. They had a lot of stuff they wanted to put away in the drawers.

Q. But Monday through Friday morning, they remained on the truck, correct?

A. Pretty much.

Q. Other than Fridays, all you had to do when you got back to the yard was unload the debris, correct?

A. Yes. Unload the debris and then load up what you were told needed to be there by a foreman.

Q. You would report the time that you worked each day to your foreman?

A. No. Our start time and the -- he'd know what time we got back to the yard.

Q. The foreman --

T. DOYLE

A. We did keep track of our time. Foreman put us down -- we worked eight hours. We came back to the yard, had different responsibilities as a driver.

Q. You never went to the foreman and said I actually started at 6:00 this day but you put me down for 7:00?

A. No, because he knew what we had to do.

Q. The foreman was aware of the total hours you worked in the day; is that accurate?

A. Excuse me?

Q. The foreman was aware of the total hours you worked in the day, correct?

A. Correct.

Q. And then he noted on a tablet, the total hours you worked that day, correct?

A. Correct.

Q. And then you were compensated for that time?

A. Yes.

T. DOYLE

Q. The time that you spent stopping at your house, that was included in your compensation for the day?

A. Yes. We worked through lunch a lot of times to get the job done.

Q. When did you eat?

A. On the way home.

Q. So you would work eight-hour shift sometimes and you would not eat at all?

A. Right. And the bathroom.

Q. Isn't it true that your foreman would also stop at his house on his way back to the yard?

A. I have no idea what my foreman did or what the other crew members did. I was responsible for myself.

Q. Did you ever report to anyone at Network that, hey, I stopped at home for a half hour today?

A. No.

Q. Do you feel that's lying about the hours you worked in the day?

A. No because there's hours I

T. DOYLE

worked in the day that I didn't get paid for.

Q. But you just testified that the foreman accurately recorded the hours that you worked in a day. So how could that be possible?

A. He didn't accurate -- I worked eight hours. Whether I was loading the truck or unloading the truck or whatever, it was officially eight hours. We were working out that in 95, 100 degrees. We worked there at 10 degrees. We weren't compensated or pulled out because of the weather. We did our work. Our job got done.

Q. In general, the total --

A. I'm sure Pat never got -- we finished our work. We completed everything that the Verizon supervisor wanted from us.

Q. Generally, the amount of time you spent working in a day was no more than eight hours; is that accurate?

A. I worked a little over.

T. DOYLE

Including the time -- yes. I worked eight hours. You know, I would have to do extra hours, half hour here, half hour there to take care of the truck.

Q. It was rare where you worked more than eight hours in a day?

MR. PELTON: Objection.

A. We didn't get much overtime than that.

Q. You didn't work much overtime; is that accurate?

A. On the phone, no. Only on certain occasions.

MR. GRIMMETT: Let's take a short break.

(Whereupon, a recess was taken at this time.)

Q. Mr. Doyle, we just took a ten-minute break. Did you speak to anybody about the substance of your testimony during that break?

A. I spoke to my lawyer.

Q. Did you discuss with your lawyer questions that you may anticipate during

T. DOYLE

this deposition?

A. No.

Q. Did you discuss with your lawyer any testimony that you should go back and correct?

A. No.

Q. At this time, do you wish go back and correct any of the testimony you provided?

A. No.

Q. What was your typical schedule when you worked for Network?

A. Different. Could be nights, could be days. Wherever we were required to go.

Q. How would you know what the shift you were supposed to work each day was?

A. They would notify my foreman Doug and he would notify us.

Q. How would Doug notify you? Would he send you a text?

A. Yes, group text.

Q. Do you still have those text

T. DOYLE

messages?

A. I don't.

Q. What happened to them?

A. It was a while ago. I delete them.

Q. When did you delete them?

A. I don't remember.

Q. Have you deleted them within the past year?

A. Could be, yes. Not sure. I haven't had -- yes. I don't recall. I delete them. I'm not sure.

Q. Did you delete them after this lawsuit started?

A. No.

Q. So you deleted them all prior to the lawsuit?

A. Well, I delete them as I go. I don't need them on my phone.

Q. So once you get a text message, you delete it?

A. Pretty much, yes.

MR. GRIMMETT: I'm going to call for the production of text messages to

the extent they could be recovered.

Q. What individuals did you directly report to over the course of your employment?

A. What foreman?

Q. Yes.

A. Mostly Giovanni, Joe, and Doug.

Q. What's Giovanni's last name?

A. I think it's Cardillo.

Q. Who was the second person?

A. Joe Scorpani (phonetic). I'm not sure that spelling.

Q. The last one was Doug Faulkner?

A. Yes. We would just get a text saying what location we'd be on, what time to be the yard, and that was it. No reason to save it.

Q. If I share my screen, are you able to view documents on your phone?

A. I could try, yes.

Q. Can you see this document?

A. Yes.

Q. I'm going to scroll through the document. What I'm showing you is

T. DOYLE

entitled Opt-in Plaintiff Thomas Doyle's objections And Responses to Defendants' First Set of Interrogatories. Do you see the document I have in front of you?

A. Not really. I just see a date.

Q. It's a little zoomed in. I don't know how to make it any smaller but I'll scrawl through the document. This is the second to last page of the document. Let me ask first, have you seen this document before?

A. Yes, I signed it.

Q. Here it says verification.

A. All right.

Q. When you signed this, you understood that you were submitting this document under penalty of perjury?

A. I don't know what it says.

Q. I'll read it just because it's so zoomed in. "I, Thomas Doyle, hereby declare under penalty of perjury that I have read the foregoing plaintiff Thomas Doyle's objections and responses to defendants first set of interrogatories

T. DOYLE

and believe it to be true to the best of my knowledge and belief."

A. I only sign whatever I wrote. I didn't know what that other guy -- Calderon, I didn't sign anything about him. I don't know who he is.

Q. Understood. This is your signature right here, right?

A. Yes.

Q. I'm going to scroll up to the top of the page -- to the first page. This states right here, "Opt-in Plaintiff Thomas Doyle's Objections and Responses to Defendants' First Set of Interrogatories."

A. Yes.

Q. That's your response, correct?

A. I believe so. I can't see it.

Q. I want to make sure you can see it.

MR. GRIMMETT: We might have to take a break and discuss this.

MR. PELTON: What is Thomas not able to see?

MR. GRIMMETT: My concern is

he's on his phone, he's constantly going on and off the screen to view a document off screen. I don't know why he's going off screen. I need to see him the entire time. I have concerns that he can't fully view this document. I'm going to have to go through a bunch of documents today. I'm afraid we may just be wasting our time. If he only has access to his phone, I'm going to ask the court for him come in person.

MR. PELTON: Thomas, can you read -- can you see that document.

THE WITNESS: I can only see a little bit.

MR. PELTON: Is that better?

THE WITNESS: I'm reading from the opt-in plaintiff Thomas Doyle's objections and responses. I'm unable to scroll the rest of it.

Q. No, I have control of the scroll. But you see that, right?

A. Yes.

T. DOYLE

Q. It's your understanding that you submitted this response under the penalty of perjury, correct?

A. Yes I'm not sure what it says. I don't remember.

Q. But you also submitted a declaration in this case, too? Do you recall that?

A. No. I don't remember.

Q. You don't remember signing a document before you signed this one?

A. I can't recall, to be honest.

Q. We'll get to that. You understand the serious consequences for committing perjury, right?

A. What are you getting at? I don't understand.

Q. I'm just saying, you understand what the consequences are for perjury, right?

A. Yes. I'm telling the truth. I'm not lying.

Q. No one is accusing you of that. I'm just making sure you understand what

T. DOYLE

perjury means. I'm going to refer you to interrogatory response number 17.

A. A little slower, please.

Q. Sure.

A. Scroll back up.

Q. Let me know when you need to scroll down.

A. Little more. Hold on. I was assigned to rack truck not the boom truck in the Bronx yard. I didn't drive a box truck. I drove either a rack truck or I was on a six-wheel dump truck with the materials from Verizon or I was on a boom truck.

Q. Anything else in this response you feel like you need to correct?

A. Can you just go up a little bit? No, the other way. Down from bottom of it.

Q. Yes, this is the end.

A. Okay.

Q. Is there anything in this response you feel like you need to correct?

T. DOYLE

A. No, sometimes the job -- you have to wait for the traffic so we have to be on the job site to set up everything. 9:00, we were able to close the street with all the safety, the cones, everything like that. We were on the job, just preparing all the equipment to set up. That was the last one.

Q. I'm referring to the middle of the response. You state, "Plaintiff further responds that he was required to be at Defendants' Hempstead yard, at approximately 6:00 am to perform substantial work at the start of the work's day at the job site, including but not limited to, loading the rack truck assigned for the day with equipment, supplies, and materials needed at the job sites, emptying debris from the rack truck that was brought back from the job sites the prior day, receiving additional information regarding work assignments, and checking the rack truck assigned for the day to ensure it was in good working

T. DOYLE

order." You previously testified that the only task other than on Friday afternoons that you performed when you returned to the yard was unloading debris, correct?

A. We had to unload the tools.

Q. I'm not referring to that. Other than unloading the tools on Friday afternoon, every day you brought the truck back to the yard, it's your testimony that you unloaded debris?

A. Yes. It's working a little wrong but we had to off the garbage off the truck the night before we could find out we had to put on in the morning from the foreman, who would call and tell me put it on this many rolls with yellow rope, put on this tape, you know, how much do we have left on the inner duct. I would tell him many feet we had left and he might say change that roll, we need more than that. And he'd get the -- one of the yard guys, forklift or whatever to change out the roll to a larger one.

Q. My question had to do with

T. DOYLE

removing the debris. This is just wrong then. You didn't remove the debris in the morning?

A. No, that's wrong. We moved debris mostly when I came back at night. In the morning, I had to load the new stuff on.

Q. The reels that you testified about, those generally stay on the trailer attached to the truck, correct?

A. Yes.

Q. You rarely had to change those out, correct?

A. No, we had to change them out a lot. Sometimes, if we go through all of them, I had to change out two rolls. A lot of times I brought the roll back completely empty. You know, we used up everything I got to put on the new rolls but sometimes, it wasn't anybody to assist me with getting them -- we had to do it in the morning.

Q. So when you got to the yard in the morning, where was the truck?

T. DOYLE

A. I'd pull in by the dumpster, unload the truck and park it wherever there was a spot or a you know, where I could find an area to park it because I also had a trailer on the back so I needed more space than normal trucks.

Q. Isn't it true that there was yard personnel that staged the truck and parked it in the street for you when you got there?

A. Most of the time, that was nights because they would be gone by the time we showed up to work. So they would leave the trucks in the street.

Q. It's your testimony that only at night yard personnel would stage the truck?

A. Most of the time when we got there in the morning, I started my truck up and I brought it out. The yard guys usually weren't there by the time we started. You know, there might be one or two but there might have been something else -- we basically started our trucks

T. DOYLE

every morning and brought them out. We had to go around, check the tires, all that stuff. Brakes lights, signals every day. And check the oil and stuff. But they would leave the trucks for us at night because they -- when we came in the night to work.

Q. You're blocking the screen and I can't see your face. Thank you. So there was never a circumstance in the morning when the truck was already staged for you; is that your testimony?

A. It could have been outside. I'm not saying that all the time. You know, they might have moved somebody -- another worker might have had to leave early and might have moved my truck out to the street to get his truck out. They were all in a line behind each other, in front of each other. A lot of time, I had to play -- switch the trucks around myself. Everybody had to do what he had to do to get going.

Q. At the end here, you said that

T. DOYLE

your start time would depend on permits?
A. Yes.
Q. At the time you'd report, it says it would vary; is that correct?
A. We still had to be on the job before -- they would have either a 9:00 a.m., 10:00 a.m. stips, you know, but you had to get to the job and he had to block off, get spots, you had to try to call people on the phone, run the license plates through the Network and they give us an address. We tried to track the people down to have them move their cars so we could work in that area. And we had to get there to make sure we were ready to go at whatever time the stints were. We take only the equipment off the truck. The safety stuff, the cones, the men working signs and all that -- be ready to go on the truck. We couldn't put it out because if the DOT saw us putting it out too early, we'd get a ticket.
Q. Isn't it true that if a permit called for later start time, you could

T. DOYLE

arrive at the yard a little later?

A. Yes, it was that time -- we could get there at 7:00. We still had to be there by the time starting.

Q. There was times where you got to the yard after 6:00 a.m., correct?

A. Yes. Most of the time, it was 6:30 a.m. We had to be there a little early to get the stuff going. If we had a lot of stuff to put on, a lot of time -- he might have said -- let us know the night before, you know, put this on tomorrow. So we would make room. I had to report to him every day what I had left on the rolls in the morning and when he found out what job we were doing and how much he needed, he would say, Tom, you got to change that roll out. I need a full time. We had a lot of inner ducts to put in. I would have to switch it out. We wouldn't have had enough finish the job.

Q. Are there times you reported to yard after 6:30?

A. Most of the time if we were

T. DOYLE

going to Brooklyn or Staten Island, we would get there at 6:30 because we tried to beat traffic.

Q. So there was no requirement that you reported to the yard at a specific time, correct?

MR. PELTON: Objection.

A. We reported to the yard whatever time we were asked to report to the yard. Whatever time the foreman or the supervisor thought we should be there to the job site in time. A lot of times, we had to take the commercial route, which I could not go parkways or anything like that. I had to take all side streets, side roads and whatever so it took me a while to get through everything and we had to watch the red lights because we had to pay for our own tickets. I had a charge, I had a violation on my paycheck one time. It moved from my check without my knowledge because they're saying I blew a red light but then I asked them for the ticket -- sometimes I could have been off

T. DOYLE

or somebody else driving the truck but we were responsible for our own tickets and we had to make sure that we didn't break any DOT rules.

Q. When did you alledgedly receive this reduction for a ticket?

A. Years ago. I corrected it. They were supposed to give us a copy of the ticket with the check, which I didn't get.

Q. Is the ticket in your name?

A. No, it was in their name but it was my license plate on my truck. They wanted me to pay it.

Q. Do you have an approximate year?

A. I don't. I just brought it to their attention that I should be -- to check the date, the time to see whether it was me or not.

Q. Going back to the original question, which I don't think I got an answer on, there were times when we got to the yard at approximately 7:00?

A. Whatever time I was asked to be

T. DOYLE

in the yard is the time I got to the yard.

Q. So it varied? There was no consistent time?

A. No, it depended on the job. It varied day to day. You finished one job; you start another. Or sometimes you go back to the same job.

Q. Isn't it true that -- withdrawn. Were there any permitted when you were doing telecom work?

A. Yes, it was stints on the roads.

Q. But that's not a permit, right?

A. Excuse me?

Q. But that's not a permit, right?

A. I don't know. Whatever stints -- the foreman was in charge of that. I had nothing do with that.

Q. Isn't it true that a permit is not required to open a manhole?

A. If it's in the restricted area or it's a school zone, we don't need permits, no. Either the supervisor from Verizon or the foreman from Network had all the permits and would tell us what we

T. DOYLE

could do and what we couldn't do.

Q. Are you aware that the city maintains a list of the prohibited times you can open a manhole?

A. Not aware. I do what I'm asked.

Q. Because of these permits or stints as you call them, that's a reason you'd have to work on some telecom projects at night, correct?

A. Correct.

Q. Did you always start the day in the Hempstead yard?

A. No, sometimes I worked out of the Bronx yard and the yard in Far Rockaway -- the National Grid building, we had a yard in the Bronx that I worked at for some time. We had the Hempstead yard I worked at. Depending on where we were working. Most of the time, I worked out of Mox in the Bronx. The telephones, that was mainly out Taft Street.

Q. How would you commute when you'd go to the Bronx yard?

A. Excuse me?

T. DOYLE

Q. Would you drive to the Bronx yard?

A. Yes.

Q. Do you have an E-ZPass?

A. Yes. That was many years ago but yes, I did use the E-ZPass.

MR. GRIMMETT: I'm going to call for the production of the E-ZPass records.

A. You got to go way back.

Q. That's fine. When you worked in Far Rockaway, would you drive over the Atlantic Beach Bridge?

A. No.

Q. How would you commute to the Westchester yard?

A. I never went to the Westchester. I never worked -- I don't even think I know where it is.

Q. When you were required to drive the truck to the job site, you were assigned a specific truck each day?

A. When I went to the Bronx, I drove the rack truck. I worked as a

laborer in the Bronx and they put on the rack truck. When I worked in Hempstead, drove the six-wheel dump trucks with a trailer. I worked on the boom truck out the Mox yard.

Q. You were assigned specific for each stint, correct?

A. Yes, I had on my own truck. Yes, I had my own truck in the Bronx. I had a truck, a six-wheeler that I basically used all the time.

Q. The six-wheeler, who would you give you the keys to that truck?

A. The keys would be in the truck in the yard.

Q. The keys never left the truck, right?

A. Basically they would stay in the yard. There was a time they put them on a keyboard.

Q. When you drove the truck to the job site, did you carry any passengers in the truck?

A. There was only certain times

T. DOYLE

when somebody didn't have a license and needed a ride. Either I or Carlos would take them. It wasn't constant.

Q. Only on occasion would you drive somebody to the job site, correct?

A. Yes, very few.

Q. Who were these individuals that you're referring to that may have a revoked license?

A. I don't remember the names.

Q. Do you recall anyone that you drove from the job site from the yard to the job site?

A. No. Basically, the guys drove their own cars and there was guys who drove motorcycles that would either meet us there. I didn't really have too many passengers, to be honest. Carlos usually did have somebody on his truck.

Q. Who did he have?

A. He had workers who were working and needed a ride. I didn't take too many passengers.

Q. You can't name one individual

T. DOYLE

who needed a ride from the yard to job site?

A. Cheekis (phonetic). I don't know if that's his last name or if that's his real name.

Q. Laborers were not expected to go to the yard and assist with any of the responsibilities of loading the truck or whatever may be needed in the morning?

A. Depended on where they live. A lot of guys lived in Brooklyn and Queens. I would basically do -- or Carlos -- we'd help each other on occasion. Basically, I would do whatever I had to do.

Q. I don't think that answers my question. Laborers weren't expected to be at the yard in the morning, correct?

A. Not all the time, no.

Q. You could handle any responsibilities related to your truck yourself, correct?

MR. PELTON: Objection. You can answer.

A. A lot of times, somebody from

T. DOYLE

another crew would see me and whatever and come and help me. We tried to help each other.

Q. Would those be other drivers?

A. Excuse me?

Q. Would those be other drivers that help yard personnel? Who would help out?

A. Anybody that was going from one truck to another truck, that was there waiting for crew or whatever, you know. They would come over, give me a hand and I would be able to get up on the truck so I didn't have to do -- lift all that up.

Q. You're blocking the screen again.

A. Sorry.

Q. You claim that you typically arrive back at the yard between approximately 4:30 and 5:30 p.m. in your interrogatory responses; is that accurate?

A. No, that's -- you know, it depends what time you could leave. I mean, sometimes, if it took me an hour and

T. DOYLE

a half, then I would get back that time. Sometimes, if I was closer and sometimes with the work -- if it was to Queens and Jamaica, I was able to get -- it was different times. Sometimes if I'm leaving Brooklyn, Staten Island or whatever I would get a little later back to the yard.

Q. But there was times you would get back earlier than 4:30 p.m., correct?

A. Yes, sometimes I would get back on time. Like 3:30.

Q. Was there ever times when you got back before 3:30?

A. There might have been, yes.

Q. What about before 3:00 p.m.?

A. It might have been if I had to bring the car in for repairs. Sometimes Pat would call me, you know, the truck could do with an oil change or something so it's ready in the morning. If it was maintenance that would pop up. They would take care of it. They work until 5:00 at night.

Q. There were circumstances where

T. DOYLE

you could complete your job efficiently and then end the day early, correct?

A. Yes, we got through the job. Every day was different. It wasn't a 9:00 to 5:00 job?

Q. Would you say less than 9:00 to 5:00?

A. No. You know, it wasn't -- you'd show up at the office at 9:00 and you could leave at 5:00. I didn't have -- it depends on -- I left when I was finished. I can't pinpoint certain times of the day or whatever we got back. Sometimes we got lucky; sometimes we didn't.

Q. Would you say it was rear that you worked for than eight hours in the day?

A. On the telephone?

Q. Yes, pretty much.

A. Yes, but when I was on the boot truck, there was sometimes I went 40 hours straight, 40 hours overtime.

Q. And you were paid for that

T. DOYLE

overtime?

A. I was paid for the overtime, yes. It would be put on the time sheet.

Q. Did you receive a paycheck each work that you worked for Network?

A. Yes.

Q. I forgot to do this but I'm going to mark the interrogatories as Exhibit 16.

(Document was hereby marked as Defendants' Exhibit 16 for identification, as of this date.)

Q. I need to show you another document. Can you see what I have on the screen?

A. Yes.

Q. I'll zoom in a little bit. Is that better?

A. Yes. What am I looking at?

Q. You can see it? You can see well?

A. Yes, I see.

Q. Have you seen this document before?

T. DOYLE

A. This was what the checks are.

Q. Is this the paystub that you received for the work that you performed between September 25, 2023 and October 1, 2023?

A. It says week ending October 1, 2023 and check date October 5th.

Q. This is for the work you performed on the week ending October 1st?

A. Right.

Q. This paystub indicates that you were compensated for 40 hours this week, right?

A. 40 hours. Eight hours, I guess it was a holiday I worked and then the overtime was nine hours.

Q. You received a paystub that resembled this document each work that you worked for Network?

A. Yes.

Q. I'll stop sharing now. Are you aware that Network tracked the location of each one of its trucks each day?

A. Yes.

T. DOYLE

Q. And are you aware that they maintain stringent GPS records as to the location of each truck?

A. That's what I heard, yes.

Q. At some point in this deposition, I may pull up the GPS records. Is there anything now that you want to change your testimony about?

A. No.

Q. I just want to make sure we're 100 percent clear. Your bathroom breaks were only 15 to 30 minutes and it happened occasionally? It rarely occurred?

A. Yes, it was on occasion when I used the bathroom or whatever. You know, I would stop home or whatever. I live right down the block from Patrick Clarke.

Q. I want you to completely understand you're under oath right now.

A. I understand that.

Q. I didn't finish the question. You're under oath. I want you to say that it's your testimony that you did not stop at your house to inflate the hours that

T. DOYLE

you worked each week?

A. I stopped at my house. I told you that already.

Q. You didn't stop at your house to go to the bathroom?

MR. PELTON: Objection.

A. I stopped in my house to go to the bathroom. What?

Q. You didn't stop at your house only to go to the bathroom, right?

A. I was stopped at the house, yes. Sometimes to use the bathroom. Yes.

Q. And you'd hang out for more than an hour at a time?

A. Not always.

Q. Sometimes you would hang out?

A. Yes, I might be there a little longer.

Q. How is your testimony changed all of a sudden? One minute you're only going to the bathroom -- I'm not done with my question. One minute you're only going to the bathroom for 15 to 30 minutes and now you're going there and hanging out

T. DOYLE

after you go to the bathroom? What actually occurred?

A. What happened? What?

Q. What occurred? What did you do whenever you'd stop at home?

A. I don't know what you're saying. I can't hear you.

Q. One minute your testimony was you'd stop at home occasionally to go to the bathroom. You couldn't go to the bathroom on the job site, right?

A. Right.

Q. Now your testimony is, okay, yes, I'd go to the bathroom and then I'd do some other things around the house, right?

A. I'm just saying I stopped at my house.

Q. What did you do at your house other than go to the bathroom?

A. I might have had something to eat.

Q. How long would you eat for?

A. I don't know. I don't remember.

T. DOYLE

Q. Would you do that in the morning and in the afternoon?

A. Depending on the day, yes.

Q. I need to be completely clear right now. You're under oath. You previously testified that you only went to the bathroom. Now you're increasing what you were doing when you stopped at your house. I'm not done. What else did you do at your house other than eat and go to the bathroom?

A. I don't know.

Q. There had to be more. What else was there?

A. I have no idea where you're going with this.

Q. I think you know exactly where I'm going with this.

A. I stopped at my house.

Q. Did you turn the TV on when you were there?

A. No.

Q. Did you read the newspaper when you were there?

T. DOYLE

A. No.

Q. Did you open a book when you were there?

A. No.

Q. What do you do while you were eating at your house?

A. I eat.

Q. You just sat at the table and ate?

A. No, I stand up. Probably make a sandwich, going to the bathroom and doing what I had to do.

Q. How long would that all take?

A. I don't know.

Q. Would it have taken more than an hour?

A. I don't know.

Q. So now it's possible that it took more than an hour? This wasn't a quick bathroom break; is that accurate?

A. I don't remember.

Q. Now you have no recollection of you stopping at the house? Is that what you're saying?

T. DOYLE

A. No, I said I stopped at my house. I don't recall times that I stopped at the house. I don't recall how much time I spent at the house.

Q. Is it possible that you spent longer than an hour at your house? Both in the morning and afternoon on the same day?

A. I don't recall.

Q. We'll get into that. Like I said, I'm going to give you -- you signed a declaration that you worked these hours under oath. You signed an interrogatory response under oath. I'm going to give you final opportunity to set the record straight as to what you actually did and why you were terminated by Network. Feel free.

A. We were never given a reason. I asked him that day. He said he didn't have to and he left the room, all right? What time I spent in my house, I don't recall. It was a while ago. I don't remember all the times I went to my house.

T. DOYLE

If I had to stop for something, I would stop there. I would stop there. I was on the way to the job site anyway. I was close to the yard.

Q. Let me ask you this, do you think it's fair for you to stop at your house for over an hour in a workday, get paid for the full day, and then commence a lawsuit against Network saying you weren't paid appropriately?

A. Do you think it's fair that I got to give up Saturdays with my family to go to Network to take the CPR course or have to do a 10-hour OSHA course or a 30-OSHA hour course on my own time and not be compensated?

Q. Was that the question?

MR. PELTON: My client is not done responding.

MR. GRIMMETT: He's not answering the question. He's avoiding the question.

MR. PELTON: No, he can finish.

Q. How were you treated unfairly,

T. DOYLE

Mr. Doyle? It seems like you had a lot of free time at home?

A. All the safety meetings I had to attend on my own time and my own -- not get paid. I had to go to the meetings on Saturdays. I get two days off. I had to spend Saturday at Network for free?

Q. That was --

A. I'm not saying I did it as revenge. I just -- if they wanted my -- if I had to go to bathroom, I had to eat something, I stopped because it was on the way to and from. I always did my job. I did what I had to do and I got it done.

Q. But there were times where you came back after you were done with the job and you stopped at home for more than an hour, right?

A. I have no idea.

MR. GRIMMETT: We're going to take a ten-minute break.

(Whereupon, a recess was taken at this time.)

Q. The truck that you were assigned

T. DOYLE

each day, it was given a specific number, correct?

A. Yes.

Q. Do you remember the numbers of the trucks you drove?

A. No.

Q. I'm going to try to refresh your recollection? Showing you a document that's been Bates stamped DEF017278, several pages. The last page being DEF017287. This will be marked as Exhibit 18. The paystub was 17.

(Document were hereby marked as Defendants' Exhibits 17-18 for identification, as of this date.)

Q. Have you seen this document before?

A. Job sites.

Q. At the top, it says timecard?

A. Yes.

Q. So you've seen your timecard, right?

A. I don't recognize -- I don't think I would have seen this. This is

T. DOYLE

something the foreman would see.

Q. But this timecard includes the time you reported to the foreman, correct?

A. The time I reported to the foreman?

Q. The hours that you worked, you reported that to the foreman, correct?

A. The foreman yes.

Q. Scrolling down to the second page, you said when you worked on telecom projects, you ordinarily drove the six-wheel dump truck, correct?

A. Correct.

Q. Would that be number 355?

A. Yes, it was 355. There was another number because there were times that Steve Orello (phonetic) would switch trucks.

Q. Was that --

A. If somebody needed a different truck or whatever for the Bronx project, one had -- Westchester, Bronx, I'd -- I drove a couple of different dump trucks.

Q. That was other truck number 356?

T. DOYLE

A. Yes, it could be.

Q. I didn't even want to get to this point. But now I'm going to show you another document. I'm going to mark it as Exhibit 19. It's Network's GPS records.

(Document was hereby marked as Defendants' Exhibit 19 for identification, as of this date.)

Q. Just looking at this document, Exhibit 18, this shows you were driving truck number 355 on September 25, 2023, correct?

A. Yes.

Q. You think that's accurate?

A. I don't recall.

Q. But during that period of time, you were mostly driving truck number 355, correct?

A. Or 356, yes.

Q. And those two on the same --

A. On the what?

Q. Withdrawn. Marking as Exhibit 19, Network's GPS records. I have to scroll all the way up to the top. It's

T. DOYLE

redacted to exclude the dates that you didn't work for Network. But you see here this record, if you go to row 7, column B it identifies the number of the truck?

A. All I'm seeing 12:00 a.m. EDT, 12:00 a.m. EDT.

Q. Do you see below that where it says stop duration minimum threshold?

A. No, I don't see that.

MR. PELTON: If you turn your phone on the side, do you see more?

A. A little bit.

Q. Do you see where it says row 7?

A. Yes, but I can't -- it's blocked by something. I just see number 355.

Q. It says 355 under drive start address, right?

A. Right.

Q. There's a column for the drive start time, there's a column for drive start address, drive end time and drive end address. Correct?

A. I'm just not seeing anything under those --

T. DOYLE

Q. Yes, it's redacted. You're seeing the right thing. I'm going to scroll down to row 3307, which is the same date as the paystub in the time sheet in Exhibit 18, September 25, 2023. This document is Bates stamped DEF017673. Row 3307 indicates that the truck is leaving the yard at approximately 7:22 and 53 seconds a.m. on September 25th. Do you see that?

A. Yes.

Q. That truck goes at 7:30 a.m. to 253 Marshall Avenue, West Hempstead. What's that address?

A. It's my block.

Q. You parked the van right near your house, right?

A. I'm looking at the address.

Q. It's 253 Marshall Avenue, West Hempstead, New York. A couple houses away from your address, right?

A. Yes.

Q. It gets to that address at 7:30:06 a.m. You're there. It doesn't

T. DOYLE

leave --

A. Where?

Q. Go down to the next column. It doesn't leave 265 Marshall Avenue until 22 minutes later, correct? So you're at your house approximately 22 minutes that morning?

A. I guess so, yes.

Q. And then let's go to later on in the day. It looks like you finished the job, row 3313. You leave Springfield Gardens at approximately 1:45:17 p.m. and you get back to 265 Marshall Avenue at 2:20:29 p.m. -- is the time you arrived at Marshall Avenue. You stopped at your house in the morning that day and you stopped at your house in the afternoon that day, right?

A. I guess so. If that's what it says.

Q. You don't leave Marshall Avenue going down to the next row until 2:56:47 p.m. on that same day. You were at your house in the afternoon for about

T. DOYLE

approximately 36 minutes. Does that sound about right?

A. Okay.

Q. All and all, for the entire day, you spent an hour setting around at home, right?

A. Yes, and then I spent a half loading the truck and half an hour unloading it at the end of the day. I worked every morning unloading the truck for a half hour or more and a half hour or more in the afternoon.

Q. You felt because of that, you were entitled to take half hour breaks at a time at your house?

MR. PELTON: Objection.

A. If I needed to use the bathroom, yes.

Q. Or sit down and eat?

A. I didn't eat all the time. I always go to the bathroom because there's no place on the road.

Q. If you're going back to the bathroom excuse, I have a lot more

T. DOYLE

egregious examples I can go through, row by row, of you spending more than hour at your house. We can do that or you can explain to me what you were actually doing at your house when you would stop?

A. Well, I wasn't reading a book. I wasn't reading a newspaper. I wasn't watching TV. So I was either going to the bathroom. Maybe I had issues or whatever. I was going to the bathroom or I was grabbing something to eat. If I go back to the yard and I have to unload the truck -- unload the truck and find a parking spot, I can't run to the bathroom because it wasn't that close. It was across the street. If I have to go to the bathroom, I'm going to go to the bathroom.

Q. So you had issues going to the bathroom every morning and every afternoon every single day? Because what I'm certifying to you right now is I have stringent GPS records here that show a pattern of this every single day.

A. Not every day. It was not every

T. DOYLE

day. Look where I was working. If I'm working in Brooklyn or the ass end of Queens by Manhattan, I go straight there. I go straight there. If it's close, that -- if I have to go to the bathroom, I'll go to the bathroom.

Q. You're willing to testify before a jury or a judge that the only time you spent at home was to go to the bathroom?

A. Or grab something to eat or if I forgot my phone, I'd stop there.

Q. How often did you forgot your phone?

A. I don't know. You never forget your phone?

Q. Rarely.

A. I rarely did but when I did, I went back.

Q. When you forget your phone, that meant you could sit around at home for an hour?

A. No.

Q. I'll keep going through it. If this refreshes your recollection as to

T. DOYLE

something else you may have done at home, please, let me know.

A. Sometimes did I give up my own time at the yard or Saturdays or meetings in the morning? You can knock on this all day long. But you know what? It all worked out in the end. I worked as much time as -- if I stopped there for a half hour or more, an hour -- I don't remember spending an hour in the house. I would go in and go out. I did my job. That's basically what this is all about. Doing your job.

Q. First I want to respond to something. I've been asked a question. I'm not able to answer your questions. If you have a question, you can speak to your attorney. Based on your response, are you staying you felt like you were shortchanged?

A. I told you that before. I didn't do anything for revenge. I needed to stop -- if I had to go to the bathroom, it was on the way back to the yard. If I

T. DOYLE

pulled over to go to the bathroom or grab something to eat because I didn't eat all, I did so. Because I needed to go back to the yard and still work on my own time.

Q. But you were still compensated for --

A. The drivers didn't get compensated for -- all the other -- the laborers would take their leave from the job site. I still had normal work to do and I didn't get paid for it. And I didn't do anything out of revenge or spite. If I had to go to the bathroom, I'm going to go.

Q. I'm going to go to 9/26, row 2315, 7:09, approximately leaves Taft Avenue, gets to Marshall Avenue 7:18. Next row, leaves Marshall Avenue a half hour later. Later that same day, row 3321 leaves Springfield Gardens at 1:35, approximately. Gets to Marshall Avenue at 2:10. Doesn't leave Marshall Avenue until 3:09, if you look at the next row. Do you see that?

T. DOYLE

A. Yes.

Q. All in all, you were at your house for an hour and a half that day?

A. All in all, I was at the yard for the same amount of time.

Q. That's not the question. What were you doing at your house for an hour and a half?

A. I don't know. I don't go that far back in memory. If I was stomach issues, it was a little longer.

Q. A half hour in the morning, hour at night?

A. I don't know. I don't remember that.

Q. 9/27, row 3323. Leaves Taft Avenue at approximately 7:14 a.m., gets to Marshall Avenue at 7:23 a.m. Doesn't leave that morning -- down the next row -- 8:27 a.m. so approximately another hour in the morning. Do you have an explanation for that?

A. I was working right down the turnpike of Springfield Gardens and it

T. DOYLE

probably steps -- stopped there. I don't remember what I did every time I went there.

Q. Sometimes you just relaxed, right?

A. Well, I didn't sit down on the couch and recline, read the papers, books, watch TV. I was there for a reason. Either grab some food for the day or go to the bathroom.

Q. You know how often you stopped at home. I have stringent records showing every single time you stopped at home. At lot of times it's for more than hour. There's a consistent pattern of this. I just want to make sure your testimony is clear under oath that all you did, all you did during this period of time was either go to the bathroom or grab something to eat; nothing else?

A. Not that I recall.

MR. GRIMMETT: Let's take a break.

(Whereupon, a recess was taken

T. DOYLE

at this time.)

Q. We just took a quick break. During your break, did you speak to anyone about the substance of your testimony?

A. No.

Q. You were testifying before the break about how you stopped at home to go to the bathroom or get something to eat. Did anyone at Network tell you that you were authorized to do that?

A. No.

Q. You just took it upon yourself to do that?

A. Yes, I guess so.

Q. And you never told them you were stopping at home?

A. I might have told them sometimes that I stopped to grab my phone and stuff like that or used the bathroom or whatever. But, you know, I didn't ask for permission.

Q. Did you ever tell them hey, I was just at home for an hour there. Did you ever report that?

T. DOYLE

A. No, I didn't see anybody to report to.

Q. So you were fully compensated for the time you spent at your house, right?

A. I was.

Q. Don't you see issue with that?

A. Do you see an issue of me working an extra hour without getting compensated? Did you see me working on Saturdays and not getting compensated? I did what I had to do. Everything worked out; our jobs were done. We did everything. We never got complaints on any of our work.

Q. In your view, the time that you were unpaid for, evens out the time you spent at home?

MR. PELTON: Objection. You can answer.

A. It all worked out.

Q. The two evened out to you?

MR. PELTON: Objection.

A. I felt like I did my work and I

T. DOYLE

was compensated for what I did and I did the other stuff because it was -- if you didn't go to the safety meetings, the boss would hold your check back. I would have to go to Queens and where they were. If you didn't go to meetings on Saturday, you would not be working Monday. You had to go. You had no choice but to go and spend my own time.

Q. That didn't answer my question. Do you feel that the time you were allegedly unpaid for equal the amount of time you spent at home?

A. It was probably more time than compensated for.

Q. You testified that it all worked out based upon you stopping at home. Why are you bringing a lawsuit then?

A. Because I didn't get travel time. I had to drive all over. Sometimes I got back to the yard late. It took me an hour and a half to get back to Brooklyn or Staten Island. Years ago, they used to give the drivers half an hour and it still

T. DOYLE

took me two and a half hours or two hours to get home from Staten Island. That was the early -- you didn't have much of a say. You did what they wanted you to do or you didn't work.

Q. For the sake of beating a dead horse, I'm going to move on but I just want to understand we do have GPS records that --

A. I understand.

Q. That indicate the amount of time we stopped at home. You're free to clear up any of your testimony should you need to.

(Document was hereby marked as Defendants' Exhibit 20 for identification, as of this date.)

Q. I'm going to show you another document Bates stamped at the bottom right corner, P_108 and goes through P_113. On the first page, it is titled Declaration of Thomas Doyle in Support of Plaintiff's Motion to Conditionally Certify Collective Action and Authorize Notice of Pendency

T. DOYLE

and Consent to Join. Do you recognize this document?

A. Can you scroll?

Q. If you need me to zoom in, let me know.

A. Scroll.

Q. More?

A. All right.

Q. Do you recognize this document?

A. Yes.

Q. Can you explain what this document is?

A. Actually, it doesn't look like my signature.

Q. Is it an electronic signature?

A. 3/19/2025. I don't remember that signature.

Q. It's your testimony that you didn't sign this document?

A. No, I just don't -- it looks like scribbles.

Q. Do you need me to zoom in? Does that look like your signature?

A. No.

T. DOYLE

Q. Do you recall signing something that looks similar to this document?

A. I signed this other thing. I don't know.

Q. You don't recall signing anything in March of 2025? Are you there?

A. Can you repeat that?

Q. You don't recall signing anything in March of 2025 in this case?

A. I don't recall, no.

Q. I will certify to you that there was a document purportedly signed by you and filed in court and this is that document.

A. I don't recall that day like that. If you look at the other one, we will see.

Q. You don't recall ever signing something called a declaration? Being asked to sign a declaration?

A. I did but I don't recognize that signature.

Q. Does this look like the document you were asked to sign?

T. DOYLE

A. I don't recall. It was a while ago.

Q. You're not willing to go through this document and attest to the accuracy of it?

A. I'm not able to read it like regular document. It's hard to read. It's not expanding on my phone.

MR. PELTON: Again, if you turn your phone on the side, you may be able to read it better.

Q. Just look at paragraph 13?

A. The only thing is, I unload the truck at night, not the morning because I had to restock in the morning. There was a box truck.

Q. Reading that paragraph, does that refresh your recollection as to whether you signed this document?

A. I remember signing it. I don't recognize my signature and I don't remember the date.

Q. But do you remember signing something that included this paragraph 13?

T. DOYLE

A. Yes. Possibly.

Q. Referring to the second to left sentence in paragraph 13 where you say one of your morning tasks included performing a thorough inspection of the truck, checking the fuel levels, checking the air in the tires and the condition of the tire rims, checking the braking system, battery power, steering mechanics, and checking the headlights and reflectors were in good condition. Does that all sound accurate?

A. Yes. If I had a problem with the brakes, I told the mechanic. I'd checked the brakes and -- we had to do a list, a checklist.

Q. Would you complete that checklist every day?

A. It wasn't mandatory. They handed it in. We had it in the car, a book. There was a book in there that had -- every day, you put the date and everything in that. It wasn't mandatory at one point. You hand the papers in.

Q. Who said it wasn't mandatory?

T. DOYLE

A. It didn't -- they wanted everyone -- to put it in a box by the office, to put it in there.

Q. Isn't it true that --

A. What's that?

Q. Isn't it true that all other drivers for Network were required to submit daily inspection sheets?

A. Not that I remember. I didn't deal with other drivers or other crews.

Q. Wasn't this daily inspection report that you would complete, wasn't it on your phone?

A. No.

Q. It was never on some sort of digital platform?

A. I never had it in my phone, no.

Q. You're saying you printed -- you printed out a sheet and put it in a box?

A. It was a book and you would just keep it. A logbook had a space in the truck. They checked the logbooks in the truck.

Q. There was a marble book with

T. DOYLE

just a checklist in it?
A. No, it was a little book that you just wrote in every day. Your checklist, check, check, check, and you signed it. They remained in the truck. You didn't bring it into the shop.
Q. You never used a QR code to access --
A. I didn't have anything on my phone. I don't know how to really use -- I'm not that tech -- you know, with the phone.
Q. You never submitted an inspection report electronically?
A. Not that I remember. Unless Dougie did. I don't know. I don't remember doing it. I don't really go with the phones.
Q. You would tell your foreman to do your job for you?
A. No, I'm just saying. I had -- this is my first time I've ever gone on Zoom. You know, I'm not -- I get calls and I make calls.

T. DOYLE

Q. If I told you that we have records of numerous truck inspection reports that you submitted electronically, would that refresh your recollection?

A. Was it up in the Bronx?

Q. It was all different locations.

A. Yes, because up in the Bronx, I had an iPad or whatever they call it and I would do it on that.

Q. You would submit truck inspection reports on an iPad?

A. Up in the Bronx when I was on the rack trucks.

Q. You knew how to use that iPad?

A. Barely but I did. Basically, I had one program on it and I did that. All the jobs were the notebook that I brought myself and would write down what every crew needed in the Bronx.

Q. Isn't it true that you often failed to submit daily inspection reports?

A. Not that I remember.

Q. Isn't it true that you actually postdated certain inspection reports?

T. DOYLE

A. Not that I remember.

Q. You're telling me you never -- let's say, November 3rd, submitted three truck reports with different dates? November3, 2022?

A. I don't remember that. The book was it in the car and if it was submitted in my name, I don't know.

Q. So someone else was doing the truck inspection?

A. I don't remember that. That's what I'm trying to tell you.

Q. It's possible that you didn't conduct the inspection? Someone else did?

A. No. I did my inspections in the book in the car that was left in the front, driver's seat and passengers seat.

Q. Would that book ever come out of the truck?

A. If the truck was in the car and someone took it out to see what I did, maybe. I don't know.

Q. Isn't it required for anyone to hold a commercial driver's license to

T. DOYLE

submit a daily inspection report?

A. I never did. I have to go for a medical every two years. You know, those -- basically, are for the big trucks, the 10 wheelers. Anyone driving the smaller trucks -- I don't recall having to fill that out.

Q. You don't have a commercial driver's license?

A. I do and I don't have -- I didn't fill that out. The guys that had to fill that out on a daily basis that drove the ten wheeler.

Q. But isn't --

A. I was never asked to fill that out. I was required to CDL doctor's examination. That was required.

Q. Isn't that still required for a six-wheel?

A. Not to my knowledge.

Q. You don't recall there ever being a QR code on the dashboard of the truck?

A. No, not that I recall. QR?

T. DOYLE

Q. QR code is something that you take -- you take your camera out and then it will access a web page or something else. You don't recall there being something that allowed you to do that?

A. I don't recall that, no.

Q. If I told you that you submitted this report, which is a 25-question report 100 times, does that refresh your recollection?

A. On my own?

Q. Yes. Digitally.

A. All right, maybe I did. I don't know.

Q. And the times were you didn't submit, would you acknowledge you didn't conduct an inspection on those days?

A. No, I checked the car every day. You had to do. If something happened to it, you were responsible for it.

Q. Isn't it true that you were a police officer for some time?

A. Yes.

Q. When you were a police officer,

T. DOYLE

you were the union delegate for your precinct?

A. What does that have to do with anything?

Q. It's my question.

A. I don't want to answer that.

Q. I'm sorry but you have to answer that.

A. I was a delegate, yes.

Q. It's fair to say that you have more knowledge than most when it comes to union agreements?

A. Yes.

Q. If I refer to Local 731, you were a member of Local 731, correct?

A. Correct.

Q. And Local 731 had a collective bargaining agreement?

A. I guess so, yes.

Q. You were aware of what the collective bargaining agreement said?

A. No.

Q. Do you ever review the collective bargaining agreement?

T. DOYLE

A. No. I was at the shop stewards. We had the shop stewards, you know, charge with complaints.

Q. So you kind of relied on the shop stewards to uphold the terms and conditions --

A. I was a delegate. I didn't review anything.

Q. I'm going to ask you to let me finish my question before you jump in?

A. Go ahead.

Q. You relied on the shop steward to enforce the terms and conditions of the collective agreement?

MR. PELTON: Objection.

A. Yes. It was useless.

(Document was hereby marked as Defendants' Exhibit 21 for identification, as of this date.)

Q. I'm going to show you another document. This is Exhibit 21. It's bates stamped DEF000127. We're going to the last page. Have you seen this document before?

T. DOYLE

A. I don't know -- no. I don't recall.

Q. This looks like the collective bargaining agreement between Network and Local 731, correct?

A. It is but that wasn't my job to review already. I was not a shop steward.

Q. You know there as a collective bargaining --

A. I know they had contract with Local 731 and the other unions, yes. I didn't get involved any union affairs.

Q. Just so the record is clear, I need to repeat my question. You knew that there was a collective bargaining in place. A collective bargaining agreement in place between Network and Local 731, correct?

A. I knew they had a contract. I didn't know what it entailed.

Q. But you knew that the contract governed your terms and conditions of employment, correct?

MR. PELTON: Objection.

T. DOYLE
A. I didn't read it. I never looked at it. I went to work and I worked. That's all. I didn't get involved with union business. I didn't attend meetings. I wasn't involved with it. So what they had, I wasn't aware of it. I know they had a contract with the different unions and I never got involved.
Q. The different unions, they all had different terms and conditions with employment, correct?
A. I have no idea.
Q. When you worked at Network, did you ever perform work on a government project?
A. I did work Con Ed, National Grid, and Verizon. I did other work on the project with the pipe and everything in Flatbush or whatever that was. I was not involved on that.
Q. Fair to say you never worked on a government project?
A. Correct. As far as I know, yes.
Q. I'm going to refer back to

T. DOYLE

declaration. If you can read paragraph four for me?

A. That was one of the things I wanted to taken out because I don't -- I don't remember if I delivered materials to it on a truck. I don't remember being a government project.

Q. So you don't believe paragraph four is accurate then?

A. I don't recall working on a government project. If I delivered materials to a truck, I was never there for eight hours. I was never there for a day, two days, three days. If I could deliver materials, in and out, and had idea.

Q. You've never written submitted a written complaint to anyone at Network about unpaid wages; is that correct?

A. We bought a lot of stuff up to the union rep and it didn't go further because he was trying to -- he got a job there because of his brother and he wasn't anything -- he didn't represent. He's

T. DOYLE

horrible. He didn't do anything. We were making complaints about the meetings on Saturday, the full day and it never went anywhere. He didn't have our back.

Q. What was his name?

A. Nelson Samos (phonetic).

Q. Could you spell his last name?

A. Not sure.

Q. Who was he related to at Network?

A. I don't know. His brother -- I don't know if he was related to anybody his I don't know if he worked at Network and he got injured or he was able to get brother in there. I don't know. All I know is he didn't have our backs.

Q. What was his brother's name?

A. I have no idea who his brother was. I don't know. I never worked with brothers. I don't know who he is. I met Nelson when I first started there in 2007.

Q. You felt like Nelson was unfairly tied in with Network but he don't know his brother?

T. DOYLE

A. I don't know his brother. I never met his brother.

Q. What you gave you the impression he was unfairly tied in with Network?

A. He brought our responses over. He told us to find another job somewhere else. It was their way or the highway.

Q. It had nothing to do with Nelson's family relations?

A. All I heard through the grapevine was that his brother hooked him up with the job. I don't know anything more than that.

Q. And you have no idea whether his brother is connected to Network in any sort of way?

A. No, I do not.

Q. Why did you say that to begin with?

A. Because I heard it through the grapevine. Somebody said. He seen him because of his brother.

Q. Did you subject a written complaint or grievance to your union

T. DOYLE

delegate?

A. No.

Q. You're pretty familiar with union contracts. Why wouldn't you put something in writing?

A. I don't know. I just didn't. I believe in the chain of command. I got my delegate and he's supposed to go above that. I'm not going to over his hand and call the union and complain about him. Just -- you did what you had to do.

Q. You are aware that most collective bargaining agreements include a grievance procedure for work-related disputes, correct?

A. Say that again.

Q. You're aware that most collective bargaining agreements include a procedure for filing grievances about related disputes, correct?

A. Okay, yes.

Q. You are aware that Local 731 agreement had a grievance procedure?

A. No, I'm not. My job was -- I

T. DOYLE

brought whatever to the union rep that was above me and he brought all the way up.

Q. If you felt that you were entitled to more wages, why didn't adhere to the grievance procedure?

A. I don't recall.

Q. Who did you complain to about unpaid travel time?

A. Complained to the foreman and they weren't going to go any further. Everything was like, if you don't like it, go somewhere else.

Q. Who said that?

A. It was -- no.

Q. So nobody said that?

A. Nobody actually said it but nobody went forward with it, the complaints. It wasn't just me. It was other people. A lot of people complained about it. The laborer -- everybody else had their own thing.

Q. You previously testified that Patrick Clarke was the one that got you this job?

T. DOYLE

A. Yes.

Q. And you knew him from around the neighborhood, right?

A. Yes.

Q. It seems like you had a relationship or you could go to him with any concerns you had, right?

A. He didn't want to hear about it. I told him things and -- I told him -- we were hitting a brick wall. If I went to him and told him that, he did what he wanted. The bosses, you do what they wanted. I was laid off a lot because I complained to the super and the next thing I know, they don't need me for months or weeks. It was like a punishment.

Q. You're going to stay in front of Patrick Clarke's face that if you went to him, he would not do what's right?

A. Listen, I knew Pat but I believe in the chain of demand. I'm not going to go bitching about this and that. I bring it to my foreman. He's supposed to bring it to the supervisor and work it's way to

T. DOYLE

Pat. I'm not go into all this and stomp my feet about nothing. We're both grown men. He has a business to run and I'm trying to go through chain of command as proper and the chain had a broken link.

Q. You never went to him once?

A. If I said something to him, working or whatever, he's like, let me run this.

Q. Did Network provide you with training on ethics?

A. Trained on a lot of things.

Q. Did that ethics course provide that you can go directly to Patrick Clarke with any issues?

A. He told us that. But nobody really went in his office.

Q. You feel like Patrick Clarke -- if there was an issue, you feel like Patrick Clarke would do nothing about it?

A. No, it was a series. If I went to him about stuff, I don't think he would do anything about it.

Q. Isn't it true that Network also

T. DOYLE

maintained an anonymous hotline that you could call with any workplace concerns?

A. I don't recall that. I don't think people used that.

Q. Even when it was anonymous? You would get chastised?

A. No, I wouldn't go higher.

Q. You testified that a lot of your coworkers were members of different unions, correct?

A. Yes.

Q. Do you know how many different unions represent Network's employees?

A. 31, 1010, 15, 1298.

Q. What about Local 14?

A. I don't know.

Q. What about 1536?

A. Yes, that's Tim. We had a couple of them.

Q. All these different unions represent different types of employees, correct?

A. Correct.

Q. All of these different union

T. DOYLE

employees had different terms and conditions of employment that depended on their collective bargaining agreement, correct?

A. Could I take a break?

Q. No, there's a question.

A. What's the question?

Q. All these different union employees, they all had different terms and conditions of employment that depended on what was stated on their collective bargaining agreement; is that accurate?

A. I know Local 15 and 282 got paid from the time it starts, the machine or the truck to the time they shut it off. They got paid for all that. They got paid for travel time. They got paid for all that.

Q. My question was more general. All these different unions, the terms and conditions of each employee's employment differed based on what was said in the collective bargaining agreement?

A. I'm not sure.

T. DOYLE

MR. GRIMMETT: Off the record.

(Whereupon, a discussion was held off the record.)

MR. GRIMMETT: I have no further questions. Your attorney may have questions but I appreciate your time.

MR. PELTON: I don't have any questions. Thank you.

[TIME NOTED: 5:50 p.m.]

______________________________

THOMAS DOYLE

_________________________

Subscribed and sworn to before me this _________ day of _________________, 20 .

________________________

Notary Public

T. DOYLE

I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Thomas Doyle | Mr. Grimmett | 4 |


E X H I B I T S


| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | DOCUMENT | 73 |
| Exhibit 17-18 | DOCUMENTS | 83 |
| Exhibit 19 | DOCUMENT | 85 |
| Exhibit 20 | DOCUMENT | 99 |
| Exhibit 21 | DOCUMENT | 111 |


REQUESTS


| Page | Line |
|---|---|
| 12 | 25 |
| 48 | 25 |
| 66 | 9 |

T. DOYLE

CERTIFICATION

I, LEE K. AUSLANDER, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of January, 2026.

LEE K. AUSLANDER

ERRATA SHEET
Priority-One Court Reporting/Veritext
718-983-1234

ASSIGNMENT NO. P1-7750338
CASE NAME: Calderon , Manuel Angel v. Network Infrastructure, INC. And Patrick Clarke
DATE OF DEPOSITION: 11/20/2025
WITNESS' NAME: Thomas Doyle

PAGE/LINE(S)/ CHANGE REASON
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________

___________________________
Thomas Doyle

SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF_______________, 20__.

_______________________
NOTARY PUBLIC
MY COMMISSION EXPIRES__________________

**0**

**05442** 1:4

**1**

**1** 21:21 74:5,7
**1,000** 19:8,9,15 19:18
**10** 17:23 45:13 81:15 108:6
**100** 45:12 75:12 109:10
**10006** 2:6
**1010** 121:15
**108** 99:21
**10:00** 60:8
**11/20/2025** 126:3
**111** 2:5 124:13
**113** 99:21
**11552** 22:16
**11797** 2:11
**12** 124:17
**12093** 4:12 21:25
**1298** 121:15
**12:00** 86:6,7
**13** 102:13,25 103:4
**135** 2:10
**14** 121:16
**15** 38:23 75:13 76:24 121:15 122:14
**1503** 2:5
**1536** 121:18
**16** 14:20,23 73:10,12 124:9
**17** 54:3 83:13
**17-18** 83:15 124:10
**18** 83:13 85:11 87:6
**18229** 125:23
**19** 85:6,8,24 124:11
**1962** 21:21
**1:24** 1:4
**1:35** 93:21
**1:45:17** 88:13
**1st** 74:10

**2**

**2** 33:3
**2,000** 19:10,11
**20** 1:14 27:19 99:17 123:15 124:12 126:22
**2007** 17:9 24:24 25:13 115:22
**2009** 22:6
**201** 2:10
**2016** 15:10 25:14 26:4
**2017** 15:10 27:5,9,14 28:13 33:4
**2018** 27:9,14 28:13
**2022** 21:9 27:19 28:2,2 35:9 107:6
**2023** 23:2 27:21 35:9 74:5,6,8 85:12 87:6
**2025** 1:14 101:7,10
**2026** 125:19
**21** 111:19,22 124:13
**22** 88:5,7
**23** 27:20
**2315** 93:17
**237** 22:15
**24** 8:12
**25** 74:5 85:12 87:6 109:9 124:17,18
**253** 4:11 21:24 87:14,20
**25th** 87:10
**26** 27:5
**265** 88:5,14
**282** 122:14
**2:00** 32:22
**2:10** 93:23
**2:20:29** 88:15
**2:44** 1:15
**2nd** 125:18

**3**

**3/19/2025** 100:17
**30** 17:24 75:13 76:24 81:16
**31** 121:15
**3307** 87:4,8
**3313** 88:12
**3321** 93:20
**3323** 94:17
**355** 84:15,16 85:12,18 86:16 86:17
**356** 84:25 85:20
**36** 89:2
**3:00** 71:16
**3:09** 93:24
**3:30** 71:12,14
**3rd** 107:4

**4**

**4** 124:4
**40** 72:23,24 74:13,15
**48** 8:8 124:18
**4:30** 70:21 71:10

**5**

**53** 87:9
**5:00** 32:20 71:23 72:6,8 72:11

**5:30** 70:21
**5:50** 123:10
**5th** 74:8

**6**

**66** 124:18
**6:00** 17:20 30:21 43:7 55:14 61:7
**6:30** 30:21 61:9 61:24 62:3

**7**

**7** 86:4,14
**718-983-1234** 126:2
**73** 124:9
**731** 7:8,10,13 110:15,16,18 112:6,12,18 117:23
**7:00** 43:8 61:4 63:24
**7:09** 93:17
**7:14** 94:18
**7:18** 93:18
**7:22** 87:9
**7:23** 94:19
**7:30** 87:13
**7:30:06** 87:25

**8**

**83** 124:10
**85** 124:11
**8:27** 94:21

**9**

**9** 124:18
**9/26** 93:16
**9/27** 94:17
**95** 45:12
**99** 124:12

**a**

**a.m.** 17:20 32:18,20,22 60:8,8 61:7,9 86:6,7 87:10 87:13,25 94:18 94:19,21
**ability** 8:4,9
**able** 26:11 31:14 49:20 51:24 55:5 70:14 71:5 92:17 102:7,12 115:15
**above** 1:18,19 117:9 118:3
**access** 52:11 105:9 109:4
**accuracy** 102:5
**accurate** 39:12 42:4 43:13 45:8,24 46:12 70:22 79:21 85:15 103:12 114:10 122:13
**accurately** 45:5
**accusing** 53:24
**acknowledge** 5:13 109:17
**action** 1:18 14:18 15:11 20:19 99:25 125:14
**actions** 11:2 21:12
**actually** 43:7 77:3 80:17 90:5 100:14 106:24 118:17
**additional** 55:22
**address** 21:22 22:14 60:13 86:18,22,23 87:15,19,22,24
**adelphi** 24:3,5 24:9,11
**adhere** 118:5
**administrative** 20:6
**affairs** 112:13
**affect** 8:9
**afraid** 52:10
**afternoon** 4:13 56:9 78:3 80:8 88:18,25 89:13 90:20
**afternoons** 56:3
**agency** 11:19 20:6
**ago** 10:12 13:4 14:19 48:5 63:8 66:6 80:24 98:24 102:3
**agreed** 3:3,8,12
**agreement** 110:19,22,25 111:15 112:5 112:17 117:24 122:4,13,24
**agreements** 110:13 117:14 117:19
**ahead** 30:2 111:12
**air** 103:7
**alc** 1:4
**alcohol** 8:11
**alledgedly** 63:6
**allegation** 17:8
**allegations** 17:3
**allegedly** 98:13
**allowed** 109:6
**america** 7:12
**amount** 39:24 45:22 94:6 98:13 99:12
**angel** 1:6 126:3
**annoyed** 36:17 37:19,21

**anonymous** 121:2,6
**answer** 5:22 6:17,17 15:18 26:15 30:2 31:6 34:3 63:23 69:24 92:17 97:21 98:11 110:7,8
**answered** 6:5 14:12 31:19
**answering** 4:24 81:22
**answers** 7:25 69:16
**anticipate** 46:25
**anybody** 12:11 23:11 37:4 46:21 57:21 70:10 97:2 115:13
**anyway** 81:4
**appeared** 16:3
**apply** 25:6
**appreciate** 123:7
**appropriately** 81:11
**approximate** 10:13 63:16
**approximately** 25:13 26:6,8 27:5,9,18 55:14 63:24 70:21 87:9 88:7,13 89:2 93:17,22 94:18 94:21
**april** 21:21
**area** 58:5 60:15 64:21
**arresting** 11:9
**arrive** 61:2 70:20
**arrived** 88:15
**aside** 11:21
**asked** 5:23 13:19 15:15,23 20:16 25:7 36:2 62:10,24 63:25 65:6 80:21 92:16 101:21,25 108:16
**asking** 4:22 5:7
**ass** 91:3
**assigned** 54:10 55:18,24 66:23 67:7 82:25
**assignment** 126:2
**assignments** 55:23
**assist** 36:9 57:21 69:8
**associate's** 24:4
**associates** 24:7
**assume** 5:18
**ate** 79:10
**atlantic** 66:14
**attached** 57:11
**attempting** 5:6
**attend** 82:5 113:6
**attended** 10:19 10:20
**attention** 63:18
**attest** 102:5
**attorney** 5:21 5:24 11:22 92:19 123:6
**attorneys** 2:5 2:10
**auslander** 1:20 125:4,24
**authorize** 99:25
**authorized** 96:11
**avenue** 22:15 87:14,20 88:5 88:14,16,22 93:18,18,19,22 93:23 94:18,19
**avoiding** 81:22
**aware** 13:22 19:21 23:13 43:11,15 65:3 65:6 74:23 75:2 110:21 113:7 117:13 117:18,23

**b**

**b** 86:4 124:7
**bachelor's** 24:13
**back** 17:11,12 17:14 18:7 21:4 23:2 24:19 26:13 27:4,10,13 28:12,20 31:22 34:13 37:11,13 37:16 40:4,22 41:2 42:15,23 43:4 44:15 47:5,9 54:6 55:21 56:10 57:6,18 58:6 63:21 64:8 66:11 70:20 71:2,8,10,11,14 72:14 82:17 88:14 89:24 90:12 91:19 92:25 93:4 94:11 98:5,22 98:23 113:25 115:5
**backs** 115:17
**barely** 106:16
**bargaining** 110:19,22,25

112:5,10,16,17 117:14,19 122:4,13,24
**based** 92:19 98:18 122:23
**basically** 13:2 34:18 41:19 58:25 67:12,19 68:15 69:13,14 92:13 106:16 108:5
**basis** 108:13
**bates** 83:10 87:7 99:20 111:22
**bathroom** 38:14,17,22,24 39:7 40:8,9,17 40:21 44:12 75:12,16 76:6 76:9,11,13,22 76:24 77:2,11 77:12,15,21 78:8,12 79:12 79:21 82:12 89:18,22,25 90:10,11,15,17 90:18,20 91:6 91:7,10 92:24 93:2,14 95:11 95:20 96:9,20
**battery** 103:9
**bcm** 1:4
**beach** 66:14
**beat** 62:4
**beating** 99:7
**behalf** 1:6 15:3
**belief** 51:3
**believe** 27:16 51:2,18 114:9 117:8 119:21
**belinda** 2:7
**best** 34:12 51:2
**better** 34:7 52:18 73:19 102:12
**big** 108:5
**bills** 19:2
**birth** 21:20
**bit** 52:17 54:18 73:18 86:13
**bitching** 119:23
**blew** 62:23
**block** 60:9 75:18 87:16
**blocked** 86:15
**blocking** 59:9 70:16
**blood** 125:14
**book** 79:3 90:7 103:21,21 104:21,25 105:3 107:7,17 107:19
**books** 95:8
**boom** 25:19 54:10,14 67:5
**boot** 72:22
**boss** 98:4
**bosses** 119:13
**bottom** 54:19 99:20
**bought** 114:21
**box** 54:11 102:17 104:3 104:20
**brake** 18:12
**brakes** 59:4 103:14,15
**braking** 103:9
**break** 6:2,6,11 6:14,15,18 27:25 41:20 46:16,20,22 51:22 63:4 79:21 82:22 95:24 96:3,4,8 122:6
**breaks** 75:12 89:15
**brent** 2:7
**brick** 119:11
**bridge** 66:14
**bring** 71:18 105:7 119:23 119:24
**bringing** 18:21 98:19
**broadway** 2:5
**broke** 24:6
**broken** 34:9 120:6
**bronx** 25:22 54:11 65:15,17 65:21,24 66:2 66:24 67:2,10 84:22,23 106:6 106:8,13,20
**brooklyn** 32:11 62:2 69:12 71:7 91:3 98:23
**brother** 114:24 115:12,16,19 115:25 116:2,3 116:12,16,23
**brother's** 115:18
**brothers** 115:21
**brought** 11:3 37:9 55:21 56:9 57:18 58:21 59:2 63:17 106:18 116:6 118:2,3
**building** 7:8 65:16
**bunch** 52:9
**business** 113:5 120:4

**c**

**c** 2:2
**calderon** 1:6 23:18,22 51:6 126:3
**call** 12:24 26:7 48:24 56:16 60:10 65:8 66:8 71:19 106:9 117:11 121:3
**called** 20:14,16 24:17 36:20 37:10,15 60:25 101:20
**calls** 35:25 105:24,25
**camera** 109:3
**car** 71:18 103:20 107:8 107:17,21 109:19
**cardillo** 49:10
**care** 39:7,8 41:4 46:5 71:23
**carlos** 34:19 35:18,20,21 40:3,17 68:3 68:19 69:13
**carry** 67:23
**cars** 60:14 68:16
**case** 10:17 14:4 14:10 15:13,24 16:2,3,9,25 20:4,5,18 53:8 101:10 126:3
**cases** 11:8
**cdl** 26:3 28:25 33:15 108:17
**certain** 46:14 67:25 72:13 106:25
**certification** 3:6 125:2
**certify** 99:24 101:12 125:6 125:12
**certifying** 90:22
**chain** 117:8 119:22 120:5,6
**chainsaw** 42:7
**change** 56:21 56:24 57:13,15 57:17 61:19 71:20 75:9 126:5
**changed** 33:11 76:20
**charge** 62:20 64:17 111:3
**chastised** 121:7
**check** 18:11 20:15 21:5 59:3,5 62:22 63:10,19 74:8 98:5 105:5,5,5
**checked** 103:15 104:23 109:19
**checking** 55:24 103:7,7,9,10
**checklist** 103:16,18 105:2,5
**checks** 36:2 74:2
**cheekis** 69:4
**choice** 98:9
**choppy** 26:15
**circumstance** 59:11
**circumstances** 71:25
**city** 26:23 65:3
**civil** 1:22
**claim** 70:19
**clarify** 10:6
**clarke** 1:10 2:15 4:19 6:23 25:2,3 75:18 118:24 120:15 120:19,21 126:3
**clarke's** 119:19
**class** 15:11 20:19 21:12
**classes** 17:21 17:23,25
**clean** 31:4 33:16
**cleaned** 30:10
**cleanup** 30:14
**clear** 75:12 78:5 95:18 99:13 112:14
**client** 81:19
**climbing** 41:13
**close** 55:5 81:5 90:16 91:5
**closer** 71:3
**code** 105:8 108:23 109:2
**collective** 99:24 110:18,22,25 111:15 112:4,9 112:16,17 117:14,19 122:4,12,24
**collectively** 6:24
**college** 24:8
**column** 86:4,20 86:21 88:4
**come** 22:23 25:6,7 29:16 37:11 40:4 52:13 70:3,13 107:19
**comes** 22:8 110:12
**command** 117:8 120:5

**commence** 81:9
**commenced** 14:17
**commercial** 62:14 107:25 108:9
**commission** 126:25
**committing** 53:16
**common** 7:9
**communicated** 12:10
**community** 24:8
**commute** 65:23 66:16
**company** 36:7 36:21
**compensated** 17:21 39:20 43:23 45:14 74:13 81:17 93:6,9 97:4,11 97:12 98:2,16
**compensation** 41:10 44:4
**complain** 117:11 118:8
**complainant** 14:14
**complained** 17:19 118:10 118:20 119:15
**complaint** 20:6 114:19 116:25
**complaints** 18:3 97:15 111:4 115:3 118:19
**complete** 17:24 17:25 30:7 72:2 103:17 104:13
**completed** 29:16,21 30:8 31:13 45:19
**completely** 23:8,9 57:19 75:19 78:5
**components** 32:15
**computer** 9:9 9:12,14,16
**con** 113:17
**concern** 51:25
**concerns** 52:6 119:8 121:3
**concrete** 7:8
**condition** 103:8 103:12
**conditionally** 99:24
**conditions** 111:7,14 112:23 113:11 122:3,11,22
**conduct** 38:3 107:15 109:18
**cones** 30:25 55:6 60:19
**connected** 116:16
**connection** 26:14 34:8,10
**consent** 100:2
**consequences** 53:15,20
**considered** 37:22
**consistent** 64:4 95:16
**constant** 68:4
**constantly** 52:2
**construction** 15:7,25 16:25 18:17
**consumed** 8:11
**contact** 14:6
**continue** 18:23
**contract** 17:12 112:11,20,22 113:8
**contracts** 117:5
**control** 52:23
**convictions** 21:2
**copy** 63:9
**corner** 99:21
**correct** 9:19 14:3 16:7,19 17:4 25:14,15 26:5 27:19 28:18 29:3,6 29:17,22 30:9 31:9 32:2,7,22 33:10,13 42:12 42:16 43:17,18 43:21,22 47:6 47:9 51:17 53:4 54:17,25 56:5 57:11,14 60:5 61:7 62:7 65:10,11 67:8 68:6 69:18,22 71:10 72:3 83:3 84:4,8,13 84:14 85:13,19 86:23 88:6 110:16,17 112:6,19,24 113:12,24 114:20 117:16 117:21 121:11 121:23,24 122:5
**corrected** 63:8
**couch** 13:18 95:8
**counsel** 1:23 3:4
**couple** 84:24 87:21 121:20
**course** 49:4 81:14,15,16

120:14
**court** 1:2 3:16 5:5,12 52:12 101:14 126:1
**courtesy** 5:9
**coworkers** 33:24 121:10
**cpr** 17:21 81:14
**crew** 35:12,13 35:16,23 36:12 39:16,19 44:17 70:2,12 106:20
**crews** 104:11
**crossways** 2:10
**currently** 8:3 12:3 21:23
**cut** 32:14
**cv** 1:4

**d**

**d** 4:2 124:2
**daily** 40:13,23 104:9,12 106:22 108:2 108:13
**danella** 15:6,24 16:24 17:3,10 17:12,17 18:16 19:4,13,16,18 20:5 21:5 24:17 27:3 28:9,10
**dashboard** 108:23
**date** 21:20 27:22 33:4 50:6 63:19 73:13 74:8 83:16 85:9 87:5 99:18 102:23 103:22 111:20 126:3
**dates** 86:2 107:5
**day** 17:22 23:10 29:13,17 29:22 30:12,14 31:3,4,13,16,21 32:4 37:20 39:12 40:2,4 41:21 42:21 43:8,12,16,20 44:4,24 45:2,6 45:23 46:7 47:18 55:16,18 55:22,25 56:9 59:5 61:15 64:6,6 65:12 66:23 72:3,5 72:14,19 74:24 78:4 80:9,21 81:9 83:2 88:11,17,19,24 89:5,10 90:21 90:24,25 91:2 92:7 93:20 94:4 95:10 101:16 103:18 103:22 105:4 109:19 114:15 115:4 123:15 125:18 126:22
**days** 23:3 32:19 32:21 47:15 82:7 109:18 114:15,15
**dead** 99:7
**deal** 104:11
**debris** 42:16,17 55:20 56:5,11 57:2,3,6
**december** 25:14 26:4 33:3
**decided** 20:21
**declaration** 16:15 53:8 80:13 99:22 101:20,21 114:2
**declare** 50:22
**def000127** 111:23
**def017278** 83:10
**def017287** 83:12
**def017673** 87:7
**defendant** 11:12 19:25
**defendant's** 124:8
**defendants** 1:11 2:10 6:22 12:4,7 50:25 73:12 83:15 85:8 99:17 111:19
**defendants’** 50:3 51:15 55:13
**degrees** 45:12 45:13
**delegate** 110:2 110:10 111:8 117:2,9
**delete** 48:5,7,13 48:14,19,22
**deleted** 48:9,17
**deliver** 114:16
**delivered** 114:6 114:12
**demand** 119:22
**department** 11:4 24:13
**depend** 60:2
**depended** 30:6 64:5 69:11 122:3,11
**depending** 65:19 78:4
**depends** 70:24 72:12
**deposed** 9:24 10:5 15:13,16 15:24

**deposition** 1:17 3:6,13 6:21 8:15 10:21 11:24 12:4,8 12:11,15,18,21 13:10 15:19,21 16:6 47:2 75:7 126:3
**depositions** 10:19,23
**description** 124:8
**dictate** 31:25
**differed** 122:23
**difference** 18:2
**different** 13:2 25:21 26:3 32:15 33:24 34:17,21 43:5 47:14 71:6 72:5 84:21,24 106:7 107:5 113:9,10,11 121:10,13,21 121:22,25 122:2,9,10,21
**digital** 104:17
**digitally** 109:13
**directly** 33:18 33:22 38:11 49:4 120:15
**director** 31:24
**discuss** 46:24 47:4 51:22
**discussed** 14:4
**discussion** 123:3
**disputes** 117:16 117:21
**district** 1:2,3
**doctor's** 108:17
**document** 49:22,25 50:5 50:9,10,12,18 52:4,8,15 53:12 73:11,15 73:24 74:19 83:9,14,17 85:5,7,10 87:7 99:16,20 100:3 100:10,13,20 101:3,13,15,24 102:5,8,20 111:18,22,24 124:9,11,12,13
**documents** 9:5 12:14,17,21 13:12 49:20 52:9 124:10
**doing** 10:8 17:17 36:14 61:17 64:11 78:9 79:12 90:5 92:13 94:8 105:18 107:10
**dolowich** 2:9
**door** 8:25
**doors** 8:24
**dot** 60:22 63:5
**doug** 35:17 47:21,22 49:8 49:14
**doug's** 38:3
**dougie** 36:18 36:20 37:20 105:17
**doyle** 1:17 4:9 4:13 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 15:15 16:1 17:1 18:1 19:1 20:1 21:1,16 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1,14 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,19 47:1 48:1 49:1 50:1,21 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1,2 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,23 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1,11 124:1 124:4 125:1 126:4,20
**doyle's** 50:2,24 51:14 52:20
**drawers** 42:9
**drive** 2:10 33:18,21 54:11 66:2,13,21 68:5 86:17,20 86:21,22,22

98:21
**driver** 18:5 25:19 33:9,16 34:19,20 43:5
**driver's** 107:18 107:25 108:10
**drivers** 30:20 32:12 41:14 70:5,7 93:8 98:25 104:8,11
**driving** 18:6 28:17 38:11 63:2 85:11,18 108:6
**drove** 25:20 26:3 28:19,23 30:22 34:20 54:12 66:25 67:4,22 68:13 68:15,17 83:6 84:12,24 108:14
**duct** 56:19
**ducts** 29:11 61:20
**duly** 4:3 125:8
**dump** 54:13 67:4 84:13,24
**dumpster** 58:2
**dumpsters** 41:8
**duration** 22:21 33:12 86:9

**e**

**e** 2:2,2 4:2 12:12 66:5,7,9 124:2,7
**earlier** 13:19 13:24 15:16 31:14 71:10
**early** 18:8 30:21 59:17 60:23 61:10 72:3 99:4
**eat** 44:7,10 77:23,24 78:11 79:8 82:12 89:20,21 90:12 91:11 93:3,3 95:21 96:9
**eating** 79:7
**ed** 113:17
**edt** 86:6,7
**education** 24:2
**edward** 2:12 4:18
**effect** 3:15
**efficiently** 72:2
**egregious** 90:2
**eight** 18:20 43:3 44:9 45:9 45:11,24 46:2 46:7 72:18 74:15 114:14
**either** 11:3,23 54:12 60:7
64:23 68:3,17 90:9 95:10,19
**electronic** 100:16
**electronically** 105:15 106:4
**employed** 12:3
**employee's** 122:22
**employees** 12:7 34:22,25 121:14,22 122:2,10
**employer** 15:8
**employers** 20:7 21:13
**employment** 22:21 27:23 33:4,13 49:5 112:24 113:12 122:3,11,22
**empty** 41:6 57:19
**emptying** 55:20
**ended** 27:13
**enforce** 111:14
**ensure** 55:25
**entail** 29:9
**entailed** 112:21
**entered** 16:24
**entire** 9:19 35:13 36:12 52:6 89:5
**entitled** 1:18 6:15 50:2 89:15 118:5
**equal** 98:13
**equipment** 25:20 31:2 55:8,18 60:18
**errata** 126:1
**esq** 2:7,7,12
**ethics** 120:12 120:14
**evened** 97:23
**evens** 97:18
**everybody** 34:17 59:23 118:21
**exact** 18:22
**exactly** 10:8 78:18
**examination** 4:6 108:18 124:3
**examined** 4:4
**examples** 90:2
**excavating** 7:9
**except** 3:9
**exclude** 86:2
**excuse** 12:16 20:11 29:18 43:14 64:14 65:25 70:6 89:25
**exhibit** 73:10 73:12 83:12

85:6,8,11,23 87:6 99:17 111:19,22 124:9,10,11,12 124:13
**exhibits** 83:15
**expanding** 102:9
**expected** 69:7 69:17
**expensive** 41:15
**expires** 126:25
**explain** 90:5 100:12
**explanation** 36:5 37:7 38:7 38:8 94:23
**extent** 16:8 49:2
**extra** 41:9 46:3 97:10

**f**

**face** 59:10 119:19
**failed** 8:7 106:22
**fair** 40:14,19 41:22 81:7,12 110:11 113:22
**fallout** 24:11
**familiar** 117:4
**family** 81:13 116:10
**far** 65:15 66:13 94:11 113:24
**faulkner** 35:17 49:14
**february** 26:8 27:18 28:2,10
**federal** 1:22
**feel** 5:21 36:12 44:23 54:17,24 80:18 98:12 120:19,20
**feels** 36:6
**feet** 56:20 120:3
**felony** 21:2
**felt** 89:14 92:20 97:25 115:23 118:4
**felton** 15:7
**fence** 41:13
**filed** 14:22,25 15:2 20:5 101:14
**filing** 3:5 117:20
**fill** 18:13 108:7 108:12,13,16
**final** 80:16
**find** 56:14 58:5 90:14 116:7
**fine** 66:12
**finish** 5:7 61:22 75:22 81:24 111:11
**finished** 17:13 30:13 45:19 64:6 72:13 88:11
**first** 4:3 10:5 10:11 24:21 25:13 26:10,17 26:24 32:10 50:4,11,25 51:12,15 92:15 99:22 105:23 115:22
**flag** 17:15
**flatbush** 113:20
**follows** 4:5
**food** 95:10
**force** 3:15
**foregoing** 50:23
**foreman** 36:7 36:13,15 39:25 42:5,19,21,25 43:3,6,11,15 44:13,16 45:5 47:20 49:6 56:16 62:11 64:17,24 84:2 84:4,6,8,9 105:20 118:10 119:24
**foremen** 25:21
**forget** 91:15,20
**forgot** 73:8 91:12,13
**forklift** 56:23
**form** 3:9 11:18 16:12 18:13
**formal** 25:9
**former** 12:6 20:7 21:12
**forth** 18:7 23:2 125:8
**forward** 32:25 118:18
**found** 36:15 61:17
**four** 22:5 32:6 32:9 114:3,10
**free** 5:21 80:19 82:3,8 99:13
**friday** 41:17 42:2,10 56:3,8
**fridays** 41:8,10 41:14 42:14
**front** 8:25 9:6 13:5,13,20 14:2 50:5 59:20 107:18 119:18
**froze** 6:10 14:8
**fuel** 103:7
**fuentes** 35:21
**full** 35:3 61:19 81:9 115:4

**fully** 15:18 52:7 97:4
**further** 3:8,12 55:12 114:22 118:11 123:5 125:12

**g**

**garbage** 18:9 56:13
**gardens** 88:13 93:21 94:25
**general** 4:21 7:16 45:17 122:20
**generally** 45:22 57:10
**generators** 42:6
**gestures** 5:14
**getting** 41:20 53:17 57:22 97:10,12
**giovanni** 49:8
**giovanni's** 49:9
**give** 17:22 38:8 60:12 63:9 67:14 70:13 80:12,15 81:13 92:4 98:25
**given** 36:4 80:20 83:2 125:10
**giving** 7:24
**go** 17:6 21:15 26:13 30:2,11 31:22 35:12,14 37:16 38:14,17 39:4 40:8,9,10 40:16,22 47:5 47:8,16 48:19 52:8 54:18 57:16 59:3 60:17,21 62:15 64:7 65:24 66:11 69:7 76:6,8,11 77:2 77:10,11,15,21 78:11 81:14 82:6,12 86:4 88:4,10 89:22 90:2,12,17,18 91:4,5,6,7,10 92:11,12,24 93:2,4,14,15,16 94:10 95:10,20 96:8 98:4,6,7,9 98:9 102:4 105:18 108:3 111:12 114:22 117:9 118:11 118:13 119:7 119:23 120:2,5 120:15 121:8
**goes** 87:13 99:21
**going** 4:21,22 4:23 5:2,18 6:20 10:6 13:8 14:9 21:4 27:13 32:25 33:2 39:6 42:8 48:24 49:24 51:11 52:3,5,8 52:12 54:2 59:24 61:10 62:2 63:21 66:8 70:10 73:9 76:22,23 76:25 78:17,19 79:12 80:12,15 82:21 83:8 85:4,5 87:3 88:23 89:24 90:9,11,18,19 91:24 93:15,16 99:8,19 111:10 111:21,23 113:25 117:10 118:11 119:18 119:22
**good** 4:13,15 55:25 103:11
**gotten** 17:11
**governed** 112:23
**government** 113:15,23 114:8,12
**governmental** 11:19
**gps** 75:3,7 85:6 85:24 90:23 99:9
**grab** 91:11 93:2 95:10,20 96:19
**grabbing** 90:12
**graduate** 24:4
**graham** 2:4
**grapevine** 116:12,22
**greater** 7:10
**grid** 65:16 113:18
**grievance** 116:25 117:15 117:24 118:6
**grievances** 117:20
**grimmett** 2:12 4:7,18 12:24 34:13 46:15 48:24 51:21,25 66:8 81:21 82:21 95:23 123:2,5 124:4
**group** 47:24
**grown** 120:3
**guess** 15:20 74:15 88:9,20 96:15 110:20

**guy** 34:19 51:5
**guys** 17:17 35:3 56:23 58:21 68:15,16 69:12 108:12

**h**

**h** 2:12 4:2 124:7
**half** 38:21,22 39:12 44:21 46:4,4 71:2 89:8,9,12,12,15 92:9 93:19 94:4,9,13 98:23,25 99:2
**hand** 70:13 103:24 117:10 125:18
**handed** 36:2 103:20
**handle** 69:20
**hang** 76:14,17
**hanging** 76:25
**happen** 6:12
**happened** 17:16 41:17 48:4 75:13 77:4 109:20
**hard** 37:24 102:8
**hate** 34:6
**head** 5:13
**headlights** 103:11
**hear** 4:15 77:8 119:9
**heard** 6:10 23:15,18 75:5 116:11,21
**heat** 31:17
**held** 1:19 15:19 26:25 123:4
**help** 69:14 70:3 70:3,8,8
**hempstead** 22:13,16 29:6 55:13 65:13,18 67:3 87:14,21
**herazo** 2:7
**hereto** 3:5
**hereunto** 125:18
**hey** 17:16 25:5 44:20 96:23
**higher** 121:8
**highest** 23:25
**highway** 116:8
**hired** 24:22
**hitting** 119:11
**hmm** 5:14
**hold** 54:9 98:5 107:25
**holiday** 74:16
**holidays** 26:22 26:23
**home** 8:16 39:5 40:11 44:8,20 75:17 77:6,10 82:3,18 89:6 91:10,21 92:2 95:13,14 96:8 96:17,24 97:19 98:14,18 99:3 99:13
**honest** 23:24 34:11 53:13 68:19
**hooked** 116:12
**hopefully** 6:12
**horrible** 115:2
**horse** 99:8
**hotline** 121:2
**hour** 17:23,24 38:21,22 39:12 44:9,21 46:4,4 70:25 76:15 79:17,20 80:7 81:8,15,16 82:19 89:6,9 89:12,12,15 90:3 91:22 92:10,10,11 93:20 94:4,8 94:13,13,21 95:15 96:24 97:10 98:23,25
**hours** 8:8,12 32:6 36:8 40:2 43:4,12,16,20 44:24,25 45:5 45:9,11,24 46:3,4,7 72:18 72:23,24 74:13 74:15,15,17 75:25 80:13 84:7 99:2,2 114:14
**house** 9:3 22:10 22:11 34:7,12 36:21,24 38:13 38:20 39:11,21 39:24,25 40:16 40:21 44:3,14 75:25 76:3,5,8 76:10,12 77:16 77:19,20 78:10 78:11,20 79:7 79:24 80:3,4,5 80:7,23,25 81:8 87:18 88:7,17,18,25 89:16 90:4,6 92:11 94:4,8 97:5
**houses** 39:17 87:21

**i**

**idea** 36:11,18 39:18 44:16 78:16 82:20 113:13 114:17 115:19 116:15

**identification** 73:13 83:16 85:9 99:18 111:20
**identifies** 86:5
**impact** 8:4
**impression** 116:4
**improve** 34:10
**incident** 13:3
**include** 117:14 117:19
**included** 44:3 102:25 103:5
**includes** 84:3
**including** 46:2 55:16
**increasing** 78:8
**indicate** 99:12
**indicated** 13:21 17:2
**indicates** 74:12 87:8
**indicating** 24:10
**individual** 20:2 68:25
**individually** 1:6
**individuals** 23:14,17 49:3 68:8
**inflate** 75:25
**information** 55:23
**infrastructure** 1:10 6:23 7:4 126:3
**injured** 115:15
**injury** 14:18,20 14:23
**inner** 29:11 56:19 61:20
**ins** 41:20
**inspection** 103:6 104:9,12 105:15 106:3 106:12,22,25 107:11,15 108:2 109:18
**inspections** 107:16
**inspector** 31:11 31:20
**instruct** 30:3
**instructions** 4:22 7:17,18
**interested** 125:15
**international** 7:12
**internet** 9:22
**interrogatories** 50:4,25 51:15 73:9
**interrogatory** 54:3 70:22 80:14
**interview** 25:10
**involved** 18:16 19:21 20:22 23:21 112:13 113:5,6,9,21
**ipad** 106:9,12 106:15
**island** 7:11 22:10,12 32:11 62:2 71:7 98:24 99:3
**issue** 97:8,9 120:20
**issues** 90:10,19 94:12 120:16

**j**

**jamaica** 71:5
**january** 24:24 125:19
**jefferson** 4:11 21:24
**job** 1:15 17:13 18:25 24:25 25:20 26:7 27:2 29:12,15 29:20 30:6,8 30:10,16 31:8 31:8,19,20 32:4,6,17,18,19 32:21 33:8,11 33:18,22,25 34:24 37:12 38:11 40:10,15 40:20 44:6 45:15 55:2,4,7 55:16,19,21 60:6,9 61:17 61:22 62:13 64:5,6,8 66:22 67:23 68:6,13 68:14 69:2 72:2,4,6 77:12 81:4 82:14,17 83:19 88:12 92:12,14 93:11 105:21 112:7 114:23 116:7 116:13 117:25 118:25
**jobs** 30:23 32:11 35:2 36:8,10 37:25 37:25 97:14 106:18
**joe** 49:8,12
**join** 24:13 100:2
**jointly** 1:10
**judge** 91:9
**jump** 111:11
**june** 28:2
**jury** 91:9

**k**

**k** 1:20 125:4,24

**kaufman** 2:9
**keep** 43:2 91:24 104:22
**kenny** 36:19
**kept** 42:5
**keyboard** 67:21
**keys** 67:14,15 67:17
**kids** 35:2
**kind** 14:12 111:5
**knee** 14:20
**knew** 25:2 43:9 106:15 112:15 112:20,22 119:3,21
**knock** 92:6
**know** 6:3,13 18:25 20:15 21:7 23:16,22 25:3 28:5 35:8 35:23 36:6 37:3,3,4,5 38:5 38:17,18,21 39:15 40:6 42:23 46:3 47:17 50:8,19 51:5,7 52:4 54:7 56:18 57:19 58:4,23 59:15 60:8 61:12,13 64:16 66:20 69:5 70:12,23 71:19 72:9 75:16 77:7,25 78:13 78:18 79:15,18 91:15 92:3,7 94:10,15 95:12 96:21 100:6 101:5 105:11 105:12,17,24 107:9,23 108:4 109:15 111:3 112:2,9,11,21 113:8,24 115:12,13,14 115:16,17,20 115:21,25 116:2,13 117:7 119:16 121:13 121:17 122:14
**knowledge** 13:11 51:3 62:23 108:21 110:12

**l**

**l** 4:2
**labor** 34:20
**laborer** 25:18 25:19 26:2 33:8,14,17 34:18 67:2 118:21
**laborers** 7:9,11 33:21 34:18 69:7,17 93:10
**laid** 24:17 26:6 26:18,19,19 119:14
**larger** 56:24
**late** 98:22
**law** 20:14
**lawsuit** 14:14 14:22 15:2,9 15:22 16:24 17:2 18:16,21 20:5,10,13 23:14,17 48:15 48:18 81:10 98:19
**lawsuits** 15:2 19:20
**lawyer** 14:19 19:6 46:23,24 47:4
**lawyers** 23:15
**layout** 30:13
**learn** 20:9,12 24:25
**leave** 31:10,14 32:7 37:4,5 40:10,15,20 58:15 59:6,17 70:24 72:11 88:2,5,12,22 93:10,23 94:20
**leaves** 93:17,19 93:21 94:17
**leaving** 71:6 87:8
**lee** 1:20 125:4 125:24
**left** 15:17 17:10 18:11 24:12 26:4,9 30:8 41:22 56:19,20 61:15 67:17 72:12 80:22 103:3 107:17
**level** 23:25
**levels** 103:7
**license** 33:16 60:11 63:14 68:2,10 107:25 108:10
**lift** 70:15
**light** 62:24
**lights** 18:12,12 59:4 62:19
**limit** 7:24
**limited** 55:17
**line** 59:20 124:16 126:5
**link** 120:6
**list** 16:11 65:4 103:16
**listen** 119:21
**little** 26:14 30:20 45:25 50:7 52:17 54:4,9,18 56:12 61:2,9

71:8 73:18 76:18 86:13 94:12 105:3
**live** 21:23 22:7 69:11 75:17
**lived** 22:4 69:12
**living** 8:19,21 8:23
**llc** 2:4
**llp** 2:9
**load** 18:8 30:22 42:18 57:7
**loaded** 29:10
**loading** 45:9 55:17 69:9 89:9
**local** 7:7,10,13 110:15,16,18 112:6,12,18 117:23 121:16 122:14
**located** 22:12
**location** 36:3 49:16 74:23 75:4
**locations** 106:7
**lock** 41:16
**logbook** 104:22
**logbooks** 104:23
**long** 7:10 18:24 22:4,10,11 30:6 31:25 38:15,19 77:24 79:14 92:7
**longer** 13:15 35:10 76:19 80:7 94:12
**look** 91:2 93:24 100:14,24 101:17,24 102:13
**looked** 113:3
**looking** 9:21 73:20 85:10 87:19
**looks** 88:11 100:21 101:3 112:4
**lot** 23:4 32:10 42:7,8 44:6 57:16,18 59:21 61:11,11,20 62:13 69:12,25 82:2 89:25 95:15 114:21 118:20 119:14 120:13 121:9
**lucky** 72:15
**lunch** 44:5
**lying** 44:23 53:23

**m**

**m** 4:2
**machine** 122:15
**mail** 12:12 16:18
**maintain** 75:3
**maintained** 121:2
**maintains** 65:4
**maintenance** 71:22
**make** 18:2 50:8 51:19 60:16 61:14 63:4 75:11 79:11 95:17 105:25
**making** 53:25 115:3
**mandatory** 17:20 103:19 103:23,25
**manhattan** 91:4
**manhole** 64:20 65:5
**manuel** 1:6 23:22 126:3
**marble** 104:25
**march** 26:8 28:10 101:7,10
**mark** 73:9 85:5
**marked** 73:11 83:12,14 85:7 99:16 111:18
**marking** 85:23
**marlon** 35:17
**marriage** 125:14
**marshall** 22:15 87:14,20 88:5 88:14,16,22 93:18,19,22,23 94:19
**material** 18:8 18:10 30:25
**materials** 29:10 41:6 54:14 55:19 114:6,13 114:16
**matter** 16:15 125:16
**mean** 10:6 32:13 38:5 70:25
**means** 6:22 7:8 54:2
**meant** 91:21
**mechanic** 103:14
**mechanics** 103:10
**medical** 108:4
**medication** 8:4 8:8
**meet** 68:17
**meetings** 17:20 18:4,19 82:4,6 92:5 98:4,7 113:6 115:3

**member** 110:16
**members** 39:16 39:19 40:7 44:17 121:10
**memory** 94:11
**men** 60:19 120:4
**mentioned** 23:6 23:19 35:20
**message** 48:21
**messages** 9:22 48:2,25
**met** 115:21 116:3
**middle** 55:10
**mike** 36:20
**mile** 38:13
**minimum** 86:9
**minute** 46:20 76:21,23 77:9 82:22
**minutes** 38:23 75:13 76:24 88:6,7 89:2
**misdemeanors** 21:2
**mm** 5:14
**monday** 42:2 42:10 98:8
**months** 24:12 24:18 27:11 37:9 119:16
**morning** 30:21 42:3,11 56:15 57:4,7,23,25 58:20 59:2,11 61:16 69:10,18 71:21 78:2 80:8 88:8,17 89:11 90:20 92:6 94:13,20 94:22 102:15 102:16 103:5
**mornings** 18:10
**motion** 99:24
**motorcycles** 68:17
**move** 60:14 99:8
**moved** 57:5 59:16,18 62:22
**mox** 65:21 67:6
**moxley** 4:11 21:24

**n**

**n** 2:2 124:2
**name** 4:8,18 15:21 16:4,23 20:23 35:18 49:9 63:12,13 68:25 69:5,6 107:9 115:6,8 115:18 126:3,4
**named** 11:11
**names** 21:15 23:16 68:11
**nassau** 24:5,8
**national** 65:16 113:17
**nature** 10:16
**near** 87:17
**need** 5:20 6:2 6:14,16 31:8 41:3 48:20 52:5 54:7,17 54:24 56:21 61:19 64:22 73:14 78:5 99:14 100:5,23 112:15 119:16
**needed** 29:13 42:18 55:19 58:6 61:18 68:3,23 69:2 69:10 84:21 89:18 92:23 93:4 106:20
**needs** 5:15 6:5
**neighborhood** 25:4 119:4
**nelson** 115:7,22 115:23
**nelson's** 116:10
**network** 1:10 4:19 6:22 7:3,3 14:7 17:7,9,10 17:13 18:23 20:18,20 22:18 22:21 23:4,10 23:21 24:14,20 24:22 25:12 26:10,16,19,25 27:5,10,12,13 27:18 28:3,12 28:20 35:7,11 37:24 44:20 47:13 60:12 64:24 73:6 74:20,23 80:18 81:10,14 82:8 86:3 96:10 104:8 112:5,18 113:14 114:19 115:11,14,24 116:5,16 120:11,25 126:3
**network's** 85:6 85:24 121:14
**never** 14:13 16:2,3,5 19:13 19:24 23:19 25:9 26:25 31:12 32:9 33:11 34:23 36:4,17 38:6 39:10,11 43:6 45:18 59:11 66:18,19 67:17 80:20 91:15 96:16 97:15 104:16,18 105:8,14 107:3 108:3,16 113:2

113:9,22 114:13,14,18 115:4,20 116:3 120:7
**new** 1:3,21 2:6 2:6,11 4:12 7:10 8:16 21:25 22:16 57:7,20 87:21 125:5
**newspaper** 78:24 90:8
**nicknames** 21:18
**night** 56:14 57:6 58:17 59:7,8 61:13 65:10 71:24 94:14 102:15
**nights** 47:14 58:13
**nine** 74:17
**nods** 5:13
**non** 5:14
**normal** 58:7 93:11
**north** 7:12
**notary** 1:20 3:14 4:4 123:16 125:4 126:24
**notebook** 106:18
**noted** 43:19 123:10
**notes** 12:20,22 12:25 13:5,9 13:15,23,25
**notice** 16:18,20 16:22 99:25
**notified** 16:12
**notify** 47:20,21 47:22
**november** 1:14 27:20 35:8 107:4
**november3** 107:6
**number** 39:7,8 54:3 83:2 84:15,17,25 85:12,18 86:5 86:16
**numbers** 83:5
**numerous** 106:3

**o**

**o** 4:2,2
**oath** 4:24 75:20 75:23 78:6 80:14,15 95:18
**object** 29:25
**objection** 29:23 30:19 32:23 34:2 46:8 62:8 69:23 76:7
89:17 97:20,24 111:16 112:25
**objections** 3:9 50:3,24 51:14 52:21
**occasion** 68:5 69:14 75:15
**occasionally** 40:14,15,20,24 40:25 75:14 77:10
**occasions** 24:15 46:14
**occurred** 40:24 75:14 77:3,5
**occurrence** 40:13
**october** 74:5,7 74:8,10
**offer** 5:8
**offered** 5:2 11:17 37:12
**office** 16:11 20:14 35:25 72:10 104:4 120:18
**officer** 10:18 11:9 109:23,25
**officially** 45:11
**oil** 59:5 71:20
**okay** 5:16,25 6:7 30:4 32:6 54:22 77:14 89:4 117:22
**old** 14:21,23
**once** 48:21 120:7
**open** 9:8 64:20 65:5 79:3
**opened** 24:19 27:12
**operators** 34:5
**opportunity** 80:16
**opt** 50:2 51:13 52:20
**opted** 23:14,17
**oral** 5:11
**order** 1:22 56:2
**ordinarily** 31:15 84:12
**orello** 84:18
**original** 63:21
**osha** 17:23,24 81:15,16
**outcome** 125:15
**outside** 38:16 59:14
**overtime** 46:9 46:11 72:24 73:2,3 74:17
**own** 12:22 17:24 18:2,9 22:2,3 40:5,6 40:18 62:20 63:3 67:9,10 68:16 81:16

82:5,5 92:4 93:5 98:10 109:12 118:22
**owned** 22:6

**p**

**p** 2:2,2 99:21 99:21
**p.m.** 1:15 32:20 32:22 70:21 71:10,16 88:13 88:15,24 123:10
**p1-7750338** 1:15 126:2
**page** 50:10 51:12,12 83:11 84:11 99:22 109:4 111:24 124:3,8,16 126:5
**pages** 83:11
**paid** 45:2 72:25 73:3 81:9,11 82:6 93:12 122:14,17,17 122:18
**papers** 95:8 103:24
**paragraph** 102:13,18,25 103:4 114:2,9
**park** 2:10 58:3 58:5
**parked** 58:10 87:17
**parking** 90:14
**parkways** 62:15
**participate** 16:9
**participated** 21:11
**parties** 3:5 125:13
**party** 11:7,10
**passengers** 67:23 68:19,24 107:18
**past** 48:10
**pat** 25:2,3,5 36:16 37:2,8 37:12,18 45:18 71:19 119:21 120:2
**patrick** 1:10 2:15 4:19 6:23 75:18 118:24 119:19 120:15 120:19,21 126:3
**pattern** 90:24 95:16
**pay** 19:2 62:20 63:15
**paycheck** 62:21 73:5
**payment** 19:4
**paystub** 74:3 74:12,18 83:13 87:5
**pedro** 35:19
**pelton** 2:4,7 29:23,25 30:19 32:23 34:2 46:8 51:23 52:14,18 62:8 69:23 76:7 81:19,24 86:11 89:17 97:20,24 102:10 111:16 112:25 123:8
**penalty** 5:2 50:18,22 53:3
**pendency** 99:25
**people** 23:20 36:16 41:11 60:11,14 118:20,20 121:5
**percent** 75:12
**perform** 55:14 113:15
**performed** 56:4 74:4,10
**performing** 103:5
**period** 25:17,25 28:6 31:9 33:3 33:7 85:17 95:19
**perjury** 5:3 50:18,22 53:4 53:16,20 54:2
**permission** 96:22
**permit** 60:24 64:13,15,19
**permits** 60:2 64:23,25 65:7
**permitted** 64:10
**person** 11:23 49:11 52:13
**personal** 13:11 14:18
**personnel** 58:9 58:17 70:8
**petitioner** 14:14
**phone** 9:11,13 9:15,17,19 11:23 46:13 48:20 49:20 52:2,12 60:11 86:12 91:12,14 91:16,20 96:19 102:9,11 104:14,18 105:11,13
**phones** 105:19
**phonetic** 49:12 69:4 84:18 115:7

**picked** 28:9
**pinpoint** 72:13
**pipe** 113:19
**place** 1:19 34:7 89:23 112:17 112:18
**plaintiff** 1:8,18 10:21 14:13,16 15:6 50:2,23 51:13 52:20 55:11
**plaintiff's** 99:23
**plaintiffs** 2:5
**plate** 63:14
**plates** 60:12
**platform** 104:17
**play** 59:22
**please** 5:7 30:2 54:4 92:3
**point** 5:21 6:3 6:14 23:8 75:6 85:4 103:24
**police** 10:18,24 11:3 24:13 109:23,25
**pop** 71:22
**possible** 45:7 79:19 80:6 107:14
**possibly** 28:4 103:2
**postdated** 106:25
**power** 103:10
**precinct** 110:3
**predominately** 29:2
**prepare** 11:24 12:15,18,20
**preparing** 55:8
**present** 2:14
**presented** 6:4 6:16
**pretty** 20:23 28:24 42:13 48:23 72:21 117:4
**prevent** 7:24
**previously** 56:2 78:7 118:23
**printed** 104:19 104:20
**prior** 20:25 21:8 48:17 55:22
**priority** 126:1
**probably** 15:10 34:8 79:11 95:2 98:15
**problem** 5:10 13:14 103:13
**procedure** 1:22 117:15,20,24 118:6
**proceed** 7:21
**proceeding** 1:13
**production** 12:25 48:25 66:9
**program** 106:17
**prohibited** 65:4
**project** 29:3,5 29:8 31:25 84:22 113:16 113:19,23 114:8,12
**projects** 65:10 84:12
**proper** 120:6
**prosecution** 11:5
**provide** 16:14 120:11,14
**provided** 47:10
**public** 1:20 3:14 4:4 123:16 125:5 126:24
**pull** 58:2 75:7
**pulled** 41:7 45:14 93:2
**punishment** 119:17
**purportedly** 101:13
**pursuant** 1:21
**put** 13:9,12 16:11 20:23 31:4 37:24 41:7,8,11,14 42:9 43:3,8 56:15,17,18 57:20 60:21 61:11,13,20 67:2,20 73:4 103:22 104:3,4 104:20 117:5
**putting** 60:22

**q**

**qr** 105:8 108:23,25 109:2
**queens** 32:12 69:12 71:4 91:4 98:6
**question** 3:10 5:8,23 6:4,5,16 14:9 18:15,15 30:3,5 31:6 34:14 56:25 63:22 69:17 75:22 76:23 81:18,22,23 92:16,18 94:7 98:11 109:9 110:6 111:11 112:15 122:7,8 122:20

**questions** 4:23 5:19 7:20,25 15:18 33:2 46:25 92:17 123:6,7,9
**quick** 79:21 96:3

**r**

**r** 2:2
**rack** 25:21 26:2 54:10,12 55:17 55:20,24 66:25 67:3 106:14
**raised** 17:15
**raising** 17:7
**rare** 46:6
**rarely** 57:13 75:14 91:17,18
**read** 34:13,15 50:20,23 52:15 78:24 95:8 102:7,8,12 113:2 114:2
**reading** 52:19 90:7,8 102:18
**ready** 60:16,20 71:21
**real** 69:6
**really** 23:19 38:6 50:6 68:18 105:11 105:18 120:18
**rear** 72:17
**reason** 7:23 49:18 65:8 80:20 95:9 126:5
**recall** 11:20 19:7 24:21 31:16 48:12 53:9,13 68:12 80:3,4,10,24 85:16 95:22 101:2,6,9,11,16 101:19 102:2 108:7,22,25 109:5,7 112:3 114:11 118:7 121:4
**receive** 19:5 21:5 63:6 73:5
**received** 16:18 19:3,11,13 74:4,18
**receiving** 55:22
**recess** 46:17 82:23 95:25
**recline** 95:8
**recognize** 83:24 100:2,10 101:22 102:22
**recollection** 38:10 79:23 83:9 91:25 102:19 106:5 109:11
**record** 34:15 80:16 86:4 112:14 123:2,4 125:10
**recorded** 45:5
**records** 66:10 75:3,7 85:6,24 90:23 95:13 99:9 106:3
**recovered** 49:2
**red** 17:15 62:19 62:24
**redacted** 86:2 87:2
**reduction** 63:7
**reels** 57:9
**refer** 6:21 7:2,7 54:2 110:15 113:25
**referring** 7:3 32:16 55:10 56:7 68:9 103:3
**reflectors** 103:11
**refresh** 38:9 83:8 102:19 106:5 109:10
**refreshes** 91:25
**regarding** 55:23
**regular** 102:8
**relate** 18:3
**related** 10:24 33:3 69:21 115:10,13 117:15,21 125:13
**relations** 116:10
**relationship** 119:7
**relaxed** 95:5
**relied** 111:5,13
**remained** 42:3 42:11 105:6
**remember** 13:3 15:4,5 19:23 23:23 48:8 53:6,10,11 68:11 77:25 79:22 80:25 83:5 92:10 94:15 95:3 100:17 102:21 102:23,24 104:10 105:16 105:18 106:23 107:2,7,12 114:6,7
**remembered** 12:23
**remind** 13:24
**remove** 57:3
**removing** 57:2
**rent** 22:2

**rep** 114:22 118:2
**repairs** 71:18
**repeat** 14:9 21:22 26:15 101:8 112:15
**report** 39:24 42:20 44:19 49:4 60:4 61:15 62:10 96:25 97:3 104:13 105:15 108:2 109:9,9
**reported** 29:5 61:23 62:6,9 84:4,5,8
**reporter** 5:5,12 34:16
**reporting** 126:1
**reports** 106:4 106:12,22,25 107:5
**represent** 4:19 114:25 121:14 121:22
**requests** 124:15
**required** 47:15 55:12 64:20 66:21 104:8 107:24 108:17 108:18,19
**requirement** 62:5
**resembled** 74:19
**reserved** 3:10
**reside** 4:10
**resided** 22:17 22:20
**respective** 3:4
**respond** 92:15
**respondent** 19:25
**responding** 81:20
**responds** 55:12
**response** 5:15 51:17 53:3 54:3,16,24 55:11 80:15 92:19
**responses** 50:3 50:24 51:14 52:21 70:22 116:6
**responsibilities** 25:16 28:14 29:9 41:3 43:5 69:9,21
**responsibility** 41:13
**responsible** 28:17 44:18 63:3 109:21
**rest** 52:22
**restock** 102:16
**restricted** 64:21
**restrictions** 26:22 30:23,24
**retire** 22:25
**retired** 23:6,8
**retirement** 22:24
**returned** 16:20 28:14 56:4
**revenge** 82:11 92:23 93:13
**review** 110:24 111:9 112:8
**reviewed** 12:14 12:17
**reviewing** 13:12
**revoked** 68:10
**rid** 41:5
**ride** 68:3,23 69:2
**right** 4:16,20 9:6 13:6 24:15 27:6,10,15,23 33:22,25 44:12 50:15 51:9,9 51:13 52:24 53:16,21 64:13 64:15 67:18 74:11,14 75:18 75:20 76:11 77:12,13,17 78:6 80:22 82:19 83:23 86:18,19 87:3 87:17,18,22 88:19 89:3,7 90:22 94:24 95:6 97:6 99:20 100:9 109:14 119:4,8 119:20
**rims** 103:9
**road** 89:23
**roads** 62:17 64:12
**rockaway** 65:16 66:13
**rodding** 34:21
**roll** 56:21,24 57:18 61:19
**rolls** 41:6 56:17 57:17,20 61:16
**room** 8:18,19 8:21,23 61:14 80:22
**rope** 56:18
**route** 62:14
**row** 86:4,14 87:4,7 88:12 88:23 90:2,3 93:16,19,20,24 94:17,20
**rules** 1:22 63:5

**run** 39:6 60:11 90:15 120:4,9

**s**

**s** 2:2 4:2 124:7 126:5
**safety** 18:4,19 31:2 55:6 60:19 82:4 98:4
**sake** 99:7
**samos** 115:7
**sandwich** 79:12
**sat** 79:9
**saturday** 17:22 82:8 98:7 115:4
**saturdays** 81:13 82:7 92:5 97:12
**save** 49:18
**saw** 60:22
**saying** 49:16 53:19 59:15 62:23 77:7,18 79:25 81:10 82:10 104:19 105:22
**says** 50:14,19 53:5 60:5 74:7 83:20 86:9,14 86:17 88:21
**schedule** 47:12
**school** 64:22
**scorpani** 49:12
**scrawl** 50:9
**screen** 9:9,18 49:19 52:3,4,5 59:9 70:16 73:16
**scribbled** 13:23
**scribbles** 100:22
**scroll** 49:24 51:11 52:22,24 54:6,8 85:25 87:4 100:4,7
**scrolling** 84:10
**sealing** 3:5
**seat** 107:18,18
**second** 6:10 26:25 27:17 49:11 50:10 84:10 103:3
**seconds** 87:10
**see** 37:10,15 49:22 50:4,6 51:18,19,24 52:5,15,16,24 59:10 63:19 70:2 73:15,21 73:21,23 84:2 86:3,8,10,12,14 86:16 87:11 93:25 97:2,8,9 97:11 101:18 107:22
**seeing** 86:6,24 87:3
**seems** 82:2 119:6
**seen** 50:11 73:24 83:17,22 83:25 111:24 116:22
**send** 47:23
**sentence** 103:4
**separate** 24:15
**september** 27:5 74:5 85:12 87:6,10
**series** 120:22
**serious** 53:15
**serving** 11:4
**set** 29:19 30:15 30:24 31:9 50:4,25 51:15 55:4,8 80:16 125:8,18
**setting** 89:6
**settlement** 19:3 19:14,15 21:5
**seven** 24:18 27:11
**seventh** 34:8
**several** 83:11
**severally** 1:10
**share** 49:19
**sharing** 74:22
**sheet** 16:4 73:4 87:5 104:20 126:1
**sheets** 104:9
**shift** 39:3 44:10 47:18
**shop** 41:16 105:7 111:2,3 111:6,13 112:8
**short** 46:16
**shortchanged** 92:21
**show** 72:10 73:14 85:4 90:23 99:19 111:21
**showed** 58:14
**showing** 49:25 83:9 95:13
**shows** 85:11
**shut** 122:16
**side** 13:17 36:8 36:9 62:16,17 86:12 102:11
**sign** 51:4,6 100:20 101:21 101:25
**signals** 18:13 59:4
**signature** 51:9 100:15,16,18 100:24 101:23 102:22 125:23
**signed** 3:13,15 16:12 50:13,16 53:12 80:12,14

101:4,13 102:20 105:6
**signing** 53:11 101:2,6,9,19 102:21,24
**signs** 30:25 60:20
**silver** 35:19
**similar** 16:25 101:3
**similarly** 1:6
**single** 90:21,24 95:14
**sir** 5:17
**sit** 89:20 91:21 95:7
**site** 29:12,20 30:9,10,23 31:8,9 32:17 33:18,22 34:24 38:11 40:10,16 40:20 55:4,16 62:13 66:22 67:23 68:6,13 68:14 69:3 77:12 81:4 93:11
**sites** 25:20 55:20,21 83:19
**sitting** 4:20
**situated** 1:7
**six** 24:12 28:20 54:13 67:4,11 67:13 84:13
108:20
**slow** 23:5 26:21
**slower** 54:4
**smaller** 50:8 108:6
**somebody** 16:10 59:16 63:2 68:2,6,20 69:25 84:21 116:22
**sorry** 6:8 29:24 70:18 110:8
**sort** 12:21 23:7 36:4 104:16 116:17
**sound** 27:6 89:2 103:12
**southern** 1:3
**space** 58:7 104:22
**speak** 5:20,24 11:22 46:20 92:18 96:4
**speaking** 11:21
**specific** 62:6 66:23 67:7 83:2
**specifically** 11:11
**spell** 115:8
**spelling** 49:13
**spend** 82:8 98:9
**spending** 90:3 92:11
**spent** 30:6 39:21 44:2 45:23 80:5,6 80:23 89:6,8 91:10 97:5,19 98:14
**spite** 93:14
**spoke** 46:23
**spoken** 12:2,6 14:10
**spot** 34:12 58:4 90:15
**spots** 60:10
**springfield** 88:12 93:21 94:25
**stage** 58:17
**staged** 58:9 59:12
**stamped** 83:10 87:7 99:20 111:23
**stand** 79:11
**start** 4:21 42:22 55:15 60:2,25 64:7 65:12 86:17,21 86:22
**started** 17:9 27:4 41:20 43:7 48:15 58:20,23,25
115:22
**starting** 35:5 61:5
**starts** 122:15
**state** 1:21 16:22 32:25 55:11 125:5
**stated** 122:12
**staten** 32:11 62:2 71:7 98:24 99:3
**states** 1:2 51:13
**stay** 5:7 18:9 31:21 41:9 57:10 67:19 119:18
**staying** 92:20
**stealing** 41:12
**steering** 103:10
**steps** 95:2
**steve** 84:18
**steward** 111:13 112:8
**stewards** 111:2 111:3,6
**stint** 25:13 26:17,25 27:17 67:8
**stints** 60:17 64:12,16 65:8
**stips** 60:8
**stipulated** 3:3,8 3:12

**stipulations** 1:23 3:2
**stomach** 94:11
**stomp** 120:2
**stop** 35:6 38:20 40:16,21 44:14 74:22 75:17,24 76:5,10 77:6 77:10 81:2,3,3 81:7 86:9 90:6 91:12 92:24
**stopped** 38:12 38:13 39:11,23 44:20 76:3,8 76:12 77:18 78:9,20 80:2,4 82:13,18 88:16 88:18 92:9 95:2,12,14 96:8,19 99:13
**stopping** 39:16 44:2 79:24 96:17 98:18
**straight** 72:24 80:17 91:4,5
**street** 4:11 21:24 55:5 58:10,15 59:19 65:22 90:17
**streets** 62:16
**stringent** 75:3 90:23 95:13
**stuff** 25:20 30:13,17,18 42:8,8 57:8 59:4,5 60:19 61:10,11 96:19 98:3 114:21 120:23
**subcontractors** 28:15
**subject** 116:24
**submit** 104:9 106:11,22 108:2 109:17
**submitted** 53:3 53:7 105:14 106:4 107:4,8 109:8 114:18
**submitting** 50:17
**subscribed** 123:14 126:21
**substance** 46:21 96:5
**substantial** 55:15
**sudden** 76:21
**sued** 11:14 19:25
**suit** 20:19
**suite** 2:5,10
**summer** 35:2
**super** 119:15
**supervisor** 29:14 36:22 37:23 45:20 62:12 64:23 119:25
**supplies** 55:19
**support** 99:23
**supposed** 47:18 63:9 117:9 119:24
**sure** 19:9 21:6 21:10 27:8 28:7,11 35:18 39:14 45:18 48:11,13 49:13 51:19 53:5,25 54:5 60:16 63:4 75:11 95:17 115:9 122:25
**swear** 21:6
**switch** 59:22 61:21 84:18
**sworn** 3:15 4:3 123:14 125:8 126:21
**system** 103:9

**t**

**t** 4:2 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1

122:1 123:1 124:1,7 125:1
**table** 79:9
**tablet** 43:19
**taft** 65:22 93:17 94:17
**take** 6:6,17 8:7 10:4 32:12 39:7,8 41:3 46:5,15 51:22 60:18 62:14,16 68:4,23 71:23 79:14 81:14 82:22 89:15 93:10 95:23 109:3,3 122:6
**taken** 1:19 46:17 79:16 82:23 95:25 114:5
**talking** 31:7
**tape** 56:18
**task** 56:3
**tasks** 29:17,21 30:7,8 31:13 103:5
**team** 37:23
**tech** 105:12
**telecom** 29:8 64:11 65:9 84:11
**telephone** 34:5 72:20
**telephones** 65:21
**tell** 5:20 40:19 56:16,20 64:25 96:10,23 105:20 107:13
**telling** 37:8 53:22 107:3
**ten** 46:20 82:22 108:14
**terminated** 36:13 38:10 80:18
**termination** 36:5 37:7 38:2
**terms** 6:20 111:6,14 112:23 113:11 122:2,10,21
**testified** 4:5 16:2 45:4 56:2 57:9 78:7 98:17 118:23 121:9
**testify** 8:5,9 13:10 91:8
**testifying** 96:7
**testimony** 4:25 11:17 46:22 47:5,9 56:10 58:16 59:13 75:9,24 76:20 77:9,14 95:17 96:5 99:14
100:19 125:7 125:10
**text** 9:21 12:11 47:23,24,25 48:21,25 49:15
**thank** 59:10 123:9
**thing** 6:3 40:23 87:3 101:4 102:14 118:22 119:15
**things** 13:3 18:22 26:21 41:7 77:16 114:4 119:10 120:13
**think** 14:8,12 24:10 27:7,20 34:11 35:9 49:10 63:22 66:19 69:16 78:18 81:7,12 83:25 85:15 120:23 121:5
**thomas** 1:17 4:9 21:16 50:2 50:21,23 51:14 51:23 52:14,20 99:23 123:11 124:4 126:4,20
**thorough** 103:6
**thought** 18:22 37:6 62:12
**three** 24:3,14 107:4 114:15
**threshold** 86:9
**ticket** 60:23 62:25 63:7,10 63:12
**tickets** 62:20 63:3
**tied** 115:24 116:5
**tim** 121:19
**time** 1:19 3:11 10:5,11 17:4 18:5,6,9,17 24:21 25:17,25 26:10,20,20 28:6,8 29:19 30:5,16,24,24 31:9,18 32:3 32:16 33:3,7 33:15 34:9 35:3 39:21,24 40:5,6,12 42:20,22,23 43:2,24 44:2 45:22 46:2,18 47:8 49:16 52:6,11 58:12 58:14,19,22 59:15,21 60:2 60:4,17,25 61:3,5,8,11,20 61:25 62:7,10 62:11,13,21

63:19,25 64:2 64:4 65:18,20 67:12,20 69:19 70:24 71:2,12 73:4 76:15 80:5,23 81:16 82:3,5,24 84:4 84:5 85:17 86:21,22 87:5 88:15 89:16,21 91:9 92:5,9 93:5 94:6 95:3 95:14,19 96:2 97:5,17,18 98:10,12,14,15 98:21 99:12 105:23 109:23 118:9 122:15 122:16,18 123:7,10
**timecard** 83:20 83:22 84:3
**times** 10:2,3 17:19 30:2 31:12 32:5 33:19 44:6 57:18 61:6,23 62:13 63:23 65:4 67:25 69:25 71:6,9 71:13 72:13 80:3,25 82:16 84:17 95:15 109:10,16
**tire** 103:8
**tires** 59:3 103:8
**title** 33:8,11
**titled** 99:22
**titles** 33:25
**today** 4:25 7:24 10:9 44:21 52:9
**today's** 11:24 12:4,7,18,21
**told** 20:17,18 36:25 38:6 42:18 76:3 92:22 96:16,18 103:14 106:2 109:8 116:7 119:10,10,12 120:17
**tom** 61:18
**tomorrow** 61:14
**took** 30:7 46:19 62:17 70:25 79:20 96:3,13 98:22 99:2 107:22
**tools** 41:9,11,15 41:16,18,21 42:3,6 56:6,8
**top** 51:12 83:20 85:25
**total** 43:12,16 43:20 45:17
**track** 43:2 60:13
**tracked** 74:23
**traffic** 55:3 62:4
**trailer** 28:21 57:10 58:6 67:5
**trained** 120:13
**training** 120:12
**trainings** 18:4
**transcribe** 5:6
**transcript** 5:12 125:9
**transferred** 24:8
**travel** 17:4 18:5 18:6,17 98:20 118:9 122:18
**treated** 81:25
**trial** 3:11
**tribunal** 11:19
**tried** 60:13 62:3 70:3
**truck** 18:6,12 25:19,22 28:18 28:19,22 29:11 30:22 34:21,21 39:6 40:5,18 40:22 41:12,22 42:3,11 45:10 45:10 46:5 54:10,10,12,12 54:13,15 55:17 55:20,24 56:9 56:14 57:11,25 58:3,9,18,20 59:12,18,19 60:18,21 63:2 63:14 66:22,23 66:25 67:3,5,9 67:10,11,14,15 67:17,22,24 68:20 69:9,21 70:11,11,14 71:19 72:23 75:4 82:25 84:13,22,25 85:12,18 86:5 87:8,13 89:9 89:11 90:13,14 102:15,17 103:6 104:23 104:24 105:6 106:3,11 107:5 107:11,20,21 108:24 114:7 114:13 122:16
**trucks** 26:2,3 58:7,15,25 59:6,22 67:4 74:24 83:6 84:19,24 106:14 108:5,7
**true** 44:13 51:2 58:8 60:24 64:9,19 104:5 104:7 106:21

106:24 109:22 120:25 125:9
**truth** 53:22
**truthful** 7:25
**try** 49:21 60:10 83:8
**trying** 107:13 114:23 120:5
**turn** 78:21 86:11 102:10
**turnpike** 94:25
**tv** 78:21 90:9 95:9
**two** 39:8 57:17 58:24 82:7 85:21 97:23 99:2,2 108:4 114:15
**types** 121:22
**typical** 47:12
**typically** 38:19 41:22 70:19

**u**

**unable** 52:21
**under** 4:24 5:2 25:21 29:14 50:18,22 53:3 75:20,23 78:6 80:14,15 86:17 86:25 95:18
**understand** 4:25 5:19 6:24 7:4,14,17 32:13,14 33:5 37:22 53:15,18 53:19,25 75:20 75:21 99:9,11
**understanding** 53:2
**understood** 16:5 19:17 30:15 39:10 50:17 51:8
**unemployment** 23:4 26:12
**unfairly** 81:25 115:24 116:5
**union** 7:7,9,12 35:4 110:2,13 112:13 113:5 114:22 116:25 117:5,11 118:2 121:25 122:9
**unions** 34:17 112:12 113:9 113:10 121:11 121:14,21 122:21
**united** 1:2
**unload** 18:9 39:5 40:4,6 42:16,17 56:6 58:3 90:13,14 102:14
**unloaded** 56:11
**unloading** 45:10 56:5,8 89:10,11
**unpaid** 17:4 18:4,17 97:18 98:13 114:20 118:9
**uphold** 111:6
**upstate** 8:16
**use** 31:2 38:16 38:22,24 40:21 66:7 76:13 89:18 105:11 106:15
**used** 57:19 67:12 75:16 96:20 98:24 105:8 121:5
**useless** 111:17
**using** 6:20 9:15 36:7,18,23
**usually** 58:22 68:19

**v**

**v** 126:3
**vallen** 35:17
**van** 36:7,18,21 37:20 87:17
**varied** 32:24 64:3,6
**varies** 32:22
**vary** 60:5
**verbal** 5:14,15
**verification** 50:14
**veritext** 126:1
**verizon** 28:16 29:3,14 31:19 31:24 45:20 54:14 64:24 113:18
**vicinity** 7:11
**view** 49:20 52:3 52:7 97:17
**violation** 62:21
**virtual** 1:13

**w**

**wages** 114:20 118:5
**wait** 5:7 55:3
**waited** 26:13
**waiting** 70:12
**waived** 3:7
**walked** 36:3
**wall** 119:11
**walsh** 36:19
**want** 51:19 75:8,11,19,23 85:3 92:15 95:17 99:9 110:7 119:9
**wanted** 20:15 42:9 45:21 63:15 82:11 99:5 104:2 114:5 119:13 119:14

**wasting** 52:10
**watch** 62:19 95:9
**watching** 90:9
**way** 39:4 44:8 44:14 54:19 66:11 81:4 82:14 85:25 92:25 116:8,17 118:3 119:25 125:15
**weather** 45:15
**web** 109:4
**week** 74:7,10 74:13 76:2
**weekend** 22:8
**weekends** 23:3 41:24
**weeks** 119:17
**went** 24:5,19 29:11 34:24 43:6 66:18,24 72:23 78:7 80:25 91:19 95:3 113:3 115:4 118:18 119:11,19 120:7,18,22
**west** 22:13,15 87:14,20
**westchester** 66:17,18 84:23
**wheel** 28:20 54:13 67:4 84:13 108:20
**wheeler** 67:11 67:13 108:14
**wheelers** 108:6
**whereof** 125:17
**wife** 22:8
**willing** 91:8 102:4
**winter** 26:20
**wish** 47:8
**withdrawn** 64:9 85:23
**witness** 4:2 11:5 29:24 30:4 52:16,19 124:3 125:7,11 125:17 126:4
**woodbury** 2:11
**work** 10:24 17:6,10 23:7 23:11 24:19 25:6,7 26:23 27:12 28:3,10 29:15 30:10,11 31:18 35:10 36:19,23 37:11 37:16 44:9 45:15,19 46:11 47:18 55:15,23 58:14 59:8 60:15 64:11 65:9 71:4,23 73:6 74:4,9,19 86:3 93:5,11 97:16,25 99:6 113:3,15,17,18 117:15 119:25
**workday** 81:8
**worked** 20:17 22:18 24:14,16 25:12 26:16 27:17 28:9 29:2,12 30:11 34:23 37:23 40:2 42:21 43:3,12,16,20 44:5,24 45:2,6 45:8,13,25 46:2,6 47:13 65:14,17,19,20 66:12,19,25 67:3,5 72:18 73:6 74:16,20 76:2 80:13 84:7,11 89:11 92:8,8 97:13 97:22 98:17 113:4,14,22 115:14,20
**worker** 59:17
**workers** 35:4 68:22
**working** 22:9 27:4 28:15 35:2,6 36:20 45:12,23 55:25 56:12 60:20 65:20 68:22 91:2,3 94:24 97:10,11 98:8 114:11 120:9
**workplace** 121:3
**work's** 55:16
**write** 106:19
**writing** 117:6
**written** 114:18 114:19 116:24
**wrong** 18:23 56:13 57:2,5
**wrote** 51:4 105:4

**x**

**x** 1:5,12 124:2 124:7

**y**

**y** 4:2
**yard** 18:7 29:6 31:23 34:23,25 35:3 40:22 41:2,25,25 42:15,24 43:4 44:15 49:17 54:11 55:13 56:5,10,23 57:24 58:9,17 58:21 61:2,7 61:24 62:6,9 62:10 63:24 64:2,2 65:13 65:15,15,17,18

65:24 66:3,17 67:6,16,20 68:13 69:2,8 69:18 70:8,20 71:8 81:5 87:9 90:13 92:5,25 93:5 94:5 98:22
**year** 10:14 28:7 28:8,11 48:10 63:16
**years** 10:12 13:4 14:19,20 14:23 18:20 22:5 24:3 63:8 66:6 98:24 108:4
**yelled** 37:21
**yelling** 36:6
**yellow** 56:17
**york** 1:3,21 2:6 2:6,11 4:12 7:10 8:17 21:25 22:16 87:21 125:6

**z**

**zone** 64:22
**zoom** 9:9,18 73:18 100:5,23 105:24
**zoomed** 50:7,21
**zpass** 66:5,7,9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.