# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
1:24-CV-05442(ALC)(BCM)
- - - - - - - - - - - - - - - - - - - - -x
MANUEL ANGEL CALDERON, Individually and
On Behalf of All Others Similarly
Situated,
Plaintiff,
-against-
NETWORK INFRASTRUCTURE INC. And PATRICK
CLARKE, Jointly and Severally,

Defendants.

- - - - - - - - - - - - - - - - - - - - -x

135 Crossways Park Drive
Woodbury, New York
November 20, 2025
10:10 a.m.
Job No. P1-7750338

DEPOSITION of FRANCISCO JAVIER ONOFRE, a Plaintiff in the above-entitled action, held at the above time and place, taken before LEE K. AUSLANDER, a Notary Public of the State of New York, pursuant to the Federal Rules of Civil Procedure, Order and stipulations between Counsel.

* * *

A P P E A R A N C E S:

PELTON GRAHAM LLC
Attorneys for Plaintiffs
111 Broadway, Suite 1503
New York, New York 10006

BY: BRENT PELTON, ESQ.
BELINDA HERAZO, ESQ.

KAUFMAN DOLOWICH, LLP
Attorneys for Defendants
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797

BY: EDWARD H. GRIMMETT, ESQ.

ALSO PRESENT:
VERONICA CLARA, SPANISH INTERPRETER
PATRICK CLARKE

* * *

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

V E R O N I C A C L A R A, called as the interpreter in this matter, was duly sworn by a Notary Public of the State of New York to accurately and faithfully translate the questions propounded to the witness from English into Spanish and the answers given by the witness from Spanish into English.

-oOo-

F R A N C I S C O J A V I E R O N O F R E, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. GRIMMETT:

Q. What is your name?
A. Francisco Javier Onofre.
Q. Where do you reside?
A. 7 Stacy Court, Shirley, New York 11967.
Q. Good morning, Mr. Onofre.
A. Good morning.
Q. My name is Edward Grimmett. I

F. J. ONOFRE

represent Network Infrastructure and Patrick Clarke in this matter. Sitting next to me today is Patrick Clarke. Have you ever met Patrick Clarke before?

A. Yes.

Q. When did you meet him?

A. I met him in 2006 when I started working with him at the company.

Q. We'll get more into that. I'm going to be asking you some questions and you're going to be answering them under oath. Do you understand that your testimony will be under the penalties of perjury?

A. Yes.

Q. Because the court reporter is attempting to transcribe everything, and on top of that, we're using a Spanish interpreter, please just wait for me to ask my question fully and for the translator to fully complete the translation and then you can answer. Also, because this is an oral transcription, the court reporter is not

F. J. ONOFRE

able to indicate head nods or other non-verbal gestures so I need a verbal answer to every question.

A. Okay.

Q. I'm going to assume that you understand my question unless you tell me otherwise.

A. All right.

Q. If you need to speak to your attorney at any point, you can but you have to do that after the question is answered.

A. Okay.

Q. If you need a break at any point, just let me know. But before any break, just make sure the question is answered.

A. Okay.

Q. I'm going to be using some terms during this deposition, one of them defendants. If I refer to defendants, that means Network Infrastructure, Inc. and Patrick Clarke, collectively.

A. Yes.

F. J. ONOFRE

Q. If I refer just to Network, that means Network Infrastructure, Inc.

A. Okay.

Q. Do you understand all the instructions I gave you?

A. Yes.

Q. Before we get into the questions, do you have any questions?

A. No.

Q. Again, I know it's difficult, but just make sure the translator finishes the translation before you answer, all right?

A. Okay.

Q. Is there any reason that would prevent or limit you today from giving truthful answers to my questions?

A. No.

Q. Are you currently taking any medication that would impact your ability to testify?

A. No.

Q. Did you fail to take any mediation that you are ordinarily

F. J. ONOFRE

prescribed to take within the last 48 hours?

A. I only take for the blood pressure. High blood pressure.

Q. Had you consumed alcohol in the last 24 hours?

A. No.

Q. Aside from speaking to your attorney, did you speak to anyone else, either in person or by the phone, to prepare for today's deposition?

A. No.

Q. Have you spoken with anyone currently employed by Network about today's deposition?

A. No.

Q. Have you spoken with any former employees of Network about today's deposition?

A. No.

Q. Have you communicated with anyone about this deposition by text message or e-mail?

A. No.

F. J. ONOFRE

Q. Did you review any documents in preparation for today's deposition?
A. Yes.
Q. What documents?
A. It's the documents that the attorney gave me.
Q. What documents are those?
A. It's in regards to the lawsuit.
Q. Do you have any idea what specific documents they were?
A. Yes.
Q. Can you please explain what they were?
A. It's the lawsuit in regards to the time worked and the time worked and the time that I managed.
Q. The time that you managed? How did you manage time?
MR. PELTON: Objection. I may object at times. You may go ahead and answer unless I specifically tell you not to.
THE WITNESS: Okay.
Q. My question was, you testified

F. J. ONOFRE

that you reviewed documents about the time that you managed. What document are you referring to?

A. I'm talking about when I first started working at the company, we had to write down everything about the truck to make sure that everything works well and that would be before leaving work.

Q. And you reviewed a document related to that?

A. Yes.

MR. GRIMMETT: I'm going to call for the production of that document.

Q. You also testified you managed time? What do you mean by that?

MR. PELTON: Objection.

MR. GRIMMETT: He said he reviewed the document about the time that he managed.

MR. PELTON: I think you're mischaracterizing but you can ask him more.

MS. HERAZO: Slight translation issue --

MR. GRIMMETT: Just one -- we went through this last time. If we're going to deal with translation issues, I just ask anything that anything you say in Spanish, if you can translate back to me.

THE INTERPRETER: So the word manejar has two meanings in this case. It means manage but to also drive to drive. So I wasn't sure what he was referring to because he just said I manage, meaning the word manage. But in this case, it means to drive. Which I didn't know because he didn't say I drive whatever -- I was driving the car. In the time that I drove is what he was saying as opposed to in the time that I managed.

MS. HERAZO: It's a verb in span.

THE INTERPRETER: I'll explain now to the witness.

Q. To clarify, you reviewed documents about the truck that you drove?

F. J. ONOFRE

MR. PELTON: Objection.

A. Yes.

Q. You described a document about your inspection of the truck, correct?

A. Yes.

Q. Were there any other documents that you reviewed in preparation for today's deposition?

MR. PELTON: Objection.

A. No.

Q. Did you prepare any notes or documents to prepare for today's deposition?

A. No.

Q. Have you discussed this case at all with others?

A. No.

Q. Do you go by any names other than Francisco Onofre?

A. No.

Q. Do you have any nicknames?

A. No.

Q. What is your date of birth?

A. 8/12/69.

F. J. ONOFRE
Q. Where do you live, currently?
A. 7 Stacy Court, Shirley, New York 11967.
Q. How long have you lived there?
A. Three years.
Q. Who do you live with?
A. With my wife.
Q. Any kids?
A. No, they are adults now.
Q. Do you have any other residences?
THE INTERPRETER: I'm sorry?
Q. Do you have any other places that you own or rent?
A. Yes, I have a house in Uniondale.
Q. What's the address?
A. 109 Myron Street in Uniondale.
Q. Do you own or rent any other residences outside of those two?
A. No.
Q. When you worked for Network, where did you reside?
A. I was living in a rented house.

F. J. ONOFRE

Q. What was the address?

A. That's the house that I bought. 1091 Myron Street.

Q. You lived at 1091 Myron Street during the duration of your employment with Network?

A. No. Correction. I had a house in Freeport before starting work with the company, I had a house in Freeport. It was on 27 Harrison Avenue in Freeport.

Q. You resided at this Freeport address during the duration of your employment with Network?

A. Yes.

Q. Are you aware that other individuals have opted into this lawsuit?

A. No.

Q. So you don't know that there's multiple people involved in this lawsuit? It's not just you?

A. I don't know because I just received a letter and that's when I communicated with the attorney's secretary.

F. J. ONOFRE

Q. That's it?

A. Yes.

Q. It's your testimony that you're not aware of any other of the plaintiffs in this case?

A. No.

Q. What is your highest level of education?

A. Second grade primary school.

Q. Do you hold any professional licenses?

A. No.

Q. Did there come a time when you were hired by Network?

A. I don't understand that question.

Q. When were you hired by Network?

A. That was in 2006. I don't remember the exact date of when I started to work with them.

Q. Do you know the individual who told you that you were hired?

A. Yes.

Q. Who was that?

F. J. ONOFRE

A. I don't remember the name. He was a supervisor of the company. The last name was Ryan.
Q. Was this individual with Network the entire time you were employed?
A. Yes.
Q. And you have no idea what his first name is?
A. The problem is that he retired and so he would come around every so often. I don't know if it's Ryan or Brian. The last one that was the supervisor there was Joe Panica.
Q. Did anyone help you get hired by Network?
A. Yes. I belong to Union 1298 and I had a friend, Mike McKenna, and he was working for the Network company and he told me to go there. That he would speak up for me.
Q. Mike McKenna was working at Network before you started?
A. Yes. Back then, yes.
Q. How long did you work together?

F. J. ONOFRE

A. I worked there for only about three months with him.

Q. Do you still talk to Mike McKenna?

A. Yes. He retired a little while ago.

Q. Did you talk to Mike McKenna about this lawsuit?

A. No.

Q. Did you interview for the job at Network?

A. Yes.

Q. Do you recall who interviewed you?

A. Yes, that guy. It's actually Tommy Ryan.

Q. During the interview, was it discussed what your job duties would be?

A. Yes. I was told that I would work as a laborer with the shovel.

Q. When you were hired, you were hired just as a laborer?

A. Yes.

Q. You weren't a driver when you

F. J. ONOFRE

were first hired?

A. At the beginning, no. But about five months later, I started driving the company vehicle.

Q. When you were a laborer, you drove directly to the job site, correct?

A. Yes.

Q. Now I'm going to be asking some specific questions about your employment. When I ask these questions, it's going to be related to 2022 to the last date of your employment. I'm going to clarify that. When I ask these questions about your employment, it's going to relate to December 2, 2017 to the last date of your employment; do you understand?

A. Okay.

Q. During that time period, you were a driver?

A. No.

Q. When were you a driver?

A. When I first started working at the company. Three months after starting and then I was given a truck to drive at

work.

Q. After you started driving the truck, were you a driver for the rest of your employment with Network?

A. Yes, as a driver.

Q. Did your coworkers have any different job titles?

A. I don't understand what you mean by title? My title as in what?

Q. Were there individuals that only worked in the yard?

A. I still am not understanding.

Q. Not everyone that was employed by Network was a driver?

A. No.

Q. Some were only laborers, correct?

A. Yes.

Q. Some only worked at the yard and never went to the job site?

A. No, the company had three or four people there that would work there and the mechanics were a part and I would have to deal with, in the morning, at the

F. J. ONOFRE

6:00 in the morning when people would arrive. When I would arrive at 6:00 in the morning, the trucks were already out.

Q. The trucks, when you arrived at the job site, were staged and ready to go for the day, correct?

A. Yes.

Q. There was nothing for you to do when you got there, correct?

MR. PELTON: Objection.

A. When I would arrive at the yard, the trucks were out already. I would arrive at 6:00 in the morning and then I would go with the foreman and you would take out the paperwork for the trucks and then we would take all the material needed and then load it onto the trucks.

Q. We'll get more into that. I'm going to mark this as Exhibit 11. I'm going to show you this.

(Document was hereby marked as Defendants' Exhibit 11 for identification, as of this date.)

A. The only thing I can tell you is

F. J. ONOFRE

I don't know how to read in English.

Q. Understood. I understand that you can't read English so I will be reading some of this document. But it's entitled Opt-in Plaintiff Francisco Onofre's Objections and Responses to Defendants' First set of Interrogatories. Feel free to go through the pages but have you seen this document before?

A. Yes. I spoke with their secretary here so that she could read to me what was in it.

Q. So this entire document was translated to you?

A. Yes.

Q. Please go to the second to last page. Is that your signature at the bottom of the page?

A. Yes, that's my signature.

Q. Above your signature it says, "I, Francisco Onofre, hereby declare, under penalty of injury, that I have read the foregoing plaintiff Francisco Onofre's objections and responses to defendant's

F. J. ONOFRE

first set of interrogatories and believe it to be true to the best of my knowledge and belief."

A. That's correct.

Q. You understand that all the responses that you put in this document are made under penalty of perjury?

A. Yes.

Q. I'm going to ask you to go to number 17. This is interrogatory number 17. There is no page number on this. It's towards the end. Are you there?

A. Yes.

Q. Under interrogatory number 17, it has your response. Do you see that?

A. Okay.

Q. I'm going to ask you to turn the page and go to the first full paragraph. It starts with notwithstanding.

A. Okay.

Q. I'm going to read the first sentence. It says, "Notwithstanding and without waiver, of the general and foregoing objections, plaintiff responses

F. J. ONOFRE

that he worked for defendants as a mechanic/fitter and laborer, driver, performing manual construction labor from in or around December 2006 to in or around December 2023."

A. Correct.

Q. It's your testimony that after the first few months of working for Network, you were a driver, correct?

A. Yes.

Q. And you were a driver for the duration of your employment with Network from that point on?

A. Yes. I drove about 12 years.

Q. You drove until 2019, then?

A. Yes.

Q. Isn't it true that you have a conviction for driving while intoxicated?

MR. PELTON: Objection.

A. Yes.

Q. I'm going to show you another document. It's going to be marked as Exhibit 12.

(Document was hereby marked as

F. J. ONOFRE
Defendants' Exhibit 12 for identification, as of this date.)
MR. PELTON: I would ask you to listen to the question and only respond to the question that's been asked.
THE WITNESS: Okay.
MR. GRIMMETT: What did he say before that?
THE INTERPRETER: He said this will be good for me.
Q. I'm going to refer you to this document. It's two pages. On the bottom right, it's been Bates stamped DF017401 and DEF017402. When you were convicted of driving while intoxicated, your blood alcohol content was found to be at 0.18, correct?
MR. PELTON: Objection.
A. Yes.
Q. And you were convicted of this driving while intoxicated in April 2012; is that correct?
MR. PELTON: Objection. I'm

F. J. ONOFRE

going to object to the entire line of questioning as far as the DUI but just to preserve the objection.

Q. Were you incarcerated for this conviction?

A. Yes, that's correct.

Q. How long were you incarcerated?

A. Six and a half months.

Q. You were allowed to return back to Network after your incarceration?

A. Yes, I was given a conditional license and I started to drive again.

Q. But your driver's license was suspended in October of 2013, correct?

A. Yes.

Q. And Network knew about your DUI conviction, correct?

A. Yes.

Q. And Network knew that your license was suspended, correct?

A. Yes.

Q. After your license was suspended, you weren't allowed to drive a truck anymore, correct?

F. J. ONOFRE

MR. PELTON: Objection.

A. I was given a conditional license which is why I started driving. But when I was incarcerated, that's when all the conditions were taken away. I was before almost four years fighting the case because they wanted to give me three or four years.

Q. I'm going to refer you to this first page. In the middle of the page, it says activity. It says conditional license issued, December 13, 1992, correct?

A. I don't remember.

Q. If you go down, it says suspensions, revocations. It says revocation October 16, 2013, correct?

A. I told you I had a conditional one. And then it was taken away when I went to jail.

Q. So your license was completely revoked after you went to jail, correct?

MR. PELTON: Objection.

A. Yes.

Q. And you were not able to drive after you returned to Network, correct?

MR. PELTON: Objection.

A. No.

Q. I want to make sure the record is completely clear. You did not have a valid driver's license after this conviction, correct?

MR. PELTON: Objection.

A. No.

Q. No, you did not have a valid license?

MR. PELTON: Objection.

A. I don't understand.

Q. I'm glad you're letting me know you don't understand my questions. We're going to have to clarify this. After your incarceration, you returned to work at Network; is that correct?

A. Yes.

Q. When you returned to Network, you were not authorized to drive by the State of New York, correct?

A. No.

F. J. ONOFRE

Q. So it's true that you were not able to drive a truck when you returned to Network?

MR. PELTON: Objection.

A. No.

Q. When you returned to Network, you stopped driving a truck?

A. Yes.

Q. Going back to Exhibit 11, we looked at interrogatory response number 17 before. This isn't entirely true that you were a driver from 2007 to 2019; is that fair to say?

A. No.

Q. Why not? You just testified that your license was revoked in 2013 and you could not drive anymore.

MR. PELTON: Objection.

Q. So you were not a driver after 2013 but your interrogatory responses state that you were a driver in December 2023?

A. No.

Q. Do you want to clarify this?

F. J. ONOFRE

A. Yes, I drove up until 2014. Sometimes there, around there. Up until 2014.

Q. You drove with a revoked driver's license?

A. Yes. I was driving with that because there weren't any drivers that knew how to drive standard.

Q. Even though your driver's license was revoked, you still drove for another year?

MR. PELTON: Objection.

A. Not for a year but yes, whenever there was a need to drive, I would be the one driving.

Q. Did Network know you drove?

A. The supervisors were aware that I didn't have a license.

Q. You completely stopped driving a truck in 2014?

A. Yes.

Q. From 2014 to 2023, what was your position? What were your responsibilities?

F. J. ONOFRE

A. In 2015 or 2016, we were working for National Grid and I would go together with the driver to work.

Q. You were just a laborer at that time, correct?

MR. PELTON: Objection.

A. No, not a laborer. I was a mechanic fitter, the one that would lay the pipes in the street. I was one of the biggest workers that Network had.

Q. From 2014 to 2023, you were a mechanic/fitter, correct?

A. No. I worked as a mechanic for 2007 to about '15, '16 when National Grid took away the contract. I was the mechanic/fitter, the one that would lay down the pipes in the streets.

Q. Even when you were on National Grid and other projects, those were your responsibilities?

A. No. I was trained to work. I was sent for training.

Q. From December 2, 2017 to the last date of your employment, what were

F. J. ONOFRE
your general responsibilities?
A. They used to have a contract with Verizon and from there, I started working throughout those dates up until 2023.
Q. That Verizon project you just testified about, is that the Make Ready project?
A. I don't know what that is.
MR. PELTON: Can we take a break when you have a minute?
MR. GRIMMETT: Yes. One more question.
MR. PELTON: Sure.
Q. In this lawsuit, you're claiming that you were not paid for the time spent driving a truck, correct?
A. Yes.
Q. You just testified that you stopped driving a truck in 2014, correct?
A. Yes.
Q. So how could you possibly raise that claim?
A. Well, I'm making the claim

F. J. ONOFRE

because since I started working in that company, I wasn't paid for driving.

Q. But you stopped driving in 2014?

A. Yes, I stopped in 2014.

Q. So your claims predate 2014?

A. Yes.

MR. GRIMMETT: We can take a break.

(Whereupon, a recess was taken at this time.)

Q. We just had a ten-minute break.

A. Yes.

Q. You discussed the substance of your testimony during the break?

A. With someone? No, with them.

Q. Yes, so what was discussed?

MR. PELTON: Objection. Attorney-client privilege.

MR. GRIMMETT: If you're discussing the substance of his testimony, it's no longer privilege; you can't.

MR. PELTON: I don't think he understands the legal nuances.

F. J. ONOFRE

Q. With your attorneys --

MR. PELTON: I will direct him not to answer that question.

MR. GRIMMETT: You're in a room for 15 minutes; he's saying his discussed his testimony. I think that's pretty clear. You're not going to respond to that at all? All right; I'll ask my questions.

Q. During the break, did you discuss what potential questions may be coming?

MR. PELTON: Objection.

A. I don't understand too well what you're saying.

Q. During the break, did you have a discussion about what you may expect?

MR. PELTON: Objection.

Q. To be asked?

MR. PELTON: Attorney-client privilege.

A. No.

Q. During the break, did you have any discussion about changing some of your

F. J. ONOFRE

prior testimony?

A. No.

Q. I know we already discussed the conviction for DUI. Do you have any other prior misdemeanor or felony convictions?

A. No.

Q. Isn't it true that you were also convicted for facilitating the aggravated unlicensed operation of a motor vehicle?

A. What is that? I don't understand.

Q. I'm going to refer you back to Exhibit 12. If you go down to where it says convictions/bail forfeitures more towards the bottom of the page --

A. What does that mean?

Q. In notes, I'm going to represent to you that this an abstract of your driving record. On top of the DUI conviction, this notes a conviction -- it's abbreviated FAC AGG UNL OP INF. Do you know what that is?

A. No.

Q. It says you were convicted on

F. J. ONOFRE

March 16, 2022. You have no idea what that is?

A. No.

Q. Outside of the DUI conviction and this other conviction that's on the abstract of the driving record, are you aware of any other misdemeanor or felony conviction?

A. All I believe is that I have one felony.

Q. Understood. The DUI was a criminal matter. This is a civil matter. Have you been deposed in a civil matter before?

A. No.

Q. Have you ever offered any sort of testimony, whether it be in court or before a government agency?

A. No.

Q. Other than this lawsuit, have you ever commenced another lawsuit before?

A. No.

Q. Have you ever filed a complaint with a government agency?

F. J. ONOFRE
A. No.
Q. Have you ever had a lawsuit brought against you before?
A. No.
Q. You've never filed another lawsuit or complaint against one of your former employers?
A. Okay, I was going to sue Network because while working with them, I broke my teeth with a pipe and so, I didn't work for two days and then I asked them if I would be paid for that time that I was out and they said no. And so, I had to work. After begging them, they then sent me to see a dentist and they paid for those missing front teeth.
Q. You have nicer teeth than I do.
A. I had a pay a lot of money for it.
Q. Understood. Did you ever file that lawsuit?
A. No. Because the person at the safety meeting told me that I could not sue because then I would be putting the

F. J. ONOFRE

company at risk or something like that.

Q. When was this?

A. That was in 2008.

Q. Going back to my original question; so you've never filed a lawsuit against any of your other former employers?

A. No.

Q. Have you ever participated in what is called a class or collective action where you got a notice in the mail and you responded to that notice and sent it to an attorney?

A. The only letter I ever received are from the attorneys here in this case.

Q. For this case?

A. Yes.

Q. Understood. Who did you go to work for after you left Network?

A. I retired.

Q. So you haven't worked anywhere since you retired?

A. No. I haven't worked because I became ill with my stomach. I have an

F. J. ONOFRE

infection in the intestines and I can't work anywhere.

Q. I'm sorry to hear that. Going back to your employment with Network, after you lost your driver's license in 2013, how did you get to Network's yard?

A. That's good question because I was living seven minutes away from Network's yard.

Q. When you went to Network's yard, I'm assuming you would walk?

A. Or my wife would take me.

Q. When you went to Network's yard, you were a passenger in the truck, correct?

A. That's right.

Q. Is that because it was too -- the job site was far away for you to commute there directly?

A. Yes, that's correct.

Q. Other laborers would commute directly to the job site?

A. Yes.

Q. What was your typical schedule

F. J. ONOFRE

when you worked for Network?

A. I would arrive at 6:00 in the morning because the supervisor told us that we had to be there early every day and so we would arrive almost at the same time as the foreman. And so, he would pick up the folder, the work folder and then between both us, we would then take out all of the tools that were needed for the job.

Q. Who was the supervisor that told you that you had to be there early?

A. There were several supervisors there. There was Tommy Ryan. There was Joe Panica, who was a foreman and then he became a supervisor. I was part of his crew because within the company, each supervisor had their own crew.

Q. Would your supervisor communicate to you via text message what time you were expected there?

MR. PELTON: Objection.

A. Can you repeat the question, please?

F. J. ONOFRE

Q. Would your supervisor tell you what time you were expected there via text message?

A. No, that was all told to us in the safety meetings, that everyone had to be there early.

Q. Didn't you just testify that laborers could have went directly to the job site? So then not everybody had to be there early, correct?

MR. PELTON: Objection.

A. Yes, not everybody. It was about 400 people back then. My responsibility, along with the foreman -- it was mine, since I was the mechanic fitter, the one that would do the job.

Q. Is that everything?

A. Yes.

Q. So the time an employee was required to report to the yard depended on a large variety of factors, correct?

A. Yes.

Q. It depends on what their job responsibilities are, correct?

F. J. ONOFRE

A. I was one of them.

Q. My question is, the time and employee has to be at the yard depends on their job responsibilities, correct?

A. Yes.

Q. Depends on who the foreman is, correct?

A. Yes.

Q. Depends on what their collective bargaining agreement says, correct?

MR. PELTON: Objection.

A. I don't know what you mean by that.

Q. It depends on what their union agreement says, yes?

A. Honestly, I don't know anything about that. I don't know about the union. All I know is that I was part of the union and that I was working for Network Infrastructure. I don't know whether they had a contract with my union. I don't know about those things. All I know is I was just a worker there.

Q. And a bunch of employees just go

F. J. ONOFRE

directly to the job site?

MR. PELTON: Objection.

A. That's correct.

Q. And then there's an employees that don't ever leave the yard, correct?

A. Like I said, Network would have employees to stay in the yard to clean the yard and the mechanics that were working with the tools but as far as us, the mechanics, we had to go -- all of us had to leave to go to the job site.

Q. Just a reminder, these questions relate from December 2, 2017 to the last day of your employment. During that period of time, the testimony is that you weren't a driver, correct?

A. Yes.

Q. And you would just show up at the yard and get a ride to the job site from that driver, correct?

MR. PELTON: Objection.

A. No. I would -- I was second in charge to the foreman dealing with the tools. In fact, I was in charge of

F. J. ONOFRE

everything there.

Q. Were you ever referred to as a crew leader?

A. The foreman would do everything that I would tell him, actually. Because I had more experience that he did.

Q. Were there ever circumstances where the foreman didn't report to work?

A. The company had a lot of things going on. They had me work with this young kid about 23 years old and they put him as a foreman when he didn't know anything and so -- they had him like that on paper, on the paperwork.

Q. My question is, was there ever times that he didn't show up to work?

A. Yes.

Q. Who would run the crew when he didn't show up to work?

A. Me.

Q. Would you track employees' time?

A. No. What I would do is I would fill out -- I would write on the paper, in Spanish everything that was being done at

F. J. ONOFRE

work and then I would give it to him so that then he would do the paperwork to turn into the office.

Q. You told him the amount of time that the employees worked in a day, correct?

MR. PELTON: Objection.

A. Yes.

Q. Isn't it true that the start of the workday would depend on the work permit for the project that you were assigned to?

MR. PELTON: Objection.

A. Can you repeat that?

Q. Isn't it true that the start of the workday would often depend on the work permit for that project?

A. Yes.

Q. Some permits could say the job could only start at 9:00 a.m., correct?

A. That's correct.

Q. On those days, the truck could leave later from the yard, correct?

A. Sometimes. Not all the time.

F. J. ONOFRE

Q. So the time that the truck would leave the yard would vary?

A. Like I said, with my crew, I was always there early and always organizing and putting in order all the tools in the truck and then whenever there were permits that you had to be there at 9:00 or 10:00 in the morning, we would still work no matter what, doing whatever things needed.

Q. We'll go further into that. So you said your start time was approximately 6:00 a.m., correct?

A. Correct.

Q. So that start time would vary, when you say approximately?

MR. PELTON: Objection.

A. No.

Q. You were there at 6:00 a.m. on the dot every day?

A. Yes.

Q. You never worked a night project?

A. Yes, I did.

Q. So your start time would vary?

F. J. ONOFRE

A. Within the company had many jobs and so sometimes, we worked during the day and at night, would barely arrive into the yard and just eat quickly and then go off again.

Q. You would go to the yard, the truck is staged and you'd take off and go?

MR. PELTON: Objection.

A. We would once again have to load up the truck to then leave because that's then a now new job.

Q. I'll get to that later.

MR. PELTON: Listen very carefully to the question and just respond to the question. If you don't understand, let him know.

THE WITNESS: Okay.

Q. Did you always start the day at the Hempstead yard?

A. Yes.

Q. The only ways you would commute there would be you'd need to walk or your wife would drop you off?

A. Sometimes my wife would take me

F. J. ONOFRE

and sometimes, it would be a friend from work.

Q. Did your wife have a job while you were employed by Network?

A. Yes.

Q. Where did she work?

A. She works driving school buses.

Q. Doesn't that usually start pretty early in the morning?

A. Yes.

Q. So how was she able to drive you to work?

A. Sometimes she would take me, sometimes my friend, and sometimes I would pay a taxi cab.

Q. She would take off from work to drive you someplace?

A. No. Sometimes, she wasn't working so she would.

Q. Did you ever start the day at the Bronx yard?

A. Yes.

Q. How would you get to the Bronx yard?

F. J. ONOFRE

A. That's when I would drive with my own personal car.

Q. After 2014, you would take your personal car to the Bronx yard?

A. Sometimes but it was more often a friend of mine that would take me to the yard.

Q. So there was sometimes you would commute to the yard with a revoked driver's license, correct?

A. That's right.

Q. Did that car have an E-ZPass?

A. Yes.

MR. GRIMMETT: I'm going to call for the production of those E-ZPass records.

Q. Did you ever start the day at the Westchester yard?

A. Yes.

Q. How would you commute to the Westchester yard?

A. I had a friend that would take me to the yard in the Bronx and then from there, I would go with the driver to go to

F. J. ONOFRE

the Westchester yard. To the job in Westchester.

Q. You previously testified that some coworkers would commute directly to the job site. What were the names of those coworkers?

A. It was many of us.

Q. Do you remember the names of anyone?

A. Yes, Ricardo Chicas.

Q. Anyone else?

A. It was many of us but the only one that really ever gave me a ride was him.

Q. When you would commute to the Westchester yard, it wasn't necessary for you to stop at a yard? You would go directly to the job site, correct?

MR. PELTON: Objection.

A. The problem was that when I didn't have work in Hempstead, then I would get sent to the Bronx. In the Bronx, the supervisor would write up who would go with whom.

F. J. ONOFRE

Q. The question is, when you would work in Westchester and you may have commuted with one of your friends to Westchester, there were times you went directly to the job site, correct?

MR. PELTON: Objection.

A. No.

Q. Whenever you arrived at the yard at the start of your shift, what were the specific tasks that you performed?

A. In which yard?

Q. Let's say the Hempstead yard. What specific tasks would you perform when you reported to the Hempstead yard?

A. When I arrived at Hempstead, they would tell me, you're going to go lay down concrete for the sidewalks or to make pits that are made with wood.

Q. You were asked to do this at the yard?

A. Yes.

Q. So you fixed the yard sidewalks?

MR. PELTON: Objection.

A. No, for work that Network would

F. J. ONOFRE

have.

Q. I'm just trying to make sure it's clear. I was confused there. When you got to the yard at 6:00 a.m., you were told what your responsibilities were for the day?

A. Yes.

Q. My question more has to do with what, if anything, did you do when you got to the yard?

A. Okay. I would arrive at 6:00 in the morning at the yard and then I would talk with the foreman about what jobs we would do for that day and he would say to me, for example, we're going to go do the pits. So then we would take all of the tools that were needed to make the pits.

Q. Isn't it true that there was someone at the yard that knew all the materials that were needed for the day?

MR. PELTON: Objection.

Q. And loaded the truck before you got there?

A. No.

F. J. ONOFRE

Q. You previously testified that the truck would be waiting for you in the street, correct?

A. Yes, sir.

Q. How does it make sense for someone to take the truck out of the garage, put it in the street, and then that's when you had to load it?

A. Because the problem was that there wasn't a lot of space. There were a lot of trucks and it would block the street.

Q. But wouldn't it be easier for someone to load the truck when it's in the yard?

A. I don't know about that but when I had to load up, I did load up and that's why I had to be there at 6:00 in the morning to load.

Q. You referred to making pits. Is that what you said? Pits?

A. They're made of wood.

Q. When you refer to the pits, is that a Verizon manhole?

F. J. ONOFRE

A. Verizon?

Q. Let me take a step back. I withdraw the question. What customer did you have to make the pits for?

A. That was for National Grid and Verizon.

Q. For Verizon, you would have to open up a manhole cover, correct?

A. Yes.

Q. When you would open up that manhole over, you would install reels, cable reels, correct?

A. No. We had to lay down fiber, new fiber. From the manhole to the building that we were working at.

Q. You would lay down fibers, right?

A. Yes.

Q. Those fibers come in a reel form, right?

A. Yes, in the reel.

Q. So it's a large reel, correct?

A. Yes.

Q. And that large reel just stays

F. J. ONOFRE

on the truck, correct?

A. Yes. There's a trailer that it gets hooked onto it.

Q. So that just stays on the truck?

A. Yes. There are times that we have to use it all throughout the day. And the next day, replace another one.

Q. So there's not that many materials to load on the truck?

MR. PELTON: Objection.

A. There were the pipes. They are not going to load themselves up on their own. There are tools that are used as well.

Q. What pipes? What are the pipes for?

A. What's used for Verizon are called the inner ducts.

Q. Those pipes -- don't those pipes largely remain on the truck?

A. Like I said, they're being used every day. Sometimes they are used and there are days in which they are not being used.

F. J. ONOFRE

Q. When you got to the yard in the morning, how long would all of your tasks stay before you left to the job site?

A. Sometimes we'd be there for half an hour, 45 minutes.

Q. How many people assisted with these tasks?

A. With the crew that I was with, it was six people.

Q. They were all at the yard?

A. Yes.

Q. And these six people all went on that truck to the job site?

A. No, it was two in the truck and others would go in the truck with the foreman. And then others would take their own cars with them.

Q. Who were these people that assisted in the morning?

A. Well, with my crew, it was so many people. I just don't remember their names. In 2023, the end, I was working with -- I can't remember their names.

Q. You don't remember anyone's

F. J. ONOFRE

names?

A. There were just so many people there that I don't remember their names.

Q. How long would it typically take to drive the yard to the job site?

A. It would depend on where the job was located. If they were working with Verizon, we would have to go to, say, 110 and then we would -- it would take a half an hour to get to the job site.

Q. I'm going to refer you back to Exhibit 11. Going back to interrogatory response number 17. If you go to the last paragraph --

THE INTERPRETER: Which?

MR. GRIMMETT: The last paragraph in his response to number 17. Right above where it says interrogatory 18.

THE INTERPRETER: Okay.

Q. It states, "Plaintiff also responds that he was typically required to be at the job site assigned for the day at approximately 7:00 a.m. to start with the

F. J. ONOFRE

work required for the day." That's what your response was, correct?

A. Can you repeat it?

Q. I need to reread it?

A. Please.

Q. Okay.

MR. PELTON: I'm going to object because I think it's out of context. It doesn't read the prior portion.

MR. GRIMMETT: You can object but I don't think it takes anything out of context. It's a sentence in his response about when he was required to be at the job site.

MR. PELTON: The response laid out in detail how he was required to be at the yard at 6:00 before saying this. You can go ahead.

Q. I'm going to reread the paragraph. "Plaintiff also responds that he was typically required to be at the job site assigned for the day at approximately 7:00 a.m. to start with the work required for the day." Based on everything you

F. J. ONOFRE

described, it wasn't really possible to get to the job site at 7:00 a.m.; is that correct?

MR. PELTON: Objection.

A. Okay. Whenever we had to be there at 7:00 a.m. then we had to be there even earlier.

Q. But you said you were always there -- you previously testified you were always there at 6:00 a.m. on the dot, right?

A. Yes.

Q. So now you're changing your testimony?

A. No. I'm not changing anything. You had to get up early but if you had to be there at 7:00 in the morning at the job site, then I'd have to be there at 5:00 a.m.

Q. So there were times you reported to the yard at 5:00 a.m.?

A. Yes. That's why I said if we were told we had to be -- we had to start at 7:00 in the morning, then that means

F. J. ONOFRE

that we would have to be in the yard by 5:00 a.m.

Q. But then they were also times where you could get to the yard at 7:00 a.m.?

A. It's possible on occasions, yes. But it wasn't something that was frequent.

Q. So the time you would get to the yard would constantly change, correct?

MR. PELTON: Objection.

A. Like I said, it all depends on the job.

Q. Understood.

MR. GRIMMETT: Let's take a break.

(Whereupon, a recess was taken at this time.)

Q. We just took a break. During the break, did you talk to anybody about your testimony?

A. No.

Q. In your interrogatory responses, you claim that you typically arrived back at the yard between approximately 4:30

F. J. ONOFRE

p.m. and approximately 8:30 p.m. Do you recall giving that response?

A. No, I don't.

Q. At the end of the workday, did you go back to the yard?

A. Yes.

Q. What time would you typically get back to the yard at the end of a workday?

A. The thing is, they had a schedule in which we had to complete eight hours minimum and then we can go back to the yard.

Q. So no matter what, you had to work on the project for eight total hours?

A. Yes.

Q. There was never a situation where you worked on a project for less than eight hours?

A. No.

Q. Isn't it true that -- withdrawn. Isn't it true that once you completed all your tasks for the day, you can return to the yard?

F. J. ONOFRE

A. What we would do when we weren't able to finish the job during the day -- no matter what. Always. We had to -- sometimes we would work more than that. But by law, we had to do the eight hours. It's the rule that Network made up.

Q. So it's your testimony that there was never a circumstance where you were on the job for less than eight hours?

A. No. I don't understand what you're saying.

Q. There was never one day -- was there ever -- withdrawn. Was there an ever a day that you worked for Network when you were on the job for less than eight hours?

A. One day.

Q. When was that day?

A. I could not possibly tell you what date or what years but I arrived at the yard early. I arrived at 2:30 and Kenny Walsh asked that -- said to me that I had only worked for half a day and then I said to him that I had completed my job

F. J. ONOFRE

already and that's why I had returned to the yard at that time.

Q. What project was that?

A. It was for some guest services.

Q. Do you recall approximately what year that was?

A. Honestly, no. But from that date on, I never again arrived at the yard early because of what he said to me that time.

Q. When you got back to the yard, there were no tasks for you to perform, correct?

A. No.

Q. What did you work on?

A. I would arrive home late and then just eat and go straight to sleep.

Q. But I'm saying when you got back to the yard, what would you do? Would you just go and park the truck and then go to your car and leave?

A. Yes.

Q. Did you receive a paycheck each week that you worked?

F. J. ONOFRE

A. Yes.

(Document was hereby marked as Defendants' Exhibit 13 for identification, as of this date.)

Q. I'm showing you a document marked as Exhibit 13. On the bottom right corner, it says in red P-32. Have you seen this document before?

A. Yes.

Q. This is the paystub that you provided in this case, correct?

A. Yes.

Q. This is the paystub for work that you performed between November 6, 2023 and November 12, 2023?

A. Yes.

Q. Did this paystub accurately reflect all the hours you worked that week?

MR. PELTON: Objection.

A. Here it says 40 hours but we worked more than 40 hours and the problem was that they did not pay us for that.

Q. How many hours did you work that

week?

A. Well, I worked like three hours overtime. The problem was that the foreman would write down the hours for overtime but when the folder would arrive at the office, someone in that office would then -- they would delete the hours that were written down.

Q. So you told your foreman the hours that you worked each day?

A. Yes.

Q. You would tell the foreman the time you started working each day?

A. Yes.

Q. And then you told the foreman the time that you worked working each day?

A. Yes, because we worked together.

Q. And then you believe that after the foreman submitted your time for the day, it was altered?

A. That's correct.

Q. This week, November 6, 2023 to November 12, 2023, do you recall what project you were working on that week?

A. In Brooklyn.
Q. What was the project?
A. Working for Verizon.
Q. How long were you assigned to the Verizon project?
A. Well, I worked for about four to five years with Verizon.
Q. And that Verizon project was sometimes performed at night, correct?
A. That's correct.
Q. When it was performed at night, you would report to the yard at night, correct?
A. That's correct.
Q. Do you ever complain to anyone that you thought you should receive more money when you got this paystub?
A. I would tell the foreman about it and he would say that it wasn't his fault because he wrote down all the hours. It's not his fault that I wasn't getting paid for all the hours.
Q. Who said that?
A. The foreman.

F. J. ONOFRE

Q. The name; what was the name of the foreman?

A. I have them in mind. I have it mind but I don't remember the name.

Q. What did he look like?

A. He's white.

Q. That's all?

A. The thing is, I don't remember his name. I have the name in my phone.

Q. Did you ever text him?

A. No, I haven't texted with him since I left the company.

Q. You texted him while you were with the company?

A. Yes, but I deleted all of the texts.

Q. When did you delete them?

A. Since I left the company since I knew I wasn't going to go back there anymore.

MR. GRIMMETT: I'm going to call for the production of the text messages to the extent they could be restored.

F. J. ONOFRE

Q. Are you aware that Network tracked the location of its trucks?

A. Yes.

Q. When you were on the Verizon project, there was never a time where you were only there for approximately seven hours?

A. No. We have to complete the eight hours and sometimes even more because before, let's say we had to do three areas, and for -- it had to be four sections so that the company can make money.

Q. And that's your testimony even when Network knew the exact time the truck was at the project and left the project?

A. They knew.

Q. They know the truck was at the job site for a total of eight hours every day?

A. Correct.

Q. The truck that you rode in as a passenger, that was assigned a number, correct?

F. J. ONOFRE

A. Yes.

Q. Do you know what truck you were a passenger in? What type of truck?

A. It was a new truck. I don't remember what brand.

Q. Do you recall that your crew had a step van?

A. It was a large truck. Ryder truck.

Q. Do you know the number of any of the trucks that were used?

A. Honestly, when I left company I left very angry.

Q. You don't recall?

A. No.

Q. Would it refresh your recollection if I told you that the trucks assigned to the crew -- there was a step van number 244? You think that's accurate?

A. Yes. It's two trucks.

Q. And there was a rodding truck?

A. Yes.

Q. The number 728?

F. J. ONOFRE

A. I don't remember too well if it was 728.

Q. What about the rack real truck? Do you recall that? Number 367? That doesn't ring a bell?

A. No. It's just two trucks that we used.

Q. To refresh your recollection, I think it's easiest if I put this on the screen.

MR. PELTON: That's fine.

(Document was hereby marked as Defendants' Exhibit 14-15 for identification, as of this date.)

Q. I'm going to show you Network's GPS records. It's Bates stamped DEF017802 through DEF017881. I'm going to mark this as Exhibit 15. I understand this is really small. I'm going to zoom in but first I want to just scroll the document and show you the Bates stamps, these numbers. It's all the way through DEF017881. Going back up to the top, can you see that?

F. J. ONOFRE

A. Yes.

Q. If you look row 7, at my cursor and go down to column B, it says truck number 748. Do you see that?

A. Yes.

Q. I'm going to represent to you that these are the GPS records assigned to truck number 748?

A. Yes.

Q. And you understand that Network maintains GPS records?

A. Yes.

Q. If you look at column A, row 8, this whole column here states drive start time. Do you understand that?

A. Yes.

Q. If you go over to column B, it's the drive start address. Do you understand that?

A. Yes.

Q. And then column C represents drive end time.

A. Okay.

Q. Do you understand that?

F. J. ONOFRE

A. Yes.

Q. And then column D represents drive end address?

A. Okay.

Q. Do you understand that?

A. Yes.

Q. I'm going to go down to the week where you provided a paystub.

MR. PELTON: If we can have a copy.

MR. GRIMMETT: Off the record.

(Whereupon, a discussion was held off the record.)

Q. I'm going to scroll all the way down the document to -- in the bottom right corner, it's Bates stamped DEF017858. If you go to row 4274, it states November 6, 2023, 9:36:30 p.m. The drive start address is 91 Taft Avenue, Hempstead, New York. That address is Network's Hempstead yard, corrects?

A. It's 94 Taft Avenue.

Q. This car was probably parked on the street outside of Network's yard,

correct?

A. It's possible.

Q. The truck arrived at November 6, 2023 at 10:07:43 p.m. at 99-25 Horace Harding Expressway, Corona, New York. Do you recognize that address?

A. No, I don't believe so. I would have to use different trucks because when there were really big projects to work on, they would take me at one crew to go work into another so that the job could be completed. I can't say for a fact that this check is my entire week of work that I did.

Q. Was the Verizon project, was that in Duffield Street in Brooklyn, New York?

A. All I know is that it's Brooklyn. I don't know about the addresses that much.

Q. I'm going to back to GPS 4275. Column C provides that it arrived on November 6, 2023, at 10:38:44 p.m. in Brooklyn, New York. Is it possible that

F. J. ONOFRE

that week you arrived at the job site at approximately 10:38 p.m.?

A. Honestly, I cannot say yes to that because I don't remember. There were a lot of addresses that I was sent to. So I could not say that's true.

Q. You were predominately working on the Verizon project, correct?

A. Yes.

Q. Let's use that for 4279. Provide that on November 7, 2023 3:24 a.m. the address is in Brooklyn and it leaves at, as I mentioned, 3:24 a.m. And it arrives on November 2023 at 4:00:14 at Taft Avenue in Hempstead. Based on the GPS records, this truck was only out of the Hempstead yard for a total of six hours and 24 minutes. Does that refresh your recollection as to how much time you spent on a project?

MR. PELTON: Objection.

A. Something I want to make clear. In 2023, I would only work two or three days a week. Maybe this check right here

F. J. ONOFRE

was just for one week that I completed. That's why I left because I could not just work for two or days a week. How was I supposed to sustain myself.

Q. For how long did you only work two or three days a week?

A. About six months.

Q. You wouldn't have been entitled for any overtime during that period of time, correct?

A. If you work over the two hours, then you have a right to overtime.

Q. Let me just go back to my original question. The GPS records state that the truck in your crew was only out of the yard for a total of six -- for approximately six hours and 24 minutes. Does that refresh your recollection about how much time you spent on a job in a given day?

A. I don't recall whether I was only just six hours at a job. When in -- at the yard, we were told that we had to stay there until the job was done. So

F. J. ONOFRE

then how can I say when I only work three days? But they would only call upon me when there was a lot of work. They are not dumb.

Q. So you only worked on the job site until the job was done, correct?

MR. PELTON: Objection.

A. For the first few years, they were giving me 40 hours and what have you. But during the last year with them, they were practically getting rid of me so that I wouldn't work with them.

Q. But my question just relates to how long you spent at the job site. I understand you have other complaints. I just want to know how long you spent at the job site?

A. Honestly, I had to do the eight hours. The total eight hours. If that truck arrived at that time, it's because another crew had arrived.

Q. But if a -- withdrawn. If the GPS records demonstrate that a truck is at the job site for less than eight hours,

F. J. ONOFRE

how were you able to work more than the amount of time that the truck was there?

A. When a truck is parked, it's because we are working. We can't possibly be driving a truck and work there. The manholes are in the streets and the trucks are practically parked in front of the manhole for our own protection. From what I can recall, it was only just one time that I arrived at the yard early.

Q. So these GPS records don't change your testimony, right?

A. No.

Q. Isn't it true that all three trucks arrive at the job site at approximately the same time?

MR. PELTON: Objection. What period of time?

Q. On a given day.

A. Like I said, it was three crews and I honestly can't say if this is true -- I'm not going to say lies.

Q. So you don't know what time all the trucks arrived?

F. J. ONOFRE

A. No. What you should do is put a GPS on every person so that you could see what time.

Q. But the GPS are on the trucks. So the GPS states the time that it arrived at the job site and left the job site?

A. I understand that. I understand all of that but like I said, I would only come to those jobs that were big. For the small jobs, the foremen would get sent to.

MR. GRIMMETT: Let's take a break.

(Whereupon, a recess was taken at this time.)

Q. We just took a break. During that break, did you talk to anyone about the substance of your testimony?

A. No.

Q. Isn't it true from August 2021 to the last day of your employment, you predominately worked on a telephone crew performing inner duct installation and/or fiber installation for Verizon?

A. Yes.

F. J. ONOFRE

Q. So that crew had three trucks, correct?

A. Yes.

Q. And it was typically the same crew every day, correct?

A. It could be, yes.

Q. Those three trucks arrived at the job site at the same time every day, correct?

MR. PELTON: Objection.

A. Yes.

Q. Those three trucks left the job site at the same time every day?

A. Yes.

Q. The GPS records that I showed you included one of those trucks. How do you explain the fact that it was there for less than eight hours?

A. Because something may break down in the truck and then you have to go back to the yard to fix it and the other two trucks are left behind.

Q. You're saying that specific truck broke down on that day?

F. J. ONOFRE

A. I can't tell you if that's the day that it broke down. I don't know why that truck -- it moved at that time.
Q. If I told you of GPS records where it shows the truck was at the job site for less than eight hours, would that change your testimony?
A. I don't know. Show me.
Q. You were a union member of the road and heavy construction laborers union, local 1298?
A. Yes.
Q. We're going to refer to this as Local 1298?
A. Yes.
Q. When did you become a member of Local 1298?
A. In 1997.
Q. Local 1298 had an agreement with Network, correct?
A. Back then, I don't know because I worked with several companies back then.
Q. Did those companies have agreements with Local 1298?

F. J. ONOFRE

A. Yes. They had a lot of our members working for that company.

Q. But there was a collective bargaining agreement in place, correct?

A. Possibly but I don't know anything about that. I never really took interest in going to the meetings and to find out if that company was affiliated with them.

Q. Are you generally familiar with the rules and requirements that employers had to follow when dealing with Local 1298?

A. Yes.

Q. Have you had an opportunity to look at this document?

A. What is this in regards to?

Q. We'll get to that. Have you seen this document before?

A. No.

Q. If I represented to you that this was a collective bargaining agreement between Network and Local 1298, does that refresh your recollection?

F. J. ONOFRE

A. No.

Q. If you look at the first page, it's Bates stamped DEF017468.

MR. PELTON: The first page.

Q. The second paragraph states, "This agreement made and entered into by and among the undersigned employer and Road and Heavy Construction Laborers' Union Local 1298 for the period of June 1, 2022 through May 31, 2026." Does this refresh your recollection as to whether Network had an agreement with Local 1298?

A. No. This is the first time that I'm seeing this now.

Q. You are aware that there was some sort of union agreement that governed the terms and conditions of your employment, correct?

MR. PELTON: Objection.

A. That I'm aware of? I have never been told about this. The only thing I knew is that I work for the union and I worked for Network. That's it.

Q. Did you ever complain to the

F. J. ONOFRE

union about how you were paid at Network?

A. Yes. Once, I did. When I wasn't getting paid overtime and I had to go into the union and I was told that they were going to talk to Network and I don't know if Pat or Kenny -- they got upset because there was a laborer that went to talk to the union.

Q. Who did you complain to at the union?

A. The delegate.

Q. What was the delegate's name?

A. I don't remember the last name but his first name was Frank.

Q. Did you submit that complaint in writing?

A. No. It was just verbally.

Q. Going back to Exhibit 14, there's two pages on each but if you keep going to page 8. Do you see where it says section five?

A. Yes.

Q. It states, "Time traveling to and from jobs, including free

F. J. ONOFRE

transportation by the contractor shall not be considered part of the workday unless it occurs during the regular workday hours." What your understanding of that?

MR. PELTON: Objection.

A. I really don't understand it.

Q. This paragraph is indicating that the time traveling to and from jobs shall not be considered part of the workday.

MR. PELTON: Same objection.

Q. How do you have any basis for a claim of unpaid travel time?

MR. PELTON: Objection.

A. If you're being told that you have be at the yard at 6:00 a.m., are you really going to arrive there at 7:00, then?

Q. So you were never aware that your collective bargaining agreement said that you do not get paid for travel time?

A. No.

Q. Are you aware that your collective bargaining agreement states

F. J. ONOFRE

what your typical shift is?

A. No.

Q. Are you aware that your collective bargaining agreement provides for the payment of a light differential?

A. No.

Q. If you go to page DEF017472, last sentence of the first paragraph under section 3; do you see that?

A. Last sentence?

Q. I'll read it. It states, "The employees shall be paid at straight time plus 30 percent night work premium for the eight hours worked during the night."
Were you paid that 30 percent premium when you worked at night?

A. Yes. It was paid because we fought for it. Not because they wanted to pay us.

Q. I want to go back to your paystub, to Exhibit 13. If you go to where it says pay rates, the left column, middle of the page. It states that your pay rate is $53.23 per hour. Is that

F. J. ONOFRE

accurate?

A. Yes.

Q. To get that pay rate, do you know what classification you were?

A. I would debate that rate of pay because I did everything for the company. Whatever I was told to do, that's what I would do.

Q. Understood. The company --

A. That's why I would get paid above the rate than what the union would offer me.

Q. So you got above the rate of a typical laborer was, right?

A. Yes.

Q. You were compensated as a foreman?

A. As if I was a foreman.

Q. You were paid the Local 1298 foreman rate, correct?

A. Practically, yes. Even through I did not know English, know how to write, how to read it, I was a good worker for them and I did everything for them.

F. J. ONOFRE

Q. Are you aware that there are different unions at Network that employees are members of?
A. Yes.
Q. And some of your coworkers are members of different unions, correct?
A. That's right. The thing is, they were given the opportunity to go to -- they were getting paid more and I was never afforded that opportunity.
Q. Weren't you paid more than what Local 731 would get?
A. Yes, but the thing is, I knew more and I'm experienced than those other people. I knew the work better.
Q. Local 731 didn't get a night premium, correct?
A. Because they are a different union that have more added benefits.
Q. They have different terms and conditions of employment, correct?
A. That's correct.
Q. That's because of their collective bargaining agreement?

F. J. ONOFRE
MR. PELTON: Objection.
A. That, I don't know anything about.
Q. Do you remember how many different unions represent Network's employees?
A. In Network?
Q. Yes.
A. It was like five different unions.
Q. What are union -- withdrawn. What are excavator operators -- what union are they?
A. 15 and 138.
Q. Local 15?
A. And 138.
Q. And their terms and conditions of employment are different, correct?
A. They are all different.
Q. Are you aware of Local 60?
A. Yes.
Q. Who does Local 60 represent?
A. It's the same as 1298. The only difference is that they are in

F. J. ONOFRE

Westchester.

Q. But their terms and conditions are different because they are part of a different union, correct?

A. It's possible.

Q. Are you aware of Local 1010?

A. As well. They are from Queens.

Q. Are their terms and conditions of employment different than Local 1298?

A. They are all different.

Q. Are you aware of Local 15?

A. Yes. Network gave all the ones that were working on Local 15 when they were working with gas.

Q. Local 15, their terms and conditions of employment are different than Local 1298, correct?

A. Oh, yes.

Q. You were at Local 14?

A. No.

Q. You were at Local 1536?

A. No.

Q. Is it fair to say that the terms and conditions of employment for each of

F. J. ONOFRE

your coworkers depended on what union they were a part of?

MR. PELTON: Objection.

A. It's possible that yes. Because I belong to a union 1298.

Q. While you were employed by Network, did you ever miss a safety meeting?

A. Yes. I missed out on several times.

Q. Was that safety meeting often made up during the workday?

A. No. The foreman would just tell me what was talked about.

Q. When you missed a safety meeting, you were never disciplined?

A. No. They would just tell us that we should not miss the safety meeting.

Q. It wasn't mandatory? If you were able to make it, you made it?

MR. PELTON: Objection.

A. No, it was mandatory.

Q. Who told you that?

F. J. ONOFRE

A. The safety meeting guy.

Q. But if it was mandatory, then why did you miss the meetings?

A. Because sometimes I would have to work at night and with no sleep, I could not possibly be present for the safety meeting.

Q. If it was mandatory, why were you never disciplined when you missed one?

A. That's their problem because I had to work and that means that I would have to sleep during the day.

Q. So you decided to sleep in instead of attend certain safety meetings?

MR. PELTON: Objection.

A. Like I said, it wasn't all the time.

Q. It wasn't important for you to wake up for some of them?

MR. PELTON: Objection.

A. It is important but the issue is when you work eight to ten hours during the night, it's not easy to get up.

Q. Isn't it true that your

F. J. ONOFRE

coworkers would also regularly miss their safety meetings?

A. Possibly, yes. But I wasn't keeping track of who else missed out.

Q. Are you aware of anyone ever getting disciplined for missing a safety meeting?

A. That I'm aware of, no.

MR. GRIMMETT: I have no further questions. I appreciate your time.

EXAMINATION BY

MR. PELTON:

Q. From the period of December 2, 2017 through the end of your employment, were you ever asked to drive a vehicle for Network?

A. Yes, I drove about three times.

Q. Three times per what? Three times total, three times a week?

A. About three times in total.

Q. And were you required to report to the Network yard in the morning?

MR. GRIMMETT: Objection.

A. Yes.

F. J. ONOFRE

Q. Who told you to report to the yard?

MR. GRIMMETT: Objection.

A. The supervisor. That we had to be there at 6:00 not morning to load up the tools so that we can everything ready and be able to leave to the work site.

Q. So you were not just going to the yard to get a ride to the job site?

A. No. Like I said I would arrive at the yard, I would speak to the foreman, he would go into the office. He would then bring out the folder and tell me, here, you have to load up this and that.

Q. Did other people within your work crew also have to go to the yard?

MR. GRIMMETT: Objection.

A. I was the only one because I was the next in line next to the foreman.

Q. At any point -- were you finished?

A. Yes.

Q. Were there periods of time when other members of the crew also had to come

F. J. ONOFRE

in the morning?

MR. GRIMMETT: Objection.

A. Yes. They would come and help. Yes.

Q. Would they also come and help at 6:00 in the morning?

MR. GRIMMETT: Objection.

A. Some would arrive 6:30. Some at 7:00. There was no really control of that.

Q. How often were safety meetings held?

A. Once a week.

Q. What time were safety meetings held?

A. At 6:00 in the morning.

Q. Were you paid for time spent at safety meetings?

A. From what I know, they'd load up the tools and leave. Sometimes we would come back at 4:30, 5:30, 6:30. We did not have a time to come back. I would go in at 6:00 but I did not have end time.

Q. My question was, were you paid

F. J. ONOFRE

for the time spend at the safety meetings?

A. Honestly, I don't know. I don't know if I was paid for that. Because like I said, I was working more than 40, 55 hours and it would always be problem because I would tell the foreman why weren't getting paid for the hours we worked and she would answer that he would write down the hours worked on the sheet and that the folder was then given to the super. And that's why we had problems with the hours -- the additional hours that we worked.

Q. Is it your understanding that you would be typically paid for an eight-hour day?

A. Yes.

Q. Did you actually, typically work more than eight hours a day?

A. Whenever I worked with guests, I would work more hours.

Q. Is it your understanding that all of the Network employees were paid for eight hours even if they attended and

F. J. ONOFRE

spent nine or ten hours working in a day?

MR. GRIMMETT: Objection.

A. It's possible.

Q. Did you ever have to do work such as unload the truck or take out garbage from the truck at the end of the day?

MR. GRIMMETT: Objection.

A. Yes. Why we would come back, yes.

Q. Looking at Exhibit 13, the paystub. You see that you were paid for 40 hours this week, right?

A. Yes.

Q. I believe you testified that you had overtime. Do you believe you worked more than eight hours each day?

A. It's possible, yes. But I don't remember because this is when I was working with the telephones and sometimes we had to make sure that we would be finished with the jobs so we had to work overtime. The foreman would call the office and would ask if they could work

F. J. ONOFRE

overtime and if the office said yes and approve it, then we would then be able to finish the job.

MR. PELTON: Nothing further.

MR. GRIMMETT: Thank you.

[TIME NOTED: 2:17 p.m.]

____________________________

FRANCISCO JAVIER ONOFRE

________________________

Subscribed and sworn to
before me this _________
day of ________________, 20 .

_______________________

Notary Public

F. J. ONOFRE

I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Francisco Javier Onofre | Mr. Grimmett | 4 |
| | Mr. Pelton | 91 |

E X H I B I T S

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | DOCUMENT | 20 |
| Exhibit 12 | DOCUMENT | 24 |
| Exhibit 13 | DOCUMENT | 63 |
| Exhibits 14-15 | DOCUMENTS | 69 |

REQUESTS

| Page | Line |
|---|---|
| 10 | 13 |
| 48 | 15 |
| 66 | 21 |

F. J. ONOFRE

CERTIFICATION

I, LEE K. AUSLANDER, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of January, 2026.

LEE K. AUSLANDER

ERRATA SHEET
Priority-One Court Reporting/Veritext
718-983-1234
ASSIGNMENT NO. P1-7750338
CASE NAME: Calderon , Manuel Angel v. Network Infrastructure, INC. And Patrick Clarke
DATE OF DEPOSITION: 11/20/2025
WITNESS' NAME: Francisco Onofre

PAGE/LINE(S)/ CHANGE REASON
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________
_____/________/___________________/___________

___________________________
Francisco Onofre

SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF_______________, 20__.

_______________________
NOTARY PUBLIC
MY COMMISSION EXPIRES__________________

**0**

**0.18** 24:18
**05442** 1:4

**1**

**1** 81:10
**10** 97:17
**10006** 2:5
**1010** 88:7
**109** 13:19
**1091** 14:4,5
**10:07:43** 72:5
**10:10** 1:15
**10:38** 73:3
**10:38:44** 72:24
**11** 20:20,23 28:10 56:13 97:10
**11/20/2025** 99:3
**110** 56:9
**111** 2:5
**11797** 2:10
**11967** 4:22 13:4
**12** 23:15,24 24:2 34:14 63:16 64:24 97:11
**1298** 16:17 79:12,15,18,20 79:25 80:14,24 81:10,13 85:20 87:24 88:10,18 89:6
**13** 26:13 63:4,7 84:22 95:12 97:12,17
**135** 1:13 2:10
**138** 87:15,17
**14** 82:19 88:20
**14-15** 69:14 97:13
**15** 30:15 33:6 69:19 87:15,16 88:12,14,16 97:17
**1503** 2:5
**1536** 88:22
**16** 26:18 30:15 35:2
**17** 22:11,12,15 28:11 56:14,19
**18** 56:20
**18229** 98:23
**1992** 26:13
**1997** 79:19
**1:24** 1:4
**1st** 98:18

**2**

**2** 18:16 30:24 42:14 91:14
**20** 1:15 96:12 97:10 99:22
**2006** 5:8 15:19 23:5
**2007** 28:13 30:15
**2008** 37:4
**201** 2:10
**2012** 24:23
**2013** 25:15 26:18 28:17,21 38:7
**2014** 29:2,4,21 29:23 30:12 31:21 32:4,5,6 48:4
**2015** 30:2
**2016** 30:2
**2017** 18:16 30:24 42:14 91:15
**2019** 23:16 28:13
**2021** 77:20
**2022** 18:12 35:2 81:11
**2023** 23:6 28:23 29:23 30:12 31:6 55:23 63:16,16 64:23,24 71:19 72:5,24 73:12 73:15,24
**2025** 1:15
**2026** 81:11 98:19
**21** 97:18
**23** 43:12
**24** 8:7 73:19 74:18 97:11
**244** 68:20
**27** 14:11
**2:17** 96:7
**2:30** 61:22

**3**

**3** 84:10
**30** 84:14,16
**31** 81:11
**32** 63:8
**367** 69:5
**3:24** 73:12,14

**4**

**4** 97:4
**40** 63:22,23 75:10 94:5 95:14
**400** 40:14
**4274** 71:18
**4275** 72:22
**4279** 73:11
**45** 55:6
**48** 8:2 97:17
**4:00:14** 73:15

**5**

**53.23** 84:25
**55** 94:5
**5:30** 93:22

**6**

**6** 63:15 64:23 71:19 72:4,24
**60** 87:21,23
**63** 97:12
**66** 97:18
**69** 97:13
**6:00** 20:2,3,14 39:3 45:13,19 51:5,12 52:19 57:18 58:11 83:17 92:6 93:7,17,24
**6:30** 93:9,22

**7**

**7** 4:21 13:3 70:3 73:12
**718-983-1234** 99:2
**728** 68:25 69:3
**731** 86:13,17
**748** 70:5,9

**8**

**8** 70:14 82:21
**8/12/69** 12:25
**8:30** 60:2

**9**

**91** 71:20 97:5
**94** 71:23
**99-25** 72:5
**9:00** 44:21 45:8
**9:36:30** 71:19

**a**

**a.m.** 1:15 44:21 45:13,19 51:5 56:25 57:24 58:3,7,11,20,22 59:3,6 73:12 73:14 83:17
**abbreviated** 34:22
**ability** 7:21
**able** 6:2 27:2 28:3 47:12 61:3 76:2 89:22 92:8 96:3
**above** 1:19,20 21:21 56:19 85:12,14
**abstract** 34:19 35:7
**accurate** 68:21 85:2
**accurately** 4:5 63:18
**action** 1:19 37:12 98:14
**activity** 26:12
**actually** 17:16 43:6 94:19
**added** 86:20
**additional** 94:13
**address** 13:18 14:2,13 70:19 71:4,20,21 72:7 73:13
**addresses** 72:21 73:6
**adults** 13:10
**affiliated** 80:9
**afforded** 86:11
**agency** 35:19 35:25
**agg** 34:22
**aggravated** 34:9
**ago** 17:7
**agreed** 3:3,8,12
**agreement** 41:11,16 79:20 80:5,23 81:7 81:13,17 83:21 83:25 84:5 86:25
**agreements** 79:25
**ahead** 9:21 57:19
**alc** 1:4
**alcohol** 8:6 24:18
**allowed** 25:10 25:24
**altered** 64:21
**amount** 44:5 76:3
**angel** 1:6 99:3
**angry** 68:14
**answer** 5:23 6:4 7:13 9:22 33:4 94:9
**answered** 6:13 6:18
**answering** 5:12
**answers** 4:8 7:18
**anybody** 59:20
**anymore** 25:25 28:18 66:21
**anyone's** 55:25
**appreciate** 91:11
**approve** 96:3
**approximately** 45:12,16 56:25 57:23 59:25 60:2 62:6 67:7 73:3 74:18 76:17
**april** 24:23
**areas** 67:12
**arrive** 20:3,3 20:12,14 39:3 39:6 46:4 51:12 62:17 64:6 76:16 83:18 92:11 93:9
**arrived** 20:5 50:9,16 59:24

61:21,22 62:9 72:4,23 73:2 75:21,22 76:11 76:25 77:6 78:8
**arrives** 73:15
**aside** 8:9
**asked** 24:7 33:20 36:12 50:20 61:23 91:16
**asking** 5:11 18:9
**assigned** 44:13 56:24 57:23 65:5 67:24 68:19 70:8
**assignment** 99:2
**assisted** 55:7 55:20
**assume** 6:6
**assuming** 38:12
**attempting** 5:18
**attend** 90:15
**attended** 94:25
**attorney** 6:11 8:10 9:7 32:19 33:21 37:14
**attorney's** 14:24
**attorneys** 2:4,9 33:2 37:16
**august** 77:20
**auslander** 1:21 98:4,24
**authorized** 27:23
**avenue** 14:11 71:20,23 73:16
**aware** 14:16 15:5 29:18 35:8 67:2 81:16,21 83:20 83:24 84:4 86:2 87:21 88:7,12 91:6,9

**b**

**b** 70:4,18 97:8
**back** 11:7 16:24 25:10 28:10 34:13 37:5 38:5 40:14 53:3 56:12,13 59:24 60:6,9,13 62:12,19 66:20 69:24 72:22 74:14 78:21 79:22,23 82:19 84:21 93:22,23 95:10
**bail** 34:15
**barely** 46:4
**bargaining** 41:11 80:5,23
83:21,25 84:5 86:25
**based** 57:25 73:16
**basis** 83:13
**bates** 24:15 69:17,22 71:17 81:4
**bcm** 1:4
**begging** 36:15
**beginning** 18:3
**behalf** 1:6
**belief** 22:4
**believe** 22:2 35:10 64:19 72:8 95:16,17
**belinda** 2:7
**bell** 69:6
**belong** 16:17 89:6
**benefits** 86:20
**best** 22:3
**better** 86:16
**big** 72:10 77:10
**biggest** 30:11
**birth** 12:24
**block** 52:12
**blood** 8:4,5 24:17 98:14
**bottom** 21:19 24:14 34:16 63:7 71:16
**bought** 14:3
**brand** 68:6
**break** 6:15,17 31:11 32:9,12 32:15 33:11,17 33:24 59:16,19 59:20 77:13,16 77:17 78:20
**brent** 2:6
**brian** 16:13
**bring** 92:14
**broadway** 2:5
**broke** 36:10 78:25 79:3
**bronx** 47:22,24 48:5,24 49:23 49:24
**brooklyn** 65:2 72:17,20,25 73:13
**brought** 36:4
**building** 53:16
**bunch** 41:25
**buses** 47:8

**c**

**c** 2:2 4:2,2,11 4:11 70:22 72:23
**cab** 47:16
**cable** 53:13
**calderon** 1:6 99:3
**call** 10:13 48:15 66:22

75:3 95:24
**called** 4:2 37:11 54:19
**car** 11:17 48:3 48:5,13 62:22 71:24
**carefully** 46:15
**cars** 55:18
**case** 11:9,14 12:16 15:6 26:7 37:16,17 63:12 99:3
**certain** 90:15
**certification** 3:6 98:2
**certify** 98:6,12
**change** 59:10 76:13 79:8 99:5
**changing** 33:25 58:14,16
**charge** 42:24 42:25
**check** 72:14 73:25
**chicas** 49:11
**circumstance** 61:9
**circumstances** 43:8
**civil** 1:23 35:13 35:14
**claim** 31:24,25 59:24 83:14
**claiming** 31:16
**claims** 32:6
**clara** 2:18
**clarify** 11:24 18:13 27:18 28:25
**clarke** 1:10 2:19 5:3,4,5 6:24 99:3
**class** 37:11
**classification** 85:5
**clean** 42:8
**clear** 27:7 33:8 51:4 73:23
**client** 32:19 33:21
**collective** 37:11 41:10 80:4,23 83:21,25 84:5 86:25
**collectively** 6:24
**column** 70:4,14 70:15,18,22 71:3 72:23 84:23
**come** 15:14 16:11 53:20 77:10 92:25 93:4,6,22,23 95:10
**coming** 33:13
**commenced** 35:22
**commission** 99:25
**communicate** 39:21
**communicated** 8:22 14:24
**commute** 38:20 38:22 46:22 48:10,21 49:5 49:16
**commuted** 50:4
**companies** 79:23,24
**company** 5:9 10:6 14:10 16:3,19 18:5 18:24 19:22 32:3 37:2 39:18 43:10 46:2 66:13,15 66:19 67:13 68:13 80:3,9 85:7,10
**compensated** 85:17
**complain** 65:16 81:25 82:10
**complaint** 35:24 36:7 82:16
**complaints** 75:16
**complete** 5:22 60:12 67:9
**completed** 60:23 61:25 72:13 74:2
**completely** 26:22 27:7 29:20
**concrete** 50:18
**conditional** 25:12 26:3,12 26:19
**conditions** 26:6 81:18 86:22 87:18 88:3,9 88:17,25
**confused** 51:4
**considered** 83:3,10
**constantly** 59:10
**construction** 23:4 79:11 81:9
**consumed** 8:6
**content** 24:18
**context** 57:9,13
**contract** 30:16 31:3 41:22
**contractor** 83:2
**control** 93:10
**convicted** 24:16,22 34:9 34:25

**conviction** 23:19 25:6,18 27:9 34:5,21 34:21 35:5,6,9
**convictions** 34:6,15
**copy** 71:11
**corner** 63:8 71:17
**corona** 72:6
**correct** 12:5 18:7 19:18 20:7,10 22:5 23:7,10 24:19 24:24 25:7,15 25:18,21,25 26:14,18,23 27:3,9,20,24 30:6,13 31:18 31:21 38:16,21 40:11,22,25 41:5,8,11 42:4 42:6,17,21 44:7,21,22,24 45:13,14 48:11 49:19 50:6 52:4 53:9,13 53:23 54:2 57:3 58:4 59:10 62:14 63:12 64:22 65:10,11,14,15 67:22,25 72:2 73:9 74:11 75:7 78:3,6,10 79:21 80:5 81:19 85:21 86:7,18,22,23 87:19 88:5,18
**correction** 14:8
**corrects** 71:22
**counsel** 1:24 3:4
**court** 1:2 3:16 4:21 5:17,25 13:3 35:18 99:1
**cover** 53:9
**coworkers** 19:7 49:5,7 86:6 89:2 91:2
**crew** 39:18,19 43:4,19 45:4 55:9,21 68:7 68:19 72:11 74:16 75:22 77:22 78:2,6 92:17,25
**crews** 76:21
**criminal** 35:13
**crossways** 1:13 2:10
**currently** 7:20 8:15 13:2
**cursor** 70:3
**customer** 53:4
**cv** 1:4

**d**

**d** 71:3 97:2
**date** 12:24 15:20 18:12,16 20:24 24:3 30:25 61:21 62:9 63:5 69:15 99:3
**dates** 31:5
**day** 20:7 39:5 42:15 44:6 45:20 46:3,19 47:21 48:18 51:7,15,21 54:7,8,23 56:24 57:2,23 57:25 60:24 61:3,13,15,18 61:19,24 64:11 64:14,17,21 67:21 74:21 76:20 77:21 78:6,9,14,25 79:3 90:13 94:17,20 95:2 95:8,18 96:12 98:18 99:22
**days** 36:12 44:23 54:24 73:25 74:4,7 75:3
**deal** 11:4 19:25
**dealing** 42:24 80:13
**debate** 85:6
**december** 18:16 23:5,6 26:13 28:22 30:24 42:14 91:14
**decided** 90:14
**declare** 21:22
**def017402** 24:16
**def017468** 81:4
**def017472** 84:8
**def017802** 69:17
**def017858** 71:18
**def017881** 69:18,24
**defendant's** 21:25 97:9
**defendants** 1:11 2:9 6:22 6:22 20:23 21:8 23:2 24:2 63:4 69:14
**delegate** 82:12
**delegate's** 82:13
**delete** 64:8 66:18
**deleted** 66:16

**demonstrate** 75:24
**dentist** 36:16
**depend** 44:11 44:17 56:7
**depended** 40:21 89:2
**depends** 40:24 41:4,7,10,15 59:12
**deposed** 35:14
**deposition** 1:18 3:6,13 6:21 8:12,16,20,23 9:3 12:9,14 99:3
**described** 12:4 58:2
**description** 97:9
**detail** 57:17
**df017401** 24:15
**difference** 87:25
**different** 19:8 72:9 86:3,7,19 86:21 87:6,10 87:19,20 88:4 88:5,10,11,17
**differential** 84:6
**difficult** 7:11
**direct** 33:3
**directly** 18:7 38:20,23 40:9 42:2 49:5,19 50:6
**disciplined** 89:17 90:10 91:7
**discuss** 33:12
**discussed** 12:16 17:19 32:14,17 33:7 34:4
**discussing** 32:21
**discussion** 33:18,25 71:13
**district** 1:2,3
**document** 10:3 10:10,14,19 12:4 20:22 21:5,10,14 22:7 23:23,25 24:14 63:3,6,9 69:13,21 71:16 80:17,20 97:10 97:11,12
**documents** 9:2 9:5,6,8,11 10:2 11:25 12:7,13 97:13
**doing** 45:10
**dolowich** 2:9
**dot** 45:20 58:11
**drive** 1:13 2:10 11:10,11,14,16 18:25 25:13,24 27:2,23 28:3 28:18 29:9,15 47:12,18 48:2 56:6 70:15,19 70:23 71:4,20 91:16
**driver** 17:25 18:20,22 19:4 19:6,15 23:3 23:10,12 28:13 28:20,22 30:4 42:17,21 48:25
**driver's** 25:14 27:8 29:6,10 38:6 48:11
**drivers** 29:8
**driving** 11:16 18:4 19:3 23:19 24:17,23 26:4 28:8 29:7 29:16,20 31:18 31:21 32:3,4 34:20 35:7 47:8 76:6
**drop** 46:24
**drove** 11:17,25 18:7 23:15,16 29:2,5,11,17 91:18
**duct** 77:23
**ducts** 54:19
**duffield** 72:17
**dui** 25:3,17 34:5,20 35:5 35:12
**duly** 4:3,13 98:8
**dumb** 75:5
**duration** 14:6 14:13 23:13
**duties** 17:19

**e**

**e** 2:2,2 4:2,11 4:12 8:24 48:13,16 97:2 97:8
**earlier** 58:8
**early** 39:5,13 40:7,11 45:5 47:10 58:17 61:22 62:10 76:11
**easier** 52:14
**easiest** 69:10
**easy** 90:24
**eat** 46:5 62:18
**education** 15:9
**edward** 2:11 4:25
**effect** 3:15
**eight** 60:12,16 60:20 61:6,10 61:17 67:10,20 75:19,20,25 78:19 79:7

84:15 90:23 94:17,20,25 95:18
**either** 8:11
**employed** 8:15 16:6 19:14 47:5 89:7
**employee** 40:20 41:4
**employees** 8:19 41:25 42:5,8 43:22 44:6 84:13 86:3 87:7 94:24
**employer** 81:8
**employers** 36:8 37:8 80:12
**employment** 14:6,14 18:10 18:13,15,17 19:5 23:13 30:25 38:5 42:15 77:21 81:19 86:22 87:19 88:10,17 88:25 91:15
**english** 4:7,9 21:2,4 85:23
**entered** 81:7
**entire** 16:6 21:14 25:2 72:14
**entirely** 28:12
**entitled** 1:19 21:6 74:9
**errata** 99:1
**esq** 2:6,7,11
**everybody** 40:10,13
**exact** 15:20 67:16
**examination** 4:16 91:12 97:3
**examined** 4:14
**example** 51:16
**excavator** 87:13
**except** 3:9
**exhibit** 20:20 20:23 23:24 24:2 28:10 34:14 56:13 63:4,7 69:14 69:19 82:19 84:22 95:12 97:10,11,12
**exhibits** 97:13
**expect** 33:18
**expected** 39:22 40:3
**experience** 43:7
**experienced** 86:15
**expires** 99:25
**explain** 9:13 11:22 78:18
**expressway** 72:6
**extent** 66:24

**f**

**f** 4:11,12 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1
**fac** 34:22
**facilitating** 34:9
**fact** 42:25 72:13 78:18
**factors** 40:22
**fail** 7:24
**fair** 28:14 88:24
**faithfully** 4:5
**familiar** 80:11
**far** 25:3 38:19 42:10
**fault** 65:21,22
**federal** 1:23
**feel** 21:9
**felony** 34:6 35:8,11
**fiber** 53:14,15 77:24
**fibers** 53:17,20
**fighting** 26:7
**file** 36:21
**filed** 35:24 36:6 37:6
**filing** 3:5
**fill** 43:24
**find** 80:9
**fine** 69:12
**finish** 61:3 96:4

**finished** 92:22 95:23
**finishes** 7:12
**first** 4:13 10:5 16:9 18:2,23 21:8 22:2,19 22:22 23:9 26:11 69:21 75:9 81:3,5,14 82:15 84:9
**fitter** 23:3 30:9 30:13,17 40:17
**five** 18:4 65:8 82:22 87:10
**fix** 78:22
**fixed** 50:23
**folder** 39:8,8 64:6 92:14 94:11
**follow** 80:13
**follows** 4:15
**force** 3:15
**foregoing** 21:24 22:25
**foreman** 20:15 39:7,16 40:15 41:7 42:24 43:5,9,13 51:14 55:17 64:5,10,13,16 64:20 65:19,25 66:3 85:18,19 85:21 89:14 92:12,20 94:7 95:24
**foremen** 77:11
**forfeitures** 34:15
**form** 3:9 53:21
**former** 8:18 36:8 37:7
**forth** 98:8
**fought** 84:19
**found** 24:18
**four** 19:23 26:7 26:9 65:7 67:12
**francisco** 1:18 4:19 12:20 21:6,22,24 96:8 97:4 99:4 99:20
**frank** 82:15
**free** 21:9 82:25
**freeport** 14:9 14:10,11,12
**frequent** 59:8
**friend** 16:18 47:2,15 48:7 48:23
**friends** 50:4
**front** 36:17 76:8
**full** 22:19
**fully** 5:21,22
**further** 3:8,12 45:11 91:10 96:5 98:12

**g**

**garage** 52:8
**garbage** 95:7
**gas** 88:15
**general** 22:24 31:2
**generally** 80:11
**gestures** 6:3
**getting** 65:22 75:12 82:4 86:10 91:7 94:8
**give** 26:8 44:2
**given** 4:8 18:25 25:12 26:3 74:21 76:20 86:9 94:11 98:10
**giving** 7:17 60:3 75:10
**glad** 27:16
**go** 9:21 12:19 16:20 20:6,15 21:9,17 22:10 22:19 26:16 30:3 34:14 37:19 41:25 42:11,12 45:11 46:5,7,8 48:25 48:25 49:18,25 50:17 51:16 55:16 56:9,14 57:19 60:6,13 62:18,21,21 66:20 70:4,18 71:8,18 72:11 74:14 78:21 82:5 84:8,21 84:22 86:9 92:13,17 93:23
**going** 5:11,12 6:6,20 10:13 11:4 18:9,11 18:13,15 20:20 20:21 22:10,18 22:22 23:22,23 24:13 25:2 26:10 27:18 28:10 33:8 34:13,18 36:9 37:5 38:4 43:11 48:15 50:17 51:16 54:13 56:12,13 57:8,20 66:20 66:22 69:16,18 69:20,24 70:7 71:8,15 72:22 76:23 79:14 80:8 82:6,19 82:21 83:18 92:9
**good** 4:23,24 24:12 38:8 85:24
**governed** 81:17

**government** 35:19,25
**gps** 69:17 70:8 70:12 72:22 73:17 74:15 75:24 76:12 77:3,5,6 78:16 79:5
**grade** 15:10
**graham** 2:4
**grid** 30:3,15,20 53:6
**grimmett** 2:11 4:17,25 10:13 10:18 11:2 24:9 31:13 32:8,20 33:5 48:15 56:17 57:11 59:15 66:22 71:12 77:12 91:10,24 92:4,18 93:3,8 95:3,9 96:6 97:4
**guest** 62:5
**guests** 94:21
**guy** 17:16 90:2

**h**

**h** 2:11 97:8
**half** 25:9 55:5 56:10 61:24
**hand** 98:18
**harding** 72:6
**harrison** 14:11
**head** 6:2
**hear** 38:4
**heavy** 79:11 81:9
**held** 1:20 71:14 93:13,16
**help** 16:15 93:4 93:6
**hempstead** 46:20 49:22 50:13,15,16 71:21,22 73:16 73:18
**herazo** 2:7 10:24 11:20
**hereto** 3:5
**hereunto** 98:18
**high** 8:5
**highest** 15:8
**hired** 15:15,18 15:23 16:15 17:22,23 18:2
**hold** 15:11
**home** 62:17
**honestly** 41:17 62:8 68:13 73:4 75:19 76:22 94:3
**hooked** 54:4
**horace** 72:5
**hour** 55:6 56:11 84:25 94:17
**hours** 8:3,7 60:13,16,20 61:6,10,17 63:19,22,23,25 64:3,5,8,11 65:21,23 67:8 67:10,20 73:19 74:12,18,23 75:10,20,20,25 78:19 79:7 83:5 84:15 90:23 94:6,8 94:10,13,13,20 94:22,25 95:2 95:14,18
**house** 13:16,25 14:3,8,10

**i**

**idea** 9:10 16:8 35:2
**identification** 20:24 24:3 63:5 69:15
**impact** 7:21
**important** 90:19,22
**incarcerated** 25:5,8 26:5
**incarceration** 25:11 27:19
**included** 78:17
**including** 82:25
**indicate** 6:2
**indicating** 83:8
**individual** 15:22 16:5
**individually** 1:6
**individuals** 14:17 19:11
**inf** 34:22
**infection** 38:2
**infrastructure** 1:10 5:2 6:23 7:3 41:21 99:3
**injury** 21:23
**inner** 54:19 77:23
**inspection** 12:5
**install** 53:12
**installation** 77:23,24
**instructions** 7:6
**interest** 80:8
**interested** 98:15
**interpreter** 2:18 4:3 5:20 11:8,22 13:13 24:11 56:16,21
**interrogatories** 21:8 22:2
**interrogatory** 22:11,15 28:11

28:21 56:13,20 59:23
**interview** 17:11 17:18
**interviewed** 17:14
**intestines** 38:2
**intoxicated** 23:19 24:17,23
**involved** 14:20
**issue** 10:25 90:22
**issued** 26:13
**issues** 11:4

**j**

**j** 4:11 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1
**jail** 26:21,23
**january** 98:19
**javier** 1:18 4:19 96:8 97:5
**job** 1:16 17:11 17:19 18:7 19:8,21 20:6 38:19,23 39:11 40:10,17,24 41:5 42:2,12 42:20 44:20 46:12 47:4 49:2,6,19 50:6 55:4,14 56:6,7 56:11,24 57:15 57:22 58:3,18 59:13 61:3,10 61:16,25 67:20 72:12 73:2 74:20,23,25 75:6,7,15,18,25 76:16 77:7,7 78:9,13 79:6 92:10 96:4
**jobs** 46:2 51:14 77:10,11 82:25 83:9 95:23
**joe** 16:14 39:16
**jointly** 1:10
**june** 81:10

**k**

**k** 1:21 98:4,24
**kaufman** 2:9
**keep** 82:20
**keeping** 91:5
**kenny** 61:23 82:7
**kid** 43:12
**kids** 13:9
**knew** 25:17,20 29:9 51:20 66:20 67:16,18 81:23 86:14,16
**know** 6:16 7:11 11:15 14:19,22 15:22 16:12 21:2 27:16 29:17 31:10 34:4,23 41:13 41:17,18,19,21 41:23,23 43:13 46:17 52:17 67:19 68:3,11 72:19,20 75:17 76:24 79:3,9 79:22 80:6 82:7 85:5,23 85:23 87:3 93:20 94:3,4
**knowledge** 22:3

**l**

**l** 4:2
**labor** 23:4
**laborer** 17:21 17:23 18:6 23:3 30:5,8 82:8 85:15
**laborers** 19:17 38:22 40:9 79:11 81:9
**laid** 57:16
**large** 40:22 53:23,25 68:9
**largely** 54:21
**late** 62:17
**law** 61:6
**lawsuit** 9:9,15 14:17,20 17:9 31:16 35:21,22 36:3,7,22 37:6
**lay** 30:9,17 50:17 53:14,17
**leader** 43:4
**leave** 42:6,12 44:24 45:3

46:11 62:22 92:8 93:21
**leaves** 73:13
**leaving** 10:9
**lee** 1:21 98:4,24
**left** 37:20 55:4 66:13,19 67:17 68:13,14 74:3 77:7 78:13,23 84:23
**legal** 32:25
**letter** 14:23 37:15
**letting** 27:16
**level** 15:8
**license** 25:13 25:14,21,23 26:4,13,22 27:8,13 28:17 29:6,11,19 38:6 48:11
**licenses** 15:12
**lies** 76:23
**light** 84:6
**limit** 7:17
**line** 25:2 92:20 97:16 99:5
**listen** 24:5 46:14
**little** 17:6
**live** 13:2,7
**lived** 13:5 14:5
**living** 13:25 38:9
**llc** 2:4
**llp** 2:9
**load** 20:18 46:10 52:9,15 52:18,18,20 54:10,13 92:6 92:15 93:20
**loaded** 51:23
**local** 79:12,15 79:18,20,25 80:13,24 81:10 81:13 85:20 86:13,17 87:16 87:21,23 88:7 88:10,12,14,16 88:18,20,22
**located** 56:8
**location** 67:3
**long** 13:5 16:25 25:8 55:3 56:5 65:5 74:6 75:15,17
**longer** 32:22
**look** 66:6 70:3 70:14 80:17 81:3
**looked** 28:11
**looking** 95:12
**lost** 38:6
**lot** 36:19 43:10 52:11,12 73:6 75:4 80:2

**m**

**made** 22:8 50:19 52:23 61:7 81:7 89:13,22
**mail** 8:24 37:12
**maintains** 70:12
**make** 6:17 7:12 10:8 27:6 31:8 50:18 51:3,18 52:6 53:5 67:13 73:23 89:22 95:22
**making** 31:25 52:21
**manage** 9:19 11:10,13,13
**managed** 9:17 9:18 10:3,15 10:20 11:19
**mandatory** 89:21,24 90:3 90:9
**manejar** 11:9
**manhole** 52:25 53:9,12,15 76:9
**manholes** 76:7
**manual** 23:4
**manuel** 1:6 99:3
**march** 35:2
**mark** 20:20 69:18
**marked** 20:22 23:23,25 63:3 63:7 69:13
**marriage** 98:14
**material** 20:17
**materials** 51:21 54:10
**matter** 4:3 5:3 35:13,13,14 45:10 60:15 61:4 98:16
**mckenna** 16:18 16:22 17:5,8
**mean** 10:16 19:9 34:17 41:13
**meaning** 11:13
**meanings** 11:9
**means** 6:23 7:3 11:10,14 58:25 90:12
**mechanic** 23:3 30:9,13,14,17 40:16
**mechanics** 19:24 42:9,11
**mediation** 7:25
**medication** 7:21
**meet** 5:7

**meeting** 36:24 89:9,12,17,20 90:2,8 91:8
**meetings** 40:6 80:8 90:4,15 91:3 93:12,15 93:19 94:2
**member** 79:10 79:17
**members** 80:3 86:4,7 92:25
**mentioned** 73:14
**message** 8:24 39:21 40:4
**messages** 66:24
**met** 5:5,8
**middle** 26:11 84:24
**mike** 16:18,22 17:4,8
**mind** 66:4,5
**mine** 40:16 48:7
**minimum** 60:13
**minute** 31:12 32:12
**minutes** 33:6 38:9 55:6 73:19 74:18
**mischaracteri...** 10:22
**misdemeanor** 34:6 35:8
**missed** 89:10 89:16 90:10 91:5
**missing** 36:17 91:7
**money** 36:19 65:18 67:14
**months** 17:3 18:4,24 23:9 25:9 74:8
**morning** 4:23 4:24 19:25 20:2,4,14 39:4 45:9 47:10 51:13 52:20 55:3,20 58:18 58:25 91:23 92:6 93:2,7,17
**motor** 34:10
**moved** 79:4
**multiple** 14:20
**myron** 13:19 14:4,5

**n**

**n** 2:2 4:2,11,12 97:2
**name** 4:18,25 16:2,4,9 66:2,2 66:5,10,10 82:13,14,15 99:3,4
**names** 12:19 49:6,9 55:23 55:24 56:2,4
**national** 30:3 30:15,19 53:6
**necessary** 49:17
**need** 6:3,10,15 29:15 46:23 57:5
**needed** 20:17 39:10 45:10 51:18,21
**network** 1:10 5:2 6:23 7:2,3 8:15,19 13:23 14:7,14 15:15 15:18 16:5,16 16:19,23 17:12 19:5,15 23:10 23:13 25:11,17 25:20 27:3,20 27:22 28:4,7 29:17 30:11 36:9 37:20 38:5 39:2 41:20 42:7 47:5 50:25 61:7,15 67:2 67:16 70:11 79:21 80:24 81:13,24 82:2 82:6 86:3 87:8 88:13 89:8 91:17,23 94:24 99:3
**network's** 38:7 38:10,11,14 69:16 71:22,25 87:6
**never** 19:21 36:6 37:6 45:22 60:18 61:9,13 62:9 67:6 80:7 81:21 83:20 86:11 89:17 90:10
**new** 1:3,14,22 2:5,5,10 4:4,21 13:3 27:24 46:12 53:15 68:5 71:21 72:6,17,25 98:5
**nicer** 36:18
**nicknames** 12:22
**night** 45:22 46:4 65:10,12 65:13 84:14,15 84:17 86:17 90:6,24
**nine** 95:2
**nods** 6:2
**non** 6:3
**notary** 1:21 3:14 4:4,13

96:13 98:4 99:24
**noted** 96:7
**notes** 12:12 34:18,21
**notice** 37:12,13
**notwithstandi...** 22:20,23
**november** 1:15 63:15,16 64:23 64:24 71:19 72:4,24 73:12 73:15
**nuances** 32:25
**number** 22:11 22:11,12,15 28:11 56:14,18 67:24 68:11,20 68:25 69:5 70:5,9
**numbers** 69:23

**o**

**o** 4:2,11,12,12
**oath** 5:13
**object** 9:21 25:2 57:8,11
**objection** 9:20 10:17 12:2,10 20:11 23:20 24:20,25 25:4 26:2,24 27:4 27:10,14 28:5 28:19 29:13 30:7 32:18 33:14,19 39:23 40:12 41:12 42:3,22 44:8 44:14 45:17 46:9 49:20 50:7,24 51:22 54:11 58:5 59:11 63:21 73:22 75:8 76:18 78:11 81:20 83:6,12 83:15 87:2 89:4,23 90:16 90:21 91:24 92:4,18 93:3,8 95:3,9
**objections** 3:9 21:7,25 22:25
**occasions** 59:7
**occurs** 83:4
**october** 25:15 26:18
**offer** 85:13
**offered** 35:17
**office** 44:4 64:7 64:7 92:13 95:25 96:2
**oh** 88:19
**okay** 6:5,14,19 7:4,15 9:24 18:18 22:17,21 24:8 36:9 46:18 51:12 56:21 57:7 58:6 70:24 71:5
**old** 43:12
**once** 46:10 60:23 82:3 93:14
**ones** 88:13
**onofre** 1:18 4:19,23 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 12:20 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,22 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 96:8 97:1,5 98:1 99:4,20
**onofre's** 21:7 21:24
**ooo** 4:10
**op** 34:22
**open** 53:9,11
**operation** 34:10
**operators** 87:13
**opportunity** 80:16 86:9,11
**opposed** 11:18
**opt** 21:6
**opted** 14:17
**oral** 5:24
**order** 1:23 45:6
**ordinarily** 7:25
**organizing** 45:5
**original** 37:5 74:15
**outcome** 98:15
**outside** 13:21 35:5 71:25

**overtime** 64:4,6 74:10,13 82:4 95:17,24 96:2
**own** 13:15,20 39:19 48:3 54:14 55:18 76:9

**p**

**p** 2:2,2 63:8
**p.m.** 60:2,2 71:19 72:5,24 73:3 96:7
**p1-7750338** 1:16 99:2
**page** 21:18,19 22:12,19 26:11 26:11 34:16 81:3,5 82:21 84:8,24 97:3,9 97:16 99:5
**pages** 21:9 24:14 82:20
**paid** 31:17 32:3 36:13,16 65:23 82:2,4 83:22 84:13,16,18 85:11,20 86:10 86:12 93:18,25 94:4,8,16,24 95:13
**panica** 16:14 39:16
**paper** 43:15,24
**paperwork** 20:16 43:15 44:3
**paragraph** 22:19 56:15,18 57:21 81:6 83:8 84:9
**park** 1:13 2:10 62:21
**parked** 71:24 76:4,8
**part** 19:24 39:17 41:19 83:3,10 88:4 89:3
**participated** 37:10
**parties** 3:5 98:13
**passenger** 38:15 67:24 68:4
**pat** 82:7
**patrick** 1:10 2:19 5:3,4,5 6:24 99:3
**pay** 36:19 47:16 63:24 84:20,23,25 85:4,6
**paycheck** 62:24
**payment** 84:6
**paystub** 63:11 63:14,18 65:18 71:9 84:22 95:13
**pelton** 2:4,6 9:20 10:17,21 12:2,10 20:11 23:20 24:4,20 24:25 26:2,24 27:4,10,14 28:5,19 29:13 30:7 31:11,15 32:18,24 33:3 33:14,19,21 39:23 40:12 41:12 42:3,22 44:8,14 45:17 46:9,14 49:20 50:7,24 51:22 54:11 57:8,16 58:5 59:11 63:21 69:12 71:10 73:22 75:8 76:18 78:11 81:5,20 83:6,12,15 87:2 89:4,23 90:16,21 91:13 96:5 97:5
**penalties** 5:14
**penalty** 21:23 22:8
**people** 14:20 19:23 20:2 40:14 55:7,10 55:13,19,22 56:3 86:16 92:16
**percent** 84:14 84:16
**perform** 50:14 62:13
**performed** 50:11 63:15 65:10,12
**performing** 23:4 77:23
**period** 18:19 42:16 74:10 76:19 81:10 91:14
**periods** 92:24
**perjury** 5:15 22:8
**permit** 44:12 44:18
**permits** 44:20 45:7
**person** 8:11 36:23 77:3
**personal** 48:3,5
**phone** 8:11 66:10
**pick** 39:8
**pipe** 36:11
**pipes** 30:10,18 54:12,16,16,20 54:20

**pits** 50:19 51:17,18 52:21 52:22,24 53:5
**place** 1:20 80:5
**places** 13:14
**plaintiff** 1:8,19 21:6,24 22:25 56:22 57:21
**plaintiffs** 2:4 15:5
**please** 5:20 9:13 21:17 39:25 57:6
**plus** 84:14
**point** 6:11,16 23:14 92:21
**portion** 57:10
**position** 29:24
**possible** 58:2 59:7 72:3,25 88:6 89:5 95:4 95:19
**possibly** 31:23 61:20 76:5 80:6 90:7 91:4
**potential** 33:12
**practically** 75:12 76:8 85:22
**predate** 32:6
**predominately** 73:8 77:22
**premium** 84:14 84:16 86:18
**preparation** 9:3 12:8
**prepare** 8:12 12:12,13
**prescribed** 8:2
**present** 2:17 90:7
**preserve** 25:4
**pressure** 8:5,5
**pretty** 33:8 47:10
**prevent** 7:17
**previously** 49:4 52:2 58:10
**primary** 15:10
**prior** 34:2,6 57:10
**priority** 99:1
**privilege** 32:19 32:22 33:22
**probably** 71:24
**problem** 16:10 49:21 52:10 63:23 64:4 90:11 94:6
**problems** 94:12
**procedure** 1:23
**production** 10:14 48:16 66:23
**professional** 15:11
**project** 31:7,9 44:12,18 45:23 60:16,19 62:4 64:25 65:3,6,9 67:6,17,17 72:16 73:9,21
**projects** 30:20 72:10
**propounded** 4:6
**protection** 76:9
**provide** 73:12
**provided** 63:12 71:9
**provides** 72:23 84:5
**public** 1:21 3:14 4:4,14 96:13 98:5 99:24
**pursuant** 1:22
**put** 22:7 43:12 52:8 69:10 77:2
**putting** 36:25 45:6

**q**

**queens** 88:8
**question** 3:10 5:21 6:4,7,12 6:17 9:25 15:17 24:5,6 31:14 33:4 37:6 38:8 39:24 41:3 43:16 46:15,16 50:2 51:9 53:4 74:15 75:14 93:25
**questioning** 25:3
**questions** 4:6 5:11 7:9,9,18 18:10,11,14 27:17 33:10,12 42:13 91:11
**quickly** 46:5

**r**

**r** 2:2 4:2,2,11 4:11,12
**rack** 69:4
**raise** 31:23
**rate** 84:25 85:4 85:6,12,14,21
**rates** 84:23
**read** 21:2,4,12 21:23 22:22 57:10 84:12 85:24
**reading** 21:5
**ready** 20:6 31:8 92:7
**real** 69:4
**really** 49:14 58:2 69:20 72:10 80:7 83:7,18 93:10

**reason** 7:16 99:5
**recall** 17:14 60:3 62:6 64:24 68:7,15 69:5 74:22 76:10
**receive** 62:24 65:17
**received** 14:23 37:15
**recess** 32:10 59:17 77:14
**recognize** 72:7
**recollection** 68:18 69:9 73:20 74:19 80:25 81:12
**record** 27:6 34:20 35:7 71:12,14 98:10
**records** 48:17 69:17 70:8,12 73:17 74:15 75:24 76:12 78:16 79:5
**red** 63:8
**reel** 53:20,22 53:23,25
**reels** 53:12,13
**refer** 6:22 7:2 24:13 26:10 34:13 52:24 56:12 79:14
**referred** 43:3 52:21
**referring** 10:4 11:12
**reflect** 63:19
**refresh** 68:17 69:9 73:19 74:19 80:25 81:12
**regards** 9:9,15 80:18
**regular** 83:4
**regularly** 91:2
**relate** 18:15 42:14
**related** 10:11 18:12 98:13
**relates** 75:14
**remain** 54:21
**remember** 15:20 16:2 26:15 49:9 55:22,24,25 56:4 66:5,9 68:6 69:2 73:5 82:14 87:5 95:20
**reminder** 42:13
**rent** 13:15,20
**rented** 13:25
**repeat** 39:24 44:15 57:4
**replace** 54:8
**report** 40:21 43:9 65:13 91:22 92:2
**reported** 50:15 58:21
**reporter** 5:17 5:25
**reporting** 99:1
**represent** 5:2 34:18 70:7 87:6,23
**represented** 80:22
**represents** 70:22 71:3
**requests** 97:15
**required** 40:21 56:23 57:2,15 57:17,22,24 91:22
**requirements** 80:12
**reread** 57:5,20
**reserved** 3:10
**reside** 4:20 13:24
**resided** 14:12
**residences** 13:12,21
**respective** 3:4
**respond** 24:6 33:9 46:16
**responded** 37:13
**responds** 56:23 57:21
**response** 22:16 28:11 56:14,18 57:3,14,16 60:3
**responses** 21:7 21:25 22:7,25 28:21 59:23
**responsibilities** 29:25 30:21 31:2 40:25 41:5 51:6
**responsibility** 40:15
**rest** 19:4
**restored** 66:25
**retired** 16:10 17:6 37:21,23
**return** 25:10 60:24
**returned** 27:3 27:19,22 28:3 28:7 62:2
**review** 9:2
**reviewed** 10:2 10:10,19 11:24 12:8
**revocation** 26:18
**revocations** 26:17
**revoked** 26:23 28:17 29:5,11

48:10
**ricardo** 49:11
**rid** 75:12
**ride** 42:20 49:14 92:10
**right** 6:9 7:14 24:15 33:9 38:17 48:12 53:18,21 56:19 58:12 63:7 71:17 73:25 74:13 76:13 85:15 86:8 95:14
**ring** 69:6
**risk** 37:2
**road** 79:11 81:9
**rodding** 68:23
**rode** 67:23
**room** 33:5
**row** 70:3,14 71:18
**rule** 61:7
**rules** 1:23 80:12
**run** 43:19
**ryan** 16:4,12 17:17 39:15
**ryder** 68:9

**s**

**s** 2:2 4:11 97:8 99:5
**safety** 36:24 40:6 89:8,12 89:16,19 90:2 90:8,15 91:3,7 93:12,15,19 94:2
**saying** 11:18 33:6,16 57:18 61:12 62:19 78:24
**says** 21:21 22:23 26:12,12 26:16,17 34:15 34:25 41:11,16 56:19 63:8,22 70:4 82:21 84:23
**schedule** 38:25 60:12
**school** 15:10 47:8
**screen** 69:11
**scroll** 69:21 71:15
**sealing** 3:5
**second** 15:10 21:17 42:23 81:6
**secretary** 14:25 21:12
**section** 82:22 84:10
**sections** 67:13
**see** 22:16 36:16 69:25 70:5 77:3 82:21 84:10 95:13
**seeing** 81:15
**seen** 21:10 63:9 80:20
**sense** 52:6
**sent** 30:23 36:15 37:13 49:23 73:6 77:11
**sentence** 22:23 57:13 84:9,11
**services** 62:5
**set** 21:8 22:2 98:8,18
**seven** 38:9 67:7
**several** 39:14 79:23 89:10
**severally** 1:10
**sheet** 94:10 99:1
**shift** 50:10 84:2
**shirley** 4:21 13:3
**shovel** 17:21
**show** 20:21 23:22 42:19 43:17,20 69:16 69:22 79:9
**showed** 78:16
**showing** 63:6
**shows** 79:6
**sidewalks** 50:18,23
**signature** 21:18 21:20,21 98:23
**signed** 3:13,15
**similarly** 1:6
**sir** 52:5
**site** 18:7 19:21 20:6 38:19,23 40:10 42:2,12 42:20 49:6,19 50:6 55:4,14 56:6,11,24 57:15,23 58:3 58:19 67:20 73:2 75:7,15 75:18,25 76:16 77:7,7 78:9,14 79:7 92:8,10
**sitting** 5:3
**situated** 1:7
**situation** 60:18
**six** 25:9 55:10 55:13 73:18 74:8,17,18,23
**sleep** 62:18 90:6,13,14
**slight** 10:24
**small** 69:20 77:11
**someplace** 47:18

**sorry** 13:13 38:4
**sort** 35:17 81:17
**southern** 1:3
**space** 52:11
**span** 11:21
**spanish** 2:18 4:7,8 5:19 11:6 43:25
**speak** 6:10 8:10 16:20 92:12
**speaking** 8:9
**specific** 9:11 18:10 50:11,14 78:24
**specifically** 9:22
**spend** 94:2
**spent** 31:17 73:21 74:20 75:15,17 93:18 95:2
**spoke** 21:11
**spoken** 8:14,18
**stacy** 4:21 13:3
**staged** 20:6 46:8
**stamped** 24:15 69:17 71:17 81:4
**stamps** 69:22
**standard** 29:9
**start** 44:10,16 44:21 45:12,15 45:25 46:19 47:9,21 48:18 50:10 56:25 57:24 58:24 70:15,19 71:20
**started** 5:8 10:6 15:20 16:23 18:4,23 19:3 25:13 26:4 31:4 32:2 64:14
**starting** 14:9 18:24
**starts** 22:20
**state** 1:22 4:4 27:24 28:22 74:15 98:5
**states** 1:2 56:22 70:15 71:19 77:6 81:6 82:24 83:25 84:12,24
**stay** 42:8 55:4 74:25
**stays** 53:25 54:5
**step** 53:3 68:8 68:19
**stipulated** 3:3,8 3:12
**stipulations** 1:24 3:2
**stomach** 37:25
**stop** 49:18
**stopped** 28:8 29:20 31:21 32:4,5
**straight** 62:18 84:13
**street** 13:19 14:4,5 30:10 52:4,8,13 71:25 72:17
**streets** 30:18 76:7
**submit** 82:16
**submitted** 64:20
**subscribed** 96:11 99:21
**substance** 32:14,21 77:18
**sue** 36:9,25
**suite** 2:5,10
**super** 94:12
**supervisor** 16:3 16:14 39:4,12 39:17,19,20 40:2 49:24 92:5
**supervisors** 29:18 39:14
**supposed** 74:5
**sure** 6:17 7:12 10:8 11:11 27:6 31:15 51:3 95:22
**suspended** 25:15,21,24
**suspensions** 26:17
**sustain** 74:5
**sworn** 3:15 4:3 4:13 96:11 98:8 99:21

**t**

**t** 97:8
**taft** 71:20,23 73:16
**take** 7:24 8:2,4 20:16,17 31:11 32:8 38:13 39:9 46:8,25 47:14,17 48:4 48:7,23 51:17 52:7 53:3 55:17 56:5,10 59:15 72:11 77:12 95:6
**taken** 1:20 26:6 26:20 32:10 59:17 77:14
**takes** 57:12
**talk** 17:4,8 51:14 59:20 77:17 82:6,9
**talked** 89:15
**talking** 10:5

**tasks** 50:11,14 55:3,8 60:24 62:13
**taxi** 47:16
**teeth** 36:11,17 36:18
**telephone** 77:22
**telephones** 95:21
**tell** 6:7 9:22 20:25 40:2 43:6 50:17 61:20 64:13 65:19 79:2 89:14,18 92:14 94:7
**ten** 32:12 90:23 95:2
**terms** 6:20 81:18 86:21 87:18 88:3,9 88:16,24
**testified** 4:14 9:25 10:15 28:16 31:8,20 49:4 52:2 58:10 95:16
**testify** 7:22 40:8
**testimony** 5:14 15:4 23:8 32:15,22 33:7 34:2 35:18 42:16 58:15 59:21 61:8 67:15 76:13 77:18 79:8 98:7,10
**text** 8:23 39:21 40:3 66:11,23
**texted** 66:12,14
**texts** 66:17
**thank** 96:6
**thing** 20:25 60:11 66:9 81:22 86:8,14
**things** 41:23 43:10 45:10
**think** 10:21 32:24 33:7 57:9,12 68:20 69:10
**thought** 65:17
**three** 13:6 17:3 18:24 19:22 26:8 64:3 67:12 73:24 74:7 75:2 76:15,21 78:2 78:8,13 91:18 91:19,19,20,21
**time** 1:20 3:11 9:16,16,17,18 9:19 10:2,16 10:19 11:3,17 11:19 15:14 16:6 18:19 30:6 31:17 32:11 36:13 39:7,22 40:3 40:20 41:3 42:16 43:22 44:5,25 45:2 45:12,15,25 59:9,18 60:8 62:3,11 64:14 64:17,20 67:6 67:16 70:16,23 73:20 74:11,20 75:21 76:3,10 76:17,19,24 77:4,6,15 78:9 78:14 79:4 81:14 82:24 83:9,14,22 84:13 90:18 91:11 92:24 93:15,18,23,24 94:2 96:7
**times** 9:21 43:17 50:5 54:6 58:21 59:4 89:11 91:18,19,20,20 91:21
**title** 19:10,10
**titles** 19:8
**today** 5:4 7:17
**today's** 8:12,16 8:19 9:3 12:9 12:13
**together** 16:25 30:3 64:18
**told** 15:23 16:20 17:20 26:19 36:24 39:4,12 40:5 44:5 51:6 58:24 64:10,16 68:18 74:24 79:5 81:22 82:5 83:16 85:8 89:25 92:2
**tommy** 17:17 39:15
**took** 30:16 59:19 77:16 80:7
**tools** 39:10 42:10,25 45:6 51:18 54:14 92:7 93:21
**top** 5:19 34:20 69:24
**total** 60:16 67:20 73:18 74:17 75:20 91:20,21
**towards** 22:13 34:16
**track** 43:22 91:5
**tracked** 67:3

**trailer** 54:3
**trained** 30:22
**training** 30:23
**transcribe** 5:18
**transcript** 98:9
**transcription** 5:25
**translate** 4:6 11:6
**translated** 21:15
**translation** 5:23 7:13 10:24 11:4
**translator** 5:22 7:12
**transportation** 83:2
**travel** 83:14,22
**traveling** 82:24 83:9
**trial** 3:11
**truck** 10:7 11:25 12:5 18:25 19:4 25:25 28:3,8 29:21 31:18,21 38:15 44:23 45:2,7 46:8,11 51:23 52:3,7 52:15 54:2,5 54:10,21 55:14 55:15,16 62:21 67:16,19,23 68:3,4,5,9,10 68:23 69:4 70:4,9 72:4 73:17 74:16 75:21,24 76:3 76:4,6 78:21 78:25 79:4,6 95:6,7
**trucks** 20:4,5 20:13,16,18 52:12 67:3 68:12,18,22 69:7 72:9 76:7 76:16,25 77:5 78:2,8,13,17,23
**true** 22:3 23:18 28:2,12 34:8 44:10,16 51:19 60:22,23 73:7 76:15,22 77:20 90:25 98:9
**truthful** 7:18
**trying** 51:3
**turn** 22:18 44:4
**two** 11:9 13:21 24:14 36:12 55:15 68:22 69:7 73:24 74:4,7,12 78:22 82:20
**type** 68:4
**typical** 38:25 84:2 85:15
**typically** 56:5 56:23 57:22 59:24 60:8 78:5 94:16,19

**u**

**under** 5:12,14 21:23 22:8,15 84:9
**undersigned** 81:8
**understand** 5:13 6:7 7:5 15:16 18:17 19:9 21:3 22:6 27:15,17 33:15 34:12 46:17 61:11 69:19 70:11,16,20,25 71:6 75:16 77:8,8 83:7
**understanding** 19:13 83:5 94:15,23
**understands** 32:25
**understood** 21:3 35:12 36:21 37:19 59:14 85:10
**union** 16:17 41:15,18,19,22 79:10,12 81:10 81:17,23 82:2 82:5,9,11 85:12 86:20 87:12,13 88:5 89:2,6
**uniondale** 13:17,19
**unions** 86:3,7 87:6,11
**united** 1:2
**unl** 34:22
**unlicensed** 34:10
**unload** 95:6
**unpaid** 83:14
**upset** 82:7
**use** 54:7 72:9 73:11
**used** 31:3 54:14 54:18,22,23,25 68:12 69:8
**using** 5:19 6:20
**usually** 47:9

**v**

**v** 4:2,11 99:3
**valid** 27:8,12
**van** 68:8,20
**variety** 40:22
**vary** 45:3,15,25
**vehicle** 18:5 34:10 91:16
**verb** 11:20
**verbal** 6:3,3

**verbally** 82:18
**veritext** 99:1
**verizon** 31:4,7 52:25 53:2,7,8 54:18 56:9 65:4,6,8,9 67:5 72:16 73:9 77:24
**veronica** 2:18

**w**

**wait** 5:20
**waiting** 52:3
**waived** 3:7
**waiver** 22:24
**wake** 90:20
**walk** 38:12 46:23
**walsh** 61:23
**want** 27:6 28:25 69:21 73:23 75:17 84:21
**wanted** 26:8 84:19
**way** 69:23 71:15 98:15
**ways** 46:22
**week** 62:25 63:20 64:2,23 64:25 71:8 72:14 73:2,25 74:2,4,7 91:20 93:14 95:14
**went** 11:3 19:21 26:21,23 38:11,14 40:9 50:5 55:13 82:8
**westchester** 48:19,22 49:2 49:3,17 50:3,5 88:2
**whereof** 98:17
**white** 66:7
**wife** 13:8 38:13 46:24,25 47:4
**withdraw** 53:4
**withdrawn** 60:22 61:14 75:23 87:12
**witness** 4:7,8 4:12 9:24 11:23 24:8 46:18 97:3 98:7,11,17 99:4
**wood** 50:19 52:23
**woodbury** 1:14 2:10
**word** 11:8,13
**work** 10:9 14:9 15:21 16:25 17:21 19:2,23 27:19 30:4,22 36:11,14 37:20 38:3 39:8 43:9 43:11,17,20 44:2,11,17 45:9 47:3,7,13 47:17 49:22 50:3,25 57:2 57:24 60:16 61:5 62:16 63:14,25 72:10 72:11,14 73:24 74:4,6,12 75:2 75:4,13 76:2,6 81:23 84:14 86:16 90:6,12 90:23 92:8,17 94:19,22 95:5 95:23,25
**workday** 44:11 44:17 60:5,10 83:3,4,11 89:13
**worked** 9:16,16 13:23 17:2 19:12,20 23:2 30:14 37:22,24 39:2 44:6 45:22 46:3 60:19 61:15,24 62:25 63:19,23 64:3,11,17,18 65:7 75:6 77:22 79:23 81:24 84:15,17 94:9,10,14,21 95:17
**worker** 41:24 85:24
**workers** 30:11
**working** 5:9 10:6 16:19,22 18:23 23:9 30:2 31:5 32:2 36:10 41:20 42:9 47:20 53:16 55:23 56:8 64:14,17 64:25 65:4 73:8 76:5 80:3 88:14,15 94:5 95:2,21
**works** 10:8 47:8
**write** 10:7 43:24 49:24 64:5 85:23 94:10
**writing** 82:17
**written** 64:9
**wrote** 65:21

**x**

**x** 1:5,12 97:2,8

**y**

**yard** 19:12,20 20:12 38:7,10 38:11,14 40:21 41:4 42:6,8,9 42:20 44:24 45:3 46:5,7,20

47:22,25 48:5 48:8,10,19,22 48:24 49:2,17 49:18 50:9,12 50:13,15,21,23 51:5,11,13,20 52:16 55:2,11 56:6 57:18 58:22 59:2,5 59:10,25 60:6 60:9,14,25 61:22 62:3,9 62:12,20 65:13 71:22,25 73:18 74:17,24 76:11 78:22 83:17 91:23 92:3,10 92:12,17

**year** 29:12,14 62:7 75:11

**years** 13:6 23:15 26:7,9 43:12 61:21 65:8 75:9

**york** 1:3,14,22 2:5,5,10 4:5,21 13:3 27:24 71:21 72:6,18 72:25 98:6

**young** 43:12

**z**

**zoom** 69:20

**zpass** 48:13,16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.