# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
MANUEL ANGEL CALDERON, individually and on behalf of all others similarly situated,

Plaintiff,

-against-

NETWORK INFRASTRUCTURE, INC. and PATRICK CLARKE, jointly and severally,

Defendants.

Case No.: 24-cv-05442(ALC)
---------------------------------------------------X

VIRTUALLY

March 9th, 2026
10:16 a.m.

DEPOSITION of CARLOS FUENTES, a Plaintiff herein, taken by the Defendants, pursuant to Federal Rules of Civil Procedure and Notice, held at the above-mentioned time and place, before Brittany E. Bosak, a Notary Public of the State of New York.

Job No. 7937847

A P P E A R A N C E S

FOR THE PLAINTIFFS:

PELTON GRAHAM LLC
111 Broadway, Suite 1503
New York, New York 10006
BY: BRENT PELTON, ESQ.

FOR THE DEFENDANTS:

KAUFMAN DOLOWICH, LLP
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
BY: EDWARD GRIMMETT, ESQ.

Also Present:
Rebecca Sloan, Spanish Interpreter
Patrick Clarke
Belinda Herazo, Pelton Graham LLC

I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Carlos Fuentes | Edward Grimmett | 5 |
| Carlos Fuentes | Brent Pelton | 87 |

FUENTES' EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 1 | Fuentes Interrogatory Responses | 37 |
| Exhibit No. 2 | Document Bates DEF001237 | 57 |
| Exhibit No. 3 | Document Bates DEF0002423 - DEF002424 | 59 |
| Exhibit No. 4 | Document Bates DEF023879 - DEF023915 | 66 |
| Exhibit No. 5 | Document Bates DEF000127 - DEF000164 | 80 |

F E D E R A L  S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

R E B E C C A   S L O A N, the interpreter, was duly sworn by a Notary Public of the State of New York to translate the questions from English to Spanish and the answers from Spanish to English to the best of her ability.

C A R L O S   F U E N T E S, after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

BY THE COURT REPORTER:

Q Please state your name for the record.

A Carlos Fuentes.

Q Please state your current address for the record.

A 110 Brooklyn Avenue, Apartment 1B, Freeport, New York 11520.

EXAMINATION BY MR. GRIMMETT:

Q Good morning, Mr. Fuentes.

A Good morning.

Q My name is Edward Grimmett. I represent Network Infrastructure and Patrick Clarke. Sitting next to me today is Patrick Clarke.

Can you see us both on your screen?

A Yes, yes, I can see him.

Q So I'm going to be asking you some

questions, and you are going to be answering them under oath.

Do you understand that your testimony is going be offered under the penalty of perjury?

A Yes, I understand; yes, I understand; yes, I understand.

Q Are you -- are you in a location with good internet connection?

A My house, yes.

Q Are you connected to wi-fi?

A Yes, I'm connected.

Q Just because it seems to be a little choppy at times, and I want to make sure that we're able to, you know, go forward with the current connection.

A It's because I'm connected with the --

MR. PELTON: It may be better to use the telephone initially, but if we need the tablet to look at documents, we may need to switch, because when we spoke previously with the phone there was no interruption or delay. I'm sorry. I was the one who asked about switching over to the tablet.

MR. GRIMMETT: Yeah. I'm fine switching over to the phone if we think that's going to

be better.

MR. PELTON: Are you able to quickly switch back to the phone?

THE WITNESS: Okay.

THE INTERPRETER: He's going to try now.

(A discussion was held off the record.)

(A recess was taken.)

Q All right. So, Mr. Fuentes, before we had a little break due to internet connection I asked, do you understand that your testimony is going to be offered under the penalties of perjury?

A Yes.

Q And you understand what perjury is, correct?

A Yes.

Q All right. So I'm going to have some instructions related to this deposition.

A That's fine.

Q Because the court reporter is attempting to transcribe everything we say and we're using a Spanish interpreter, please, wait for me to finish asking my question and for translator to fully complete the translation before you start talking.

A That's fine.

Q I'm going to give the same courtesy to you

as well.
Because this is an oral transcription the court reporter can't indicate head nods or other nonverbal gestures, so every answer just needs to be verbal.
A Correct, that's fine.
Q Like a yes or a no, no uh-huh, uh-uh, nothing like that.
Understood?
A Yes.
Q I'm going to assume that you understood all my questions unless you tell me otherwise.
If you need to speak to your attorney at any point, I'll -- isle give you the opportunity to do so, but, please, just make sure the question that was asked was answered first.
A That's fine.
Q If you need a break at any point, just let me know.
A Okay. I'll let you know.
Q But same thing, before we take that break I just need to make sure that the question that was asked was answered.
A That's fine.
Q If I refer to defendants, that means

Network Infrastructure, Inc. and Patrick Clarke collectively?

A Okay.

Q If I refer to the union or Local 731, that means Building Concrete Excavating and Common Laborers, Union Local Number 731 of Greater New York, Long Island, and Vicinity of the Labors' International Union of North America.

A Yes. But we're -- we're not in Long Island. We're from the city.

Q That's -- that's the name of the union you were a member of, though, correct?

A Yes, that's the one I belong to, yes, 731.

Q So I'm going to refer to them as Local 731.

A Yes, that's fine.

Q Do you understand all these instructions?

A Yes.

Q Do you have any questions for me before we proceed?

A Why did you call it Long Island, the 731?

Q That is the full name of the union, and it says of Greater New York, Long Island, and Vicinity.

A Oh, that's fine. Thank you.

Q Okay. So is there any reason that would

prevent or limit you today from giving truthful answers to my questions?

A No, none, no.

Q Are you currently taking any medication that would impact your ability to testify truthfully?

A No.

Q Did you fail to take any medication that you're ordinarily prescribed to take within the last 48 hours?

A No.

Q Have you consumed alcohol in the last 24 hours?

A No.

Q Where are you taking this deposition from?

A My house.

Q And where -- where is your house?

A 110 Brooklyn Avenue, Apartment 1B, Freeport, New York.

Q So you're in -- in an apartment, not a house, correct?

A But I call it house because this is where I live, so yes, this my house -- my home.

Q Okay. But the actual -- where you are located right now is technically considered an

apartment, correct?
A Yes.
Q And how many rooms are in the apartment?
A Two.
Q What room are you currently in?
A Mine.
Q Your bedroom?
A Yes.
Q Is there anyone in that room with you?
A No.
Q Do you live with anyone else in the apartment?
A With my -- with my fiancee.
Q Okay. Is she in the apartment today?
A Yes. She's working in the living room.
Q Is your door closed?
A Yes.
Q Do you have any documents or other windows open on your phone right now?
A No.
Q Okay. I know before you were utilizing an iPad.
Do you have any documents or other windows open on your iPad?
A No.

Q Are you able to share the screen on your phone if I asked you to?
A I don't know how to do it, but sure.
Q So if I gave you instructions on how to share your screen, you -- you would be able to?
A Can I ask a question?
Q Sure.
A When you are asking me if I have any other windows open, are you asking me if I have, like, Facebook and stuff like that open; is that what you are asking me?
Q Correct. I want to know if -- whether you are focused on just this -- just this deposition screen or whether you have any other documents or information in -- in front of you, either on the screen or on another monitor.
A I mean, when I connected I was looking at my social media, but, if anything, I can just close it.
Q Is -- are you looking at the social media right now?
A No. I mean, I was using my phone before.
Q Okay. But currently all these -- all these apps that you were looking at are closed?
A I mean, they are open, but I -- I'm not

looking at them right now.
Q Okay. So you are not looking at anything other than the Zoom screen, correct?
A Correct. This is all -- this is all I'm seeing.
Q Okay. Do you have any physical documents or notes in front of you right now?
A No, nothing.
Q Have you ever been deposed before, what we're doing right now?
A Yes.
Q How many times?
A Once.
Q Okay. When was that?
A I don't remember, maybe about three years ago.
Q What was the nature of that case?
A It was car accident.
Q Were you the plaintiff?
A Yes, I was.
Q And who did -- who did you bring that action against?
A Do I have to answer that? That's -- that's not your problem.
Q Yes, you have to answer.

MR. PELTON: I -- I can -- I'll object. I'll object. It's not relevant.

But in this deposition Defendants are able to ask a pretty broad range of questions, and it's not necessarily that they will be able to use it at trial, but they are typically able to ask questions. I'll object at times, but unless I instruct you not to answer, please go ahead and answer.

And going back to a prior question, just Belinda and Carlos, there's absolutely no communication between us allowed during this -- outside of this Zoom; just there's no texting, no anything of that sort.

A Can you repeat the question, please? I'm sorry.

Q Yeah.

Who did you bring the action against for your car accident?

A Nassau County Police.

Q Okay. And how did that -- how did that case get resolved?

A I won.

Q Did you get a settlement?

A Yes. We reached a settlement. It was

negligence on their part.

Q Okay. How much was the settlement for?

A $600,000.

Q Have you had any other depositions?

A No.

Q Have you ever offered testimony in any other type of proceeding, whether it be as a witness or something else?

A No.

Q Aside from speaking with your attorneys, did you speak to anyone else to prepare for today's deposition?

A No.

Q Did you speak with anyone currently employed by Network about today's deposition?

A No.

Q Did you speak with any former employees of Network about today's deposition?

A No.

Q Other than your attorneys, have you communicated with anyone about this -- about this deposition either by text message, instant message, email?

A No, with nobody.

Q Did you review any documents to prepare

for today's deposition?
A No.
Q Something seems amusing?
A The question.
Q Why is the question, me asking if you have any documents, amusing?
A It's just funny to me because you are asking me if I prepare myself in any way, but, I mean, I just woke up, so, I mean, it's just funny because I don't even know what was going to happen here today, but -- oh, well.
Q Understood.
So I'm assuming you didn't prepare any notes or documents to prepare for today's deposition?
A No.
Q Have you discussed this case at all with anyone else?
A No.
Q Other than this lawsuit and the personal injury action you mentioned before, have you ever been a plaintiff or complainant in any other lawsuit before no.
Q Have you ever been a defendant; has anyone ever sued you?

A No.
Q Have you ever brought an action or threatened to sue a former employer?
A No.
Q Have you ever filed any sort of complaints with the Department of Labor, Equal Employment Opportunity Commission, New York State Human Right -- New York State Human Rights Commission, any sort of government agency against one of your former employers?
A If you are talking about claims, I've done the unemployment claim, if that's what you're referring to.
Q Okay. Who did you -- when did you file an unemployment claim?
A That was last year or two years ago -- last year -- I don't remember.
Q Against what employer?
A I was working for the company Yonkers.
Q Did you testify in an unemployment hearing?
A No, no, no. I mean -- I'm sorry. What I'm referring to is to collect, like, unemployment benefits. I didn't sue anyone or place a claim against someone.

Q I -- I understand what seeking unemployment benefits entails. Sometimes they make you attend a hearing if you want to get unemployment benefits?

A Oh, no. On the contrary, that was just -- I filled out paperwork online, and I just had to send them documents, and that's it.

Q Understood.

So have you filed any other unemployment claims?

A No.

Q And other than this one unemployment claim to Yonkers, you haven't filed any other sort of complaints -- complaints or claims with the government regarding a former employer?

A Recently?

Q Ever.

THE INTERPRETER: I'm sorry?

MR. GRIMMETT: Ever.

A I mean, for the other companies I worked for if I didn't have a job, then I would reach out to have an employment.

Q I'm sorry. I'm not fulling understanding.

So did you file unemployment claims for other companies that you used to work for?

A Well, the thing is I don't understand the way you are saying it. The question is clear. You are asking me if I collected benefits with other companies, so if I didn't -- if I was working for company and then no lodger working for that company, of course I collected benefits. The same thing happened with Network. I wasn't work withing them. I collected benefits from them.
Q Okay. So after you were employed by Network you received unemployment benefits?
A Yes, when I was working for Network, yes.
Q At any -- at any point where you were collecting unemployment benefits did you have to attend a hearing?
A No.
Q Do you have any prior misdemeanor or felony convictions?
A I have a DWI, but I don't know if that's --
Q You only have one DWI?
A Yes. Thank goodness.
Q Any other convictions?
A No, never.
Q Okay. When did your DWI -- when were you arrested for that?

A About 20 years ago, in 2006.
Q And when were you convicted?
A I don't remember. It was 20 years ago.
Q So probably that same year, 2006?
A Yes, it was around there, I think.
Q Okay. Were there any consequences in terms of your driver's license?
THE INTERPRETER: I'm sorry. I cut you off. What did you say?
MR. GRIMMETT: Yeah. No worries.
Q Were there any consequences to your driver's license due to this DWI?
A I was not able to drive until I finished the course, which was six months.
MR. GRIMMETT: I'm sorry. What was the end of that, which was what?
THE INTERPRETER: Six months.
Q Okay. So your license was suspended for six months?
A Yes.
Q After -- after your suspension to your license was lifted have you received any other sort of suspensions or revocations to your driver's license?
A No, never.

Q Are you aware of the nature of this -- this lawsuit?
A Yes.
Q Please explain your understanding of this lawsuit.
A It's for hours worked that have not been paid at jobs that were done at the yard while I was driving a truck, and I was never paid for that.
Q Okay. Are you aware that this action is being brought as a class and collective action?
A Yes.
Q Okay. What is your understanding of -- of a collective action?
A It's a group of people that have been going through the -- that went through the same problem.
Q Okay. Are you aware of the other individuals who have opted into this lawsuit?
A No.
Q So you don't know the names of any other individual that opted into this lawsuit?
A I don't know who they are.
Q Do you know what a class action is?
A No. Maybe you can explain it to me because I -- I don't understand that term.

Q Okay. So you don't -- you don't know what a class action is, correct?
A I know what a class action is. I know it's when it's various people.
Q Okay. Do you understand the difference between a class and a collective action?
MR. PELTON: Object -- object to the extent that it requires advanced legal knowledge.
But go ahead and answer it to the extent you know.
A I mean, I know what a class action is. I don't understand the collective action -- oh, actually, the other way around.
Q So you testified that, you know, your general knowledge is that this is -- this has to do with a group of individuals that allegedly dealt with the -- a similar violation.
A Yes.
Q Have you ever been involved in a situation like this before, where you participated in a class or collective action?
A No, I never been.
Q Have you ever gotten a settlement for filling out some sort of form?

A No.
Q Do you go by any names other than Carlos Fuentes?
A No, Carlos Fuentes.
Q Do you have any nicknames?
A Gordo (phonetic).
Q Gordo.
When you were employed by Network did anyone call you that?
A No. They always called me by my name, Carlos, or Big Guy, they used to say.
MR. GRIMMETT: Can you repeat that?
THE INTERPRETER: Or Big Guy.
Q Big Guy, okay.
What's your date of birth?
A January 27, 1982.
Q How long have you lived in the apartment?
A Two years.
Q Where did you live before that?
A I lived in Uniondale because I was -- I got separated.
Q Okay. What was the address of your Uniondale residence?
A I don't remember, I don't remember right now.

Q How -- how long did you reside at the Uniondale address?
A I don't -- I don't remember, maybe two to three years.
Q Where did you reside before that?
A New Hyde Park -- I'm sorry -- floral Park, Floral Park.
Q What was your address in Floral Park?
A I'm very bad at remembering things like that, but I believe it was 8323 Little Neck Parkway, Floral Park, New York.
Q Did you reside at this Floral Park address for the duration of your employment with Network?
A Yes.
Q So you never lived at this Uniondale address while employed by Network, correct?
A No.
Q What do you currently do for a living?
A I'm a laborer.
Q Who do you work for?
A Bomb Brothers.
Q Can you spell the -- the first part of that?
A Bomb Brothers, B-O-M-B.
Q How long have you been employed by Bomb

Brothers?
A About six months.
Q Who did you work with before Bomb Brothers?
A Forete.
Q Can you spell that?
A F-O-R-E-T-E, Forete.
Q And were you a laborer at Forete as well?
A Yes.
Q How long were you employed by Forete?
A The same thing, about four to five months.
Q Why did your employment with Forete end?
A Because then I received the opportunity to work at the other company.
Q Did you resign from Forete?
A Yes.
Q Where did you work before Forete?
A So, I mean, it's hard to say. Okay. So I worked for Scanska, and the thing is during the wintertime I also worked for three different companies, all right, so just put down Yonkers and Scanska.
THE INTERPRETER: Scanska is spelled S-C-A-N-S-K-A.
Q So after your employment ended with

Network who did you go to work for?
A Scanska.
Q And why did you employment with Scanska end?
A Because winter started, and they started letting go some of the personnel.
Q Okay. And then you went to Yonkers after that?
A Yes.
Q And why did your employment with Yonkers end?
A Because the contract ended, the one with the airport.
Q And then you went to Forete after Yonkers?
A Yes.
Q Who was the contract with at Yonkers, what airport?
A The Kennedy Airport.
Q What's your highest level of education?
A High school.
Q Do you have any professional licenses?
A No.
Q When were you hired by Network?
A January 23rd, 2018.
Q And who were you hired by?

A Network.
Q Any person individually at Network that hired you?
A I think it was Sonny and Steve Napalie (phonetic).
Q Did anyone assist you to get hired, anyone refer you to -- refer you for the job?
A Yes.
Q Who was that?
A Giovanni Bonilla.
Q How did you know Giovanni Bonilla?
A We are cousins, third generation cousins.
Q And Giovanni Bonilla still employed by Network?
A No.
Q When did you stop working at Network?
A In the beginning of -- I believe it was in the beginning of 2024, '24 -- yes, '24.
Q So it's your testimony that you worked for Network from January 23rd, 2019, to approximately the beginning of 2024; is that accurate?
A Yes. But I'm not completely sure if it was in the beginning of 2024 or if it was the end of 2023. I'm not a hundred percent sure.
Q Okay. But your employment ended either

the end of 2023 or the beginning of 2024; is that accurate?

A Yes.

Q Were there any breaks in your employment from 2019 to the end of your employment?

A It was 2018, not 2019.

Q So you started working in January 23rd, 2018?

A Yes.

Q Since -- from 2018 through the end of your employment were there any breaks?

A Yes. So we would have -- there was like a break or recess time that was around December that they lay off people for the months of December, January, February, but they will call in -- so they will lay off the people that they had on the phone, and they will call in the people that they had more time or longer time, and they would have them do the work that we used to do during that time.

Q So generally every December to February during your employment with Network you were layed off?

A Yes.

Q What was your job title when you were hired by Network?

A Laborer.
Q What were your responsibilities as a laborer?
THE INTERPRETER: I'm sorry. I think it was me. I'm sorry. Can you hear me?
MR. GRIMMETT: Yeah, I can hear you. Okay.
THE INTERPRETER: If it happens again, I'm going to have to move, but okay.
MR. GRIMMETT: That's okay.
Did you get everything that was said?
THE INTERPRETER: Not at all.
A To prep everything that we needed to work, to have the -- make sure that we have the PPE, the correct PPE to enter into the manholes, and the signs that we needed, everything that we needed to protect ourself, our safety.
Q Okay. What would you do when you were actually on the project?
A It all depended. Sometimes I would be the man that was actually going into the manholes to work with the drains, or I would be the one who was on the top prepping the barracks or sometimes --
THE INTERPRETER: Sorry. I'm going to have to ask him to repeat the last part. Okay.

A And the pipes.
Q And what was your work schedule?
A Depending, there was days -- sometimes days and sometimes nights.
Q Okay. So your schedule often varied, correct?
A Depends, yes.
Q What type of projects did you work on?
A We were working with the phone lines, basically what they called the fiberoptic. They used to call it made ready.
Q Okay. And you predominantly worked on that made ready project, correct?
A Yes.
Q Was that a contract with Verizon?
A Yes.
Q And did that project require you to open manholes?
A Yes.
Q And did that project require you to install cable reels?
A Yes.
Q You were a laborer for the duration of your employment with Network, correct?
A And I also drove; I was also a driver.

Q Did any of your coworkers have different job titles?
A The foreman.
Q Okay. Were there any, sort of, operating engineers?
A No.
Q You're not aware of any other job title that -- than a foreman?
A The super -- the supervisor.
Q Okay. So other than the supervisor and the foreman is it your testimony that everyone employed by Network was a laborer?
A And drivers.
Q Were there any mechanics?
A At the place where we worked, yes. There was someone who would fix the cars.
Q So there were certain employees that were only -- that only worked at the yard, correct?
A So let me explain to you. So the thing is we would arrive at 5:30 at the yard. They would usually arrive at 6:30 -- between 6:30 or 7:00, so we basically come into the yard and do their job, which was prepping the cars and prepping everything to go out because we needed to go out. Now, once think came in they were the ones who were getting

things ready during the day.

Q So it's your testimony that the designated yard staff never did anything with the trucks in the morning?

A I mean, we had to do it. They would do it if it was something from 7:00 on, but if we had to be there earlier, which was 5:00/5:30, then we had to do it.

Q So you would do their job for them?

A Yes, we had to do it.

Q And what kind of stuff did they get ready during the day when trucks weren't there?

A Well, let me start by saying that Network used to have two things that they ran, which was gas and phone, so if it wasn't to work on our trucks, to get our trucks ready, would be maybe for the gas trucks, or they would do other different things.

Q Were there times when a yard personnel would actually prep your truck and park it outside -- outside on the street for you to take to the project?

A No, very few times. It was always -- it was always us.

Q So when you say a few times there were times that it happened then, correct?

A Yes.
Q When you say a few times how many -- how many times?
A I don't know how to explain it because we were -- we were six groups, so maybe about once or twice a month.
Q And if I spoke to -- if I spoke to somebody on the designated yard staff that -- that did stage these trucks, they would say these same things; they only did that once or twice a month?
A I imagine yes because they were very busy doing other things.
Q How did you get the keys when you first got -- got to the yard?
A So we used to go in and go to where there was a white box where all the keys were stored, and then we will have a PIN card to go and enter where the cars were -- were stationed.
Q So the keys were located in the white box?
A So there was with a time when they were starting to steal things because at first they used to keep the keys inside the cars, but then something was going on, so then that's when they started storing them in this white box that I'm telling you.
Q Okay. And that -- and that white box was

locked?

A No.

Q Then what would prevent anybody from stealing the keys by simply putting them in the white box?

A Because this white box was inside the building. It wasn't at the same location where the cars were. It was inside the building.

Q And how did you get inside the building?

A We all had a card to access the building, so the drivers and the workers, we all had the card to access the building.

Q Who issued the card?

A Steve.

Q Steve who?

A Steve Marillow, Marie-o (phonetic) -- I don't remember.

MR. GRIMMETT: Okay. How about we take like a five-minute break? We have been going for about an hour now.

MR. PELTON: That sounds good.

(A discussion was held off the record.)

(A recess was taken.)

Q So, Mr. Fuentes, we just took a little break.

Did you speak to anyone during that break about your testimony?
A No, no.
Q Okay. So before the break you were testifying about how you would use a card to swipe into the -- the building each day, correct?
A Yes.
Q And based on when you would swipe into the building for the day Network would know the specific time that you got to the yard, correct?
A I don't know. I think so, but I don't know.
Q So when you would get -- when you would get to the yard, the time you would get there in the morning would often vary; is that correct?
A Not much but -- well, let's say yes, yes, yes.
Q Okay. You could have gotten there after 7:00 a.m., correct?
MR. PELTON: Objection.
You can answer it.
A I never arrived at this time. I always got there around 5:30 in the morning.
Q So there was never an instance where you got to the yard after 7:00 a.m.?

A Within the six years maybe once or twice.
Q And was there ever an instance where you got to the yard after 6:30 a.m.?
A No, I don't remember. I always arrived -- no, I don't remember. I don't think so.
Q How would you know what shift you were expected to work each day?
A The foremen used to send us a message.
Q Okay. Who was your foreman?
A I had different foremen. The latest one I had was -- the last one I had was Dougie.
MR. GRIMMETT: Can you repeat the name?
THE INTERPRETER: Dougie.
Q What was Dougie's last name?
A I don't remember. I think it was Falkerson (phonetic), I don't remember.
Q Do you have text messages with any of your -- your previous foremen at Network?
A No.
Q Why do you no longer have them?
A Because I switched phones.
Q When did you switch phones?
A So the one I have right now is a 17, so I just switched to this one a few months ago, and the last one I had was a year and a half.

Q So on your previous phone you would have had text messages with foremen?

A I think so, yes.

Q Do you know that you had an obligation to preserve relevant records relevant to this lawsuit?

A No.

Q So you did nothing to preserve any text messages that you may have had on a previous phone?

A No.

Q Okay. So I'm going to share a document with you.

(Fuentes Interrogatory Responses was marked as Fuentes' Exhibit No. 1 for identification, as of this date.)

Q Mr. Fuentes, I'm showing you a document that's titled, Opt-In Plaintiff Carlos Fuentes' Objections and Responses to Defendants' First Set of Interrogatories. I'm going to scroll through the document.

Can you see this document?

A No.

Q Sometimes if you slide to the right on your screen, you are able to see it on your -- on your phone.

A Yes. I think I'm seeing it now.

Q Okay. So I'm going to scroll through the document.

Does this document look familiar to you?

A Yes.

Q So on the second-to-last page, that's your signature right there, correct?

A Yes, that's my signature.

Q And where you signed above it says, I, Carlos Fuentes, hereby declare under penalty of perjury that I have read the foregoing, Plaintiff Carlos Fuentes' Objections and Responses to Defendants' First Set of Interrogatories and believe it to be true to the best of my knowledge and belief.

A Okay.

Q So you -- you understand that you provided this document under the penalty of perjury, correct?

A Yes.

Q I'm going to go to response number 17.

The question is, over the course of Plaintiff's alleged employment with Defendants identify the specific times and/or locations that plaintiff reported to work at the start of each workday.

And you -- you responded in the last

paragraph that you were typically -- Plaintiff also responds that he was typically required to be at the job site assigned for the day between approximately 7:30 a.m. and 8:00 a.m. and sometimes later, depending on the morning traffic, to start with work required for the day.

A Yes, that's correct.

Q So based on this response, the time you had to be on the job site each day varied, correct?

A Yes, depending on the sites that we were supposed to go to, yes, that's correct.

Q So sometimes you would have to be at the job site after 8:00 a.m., correct?

A The thing that you are not understanding is that we always had to arrive early to make sure we were able to grab a -- a spot for the cars.

Q But you previously testified that sometimes the project would be at night.

You wouldn't have to be at the yard early on those days, right?

A I mean, early at night, right?

Q I'm sorry. I'm not understanding.

So if -- there were times when you worked on a project that was after 8:00 a.m., correct?

A Yes.

Q And I'm not referring to the yard. I'm just referring to the time that you had to be at -- at the job site.

So there were times where you had to be -- arrive at the job site after 8:00 a.m., right?

A Yes.

Q Some jobs required you to be at the job site at approximately 9:00 a.m., correct?

A Yes, yes, Mr. Lawyer. The thing is, in order for us to work in the manholes we needed to make sure that we arrived early at the site because we needed to save a spot to get prepped to work inside the manholes, so we needed to go and make sure we had spots saved or make sure that everything was right before we worked in the manholes. That's why we had to get there earlier.

Q So I'm only referring to the time you had to get to the job site.

There were times where you had to get to the job site at night, correct?

A Yes, correct.

Q When -- when you had to get to the job site at -- at night what time would you get to the yard -- yard beforehand?

A It was all depending the time we had to do

the job. Sometimes it would be three o'clock in the morning. Sometimes it would be five o'clock in the morning.

Q Okay. So the time you actually had to get in the yard each morning varied, correct?

MR. PELTON: Objection.

A Yeah.

Q The time that -- the -- strike that.

So the time that you had to get to the yard all depended on the specific time you had to get to the job site, correct?

MR. PELTON: Objection.

A Yes.

Q And the time you got to the yard in the morning didn't matter as long as you got to the job site on time, correct?

MR. PELTON: Objection.

A Can you repeat that question again? I don't understand it.

Q So the time that you go to the yard in the morning didn't matter as long as you got to the job site on time, correct?

A No. Of course it mattered because we needed to prep everything that we needed bring, so of course it mattered for us to get to the yard a

certain time.

Q Okay. But what I'm -- what I'm saying is, as long as you could get everything you need to done and you have a project at -- at 3:00 a.m. when there's no traffic, the time that you had to get to the yard beforehand would be less than when there was a time that there was traffic.

A Well, yes. But we always needed to take our time to make sure that we gather everything that we needed to bring, so we would try to be there, let's say, about 30 minutes to an hour before, yes.

Q So you'd typically get to the yard 30 minutes to an hour before the time you had to be at the job site, correct?

MR. PELTON: Objection.

Go ahead.

A Half an hour before, yes.

Q So generally you would get to the yard a half hour before you had to be at the job site, correct?

A I arrived before -- early because I needed to make sure I needed to gather everything we needed. It wasn't because I wanted to be there earlier. It's because we needed to make sure we had everything ready that we needed to leave.

Q Okay. So that was approximately a half hour earlier, correct?
MR. PELTON: Objection.
A Let's say 45 minutes or half an hour.
Q Understood.
How did you get to the yard each morning?
A I had my car.
Q Did you always start the day in the Hempstead yard?
A Yes.
Q Did you ever start your day at Bronx yard?
THE INTERPRETER: You said Bronx?
MR. GRIMMETT: Yes.
A I only went there twice.
Q Okay. Did you ever start the day at the Westchester yard?
A No, never.
Q And your coworkers who were laborers, they would drive directly to the job site, correct?
A A few. Others would just come to the job site.
Q That was my question.
So they would just -- other laborers would drive directly to the job site, correct?
A Yes.

Q Only the drivers reported to the yard, correct?

MR. PELTON: Objection.

A No. They also had helpers, and the helpers were also there.

Q Okay. But those helpers weren't required to be at the job site, correct?

MR. PELTON: Objection.

A No. We all had to come to the yard, but there were just a few that, you know, live closer to the yard and were there longer, working there longer for Network, but we all had to show up to the yard or, otherwise, it would go and -- maybe they lived in Brooklyn, and they would show up directly to the job site.

Q So you are saying there were some laborers that would go to the yard, and even though they weren't drivers, they would ride in a Network vehicle to the job site?

MR. PELTON: Objection.

THE INTERPRETER: You said objection, Counsel?

MR. PELTON: Yes.

A Correct.

Q And would -- would these -- would these

laborers be in your vehicle that you were driving?

A Yes, yes. And I was also a laborer for two years, and I had to ride with someone and had to help someone, be Carlos Fernandez, and then I -- I was a driver and I had a helper, so yes.

Q Was Carlos Fernandez, the only person that you drove with?

A No. It was also with Mario Sara. I also worked with Mario Gadamas (phonetic), and then I don't know. I don't remember; I don't remember the others, but these are the ones I worked with the most.

Q So there would only be one passenger in a vehicle at times?

MR. PELTON: Objection.

A Most of the time -- no. Sometimes there were two.

Q And you testified that you were not always responsible for driving, correct?

A The first few years I was not responsible to drive, then after I was the one responsible to drive.

Q When did you start driving?

A I think it was between -- around 2001 [sic], after the pandemic. That's when I started

driving the router truck, but -- because before that I was driving the truck where we used to carry all the supplies for the fiberoptic and everything else. It was a van and a pickup truck.

Q When did you start driving the van/pickup truck?

A So I did my course at 23rd, 24th, the 25th. January 25th of 2018 was my first time driving the van for Network at the yard, which was pulling -- I was pulling the rolls, the reels, to pull the -- the cables, and the foreman was Paul.

Q Okay. So around when you first started working at Network, that's where you drove the van where you were pulling the reels, correct?

MR. PELTON: Objection.

A Like you said, when I was working I started as a laborer, but at the same time I was driving at the van to pull the reels, the cables.

Q And then you testified that there were times where you were not a driver, correct?

A Correct.

Q When were you not a driver?

A When I started working for made ready with Gio Bonilla. Can I give you more, extend more on this, or no?

Q I would just like to know how long you were not a driver for.
A The thing is, I don't understand really because I was not driving, like, the -- the big trucks. I was driving the pickup truck. I wasn't driving a box truck. It was a pickup truck, and for about a year and a half we were not doing any type of fiberoptic works, and then for about a month I was driving the pickup truck, the big truck. That's what I'm trying to -- I don't know. I need to explain more.
Q Okay. Do you have a commercial driver's license?
A No.
Q So approximately how long were you only a laborer and you did not drive a Network vehicle?
A Let's say on and off about two years.
Q Okay. So during this two-year period where you were not driving a Network vehicle you would report to the -- report to the yard on occasion?
A I always showed up to the yard, and I always helped Carlos Fernandez to load up the truck.
Q There was never a circumstance where you drove directly to the job site?

A Maybe once or twice due to a medical emergency.
Q What -- what was the medical emergency?
A Like if I needed to go have a physical done or get my heart checked or things that I couldn't -- I couldn't move around.
Q Okay. So it wasn't really a medical emergency; there would be times when you would go to the doctor and then drive to the job site?
A Yes, you are right. I expressed it the wrong way. I meant medical appointments that I couldn't change and I needed to -- to go to.
Q Understood.
There were other drivers that drove -- drove the truck without any sort of passengers, correct?
A I think there was only one person.
Q Who was that?
A Jimmy Hustle.
Q Why didn't he need a helper, whereas other -- other drivers get?
A He -- he had a helper, but no one wanted to ride with him because he used to smoke a cigar, and no one liked that smell, but he used to get the help.

Q Were the -- was he ever helped by somebody who was designated yard staff?
THE INTERPRETER: Was he -- I'm sorry?
Q Was he ever helped by a Network employee who was designated specifically to the yard?
A Who, Jimmy?
Q Yes.
A Yes. I mean him and I, all of us, we were all a team. We all helped each other.
Q So you testified that there would be -- on occasion you would drive directly to the job site, correct?
A No. I said that I did it twice. I didn't say on occasion. I said twice, two times.
Q Okay. But you had the flexibility, if you wanted to, to drive directly to the job site, correct?
MR. PELTON: Objection.
A Yes. But I never did it, only two times.
Q Why did you never do it?
A Because they always needed someone to help them. They always needed someone to help load the trucks, and it was hard to find parking where -- at the job sites.
Q So it was -- it was convenient for you to

go to the yard at the start --
MR. PELTON: Objection.
Q -- of the workday --
MR. GRIMMETT: Brent, if you could, just let me finish.
Q So it was convenient for you to go to the yard the start of the workday as opposed to driving directly to the job site, correct?
A No. For me it was not convenient for me to be there 30 minutes before to go and load a truck at the yard, no; it was not convenient.
Q But wasn't it difficult to find parking at the job site?
A Of course it was hard. But the -- the drivers needed -- needed helpers, so -- they couldn't do it alone at the yard. You have to be at the yard.
Q Okay. And you would save on gas by going to the yard in the morning, correct?
A No. Because I could go. It wasn't necessary.
Q When you were a driver did someone assign you a specific truck that you would be driving each day?
A Yes. They gave me one for me to drive

where I didn't need the CDL because it didn't have any -- any air brakes.

Q Do you recall that -- that vehicle having a specific vehicle number?

A Yes. The first one I had, we used to call it the Bumblebee because it was yellow, and then I drove the 731, but I don't remember the number that was -- for the Bumblebee.

Q Got you.

So you -- you mostly drove vehicle number 731, correct?

A Yes.

Q So I'm going back to Fuentes' 1, interrogatory number 18, the second sentence -- second sentence of the last paragraph, which I'm highlighting.

You state, Plaintiff also responds that he often left the job sites between approximately 2:30 p.m. and 3:30 p.m. after not being allowed to take any rest for meals during the course of the shift but that at other times the crew could be required to work longer hours.

That's your -- that's your response?

A Yes.

Q Anything you want to change about that

response?

A Okay. I mean, what the -- the -- the main issue that we used to have was either -- you know, the manhole was trying -- sometimes we were pulling that --

THE INTERPRETER: Okay. You know what it is? He's -- he's referring to the IDs.

A We were pulling the IDs, and sometimes they would get stuck as we were pulling them from the manhole, and that -- that would be the main issue, and it would take us longer to figure that out from the manhole, pulling it and getting stuck, so that's why sometimes we would take longer, and we would come after.

Q Okay. And it's your testimony that you were never given a meal break?

A No. We would work straight.

Q When would you eat?

A When we were going in the car.

Q So while you were driving you would eat?

A Yeah. But it was not like a full meal. It wasn't like a dish of food. It was something quick, like chips or something like that.

Q Okay. And you state that you often left the job site between approximately 2:30 and

3:30 p.m.
There were times where you would complete the project for the day earlier than that, correct?
A Yes, many times.
Q So there would be times where you would end even as early as 12:00 p.m., correct?
A Like around 1:00.
Q So typically you would end a day around 1:00 p.m.?
MR. PELTON: Objection.
A No. I mean, it didn't end at 1:00 because I still needed to bring the truck back. I needed to bring it to the yard, so it wasn't 1:00.
Q Okay. Got you.
But generally you would be done working on the -- the job site at around 1:00 p.m., correct?
MR. PELTON: Objection.
A No.
Q The time would largely vary; is that what you're saying?
MR. PELTON: Objection.
A Yes, of course. We would end around 2:00/2:30.
Q You previously testified you would end around 1:00 p.m.

MR. PELTON: Objection.
That's not what he testified to.
MR. GRIMMETT: Brent, then explain to me what he actually testified to. He said he would end at the job site at 1:00 p.m.
MR. PELTON: Like, I -- I think on one occasion or --
MR. GRIMMETT: He did not -- he did not say that, so -- if you're going to be trying to -- to help your client testify right now, we're not going to play that.
MR. PELTON: You can go back in the -- the transcript. That's not what he --
MR. GRIMMETT: He did not say on one occasion. Okay. You are allowed to voice your objection, but I'm allowed to ask my questions as well.
MR. PELTON: Yes. But don't try to trickily reword his -- his phrases where it's not what he said.
MR. GRIMMETT: I'm not the one -- I'm not the one doing that. That's what he testified to, and I'm allowed to ask questions about his testimony. You're the one that's now inserting yourself and -- with the speaking objection

and -- and trying to modify his testimony.

MR. PELTON: That's not true.

MR. GRIMMETT: Okay. Well, that's the way I see it.

A Can I have a break now?

Q Yeah.

(A recess was taken.)

Q Mr. Fuentes, just took a little break.

Did you speak to anyone during that break regarding the substance of your testimony? Just wait for the translation, please.

A No.

Q Okay. So I just want to clarify one thing. In your interrogatory response you testified that you would leave the job site between approximately 2:30 p.m. and 3:30 p.m.

There were times that you actually left the job site before 2:30 p.m., correct?

A It -- it would vary. I mean, I can't say with certainty that we would end at a certain time all the time because it all depended on the job that we were doing. If the job got complicated, you know, we would have to stay at 2:30 or a little past that. If not, we would be earlier, by 1:00, but it would vary. I can't say with certainty.

Q Okay. Thank you.

And then later in your response you say, Plaintiff responds that as a result of afternoon traffic he typically arrived at the Hempstead yard between approximately 4:30 p.m. and as late as approximately 5:30 p.m. to finish with his workday.

The time that you would get back to the yard would also vary depending on the job, correct?

A Correct.

Q And sometimes you would get back to the yard before 4:30 p.m., correct?

A Of course.

Q How often would you get back to the yard before 4:30 p.m.?

A Mr. Attorney, I want you to understand something. When -- the -- the jobs really vary. Let's say, for example, we were assigned to go to Brooklyn by First or Second Avenue, which is about two minutes away from the Verrazzano Bridge, we would be there for, let's say, about a month, so for a month we would arrive at a certain time, or then we were assigned to go to Jamaica, Queens. Then that would be another, different time that we were coming in, so it's not like a regular job that you would start at a certain time and end at a certain

time. It would depend on the type of job we had and the distance of the job.

Q Okay. Thank you for explaining that.

Okay. So I'm going to refer you to another document. I'm going mark this as Fuentes' 2. The bottom-right is Bates stamped DEF001237.

(Document Bates DEF001237 was marked as Fuentes' Exhibit No. 2 for identification, as of this date.)

A Let me see, I don't -- I can't find it. Where do you say, the right side?

Q Yeah. So I was just identifying that -- that in the bottom-right there's -- it's marked DEF001237, but I'm not going to have questions regarding -- regarding that.

A Okay.

Q Do you see the document, though?

A Yes. I see the document, but I don't see what you're referring to, but I do see the document.

Q Have you ever seen this document before?

A Yes. These are the paystubs. I would see them every time I would finish work.

Q So you received a paystub every week that you worked for Network, correct?

A Yes.

Q And this is the paystub for work that you performed between October 16th and October 22nd, 2023, correct?

A Yes, I see it, yes.

Q And if I go to where it says R-E-G time, is it fair to say that this paystub indicates that you worked -- you were compensated for 40 hours this week?

A Correct.

Q And if I go to the column that says, year-to-date, is it fair to say that you were paid 25 hours of overtime over the course of that year at that point?

A Yes.

Q And you're aware that Network maintained daily time sheets, correct?

A I mean, I never had to sign anything in order to start working per day there. I mean, maybe once or -- maybe ten times I had to sign something. Where I'm currently working I sign in every day.

Q Did you tell your foremen your start time?

A Yes. I mean, once we receive the text message and when we arrive with the truck he would automatically know.

Q So did you tell your foremen your end time?
A Yes.
Q So the foreman would keep track of your hours, correct?
MR. PELTON: Objection.
A He was the one who would report my hours.
Q So I'm going to show you a document. I'll mark it as Fuentes' 3. It's Bates stamped in the bottom, right corner DEF002423, and then there's a second page DEF002424.
(Document Bates DEF0002423 - DEF002424 was marked as Fuentes' Exhibit No. 3 for identification, as of this date.)
Q Mr. Fuentes, can you see this document?
A Yes.
Q Have you ever seen this document before?
A No.
Q Your foreman never showed you these documents before?
A No.
Q Did you ever complain to your foreman that he wasn't keeping track of certain time?
A I would ask him how come I wouldn't get paid as a driver, and he said, do you want to keep

driving -- do you want to keep your job or --
Q Who said that to you?
A The foremen.
Q Which specific foremen?
A Dougie was the one that said if I wanted to continue working, that I needed to continue driving; otherwise, I would find someone else.
Q And you drove a rotter truck, number 731, correct?
A Yes.
Q Referring to the first page, do you recall working on a project on 69th Avenue in Queens, New York?
A I don't know. I don't remember. We were always going to different sites, but I guess, yes.
Q And do you -- are you aware that Network maintains GPS records for each of its vehicles?
A Yes, I know.
Q Why do you no longer work for Network?
A Because work ended and they were just giving me work once in a while, so I -- I searched -- I looked for another job.
Q You -- you testified that you -- you stopped working at the end of 2023 or the beginning of 2024, correct?

A I believe it was in the beginning of 2024 because of -- I remember receiving tax things, so yes, I think it was the beginning of 2024.
Q Okay. But wouldn't -- wouldn't work pick back up after the winter months in 2024?
A Yes. But they didn't call me.
Q Okay. So you -- you resigned from your position in 2024?
MR. PELTON: Objection.
A I didn't resign. I mean, they -- they gave me layoff. They never called me back, so how can I resign.
Q Did they provide you with a reason that you were layed off?
A No. They would never tell you. They only say that the work was going to slow down, and they were going to lay you off, but they would never give you a reason.
Q Were there any other members of your crew that were layed off?
A Yes. We had to -- actually, we went through something with my crew regarding issues with the time as well, and at that time Mr. Pat was the one who helped me, and I'm always thankful to him because he was able to help me keep some -- keep the

job there.
Q What were the issues with the time?
A It wasn't my issue. It was with the foreman and the other driver, the truck driver.
Q What were they doing?
A Dougie would show up to -- to work very late, and we would start the work without him.
Q What about to her members of the crew; what were -- what were the issues with their time?
A Well, I'm guessing because we were all a team, a crew, we were all at fault.
Q But -- so it's your testimony that it was only Dougie that would show up to work -- work late?
MR. PELTON: Objection.
A No. I'm not saying -- I'm just saying that I -- that was one of the reasons why the crew was dissolved, you know, because they would find Dougie and the other driver, Tommy, at each other's -- one of their houses and -- while we were at the site working.
Q Would your foremen ever use his Network vehicle for a side business?
A I have no idea.
Q Would he arrive at the job site in his personal vehicle?

A Many times, yes.
Q And it's your understanding that the foreman and another member of the crew would stop at their house instead of going to the job site, correct?
A No, no, no, not like that, no. No, no, no it's not that they were together. So Dougie's issue was that he would come late to this job site and we would start work without him. Tommy was that he would leave the yard but would stop by his house to either grab something to eat or something instead of going to the job site -- straight to the job site.
Q So it was Tommy who was the one that would stop at -- stop at his house, correct?
A Yes.
Q Okay. Did you ever make any sort of similar stops?
A No.
Q Because you are testifying under perjury right now, and I'm going to be going into some GPS records.
Is it your testimony that you never stopped at your house or a restaurant or a parking lot at any point during the workday?
MR. PELTON: Objection.

A Okay. So let -- so tell this guy that if you want to start looking at the GPS records, you need to start looking at the cameras and see that I was following orders from someone else. I was following the orders and -- to stop somewhere and find parking and stop here before we go to the job site and find a park -- because it was hard to find a parking space, so you can check the cameras and find that there's records on the -- that was following orders from someone else.

Q Okay. So there were some times where you would in the morning before you get to the job site stop the -- stop the vehicle at a certain location before you had to get to the job site, correct?

A Yes, of course, and also had to stop to get gas as well.

Q But when you are done at the job site all you have to really do is go back to the yard; there's no stopping, correct?

MR. PELTON: Objection.

A It depends on what the foremen would tell me to do, and that's what I would do.

Q So there were occasions where you would stop after you were done at the job site?

A I wouldn't go to a certain place. It was

just mainly I was -- I was told by the foreman that I would need to start and either wait for the traffic to go down or wait for a certain time to -- for me to get back.

Q Why would he tell you to wait?

A Because sometimes we had to wait for the traffic because it was heavy traffic for it to go down, or sometimes he wanted us to wait to get things ready to put the -- or sometimes we needed just to save the spot for the next day, put something over the manhole to, kind of, save the spot for the next day, so we were able to find parking the next day.

Q And is it your understanding that Tommy Doyle was disciplined for stopping at his -- at his house?

A Yeah, I believe that's what he was disciplined, yes.

Q Okay. And does it make sense if he wasn't permitted to stop at his house, why would your foreman tell you to stop at some location instead of going directly back to the yard?

A I don't understand. Say it again?

Q Network had issues with Tommy stopping at his house instead of going directly to the job site,

correct?
A Correct.
Q So Network wanted its employees to go from the yard to the job site, from the job site back to the yard, correct?
A Correct.
Q How does it make sense for Network to pay somebody for waiting to drive from the job site back to the yard when the job is already completed?
MR. PELTON: Objection.
A Okay. So first of all, what Network doesn't know is that all the work that we put in to save these spots to help ourselves do our jobs better, we had to do all this job. Second of all, Tommy was basically a senior citizen. We couldn't really rely on him to help us do this job.
Q Okay. I don't think that answers my question, but I'm going to share a document with you.
A But if you have the GPS, why are you asking me? Just look tat GPS.
Q That's exactly what we're going to do.
MR. GRIMMETT: So this is Fuentes' -- I'm going to mark this as Fuentes' 4.
(Document Bates DEF023879 - DEF023915 was

marked as Fuentes' Exhibit No. 4 for identification, as of this date.)

Q It is -- I'm going to represent that this is the GPS records for a number 731 -- Network vehicle number 731 in the year of 2023. The first page is Bates stamped DEF023879. I'm going to go down to page 23908.

(A discussion was held off the record.)

Q Okay. So I previously showed you a time sheet from October 19, 2023.

Do you recall that, Mr. Fuentes?

A Yes.

Q Are you able to read the document that's in front of you?

A No.

Q Okay. Do you need me to zoom in?

A Okay.

Q Is that any better?

A Yes.

Q So on October 19th -- this is the first time the truck moves, at 6:17 a.m., from 125 Taft Avenue, Hempstead, New York.

Do you see that?

A That's correct.

Q And do you recall your time sheet said you

started at 6:00 a.m. that day?
A I don't remember. But I must have been there around 5:30, so yes.
Q Going down to the following page, the vehicle spends a majority of the day at 6083 Exeter Street in Forest Hills, New York.
A Correct, working.
Q That was -- that was job site?
A Okay. Excuse me. If you are going to show me the GPS records, I need you to also show me the work sheet of that day because the GPS should go along with the work sheet from that day because they usually have a map that shows the job sites for the day, so if we're going compare it, let's compare along with that too.
Q Well, I'm showing -- I'm showing you this. If you don't recall what the specific job site was that day, then that's fine.
A And -- okay. A question, I'm not going to be -- I'm not going to be able to answer any further questions if you don't show me the map or the work sheet for that day. It's not fair for you to show me these records from the GPS if you were not showing me what was the work site for that day. It's not fair for me to answer those questions.

Q Mr. Fuentes, this is your deposition, and you are going to have to answer my questions.

MR. GRIMMETT: Brent --

A Show me the work sheets. You have the work sheets for the job. You have the work sheets. Show them to me.

Q One, I am -- I didn't finish speaking. Two, there's a translator here, so you have to let the translator finish, and I'm going to need you to answer my questions. This is a deposition. You have to answer the questions fully.

MR. GRIMMETT: Brent, if you need to instruct your client as to anything, please feel free to do so.

MR. PELTON: Carlos, we can object, but I -- I'd ask you to do the best possible to -- to answer his questions to the extent that you are able to.

A I am going to answer the questions, but what I don't find it fair -- and you cannot accuse me on any -- any of the answers I'm going to give you according just to the GPS records because it is not fair for me to just see these records and not going along with the maps. The maps will show how far was the distance that I -- where I was stopped

or standing when I was around the date of the jobs, so it's not fair. You would need the comparison.

Q Okay. So my -- my next question, Mr. Fuentes, is, at approximately 12:16 it leaves this Exeter Street, Forest Hills, New York; do you see that?

A Yes.

Q It ends up, the vehicle ends up going to a 6119 190th Street, Fresh Meadows, New York at 12:55 p.m.

Do you see that?

A Yes.

Q You are familiar with Queens, correct?

A No.

Q You don't recognize that address?

A No.

Q Do you recall ever stopping at -- at a parking lot with a Hooters and a -- and a movie theater?

A Yes. I used to park there, yes. I used to park. It was the easiest place to park in order to wait for Dougie to tell me what to do.

Q Okay. But this is after you were at the job site. The only reason you would need to stop at a parking lot with a Hooters or a movie theater was

to go in?

MR. PELTON: Objection.

A No. Because at that place there was a Kohl's. There was also an ice cream shop. There was also a protein shop. Why does it have to be for Hooters?

Q Did you ever get out of your vehicle and go to any of these locations when you parked there?

A I would always go in there.

Q You would go in where?

A I always stayed in the car.

Q So you -- the -- the vehicle -- on the next line, the vehicle left this address at 2:38 p.m., so you stayed in the vehicle for over an hour and a half?

A Yes.

Q And it's your testimony that this -- this was to -- at the instruction of your foreman, to wait in a parking lot for an hour and a half?

A I was waiting for him to tell me what to do. I couldn't decide on my own.

Q Why -- why did you -- why did you have to wait on that specific day?

A Ask Dougie.

Q Okay. Traffic isn't bad around 1:00 p.m.,

right?

A Yes, it's bad.

Q When is traffic usually the worst?

A Always, New York, always.

Q All right. Doesn't it usually get worse around when people start getting off from work?

A And schools and restaurants, from everywhere.

Q Okay. So around 2:30/3:30 is when it really starts getting bad, right?

A From one o'clock it's full on that side.

Q In this situation you waited in a parking lot until traffic actually got worse, correct?

A No. I was waiting for Dougie to tell me that I can leave.

Q Why did you leave at 238?

A They were orders from Dougie. I was awaiting for Dougie's orders. I don't have a decision to make.

Q Okay. Why did Dougie tell you you had to stop?

A Because he was for -- seeing a job. He was looking at a job.

MR. GRIMMETT: He was what?

THE INTERPRETER: He was looking at a job.

Q What job?
A He was trying to see if we were able to place cones to save some spots.
Q Back at the job site?
A Okay. This is the thing. This is what -- because you don't understand the job, and you don't have the map, so I can't show you what -- what we're referring to, so when you look at the map there's different manholes around the job site, so we had to determine which manholes we were going to be working at and which areas we were going to find these parking spots in order for us to work, so usually in the afternoons what we would do is go and seek parking spots that we can save for the next date for us to work, but because of that day I had -- I was driving a truck I couldn't easily move around because, otherwise, I was going to block traffic, so the easiest thing for me to do was to wait at a parking lot while they were looking for parking -- saving parking spots.
Q By Dougie was the one that was saving these parking spots, correct?
A Dougie was the one who was saving the spots. Then once he found the spot he would tell me to come and give him the supplies, like the cones

and everything he needed to save the spots. He was waiting for cars to move, so he can save these spots.

Q But you didn't actually go back and do that; did you?

A Because I was waiting for him to call me. So the car never moved, and we couldn't do anything.

Q You went directly back to the yard from this parking lot, correct?

A Correct.

Q And if I looked at, maybe, the seven other examples where you stopped in this parking lot for an extended period of time, you went directly from that parking lot back to the yard, correct?

A Yes.

Q You never went back and put cones down for Dougie, correct?

A Like I said -- and I'm repeating again -- if we were able to save them, we did. If not, then he would just call and say, you know what, just leave.

Q Okay. But you never physically drove back to where Dougie was when you were stopped in this parking lot, correct?

A Maybe two to three times it worked, maybe

the other times it didn't.

Q And if I looked back at the GPS records, I would see the times where you actually drove from the parking lot back to these locations that Dougie found?

A With pleasure, it would be my pleasure. If you can find them, find them and compare them to the maps. I need to use the bathroom. I need a quick break, please.

Q We could -- we could take five minutes.

(A discussion was held off the record.)

(A recess was taken.)

Q Mr. Fuentes, we just took a brief break.

Did you talk to anyone about your testimony?

A No.

Q So before the break we were discussing when you would stop at this -- this parking lot.

Was there ever a circumstance where you drove back from the parking lot to a job site or location near the job site to reserve parking?

A No. Because sometimes it would be too late, or Dougie would get there, or someone else would bring the cones for Dougie.

Q So never really was a purpose for you to

wait in this parking lot then, correct?
A Of course there was a purpose, which was to save a spot, parking spots, for the following day.
Q But you never actually assisted with saving the parking spot; all you did was wait in this parking lot, correct?
A So, I mean, I was the one who had the cones or the hole toppers, and sometimes what they would do, is Marlin would come, and he would come and help me or grab the hole toppers or the cones and bring them to Dougie, where Dougie would come.
Q I want to make sure this is clear, so they would -- they would come to you at that parking lot to grab the cones?
A Yes. When we were working in that -- the area, the area, they would come or find the best way for me not to have to move the truck so much, so I wouldn't have to cause any traffic.
Q Okay. So they would -- you would have to wait in this parking lot to see if you could reserve parking for next day, correct?
A Yes.
Q And then somebody would come and meet you at that parking lot to get the cones?

A Yes.
Q And then they would take those back to the cones that the parking -- that -- to the spots that Dougie found?
A Correct.
Q Why would you not just give them the cones when you were all together at the job site?
A Because sometimes we were not working close to each other. When we were pulling the IDs were at different sites, different places, and sometimes Dougie had his personal car, and he didn't have space to place the cones in his car.
Q How many cones -- how many cones did you keep on the truck -- on your vehicle?
A I'm going to give you an estimate because I'm not sure, but it would be about 25 to 35 cones.
Q And what type of vehicle did Dougie drive?
A A jeep.
Q You were paid for the entire time that you were waiting in that parking lot, correct?
A Correct.
Q Didn't you have a discussion with Patrick Clarke about the issues with Tommy Doyle and your foreman, Dougie?
A No, never.

Q Didn't -- was there ever a circumstance where you had a conversation with Mr. Clarke about the possibility that you would be terminated?
A Yes, when he called me. When it happened he called me.
Q When what happened?
A When the situation with the crew occurred he called me and he said that, you know, he knew the type of work and he knew that I wasn't supposed to be there, and I'm always going to be thankful to him for what he did and for letting me have a job, and he knew the type of work I did.
Q Did Mr. Clarke tell you that it was inappropriate for you to make these type of stops?
A Well, when we spoke -- I mean, we were speaking in general, and we agreed that I had to tell him and let someone in the company know what was happening.
Q So you were the one that reported Mr. Doyle and Dougie's conduct?
A No.
Q Okay. So the conversation you had with Mr. Clarke; isn't it true that he expressed to you that it was inappropriate to make these type of stops at the parking lot?

A Yes -- in general, yes, he did mention that, but it was in general. He said that it was not correct for me to do that.

Q Okay. So you understand now why it would be inappropriate to wait in a parking lot for about an hour and a half after you were done at the job site?

A Well, yes, probably. But, I mean, I was just following orders. I'm a subordinate. I had someone above me to follow orders from. I was just following orders.

Q Okay. And if I -- if I had a deposition with Dougie, he would say that he gave you these orders?

A Well, that's what he used to tell me, so yes.

Q Okay. So you were a member of Local 731, correct?

A Yes.

Q And Local 731 had a collective bargaining agreement with Network, correct?

A Yes.

MR. GRIMMETT: I'm going to mark this as Fuentes' 5. The first page is DEF000127, last page DEF000164.

(Document Bates DEF000127 - DEF000164 was marked as Fuentes' Exhibit No. 5 for identification, as of this date.)

Q And, Mr. Fuentes, can you see the document?

A Yes, sir.

Q Are you familiar with this document?

A No.

Q Have you ever seen this document before?

A No, sir.

Q But you are aware that Local 731 has a collective bargaining agreement with Network, correct?

A Yes.

Q And that agreement was in effect during your employment with Network, correct?

MR. PELTON: Objection.

A Yes.

Q And you're familiar with the rules and requirements of -- of this collective bargaining agreement, correct?

A The 731 rules?

Q Yeah.

A No.

Q So you had a -- a -- you were a member of

the Local 731, and based on Local 731's agreement with Network there were certain terms and conditions of your employment.

Are you aware of that?

A I just know that I have to pay my book, the services, the PPE -- that's all I know.

Q Was it -- are you aware of any terms and conditions related to the hours you worked or how you were paid?

A Well, I knew the amount of money they were paying me; I knew that.

Q Did you ever receive training through your union?

A Not when I was with Network, but -- I mean, currently I'm receiving, where I am right now, but not with them.

Q Did you attend safety meetings while you were employed by Network?

A Yes.

Q How many safety meetings did you attend?

A I would say maybe -- at the time maybe seven that I missed, but besides that all of them.

Q And you were required to sign a sign-in sheet whenever you attended a safety meeting?

A Yes, many times, always -- I mean,

sometimes we would just sign real quick, but we always had a sheet to sign in.
Q So every time that you attended a safety meeting you signed in; is that fair to say?
A I would -- I was always present, but, I mean, I do have to say there were times that I forgot to sign because I had to go somewhere; I was in a rush -- but many times I did sign.
Q So you testified that you missed approximately seven safety meetings, correct?
A Yes. Because I was working. I mean, when I missed a safety meeting when I was working, I mean, that doesn't count, right?
Q Okay. You were never disciplined for missing a safety meeting, correct?
A Well, they were mandatory.
Q Okay. But my question is, when you missed a safety meeting were you ever disciplined?
A No.
Q Did you provide advanced notice that you weren't going to make a safety meeting?
A No. We used to tell the foreman.
Q Okay. If these meetings were mandatory, why were you able to miss seven meetings?
A Honestly, I don't remember. I know it was

in the beginning. Maybe I went to work. I don't remember.

Q Do you recall a coworker ever being instructed that he couldn't work a day when he missed a safety meeting?

A Well, I can speak for the -- the yard -- the Hempstead yard because that's where I was working. I can't speak for the Bronx yard, but it never happened at the Hempstead yard.

Q Okay. So you are not aware of any other coworkers being disciplined for missing a safety meeting; is that -- is that fair to say?

THE INTERPRETER: You said, you are not aware?

Q You are not aware of any other coworkers being disciplined for missing a safety meeting; is that fair to say?

A Yes, that's correct. I don't know; the truth is I don't know.

Q Did you ever receive -- did Network ever conduct a safety meeting while you were on the job site?

A Yes. For some time they changed it to that method, yes.

Q When were the -- when did Network do that?

A I want to apologize in advance to you, Mr. Attorney, because I'm very bad with dates, and I don't have a good memory when it comes to dates, but I can give you an estimate that maybe it started happening six months before I start -- I stop working there.

Q Okay. If you missed a safety meeting, did Network do anything to make -- make it up to you?

A No.

Q They wouldn't let you know what was discussed at the safety meeting while at the job site?

A I mean, sometimes Sonny would come, because he was the one, and explain to you what -- what happened.

Q If you missed -- if you missed the safety meeting, would there be a Zoom circulated to -- to fill you in on what was discussed?

A No, no. I mean, there was -- there was a time where they started having the meetings on Zoom, but never to -- to, kind of, recover, no.

Q What time were the meetings on Zoom held?

A I -- it old depended. It would be sometimes before we started work or maybe while we were working and we had to stop and attend the

meeting, could be either 7:00, 7:15, 7:30.
Q Is that the case for all safety meetings or just the Zoom safety meetings?
A No, only the ones that were held on Zoom.
Q Some of your coworkers were members of different unions, correct?
A Yes.
Q Do you know the -- the different unions that they were members of?
A I just remember one. I believe it was 1010, and then the others, I believe they were the Bronx, something -- Local 15.
Q Who does Local 1010 represent?
A I don't know, I don't know who they were.
Q Who does Local 15 represent?
A I just know they are the ones operating the excavators, but I don't know who they represent.
Q Okay. Are you aware of a Local 60?
A Yes. I don't know anyone.
Q Are you aware of Local 98?
A Yes.
Q Are you aware of Local 14?
A No.
Q Are you aware of Local 1536?
A No.

Q So all of these employees were members of different -- different unions.
Are you aware that each of these employees had different rules that came from their union's collective bargaining agreement?
A No, I didn't know.
Q Are the terms and conditions of each employee different based on the union that they are a member of?
MR. PELTON: Objection.
A I'm -- I'm imagining that, but because I belong to 731 I don't know how the other ones worked.
Q So you're only aware of the Local 731 rules then, correct?
A The only thing I'm aware of is pay time and overtime. I don't know if there's anything else I need to know regarding 731.
MR. GRIMMETT: Can you just give me a few minutes?
(A discussion was held off the record.)
(A recess was taken.)
MR. GRIMMETT: Okay. I don't have any further questions.
MR. PELTON: I just have a few follow-up

questions.

EXAMINATION BY

MR. PELTON:

Q Mr. Fuentes, Mr. Grimmett just asked you whether you knew the terms and conditions of -- of all the other unions.

Do you remember that?

A Yes.

Q And do you know what's contained in your own CBA agreement, collective bargaining agreement?

A No.

Q And, similarly, you don't know what is necessarily in the other collective bargaining agreements, right?

A No.

Q Okay. Would it be fair to say that all of the Network Infrastructure field employees, the -- the laborers, the foremen, the equipment operators, none of them were able to punch in and punch out at the start of their day; were they?

MR. GRIMMETT: Objection.

A Yes, that's correct.

Q You -- you testified that there was a box that you would get keys out of at the office.

A Yes.

Q Was there a time clock next to that box?
A No.
Q Do you know if any of the other trades were able to clock in and clock out?
A No, I don't know.
Q If Network Infrastructure wanted to accurately report your -- record your time, couldn't they have installed a time clock at the -- at -- at the white box?
MR. GRIMMETT: Objection.
A Yes, they could.
Q And -- but the time -- the time was not kept that way; the -- Network Infrastructure employees were typically paid based on an eight-hour day, correct?
A Yes.
Q And many types you worked more than eight hours per day, correct?
MR. GRIMMETT: Objection.
A Yes.
Q And it wasn't just you.
Did other people work more eight hours per day as well?
MR. GRIMMETT: Objection.
A Yes, of course.

Q And did the people who worked as backhoe operators oftentimes work more than eight hours in a day?
MR. GRIMMETT: Objection.
A Which ones? I'm sorry.
Q Backhoe operators, excavator operators.
A I can't say for sure because I didn't work in the gas section.
Q Okay. But foremen and -- would it be fair that foremen oftentimes worked more than eight hours in a day?
MR. GRIMMETT: Okay.
A Yes.
Q And were you the only person that -- who had to report early for the safety meetings?
A No. It was a group of us.
Q Was it essentially all of the Network Infrastructure employees?
A Yes. But only the ones who work on the phone department because there was a phone department and a gas department in Hempstead, so it was only the ones that work in the phone department.
Q And the gas department would have their own separate meetings; is that correct?
MR. GRIMMETT: Objection.

A Yes.
Q And is it your understanding that none of the employees were paid for that time?
MR. GRIMMETT: Objection.
A No.
Q What did you do when you first arrived at the yard?
A I arrived to either clean the truck or to clean the IDs. It -- different things.
Q Did you ever perform work at the yard before turning the vehicle on?
A Clean it, put whatever I had to put in the trash, turn it on, and place it outside to get it ready for what we needed to do.
Q Were you oftentimes the person who would move the truck from inside the yard to outside the yard?
A Various of us, we were many of us who used to do that.
Q When you arrived was the truck typically inside the yard, or was it sitting outside the yard?
MR. GRIMMETT: Objection.
A Many times, the majority of the times, we were the ones who were the ones who would take it out.

Q And what all would you do before leaving to go out to the job site?

MR. GRIMMETT: Objection.

A It was different. It would vary depending on the job. If we were working with IDs, then we had the change the reel. If we were working with the fiber, then we had to place the wheels, the lubricant, the cables. It was all depending.

Q And how long would you typically stay at the yard before leaving to the job site?

MR. GRIMMETT: Objection.

A Forty-five minutes, half an hour. It all depended on what we were carrying.

Q And then how long would it typically take for you to drive out to the job site?

A Like I told the other attorney, it was all depending where we were being sent to work. It could be from an hour and a half to two hours. It all depended on the job.

Q Sometimes as low as half an hour?

A Forty-five minutes to an hour when -- when it was Queens, yes, yes.

Q Do you recall Mr. Grimmett asking you how long you would arrive at the yard before your shift?

A Yes, I remember.

Q And you recall -- and you testified 30 to 45 minutes?
A Yes.
Q Was that 30 to 45 minutes the time that you would spend at the yard before driving to the job site?
A Yes.
Q And was it just you in the yard, or were there other people as well who would show up early in the yard?
A Yes, more people.
Q And they may be members of 1010 or 15 or one of the other unions?
A Yes.
Q But they, similarly, were not paid for all hours worked?
MR. GRIMMETT: Objection.
A Yes.
Q Did your foreman actually ask you what time you arrived at the yard and what time you left at the yard each day, or did he just put in eight hours unless there was overtime at the job site?
MR. GRIMMETT: Objection.
A He would only do the 40 hours a week.
Q And would it be fair to say that everybody

knew that you'd only be paid the eight hours per day unless there was overtime approved on the job site?

A Yes, that's correct.

Q And that applied to the various different classifications of -- of workers --

MR. GRIMMETT: Objection.

Q -- right?

A Yes.

Q I believe you testified that you were able to get into the office with a key card, correct?

A Yes.

Q Was that, kind of, like a hotel key card that you used?

A So there were two types. There was one that looked like a card, and there was another one that -- it's like a key chain, but it's like a small metal that you would scan.

Q Okay. And it's -- what did you scan exactly with it -- or -- like, how would you scan the door?

A I mean, there was something on the door where you would just place it, and it would -- it would scan automatically. I don't know what it's called, but it's the new things that doors have now.

Q Okay. Do you know if there was a software

system that recorded every person who scanned in?
A No, I don't know.
Q There was never a time where you had to go back and -- to say, yes, I worked that day, check the door scan, or anything of that --
A No, never.
Q Okay. And you testified that you initially worked as a non-driving laborer, correct?
A Yes, that's correct.
Q And during the time period that you worked for Network but you were not assigned to -- to work as a -- as a driver did you have the option to just report to the job site?
MR. GRIMMETT: Objection.
A No. I always -- no. I always reported to work.
Q Where do you mean -- where did you report?
A I would ride to the yard, the yard.
Q Why did you go to the yard as opposed to the job site?
A Because we would help to place all the material, to load -- to load all the material before leaving.
Q Was there anything that you would scan when you first arrived at the yard during that time

period?

A No.

Q And was it just you, or did other non-driving laborers and other manual workers also report to the yard to help load tools and materials?

MR. GRIMMETT: Objection.

A We were many.

Q How -- how many people would -- would show up to the yard early?

MR. GRIMMETT: Objection.

A From 12 to 14 people.

Q And was that just your group, or did that include the gas group as well?

A No. It was only the phone -- well, the gas people too, but they usually arrived earlier, so they would take care of things earlier.

Q Okay. So not including the gas people, how many people with the tele-data would typically show up at the yard?

MR. GRIMMETT: Objection.

A Yes, about 14 people.

Q Okay. And that's at the Hempstead yard?

A Yes.

Q Was there a rule as to what time your truck typically had to leave the yard?

MR. GRIMMETT: Objection.

A No, whenever it was ready. It could be between 6:00 in the morning, 6:30.

Q And was there a rule as to your truck is not allowed to get back to the yard before a certain time?

MR. GRIMMETT: Objection.

A Yes. We had to arrive around 2:30/3:00. That was the rule.

Q Do you know who -- who told you those rules?

A When I started I believe it was Geo Cardillo (phonetic).

Q Okay. Who -- who -- who is Geo Cardillo?

A He was the supervisor of the phone department.

Q Okay. I have no further questions. Thank you so much for your time, Carlos.

A So it's done?

Q We'll see if Mr. Grimmett has any follow-up.

MR. GRIMMETT: No, nothing here. I appreciate your time, Mr. Fuentes.

(A discussion was held off the record.)

THE COURT REPORTER: Mr. Pelton, do you

want a copy of the transcript?

MR. PELTON: I think that we're sharing. Thank you.

(2:17 p.m.)

W I T N E S S   C E R T I F I C A T I O N

I have read the foregoing transcript of my testimony and find it to be true and accurate to the best of my knowledge and belief.

______________________

Carlos Fuentes

Subscribed and sworn to before me
this _____ day of _________, 2026

NOTARY PUBLIC

C E R T I F I C A T E

I, Brittany E. Bosak, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of March 2026.



Brittany E. Bosak

ERRATA SHEET
Priority-One Court Reporting/Veritext
718-983-1234
ASSIGNMENT NO. P1-7937847
CASE NAME: Calderon , Manuel Angel v. Network Infrastructure, INC. And Patrick Clarke
DATE OF DEPOSITION: 3/9/2026
WITNESS' NAME: Carlos Fuentes

PAGE/LINE(S)/ CHANGE REASON
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________

___________________________
Carlos Fuentes

SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF_______________, 20__.

_______________________
NOTARY PUBLIC
MY COMMISSION EXPIRES__________________

**0**

**05442** 1:12

**1**

**1** 3:8 37:13 51:13
**10006** 2:3
**1010** 85:11,13 92:12
**10978** 99:20
**10:16** 1:16
**110** 5:14 10:18
**111** 2:3
**11520** 5:15
**11797** 2:7
**12** 95:11
**125** 67:22
**12:00** 53:6
**12:16** 70:4
**12:55** 70:10
**135** 2:7
**14** 85:22 95:11 95:21
**15** 85:12,15 92:12
**1503** 2:3
**1536** 85:24
**16th** 58:3
**17** 36:23 38:19
**18** 51:14
**19** 67:10
**190th** 70:9
**1982** 23:16
**19th** 67:20
**1:00** 53:7,9,11 53:13,16,25 54:5 55:24 71:25
**1b** 5:14 10:18

**2**

**2** 3:10 57:6,9
**20** 20:1,3 100:22
**2001** 45:24
**2006** 20:1,4
**201** 2:7
**2018** 26:24 28:6,8,10 46:8
**2019** 27:20 28:5,6
**2023** 27:24 28:1 58:4 60:24 67:5,10
**2024** 27:18,21 27:23 28:1 60:25 61:1,3,5 61:8
**2026** 1:16 98:13 99:16
**22nd** 58:4
**238** 72:16
**23908** 67:7
**23rd** 26:24 27:20 28:8 46:7
**24** 1:12 10:12 27:18,18
**24th** 46:7
**25** 58:13 77:16
**25th** 46:8,8
**27** 23:16
**2:00/2:30** 53:23
**2:17** 97:5
**2:30** 51:19 52:25 55:16,18 55:23
**2:30/3:00** 96:8
**2:30/3:30** 72:9
**2:38** 71:14

**3**

**3** 3:11 59:9,13
**3/9/2026** 100:3
**30** 42:11,12 50:10 92:1,4
**35** 77:16
**37** 3:9
**3:00** 42:4
**3:30** 51:19 53:1 55:16

**4**

**4** 3:13 66:24 67:1
**40** 58:8 92:24
**45** 43:4 92:2,4
**48** 10:10
**4:30** 56:5,11,14

**5**

**5** 3:3,15 79:24 80:2
**57** 3:10
**59** 3:12
**5:00/5:30** 32:7
**5:30** 31:20 35:23 56:6 68:3

**6**

**60** 85:18
**600,000** 15:3
**6083** 68:6
**6119** 70:9
**66** 3:14
**69th** 60:12
**6:00** 68:1 96:3
**6:17** 67:21
**6:30** 31:21,21 36:3 96:3

**7**

**718-983-1234** 100:2
**731** 9:4,6,13,15 9:21 51:7,11 60:8 67:4,5 79:17,20 80:11 80:22 81:1 86:12,14,18
**731's** 81:1
**7937847** 1:25

**7:00** 31:21 32:6 35:19,25 85:1
**7:15** 85:1
**7:30** 39:4 85:1

**8**

**80** 3:16
**8323** 24:10
**87** 3:4
**8:00** 39:4,13,24 40:5

**9**

**98** 85:20
**9:00** 40:8
**9th** 1:16 99:16

**a**

**a.m.** 1:16 35:19 35:25 36:3 39:4,4,13,24 40:5,8 42:4 67:21 68:1
**ability** 5:5 10:5
**able** 6:14 7:2 12:1,5 14:3,5,6 20:13 37:23 39:16 61:25 65:12 67:13 68:20 69:18 73:2 74:19 82:24 87:19 88:4 93:9
**above** 1:21 38:8 79:10
**absolutely** 14:11
**access** 34:10,12
**accident** 13:18 14:19
**accurate** 27:21 28:2 98:5
**accurately** 88:7
**accuse** 69:20
**action** 13:22 14:18 16:21 17:2 21:9,10 21:13,23 22:2 22:3,6,12,13,22 99:12
**actual** 10:24
**actually** 22:14 29:19,21 32:19 41:4 54:4 55:17 61:21 72:13 74:4 75:3 76:5 92:19
**address** 5:12 23:22 24:2,8 24:12,16 70:15 71:13
**advance** 84:1
**advanced** 22:8 82:20
**afternoon** 56:3
**afternoons** 73:13
**agency** 17:9
**ago** 13:16 17:16 20:1,3 36:24
**agreed** 4:2,7,10 78:16
**agreement** 79:21 80:12,15 80:21 81:1 86:5 87:10,10
**agreements** 87:14
**ahead** 14:9 22:10 42:16
**air** 51:2
**airport** 26:13 26:17,18
**alc** 1:12
**alcohol** 10:12
**alleged** 38:21
**allegedly** 22:17
**allowed** 14:12 51:19 54:15,16 54:23 96:5
**america** 9:8
**amount** 81:10
**amusing** 16:3,6
**angel** 1:3 100:3
**answer** 8:4 13:23,25 14:8 14:9 22:10 35:21 68:20,25 69:2,10,11,17 69:19
**answered** 8:16 8:23
**answering** 6:1
**answers** 5:4 10:2 66:17 69:21
**anybody** 34:3
**apartment** 5:14 10:18,20 11:1 11:3,12,14 23:17
**apologize** 84:1
**applied** 93:4
**appointments** 48:11
**appreciate** 96:23
**approved** 93:2
**approximately** 27:20 39:3 40:8 43:1 47:15 51:18 52:25 55:16 56:5,6 70:4 82:10
**apps** 12:24
**area** 76:17,17
**areas** 73:11
**arrested** 19:25
**arrive** 31:20,21 39:15 40:5 56:21 58:24 62:24 91:24 96:8

**arrived** 35:22 36:4 40:11 42:21 56:4 90:6,8,20 92:20 94:25 95:15
**aside** 15:10
**asked** 6:22 7:9 8:16,23 12:2 87:4
**asking** 5:25 7:22 12:8,9,11 16:5,8 19:3 66:21 91:23
**assign** 50:22
**assigned** 39:3 56:17,22 94:11
**assignment** 100:2
**assist** 27:6
**assisted** 76:5
**assume** 8:11
**assuming** 16:13
**attempting** 7:19
**attend** 18:3 19:14 81:17,20 84:25
**attended** 81:24 82:3
**attorney** 8:13 56:15 84:2 91:16
**attorneys** 15:10 15:20
**automatically** 58:25 93:23
**avenue** 5:14 10:18 56:18 60:12 67:22
**awaiting** 72:18
**aware** 21:1,9 21:17 31:7 58:16 60:16 80:11 81:4,7 83:10,14,15 85:18,20,22,24 86:3,14,16

**b**

**b** 5:1 24:24,24
**back** 7:3 14:10 51:13 53:12 54:12 56:7,10 56:13 61:5,11 64:18 65:4,22 66:4,8 73:4 74:4,8,14,16,22 75:2,4,20 77:2 94:4 96:5
**backhoe** 89:1,6
**bad** 24:9 71:25 72:2,10 84:2
**bargaining** 79:20 80:12,20 86:5 87:10,13
**barracks** 29:23
**based** 35:8 39:8 81:1 86:8 88:14
**basically** 30:10 31:22 66:15
**bates** 3:10,11 3:13,15 57:6,8 59:9,12 66:25 67:6 80:1
**bathroom** 75:8
**bedroom** 11:7
**beginning** 27:17,18,21,23 28:1 60:24 61:1,3 83:1
**behalf** 1:3
**belief** 38:14 98:6
**believe** 24:10 27:17 38:12 61:1 65:17 85:10,11 93:9 96:12
**belinda** 2:14 14:11
**belong** 9:13 86:12
**benefits** 17:24 18:2,4 19:3,6,8 19:10,13
**best** 5:4 38:13 69:16 76:17 98:6
**better** 6:17 7:1 66:14 67:18
**big** 23:11,13,14 47:4,9
**birth** 23:15
**block** 73:17
**blood** 99:12
**bomb** 24:21,24 24:25 25:3
**bonilla** 27:10 27:11,13 46:24
**book** 81:5
**bosak** 1:22 99:4 99:21
**bottom** 57:6,14 59:10
**box** 33:16,19 33:24,25 34:5 34:6 47:6 87:23 88:1,9
**brakes** 51:2
**break** 7:9 8:18 8:21 28:13 34:19,25 35:1 35:4 52:16 55:5,8,9 75:9 75:13,17
**breaks** 28:4,11
**brent** 2:4 3:4 50:4 54:3 69:3 69:12
**bridge** 56:19
**brief** 75:13

**bring** 13:21 14:18 41:24 42:10 53:12,13 75:24 76:12
**brittany** 1:21 99:4,21
**broad** 14:4
**broadway** 2:3
**bronx** 43:11,12 83:8 85:12
**brooklyn** 5:14 10:18 44:14 56:18
**brothers** 24:21 24:24 25:1,4
**brought** 17:2 21:10
**building** 9:5 34:7,8,9,10,12 35:6,9
**bumblebee** 51:6,8
**business** 62:22
**busy** 33:11

**c**

**c** 2:1 5:1,1,6 25:24 98:1,1 99:2,2
**cable** 30:21
**cables** 46:11,18 91:8
**calderon** 1:3 100:3
**call** 9:21 10:22 23:9 28:15,17 30:11 51:5 61:6 74:6,20
**called** 23:10 30:10 61:11 78:4,5,8 93:24
**cameras** 64:3,8
**car** 13:18 14:19 43:7 52:19 71:11 74:7 77:11,12
**card** 33:17 34:10,11,13 35:5 93:10,12 93:15
**cardillo** 96:13 96:14
**care** 95:16
**carlos** 1:18 3:3 3:4 5:11 14:11 23:2,4,11 37:16 38:9,11 45:4,6 47:23 69:15 96:18 98:10 100:4,20
**carry** 46:2
**carrying** 91:13
**cars** 31:16,23 33:18,22 34:8 39:16 74:2
**case** 1:12 13:17 14:22 16:17 85:2 100:3
**cause** 76:19
**cba** 87:10
**cdl** 51:1
**certain** 31:17 42:1 55:20 56:21,25,25 59:23 64:13,25 65:3 81:2 96:5
**certainty** 55:20 55:25
**certification** 4:4
**certify** 99:6,11
**chain** 93:16
**change** 48:12 51:25 91:6 100:5
**changed** 83:23
**check** 64:8 94:4
**checked** 48:5
**chips** 52:23
**choppy** 6:13
**cigar** 48:23
**circulated** 84:17
**circumstance** 47:24 75:19 78:1
**citizen** 66:15
**city** 9:10
**civil** 1:20
**claim** 17:12,15 17:24 18:12
**claims** 17:11 18:10,14,24
**clarify** 55:13
**clarke** 1:9 2:13 5:21,22 9:1 77:23 78:2,13 78:23 100:3
**class** 21:10,23 22:2,3,6,12,21
**classifications** 93:5
**clean** 90:8,9,12
**clear** 19:2 76:13
**client** 54:10 69:13
**clock** 88:1,4,4,8
**close** 12:18 77:9
**closed** 11:16 12:24
**closer** 44:10
**collect** 17:23
**collected** 19:3,6 19:8
**collecting** 19:13
**collective** 21:10 21:13 22:6,13 22:22 79:20 80:12,20 86:5 87:10,13
**collectively** 9:2

**column** 58:11
**come** 31:22 43:20 44:9 52:14 59:24 63:8 73:25 76:10,10,12,14 76:17,24 84:13
**comes** 84:3
**coming** 56:24
**commercial** 47:12
**commission** 17:7,8 100:25
**common** 9:5
**communicated** 15:21
**communication** 14:12
**companies** 18:20,25 19:4 25:21
**company** 17:19 19:5,5 25:14 78:17
**compare** 68:14 68:14 75:7
**comparison** 70:2
**compensated** 58:8
**complain** 59:22
**complainant** 16:22
**complaints** 17:5 18:14,14
**complete** 7:23 53:2
**completed** 66:9
**completely** 27:22
**complicated** 55:22
**concrete** 9:5
**conditions** 81:2 81:8 86:7 87:5
**conduct** 78:20 83:21
**cones** 73:3,25 74:16 75:24 76:9,11,15,25 77:3,6,12,13,13 77:16
**connected** 6:10 6:11,16 12:17
**connection** 6:8 6:15 7:9
**consequences** 20:6,11
**considered** 10:25
**consumed** 10:12
**contained** 87:9
**continue** 60:6,6
**contract** 26:12 26:16 30:15
**contrary** 18:5
**convenient** 49:25 50:6,9 50:11
**conversation** 78:2,22
**convicted** 20:2
**convictions** 19:17,22
**copy** 97:1
**corner** 59:10
**correct** 7:14 8:6 9:12 10:21 11:1 12:12 13:3,4 22:2 24:16 29:15 30:6,13,24 31:18 32:25 35:6,10,15,19 38:6,17 39:7,9 39:11,13,24 40:8,20,21 41:5,11,16,22 42:14,20 43:2 43:19,24 44:2 44:7,24 45:19 46:14,20,21 48:16 49:12,17 50:8,19 51:11 53:3,6,16 55:18 56:8,9 56:11 57:25 58:4,10,17 59:5 60:9,25 63:5,14 64:14 64:19 66:1,2,5 66:6 67:24 68:7 70:13 72:13 73:22 74:9,10,14,17 74:24 76:1,7 76:22 77:5,20 77:21 79:3,18 79:21 80:13,16 80:21 82:10,15 83:18 85:6 86:15 87:22 88:15,18 89:24 93:3,10 94:8,9
**counsel** 4:4 44:22
**count** 82:13
**county** 14:20
**course** 19:6 20:14 38:20 41:23,25 46:7 50:14 51:20 53:22 56:12 58:13 64:15 76:2 88:25
**court** 1:1 4:13 5:9 7:19 8:3 96:25 100:1
**courtesy** 7:25
**cousins** 27:12 27:12
**coworker** 83:3

**coworkers** 31:1 43:18 83:11,15 85:5
**cream** 71:4
**crew** 51:21 61:19,22 62:8 62:11,16 63:3 78:7
**crossways** 2:7
**current** 5:12 6:14
**currently** 10:4 11:5 12:23 15:14 24:18 58:21 81:15
**cut** 20:8
**cv** 1:12

**d**

**d** 3:1 4:1
**daily** 58:17
**data** 95:18
**date** 23:15 37:14 57:10 58:12 59:14 67:2 70:1 73:14 80:3 100:3
**dates** 84:2,3
**day** 32:1,12 35:6,9 36:7 39:3,6,9 43:8 43:11,15 50:24 53:3,8 58:19 58:21 65:10,12 65:13 68:1,5 68:11,12,14,18 68:22,24 71:23 73:15 76:4,22 83:4 87:20 88:15,18,23 89:3,11 92:21 93:1 94:4 98:13 99:16 100:22
**days** 30:3,4 39:20
**dealt** 22:17
**december** 28:13,14,20
**decide** 71:21
**decision** 72:19
**declare** 38:9
**def000127** 3:16 79:24 80:1
**def000164** 3:16 79:25 80:1
**def0002423** 3:12 59:12
**def001237** 3:10 57:7,8,15
**def002423** 59:10
**def002424** 3:12 59:11,12
**def023879** 3:14 66:25 67:6
**def023915** 3:14 66:25
**defendant** 16:24
**defendants** 1:11,19 2:6 8:25 14:3 37:17 38:12,21
**delay** 6:21
**department** 17:6 89:20,21 89:21,22,23 96:16
**depend** 57:1
**depended** 29:20 41:10 55:21 84:23 91:13,19
**depending** 30:3 39:5,10 40:25 56:8 91:4,8,17
**depends** 30:7 64:21
**deposed** 13:9
**deposition** 1:18 7:17 10:15 12:13 14:3 15:12,15,18,22 16:1,15 69:1 69:10 79:12 100:3
**depositions** 15:4
**description** 3:7
**designated** 32:2 33:8 49:2 49:5
**determine** 73:10
**difference** 22:5
**different** 25:20 31:1 32:17 36:10 56:23 60:15 73:9 77:10,10 85:6 85:8 86:2,2,4,8 90:9 91:4 93:4
**difficult** 50:12
**directly** 43:19 43:24 44:14 47:25 49:11,16 50:8 65:22,25 74:8,13
**disciplined** 65:15,18 82:14 82:18 83:11,16
**discussed** 16:17 84:11,18
**discussing** 75:17
**discussion** 7:6 34:22 67:8 75:11 77:22 86:21 96:24
**dish** 52:22
**dissolved** 62:17

**distance** 57:2 69:25
**district** 1:1,1
**doctor** 48:9
**document** 3:10 3:11,13,15 37:10,15,19,20 38:2,3,17 57:5 57:8,18,19,20 57:21 59:8,12 59:15,17 66:18 66:25 67:13 80:1,5,7,9
**documents** 6:19 11:18,23 12:14 13:6 15:25 16:6,14 18:7 59:20
**doing** 13:10 33:12 47:7 54:22 55:22 62:5
**dolowich** 2:6
**door** 11:16 93:20,21 94:5
**doors** 93:24
**dougie** 36:11 36:13 60:5 62:6,13,18 70:22 71:24 72:14,17,20 73:21,23 74:17 74:23 75:4,23 75:24 76:12,12 77:4,11,17,24 79:13
**dougie's** 36:14 63:7 72:18 78:20
**doyle** 65:15 77:23 78:20
**drains** 29:22
**drive** 2:7 20:13 43:19,24 45:21 45:22 47:16 48:9 49:11,16 50:25 66:8 77:17 91:15
**driver** 30:25 45:5 46:20,22 47:2 50:22 59:25 62:4,4 62:18 94:12
**driver's** 20:7 20:12,23 47:12
**drivers** 31:13 34:11 44:1,18 48:14,21 50:15
**driving** 21:8 45:1,19,23 46:1,2,5,9,18 47:4,5,6,9,19 50:7,23 52:20 60:1,7 73:16 92:5 94:8 95:4
**drove** 30:25 45:7 46:13 47:25 48:14,15 51:7,10 60:8 74:22 75:3,20
**due** 7:9 20:12 48:1
**duly** 5:1,7 99:8
**duration** 24:13 30:23
**dwi** 19:18,20 19:24 20:12

**e**

**e** 1:21 2:1,1 3:1 4:1,1 5:1,1,6,6 25:7,7 58:6 98:1,1 99:2,2,4 99:21
**earlier** 32:7 40:16 42:24 43:2 53:3 55:24 95:15,16
**early** 39:15,19 39:21 40:11 42:21 53:6 89:15 92:9 95:9
**easiest** 70:21 73:18
**easily** 73:16
**eat** 52:18,20 63:11
**education** 26:19
**edward** 2:8 3:3 5:20
**effect** 4:12 80:15
**eight** 88:14,17 88:22 89:2,10 92:21 93:1
**either** 12:15 15:22 27:25 52:3 63:11 65:2 85:1 90:8
**email** 15:23
**emergency** 48:2,3,8
**employed** 15:15 19:9 23:8 24:16,25 25:10 27:13 31:12 81:18
**employee** 49:4 86:8
**employees** 15:17 31:17 66:3 86:1,3 87:17 88:14 89:18 90:3
**employer** 17:3 17:18 18:15
**employers** 17:10
**employment** 17:6 18:22 24:13 25:12,25 26:3,10 27:25 28:4,5,11,21 30:24 38:21

80:16 81:3
**ended** 25:25 26:12 27:25 60:20
**ends** 70:8,8
**engineers** 31:5
**english** 5:3,4
**entails** 18:2
**enter** 29:15 33:17
**entire** 77:19
**equal** 17:6
**equipment** 87:18
**errata** 100:1
**esq** 2:4,8
**essentially** 89:17
**estimate** 77:15 84:4
**everybody** 92:25
**exactly** 66:22 93:19
**examination** 3:2 4:5,11 5:16 87:2 99:7,9
**examined** 5:8
**example** 56:17
**examples** 74:12
**excavating** 9:5
**excavator** 89:6
**excavators** 85:17
**except** 4:8
**excuse** 68:9
**exeter** 68:6 70:5
**exhibit** 3:7,8,10 3:11,13,15 37:13 57:9 59:13 67:1 80:2
**exhibits** 3:6
**expected** 36:7
**expires** 100:25
**explain** 21:4,24 31:19 33:4 47:11 54:3 84:14
**explaining** 57:3
**expressed** 48:10 78:23
**extend** 46:24
**extended** 74:13
**extent** 22:8,10 69:17

**f**

**f** 4:1 5:6 25:7 98:1 99:2
**facebook** 12:10
**fail** 10:8
**fair** 58:7,12 68:22,25 69:20 69:23 70:2 82:4 83:12,17 87:16 89:9
92:25
**falkerson** 36:16
**familiar** 38:3 70:13 80:7,19
**far** 69:25
**fault** 62:11
**february** 28:15 28:20
**federal** 1:19
**feel** 69:14
**felony** 19:17
**fernandez** 45:4 45:6 47:23
**fi** 6:10
**fiancee** 11:13
**fiber** 91:7
**fiberoptic** 30:10 46:3 47:8
**field** 87:17
**figure** 52:11
**file** 17:14 18:24
**filed** 17:5 18:9 18:13
**filing** 4:4
**fill** 84:18
**filled** 18:6
**filling** 22:25
**find** 49:23 50:12 57:11 60:7 62:17 64:6,7,7,9 65:12 69:20 73:11 75:7,7
76:17 98:5
**fine** 6:24 7:18 7:24 8:6,17,24 9:16,24 68:18
**finish** 7:21 50:5 56:6 57:23 69:7,9
**finished** 20:13
**first** 5:6 8:16 24:22 33:13,21 37:17 38:12 45:20 46:8,12 51:5 56:18 60:11 66:11 67:5,20 79:24 90:6 94:25
**five** 25:11 34:19 41:2 75:10 91:12,21
**fix** 31:16
**flexibility** 49:15
**floral** 24:6,7,8 24:11,12
**focused** 12:13
**follow** 79:10 86:25 96:21
**following** 64:4 64:5,10 68:4 76:3 79:9,11
**follows** 5:8
**food** 52:22
**force** 4:12

**foregoing** 38:10 98:4
**foreman** 31:3,8 31:11 36:9 46:11 59:4,19 59:22 62:4 63:3 65:1,21 71:18 77:24 82:22 92:19
**foremen** 36:8 36:10,18 37:2 58:22 59:1 60:3,4 62:21 64:21 87:18 89:9,10
**forest** 68:6 70:5
**forete** 25:5,7,8 25:10,12,15,17 26:14
**forgot** 82:7
**form** 4:8 22:25
**former** 15:17 17:3,9 18:15
**forth** 99:8
**forty** 91:12,21
**forward** 6:14
**found** 73:24 75:5 77:4
**four** 25:11
**free** 69:14
**freeport** 5:15 10:19
**fresh** 70:9
**front** 12:15 13:7 67:14
**fuentes** 1:18 3:3,4,6,8 5:11 5:18 7:8 23:3,4 34:24 37:12,13 37:15,16 38:9 38:11 51:13 55:8 57:6,9 59:9,13,15 66:23,24 67:1 67:11 69:1 70:4 75:13 79:24 80:2,4 87:4 96:23 98:10 100:4,20
**full** 9:22 52:21 72:11
**fulling** 18:23
**fully** 7:22 69:11
**funny** 16:7,9
**further** 4:7,10 68:20 86:24 96:17 99:11

**g**

**g** 58:6
**gadamas** 45:9
**gas** 32:14,16 50:18 64:16 89:8,21,23 95:13,15,17
**gather** 42:9,22
**general** 22:16 78:16 79:1,2
**generally** 28:20 42:18 53:15
**generation** 27:12
**geo** 96:12,14
**gestures** 8:4
**getting** 31:25 52:12 72:6,10
**gio** 46:24
**giovanni** 27:10 27:11,13
**give** 7:25 8:14 46:24 61:17 69:21 73:25 77:6,15 84:4 86:19
**given** 52:16 99:10
**giving** 10:1 60:21
**go** 6:14 14:8 22:10 23:2 26:1,6 31:24 31:24 33:15,15 33:17 38:19 39:11 40:13 41:20 42:16 44:13,17 48:4 48:8,12 50:1,6 50:10,20 54:12 56:17,22 58:6 58:11 64:6,18 64:25 65:3,7 66:3 67:6 68:11 71:1,8,9 71:10 73:13 74:4 82:7 91:2 94:3,19
**going** 5:25 6:1 6:4,25 7:5,10 7:16,25 8:11 9:14 14:10 16:10 21:15 29:9,21,24 33:23 34:19 37:10,18 38:1 38:19 50:18 51:13 52:19 54:9,11 57:4,5 57:15 59:8 60:15 61:16,17 63:4,12,20,20 65:22,25 66:18 66:22,24 67:3 67:6 68:4,9,14 68:19,20 69:2 69:9,19,21,24 70:8 73:10,11 73:17 77:15 78:10 79:23 82:21
**good** 5:18,19 6:7 34:21 84:3
**goodness** 19:21
**gordo** 23:6,7

**gotten** 22:24 35:18
**government** 17:9 18:15
**gps** 60:17 63:20 64:2 66:20,21 67:4 68:10,11 68:23 69:22 75:2
**grab** 39:16 63:11 76:11,15
**graham** 2:2,14
**greater** 9:6,23
**grimmett** 2:8 3:3 5:17,20 6:24 18:19 20:10,15 23:12 29:6,10 34:18 36:12 43:13 50:4 54:3,8,14 54:21 55:3 66:23 69:3,12 72:24 79:23 86:19,23 87:4 87:21 88:10,19 88:24 89:4,12 89:25 90:4,22 91:3,11,23 92:17,23 93:6 94:14 95:6,10 95:20 96:1,7 96:20,22
**group** 21:14 22:17 89:16 95:12,13
**groups** 33:5
**guess** 60:15
**guessing** 62:10
**guy** 23:11,13 23:14 64:1

**h**

**half** 36:25 42:17,19 43:1 43:4 47:7 71:15,19 79:6 91:12,18,20
**hand** 99:15
**happen** 16:10
**happened** 19:7 32:25 78:4,6 83:9 84:15
**happening** 78:18 84:5
**happens** 29:8
**hard** 25:18 49:23 50:14 64:7
**head** 8:3
**hear** 29:5,6
**hearing** 17:21 18:3 19:14
**heart** 48:5
**heavy** 65:7
**held** 1:20 7:6 34:22 67:8 75:11 84:22 85:4 86:21 96:24
**help** 45:4 48:25 49:21,22 54:10 61:25 66:13,16 76:11 94:21 95:5
**helped** 47:23 49:1,4,9 61:24
**helper** 45:5 48:20,22
**helpers** 44:4,5 44:6 50:15
**hempstead** 43:9 56:4 67:22 83:7,9 89:21 95:22
**herazo** 2:14
**hereinbefore** 99:8
**hereto** 4:3
**hereunto** 99:15
**high** 26:20
**highest** 26:19
**highlighting** 51:16
**hills** 68:6 70:5
**hired** 26:23,25 27:3,6 28:25
**hole** 76:9,11
**home** 10:23
**honestly** 82:25
**hooters** 70:18 70:25 71:6
**hotel** 93:12
**hour** 34:20 42:11,13,17,19 43:2,4 71:15 71:19 79:6 88:14 91:12,18 91:20,21
**hours** 10:10,13 21:6 51:22 58:8,13 59:5,7 81:8 88:18,22 89:2,10 91:18 92:16,22,24 93:1
**house** 6:9 10:16 10:17,21,22,23 63:4,10,14,23 65:16,20,25
**houses** 62:19
**huh** 8:7
**human** 17:7,8
**hundred** 27:24
**hustle** 48:19
**hyde** 24:6

**i**

**ice** 71:4
**idea** 62:23
**identification** 37:14 57:9 59:14 67:2 80:3
**identify** 38:22

**identifying** 57:13
**ids** 52:7,8 77:9 90:9 91:5
**imagine** 33:11
**imagining** 86:11
**impact** 10:5
**inappropriate** 78:14,24 79:5
**include** 95:13
**including** 95:17
**indicate** 8:3
**indicates** 58:7
**individual** 21:21
**individually** 1:3 27:2
**individuals** 21:18 22:17
**information** 12:15
**infrastructure** 1:9 5:21 9:1 87:17 88:6,13 89:18 100:3
**initially** 6:18 94:8
**injury** 16:21
**inserting** 54:24
**inside** 33:22 34:6,8,9 40:13 90:16,21
**install** 30:21
**installed** 88:8
**instance** 35:24 36:2
**instant** 15:22
**instruct** 14:8 69:13
**instructed** 83:4
**instruction** 71:18
**instructions** 7:17 9:17 12:4
**interested** 99:13
**international** 9:8
**internet** 6:8 7:9
**interpreter** 2:12 5:1 7:5,21 18:18 20:8,17 23:13 25:23 29:4,8,12,24 36:13 43:12 44:21 49:3 52:6 72:25 83:13
**interrogatories** 37:18 38:12
**interrogatory** 3:8 37:12 51:14 55:14
**interruption** 6:21
**involved** 22:20
**ipad** 11:22,24
**island** 9:7,10 9:21,23
**isle** 8:14
**issue** 52:3,11 62:3 63:7
**issued** 34:13
**issues** 61:22 62:2,9 65:24 77:23

**j**

**jamaica** 56:22
**january** 23:16 26:24 27:20 28:8,15 46:8
**jeep** 77:18
**jimmy** 48:19 49:6
**job** 1:25 18:21 27:7 28:24 31:2,7,22 32:9 39:3,9,13 40:3 40:5,7,18,20,22 41:1,11,15,21 42:14,19 43:19 43:20,24 44:7 44:15,19 47:25 48:9 49:11,16 49:24 50:8,13 51:18 52:25 53:16 54:5 55:15,18,21,22 56:8,24 57:1,2 60:1,22 62:1 62:24 63:4,8 63:12,12 64:6 64:12,14,17,24 65:25 66:4,4,8 66:9,14,16 68:8,13,17 69:5 70:24 72:22,23,25 73:1,4,6,9 75:20,21 77:7 78:11 79:6 83:21 84:11 91:2,5,10,15,19 92:6,22 93:2 94:13,20
**jobs** 21:7 40:7 56:16 66:13 70:1
**jointly** 1:10

**k**

**k** 25:24
**kaufman** 2:6
**keep** 33:22 59:4 59:25 60:1 61:25,25 77:14
**keeping** 59:23
**kennedy** 26:18
**kept** 88:13
**key** 93:10,12,16
**keys** 33:13,16 33:19,22 34:4

87:24
**kind** 32:11 65:11 84:21 93:12
**knew** 78:8,9,12 81:10,11 87:5 93:1
**know** 6:14 8:19 8:20 11:21 12:3,12 16:10 19:18 21:20,22 21:23 22:1,3,3 22:11,12,15 27:11 33:4 35:9,11,12 36:6 37:4 44:10 45:10 47:1,10 52:3,6 55:23 58:25 60:14,18 62:17 66:12 74:20 78:8,17 81:5,6 82:25 83:18,19 84:10 85:8,14 85:14,16,17,19 86:6,12,17,18 87:9,12 88:3,5 93:23,25 94:2 96:10
**knowledge** 22:9,16 38:13 98:6
**kohl's** 71:4

**l**

**l** 4:1,1 5:1,6
**labor** 17:6
**laborer** 24:19 25:8 29:1,3 30:23 31:12 45:2 46:17 47:16 94:8
**laborers** 9:6 43:18,23 44:16 45:1 87:18 95:4
**labors** 9:7
**largely** 53:19
**late** 56:5 62:7 62:13 63:8 75:23
**latest** 36:10
**lawsuit** 16:20 16:22 21:2,5 21:18,21 37:5
**lawyer** 40:9
**lay** 28:14,16 61:17
**layed** 28:21 61:14,20
**layoff** 61:11
**leave** 42:25 55:15 63:10 72:15,16 74:21 95:25
**leaves** 70:4
**leaving** 91:1,10 94:23
**left** 51:18 52:24 55:17 71:13 92:20
**legal** 22:8
**letting** 26:6 78:11
**level** 26:19
**license** 20:7,12 20:18,22,24 47:13
**licenses** 26:21
**lifted** 20:22
**liked** 48:24
**limit** 10:1
**line** 71:13 100:5
**lines** 30:9
**little** 6:12 7:9 24:10 34:24 55:8,23
**live** 10:23 11:11 23:19 44:10
**lived** 23:17,20 24:15 44:13
**living** 11:15 24:18
**llc** 2:2,14
**llp** 2:6
**load** 47:23 49:22 50:10 94:22,22 95:5
**local** 9:4,6,14 79:17,20 80:11 81:1,1 85:12 85:13,15,18,20 85:22,24 86:14
**located** 10:25 33:19
**location** 6:7 34:7 64:13 65:21 75:21
**locations** 38:22 71:8 75:4
**locked** 34:1
**lodger** 19:5
**long** 9:7,9,21 9:23 23:17 24:1,25 25:10 41:15,21 42:3 47:1,15 91:9 91:14,24
**longer** 28:18 36:20 44:11,11 51:22 52:11,13 60:19
**look** 6:19 38:3 66:21 73:8
**looked** 60:22 74:11 75:2 93:15
**looking** 12:17 12:20,24 13:1 13:2 64:2,3 72:23,25 73:19

**lot** 63:24 70:18 70:25 71:19 72:13 73:19 74:9,12,14,24 75:4,18,20 76:1,7,14,21,25 77:20 78:25 79:5
**low** 91:20
**lubricant** 91:8

**m**

**m** 24:24
**made** 30:11,13 46:23
**main** 52:2,10
**maintained** 58:16
**maintains** 60:17
**majority** 68:5 90:23
**make** 6:13 8:15 8:22 18:2 29:14 39:15 40:11,13,14 42:9,22,24 63:16 65:19 66:7 72:19 76:13 78:14,24 82:21 84:8,8
**man** 29:21
**mandatory** 82:16,23
**manhole** 52:4 52:10,12 65:11
**manholes** 29:15,21 30:18 40:10,13,15 73:9,10
**manual** 95:4
**manuel** 1:3 100:3
**map** 68:13,21 73:7,8
**maps** 69:24,24 75:8
**march** 1:16 99:16
**marie** 34:16
**marillow** 34:16
**mario** 45:8,9
**mark** 57:5 59:9 66:24 79:23
**marked** 37:13 57:8,14 59:13 67:1 80:2
**marlin** 76:10
**marriage** 99:13
**material** 94:22 94:22
**materials** 95:5
**matter** 41:15 41:21 99:14
**mattered** 41:23 41:25
**meadows** 70:9
**meal** 52:16,21
**meals** 51:20
**mean** 12:17,22 12:25 16:9,9 17:22 18:20 22:12 25:18 32:5 39:21 49:8 52:2 53:11 55:19 58:18,19,23 61:10 76:8 78:15 79:8 81:15,25 82:6 82:11,13 84:13 84:19 93:21 94:17
**means** 8:25 9:5
**meant** 48:11
**mechanics** 31:14
**media** 12:18,20
**medical** 48:1,3 48:7,11
**medication** 10:4,8
**meet** 76:24
**meeting** 81:24 82:4,12,15,18 82:21 83:5,12 83:16,21 84:7 84:11,17 85:1 85:2,3 89:15 89:24
**meetings** 81:17 81:20 82:10,23 82:24 84:20,22
**member** 9:12 63:3 79:17 80:25 86:9
**members** 61:19 62:8 85:5,9 86:1 92:12
**memory** 84:3
**mention** 79:1
**mentioned** 1:21 16:21
**message** 15:22 15:22 36:8 58:24
**messages** 36:17 37:2,8
**metal** 93:17
**method** 83:24
**mine** 11:6
**minute** 34:19
**minutes** 42:11 42:13 43:4 50:10 56:19 75:10 86:20 91:12,21 92:2 92:4
**misdemeanor** 19:16
**missed** 81:22 82:9,12,17 83:5 84:7,16 84:16

**missing** 82:15 83:11,16
**modify** 55:1
**money** 81:10
**monitor** 12:16
**month** 33:6,10 47:8 56:20,21
**months** 20:14 20:17,19 25:2 25:11 28:14 36:24 61:5 84:5
**morning** 5:18 5:19 32:4 35:15,23 39:5 41:2,3,5,15,21 43:6 50:19 64:12 96:3
**move** 29:9 48:6 73:16 74:2 76:18 90:16
**moved** 74:7
**moves** 67:21
**movie** 70:18,25

**n**

**n** 2:1 3:1 4:1 5:1,6 25:24 98:1,1
**name** 5:10,20 9:11,22 23:10 36:12,14 100:3 100:4
**names** 21:20 23:2
**napalie** 27:4
**nassau** 14:20
**nature** 13:17 21:1
**near** 75:21
**necessarily** 14:5 87:13
**necessary** 50:21
**neck** 24:10
**need** 6:18,19 8:13,18,22 42:3 47:10 48:20 51:1 64:3 65:2 67:16 68:10 69:9,12 70:2 70:24 75:8,8 86:18
**needed** 29:13 29:16,16 31:24 40:10,12,13 41:24,24 42:8 42:10,21,22,23 42:24,25 48:4 48:12 49:21,22 50:15,15 53:12 53:12 60:6 65:9 74:1 90:14
**needs** 8:4
**negligence** 15:1
**network** 1:9 5:21 9:1 15:15 15:18 19:7,10 19:11 23:8 24:13,16 26:1 26:23 27:1,2 27:14,16,20 28:21,25 30:24 31:12 32:13 35:9 36:18 44:12,18 46:9 46:13 47:16,19 49:4 57:25 58:16 60:16,19 62:21 65:24 66:3,7,11 67:4 79:21 80:12,16 81:2,14,18 83:20,25 84:8 87:17 88:6,13 89:17 94:11 100:3
**never** 19:23 20:25 21:8 22:23 24:15 32:3 35:22,24 43:17 47:24 49:19,20 52:16 58:18 59:19 61:11,15,17 63:22 74:7,16 74:22 75:25 76:5 77:25 82:14 83:9 84:21 94:3,6
**new** 1:1,22 2:3 2:3,7 5:2,7,15 9:6,23 10:19 17:7,8 24:6,11 60:12 67:22 68:6 70:5,9 72:4 93:24 99:5
**nicknames** 23:5
**night** 39:18,21 40:20,23
**nights** 30:4
**nods** 8:3
**non** 94:8 95:4
**nonverbal** 8:4
**north** 9:8
**notary** 1:22 4:12 5:2,7 98:16 99:5 100:24
**notes** 13:7 16:14
**notice** 1:20 82:20
**number** 9:6 38:19 51:4,7 51:10,14 60:8 67:4,5

**o**

**o** 4:1 5:1,6 24:24 25:7

34:16 98:1
**o'clock** 41:1,2 72:11
**oath** 6:2
**object** 14:1,2,7 22:7,7 69:15
**objection** 35:20 41:6,12,17 42:15 43:3 44:3,8,20,21 45:15 46:15 49:18 50:2 53:10,17,21 54:1,16,25 59:6 61:9 62:14 63:25 64:20 66:10 71:2 80:17 86:10 87:21 88:10,19,24 89:4,25 90:4 90:22 91:3,11 92:17,23 93:6 94:14 95:6,10 95:20 96:1,7
**objections** 4:8 37:17 38:11
**obligation** 37:4
**occasion** 47:21 49:11,14 54:7 54:15
**occasions** 64:23
**occurred** 78:7
**october** 58:3,4 67:10,20
**offered** 6:4 7:11 15:6
**office** 87:24 93:10
**oftentimes** 89:2 89:10 90:15
**oh** 9:24 16:11 18:5 22:13
**okay** 7:4 8:20 9:3,25 10:24 11:14,21 12:23 13:2,6,14 14:21 15:2 17:14 19:9,24 20:6,18 21:9 21:12,17 22:1 22:5 23:14,22 25:18 26:7 27:25 29:7,9 29:10,18,25 30:5,12 31:4 31:10 33:25 34:18 35:4,18 36:9 37:10 38:1,15 41:4 42:2 43:1,15 44:6 46:12 47:12,18 48:7 49:15 50:18 52:2,6,15,24 53:14 54:15 55:3,13 56:1 57:3,4,17 61:4 61:7 63:16 64:1,11 65:19 66:11,17 67:9 67:16,17 68:9 68:19 70:3,23 71:25 72:9,20 73:5 74:22 76:20 78:22 79:4,12,17 82:14,17,23 83:10 84:7 85:18 86:23 87:16 89:9,12 93:18,25 94:7 95:17,22 96:14 96:17
**old** 84:23
**once** 13:13 31:24 33:5,10 36:1 48:1 58:20,23 60:21 73:24
**ones** 31:25 45:11 85:4,16 86:12 89:5,19 89:22 90:24,24
**online** 18:6
**open** 11:19,24 12:9,10,25 30:17
**operating** 31:4 85:16
**operators** 87:18 89:2,6,6
**opportunity** 8:14 17:7 25:13
**opposed** 50:7 94:19
**opt** 37:16
**opted** 21:18,21
**option** 94:12
**oral** 8:2
**order** 40:10 58:19 70:21 73:12
**orders** 64:4,5 64:10 72:17,18 79:9,10,11,14
**ordinarily** 10:9
**ourself** 29:17
**outcome** 99:14
**outside** 14:13 32:20,20 90:13 90:16,21
**overtime** 58:13 86:17 92:22 93:2
**own** 71:21 87:10 89:24

**p**

**p** 2:1,1 4:1
**p.m.** 51:19,19 53:1,6,9,16,25 54:5 55:16,16

55:18 56:5,6 56:11,14 70:10 71:14,25 97:5
**p1-7937847** 100:2
**page** 3:2,7 38:5 59:11 60:11 67:6,7 68:4 79:24,25 100:5
**paid** 21:7,8 58:12 59:25 77:19 81:9 88:14 90:3 92:15 93:1
**pandemic** 45:25
**paperwork** 18:6
**paragraph** 39:1 51:15
**park** 2:7 24:6,6 24:7,8,11,12 32:19 64:7 70:20,21,21
**parked** 71:8
**parking** 49:23 50:12 63:23 64:6,8 65:13 70:18,25 71:19 72:12 73:12,14 73:19,19,20,22 74:9,12,14,24 75:4,18,20,21 76:1,3,6,7,14 76:21,22,25 77:3,20 78:25 79:5
**parkway** 24:10
**part** 15:1 24:22 29:25
**participated** 22:21
**parties** 4:3 99:12
**passenger** 45:13
**passengers** 48:15
**past** 55:23
**pat** 61:23
**patrick** 1:9 2:13 5:21,22 9:1 77:22 100:3
**paul** 46:11
**pay** 66:7 81:5 86:16
**paying** 81:11
**paystub** 57:24 58:2,7
**paystubs** 57:22
**pelton** 2:2,4,14 3:4 6:17 7:2 14:1 22:7 34:21 35:20 41:6,12,17 42:15 43:3 44:3,8,20,23 45:15 46:15 49:18 50:2 53:10,17,21 54:1,6,12,18 55:2 59:6 61:9 62:14 63:25 64:20 66:10 69:15 71:2 80:17 86:10,25 87:3 96:25 97:2
**penalties** 7:11
**penalty** 6:4 38:9,17
**people** 21:14 22:4 28:14,16 28:17 72:6 88:22 89:1 92:9,11 95:8 95:11,15,17,18 95:21
**percent** 27:24
**perform** 90:10
**performed** 58:3
**period** 47:18 74:13 94:10 95:1
**perjury** 6:4 7:11,13 38:10 38:17 63:19
**permitted** 65:20
**person** 27:2 45:6 48:17 89:14 90:15 94:1
**personal** 16:20 62:25 77:11
**personnel** 26:6 32:18
**phone** 6:20,25 7:3 11:19 12:2 12:22 28:16 30:9 32:15 37:1,8,24 89:20,20,22 95:14 96:15
**phones** 36:21 36:22
**phonetic** 23:6 27:5 34:16 36:16 45:9 96:13
**phrases** 54:19
**physical** 13:6 48:4
**physically** 74:22
**pick** 61:4
**pickup** 46:4,5 47:5,6,9
**pin** 33:17
**pipes** 30:1
**place** 1:21 17:24 31:15 64:25 70:21 71:3 73:3 77:12 90:13

91:7 93:22 94:21
**places** 77:10
**plaintiff** 1:5,18 13:19 16:22 37:16 38:10,23 39:1 51:17 56:3
**plaintiff's** 38:21
**plaintiffs** 2:2
**play** 54:11
**please** 5:10,12 7:21 8:15 14:8 14:15 21:4 55:11 69:13 75:9
**pleasure** 75:6,6
**point** 8:14,18 19:12 58:14 63:24
**police** 14:20
**position** 61:8
**possibility** 78:3
**possible** 69:16
**ppe** 29:14,15 81:6
**predominantly** 30:12
**prep** 29:13 32:19 41:24
**prepare** 15:11 15:25 16:8,13 16:14
**prepped** 40:12
**prepping** 29:23 31:23,23
**prescribed** 10:9
**present** 2:11 82:5
**preserve** 37:5,7
**pretty** 14:4
**prevent** 10:1 34:3
**previous** 36:18 37:1,8
**previously** 6:20 39:17 53:24 67:9
**prior** 14:10 19:16
**priority** 100:1
**probably** 20:4 79:8
**problem** 13:24 21:16
**procedure** 1:20
**proceed** 9:20
**proceeding** 15:7
**professional** 26:21
**project** 29:19 30:13,17,20 32:21 39:18,24 42:4 53:3 60:12
**projects** 30:8
**protect** 29:17
**protein** 71:5
**provide** 61:13 82:20
**provided** 38:16
**public** 1:22 4:12 5:2,7 98:16 99:5 100:24
**pull** 46:11,18
**pulling** 46:10 46:10,14 52:4 52:8,9,12 77:9
**punch** 87:19,19
**purpose** 75:25 76:2
**pursuant** 1:19
**put** 25:21 65:9 65:10 66:12 74:16 90:12,12 92:21
**putting** 34:4

**q**

**queens** 56:22 60:12 70:13 91:22
**question** 4:8 7:22 8:15,22 12:6 14:10,15 16:4,5 19:2 38:20 41:18 43:22 66:18
68:19 70:3 82:17
**questions** 5:3 6:1 8:12 9:19 10:2 14:4,7 54:16,23 57:15 68:21,25 69:2 69:10,11,17,19 86:24 87:1 96:17
**quick** 52:23 75:9 82:1
**quickly** 7:2

**r**

**r** 2:1 4:1 5:1,6 25:7 58:6 98:1 99:2
**ran** 32:14
**range** 14:4
**reach** 18:21
**reached** 14:25
**read** 38:10 67:13 98:4
**ready** 30:11,13 32:1,11,16 42:25 46:23 65:9 90:14 96:2
**real** 82:1
**really** 47:3 48:7 56:16 64:18 66:16 72:10 75:25

**reason** 9:25 61:13,18 70:24 100:5
**reasons** 62:16
**rebecca** 2:12
**recall** 51:3 60:11 67:11,25 68:17 70:17 83:3 91:23 92:1
**receive** 58:23 81:12 83:20
**received** 19:10 20:22 25:13 57:24
**receiving** 61:2 81:15
**recently** 18:16
**recess** 7:7 28:13 34:23 55:7 75:12 86:22
**recognize** 70:15
**record** 5:10,13 7:6 34:22 67:8 75:11 86:21 88:7 96:24 99:9
**recorded** 94:1
**records** 37:5 60:17 63:21 64:2,9 67:4 68:10,23 69:22 69:23 75:2
**recover** 84:21
**reel** 91:6
**reels** 30:21 46:10,14,18
**refer** 8:25 9:4 9:14 27:7,7 57:4
**referring** 17:13 17:23 40:1,2 40:17 52:7 57:20 60:11 73:8
**regarding** 18:15 55:10 57:16,16 61:22 86:18
**regular** 56:24
**related** 7:17 81:8 99:11
**relevant** 14:2 37:5,5
**rely** 66:16
**remember** 13:15 17:17 20:3 23:24,24 24:3 34:17 36:4,5,15,16 45:10,10 51:7 60:14 61:2 68:2 82:25 83:2 85:10 87:7 91:25
**remembering** 24:9
**repeat** 14:15 23:12 29:25 36:12 41:18
**repeating** 74:18
**report** 47:20,20 59:7 88:7 89:15 94:13,17 95:5
**reported** 38:23 44:1 78:19 94:15
**reporter** 5:9 7:19 8:3 96:25 99:4
**reporting** 100:1
**represent** 5:20 67:3 85:13,15 85:17
**require** 30:17 30:20
**required** 39:2,6 40:7 44:6 51:22 81:23
**requirements** 80:20
**requires** 22:8
**reserve** 75:21 76:21
**reserved** 4:9
**reside** 24:1,5 24:12
**residence** 23:23
**resign** 25:15 61:10,12
**resigned** 61:7
**resolved** 14:22
**respective** 4:3
**responded** 38:25
**responds** 39:2 51:17 56:3
**response** 38:19 39:8 51:23 52:1 55:14 56:2
**responses** 3:9 37:12,17 38:11
**responsibilities** 29:2
**responsible** 45:19,20,21
**rest** 51:20
**restaurant** 63:23
**restaurants** 72:7
**result** 56:3
**review** 15:25
**revocations** 20:23
**reword** 54:19
**ride** 44:18 45:3 48:23 94:18

**right** 7:8,16 10:25 11:19 12:21 13:1,7 13:10 17:8 23:24 25:21 36:23 37:22 38:6 39:20,21 40:5,15 48:10 54:10 57:6,12 57:14 59:10 63:20 72:1,5 72:10 81:15 82:13 87:14 93:7
**rights** 17:8
**rolls** 46:10
**room** 11:5,9,15
**rooms** 11:3
**rotter** 60:8
**router** 46:1
**rule** 95:24 96:4 96:9
**rules** 1:20 80:19,22 86:4 86:15 96:11
**rush** 82:8

**s**

**s** 2:1 4:1,1 5:1,6 5:6 25:24,24 98:1,1 100:5
**safety** 29:17 81:17,20,24 82:3,10,12,15 82:18,21 83:5 83:11,16,21 84:7,11,16 85:2,3 89:15
**sara** 45:8
**save** 40:12 50:18 65:10,11 66:13 73:3,14 74:1,2,19 76:3
**saved** 40:14
**saving** 73:20,21 73:23 76:6
**saying** 19:2 32:13 42:2 44:16 53:20 62:15,15
**says** 9:23 38:8 58:6,11
**scan** 93:17,18 93:19,23 94:5 94:24
**scanned** 94:1
**scanska** 25:19 25:22,23 26:2 26:3
**schedule** 30:2,5
**school** 26:20
**schools** 72:7
**screen** 5:23 12:1,5,14,16 13:3 37:23
**scroll** 37:18 38:1
**sealing** 4:4
**searched** 60:22
**second** 38:5 51:14,15 56:18 59:11 66:14
**section** 89:8
**see** 5:23,24 37:20,23 55:4 57:11,18,19,19 57:20,22 58:5 59:15 64:3 67:23 69:23 70:6,11 73:2 75:3 76:21 80:4 96:20
**seeing** 13:5 37:25 72:22
**seek** 73:13
**seeking** 18:1
**seems** 6:12 16:3
**seen** 57:21 59:17 80:9
**send** 18:7 36:8
**senior** 66:15
**sense** 65:19 66:7
**sent** 91:17
**sentence** 51:14 51:15
**separate** 89:24
**separated** 23:21
**services** 81:6
**set** 37:17 38:12 99:8,15
**settlement** 14:24,25 15:2 22:24
**seven** 74:11 81:22 82:10,24
**severally** 1:10
**share** 12:1,5 37:10 66:18
**sharing** 97:2
**sheet** 67:10,25 68:11,12,22 81:24 82:2 100:1
**sheets** 58:17 69:4,5,5
**shift** 36:6 51:21 91:24
**shop** 71:4,5
**shorthand** 99:4
**show** 44:12,14 59:8 62:6,13 68:10,10,21,22 69:4,6,24 73:7 92:9 95:8,19
**showed** 47:22 59:19 67:9
**showing** 37:15 68:16,16,24
**shows** 68:13
**sic** 45:25
**side** 57:12 62:22 72:11

**sign** 58:18,20 58:21 81:23,23 82:1,2,7,8
**signature** 38:6 38:7 99:20
**signed** 4:11,13 38:8 82:4
**signs** 29:16
**similar** 22:18 63:17
**similarly** 1:4 87:12 92:15
**simply** 34:4
**sir** 80:6,10
**site** 39:3,9,13 40:3,5,8,11,18 40:20,23 41:11 41:16,22 42:14 42:19 43:19,21 43:24 44:7,15 44:19 47:25 48:9 49:11,16 50:8,13 52:25 53:16 54:5 55:15,18 62:20 62:24 63:4,8 63:12,12 64:7 64:12,14,17,24 65:25 66:4,4,8 68:8,17,24 70:24 73:4,9 75:20,21 77:7 79:7 83:22 84:12 91:2,10 91:15 92:6,22 93:2 94:13,20
**sites** 39:10 49:24 51:18 60:15 68:13 77:10
**sitting** 5:21 90:21
**situated** 1:4
**situation** 22:20 72:12 78:7
**six** 20:14,17,19 25:2 33:5 36:1 84:5
**slide** 37:22
**sloan** 2:12
**slow** 61:16
**small** 93:16
**smell** 48:24
**smoke** 48:23
**social** 12:18,20
**software** 93:25
**somebody** 33:8 49:1 66:8 76:24
**sonny** 27:4 84:13
**sorry** 6:21 14:16 17:22 18:18,23 20:8 20:15 24:6 29:4,5,24 39:22 49:3 89:5
**sort** 14:14 17:5 17:9 18:13 20:22 22:25 31:4 48:15 63:16
**sounds** 34:21
**southern** 1:1
**space** 64:8 77:12
**spanish** 2:12 5:3,4 7:21
**speak** 8:13 15:11,14,17 35:1 55:9 83:6 83:8
**speaking** 15:10 54:25 69:7 78:16
**specific** 35:9 38:22 41:10 50:23 51:4 60:4 68:17 71:23
**specifically** 49:5
**spell** 24:22 25:6
**spelled** 25:23
**spend** 92:5
**spends** 68:5
**spoke** 6:20 33:7 33:7 78:15
**spot** 39:16 40:12 65:10,12 73:24 76:3,6
**spots** 40:14 66:13 73:3,12 73:14,20,22,24 74:1,3 76:3 77:3
**staff** 32:3 33:8 49:2
**stage** 33:9
**stamped** 57:6 59:9 67:6
**standing** 70:1
**start** 7:23 32:13 38:23 39:5 43:8,11 43:15 45:23 46:5 50:1,7 56:25 58:19,22 62:7 63:9 64:2 64:3 65:2 72:6 84:5 87:20
**started** 26:5,5 28:7 33:23 45:25 46:12,17 46:23 68:1 84:4,20,24 96:12
**starting** 33:21
**starts** 72:10
**state** 1:22 5:2,7 5:10,12 17:7,8 51:17 52:24 99:5
**states** 1:1

**stationed** 33:18
**stay** 55:23 91:9
**stayed** 71:11,14
**steal** 33:21
**stealing** 34:4
**steve** 27:4 34:14,15,16
**stipulated** 4:2,7 4:10
**stop** 27:16 63:3 63:10,14,14 64:5,6,13,13,15 64:24 65:20,21 70:24 72:21 75:18 84:5,25
**stopped** 60:24 63:23 69:25 74:12,23
**stopping** 64:19 65:15,24 70:17
**stops** 63:17 78:14,25
**stored** 33:16
**storing** 33:24
**straight** 52:17 63:12
**street** 32:20 68:6 70:5,9
**strike** 41:8
**stuck** 52:9,12
**stuff** 12:10 32:11
**subordinate** 79:9
**subscribed** 98:12 100:21
**substance** 55:10
**sue** 17:3,24
**sued** 16:25
**suite** 2:3,7
**super** 31:9
**supervisor** 31:9 31:10 96:15
**supplies** 46:3 73:25
**supposed** 39:11 78:9
**sure** 6:13 8:15 8:22 12:3,7 27:22,24 29:14 39:15 40:11,14 40:14 42:9,22 42:24 76:13 77:16 89:7
**suspended** 20:18
**suspension** 20:21
**suspensions** 20:23
**swipe** 35:5,8
**switch** 6:19 7:3 36:22
**switched** 36:21 36:24
**switching** 6:22 6:24
**sworn** 4:13 5:2 5:7 98:12 99:8 100:21
**system** 94:1

**t**

**t** 4:1,1 5:6 25:7 98:1,1,1 99:2,2
**tablet** 6:18,23
**taft** 67:22
**take** 8:21 10:8 10:9 32:20 34:18 42:8 51:20 52:11,13 75:10 77:2 90:24 91:14 95:16
**taken** 1:19 7:7 34:23 55:7 75:12 86:22
**talk** 75:14
**talking** 7:23 17:11
**tat** 66:21
**tax** 61:2
**team** 49:9 62:11
**technically** 10:25
**tele** 95:18
**telephone** 6:18
**tell** 8:12 58:22 59:1 61:15 64:1,21 65:5 65:21 70:22 71:20 72:14,20 73:24 78:13,17 79:15 82:22
**telling** 33:24
**ten** 58:20
**term** 21:25
**terminated** 78:3
**terms** 20:7 81:2 81:7 86:7 87:5
**testified** 5:8 22:15 39:17 45:18 46:19 49:10 53:24 54:2,4,22 55:14 60:23 82:9 87:23 92:1 93:9 94:7
**testify** 10:5 17:20 54:10
**testifying** 35:5 63:19
**testimony** 6:3 7:10 15:6 27:19 31:11 32:2 35:2 52:15 54:24 55:1,10 62:12 63:22 71:17 75:15 98:5 99:10
**text** 15:22 36:17 37:2,7

58:23
**texting** 14:13
**thank** 9:24 19:21 56:1 57:3 96:17 97:3
**thankful** 61:24 78:10
**theater** 70:19 70:25
**thing** 8:21 19:1 19:6 25:11,19 31:19 39:14 40:9 47:3 55:14 73:5,18 86:16
**things** 24:9 32:1,14,17 33:10,12,21 48:5 61:2 65:9 90:9 93:24 95:16
**think** 6:25 20:5 27:4 29:4 31:25 35:11 36:5,15 37:3 37:25 45:24 48:17 54:6 61:3 66:17 97:2
**third** 27:12
**threatened** 17:3
**three** 13:15 24:4 25:20 41:1 74:25
**time** 1:21 4:9 28:13,18,18,19 33:20 35:10,14 35:22 39:8 40:2,17,23,25 41:4,8,9,10,14 41:16,20,22 42:1,5,7,9,13 45:16 46:8,17 53:19 55:20,21 56:7,21,23,25 57:1,23 58:6 58:17,22 59:2 59:23 61:23,23 62:2,9 65:3 67:9,21,25 74:13 77:19 81:21 82:3 83:23 84:20,22 86:16 88:1,7,8 88:12,12 90:3 92:4,20,20 94:3,10,25 95:24 96:6,18 96:23
**times** 6:13 13:12 14:7 32:18,22,24,25 33:2,3 38:22 39:23 40:4,19 45:14 46:20 48:8 49:14,19 51:21 53:2,4,5 55:17 58:20 63:1 64:11 74:25 75:1,3 81:25 82:6,8 90:23,23
**title** 28:24 31:7
**titled** 37:16
**titles** 31:2
**today** 5:22 10:1 11:14 16:11
**today's** 15:11 15:15,18 16:1 16:14
**together** 63:7 77:7
**told** 65:1 91:16 96:10
**tommy** 62:18 63:9,13 65:14 65:24 66:15 77:23
**took** 34:24 55:8 75:13
**tools** 95:5
**top** 29:23
**toppers** 76:9,11
**track** 59:4,23
**trades** 88:3
**traffic** 39:5 42:5,7 56:4 65:3,7,7 71:25 72:3,13 73:17 76:19
**training** 81:12
**transcribe** 7:20
**transcript** 54:13 97:1 98:4
**transcription** 8:2
**translate** 5:3
**translation** 7:23 55:11
**translator** 7:22 69:8,9
**trash** 90:13
**trial** 4:9 14:6
**trickily** 54:19
**truck** 21:8 32:19 46:1,2,4 46:6 47:5,6,6,9 47:9,23 48:15 50:10,23 53:12 58:24 60:8 62:4 67:21 73:16 76:18 77:14 90:8,16 90:20 95:25 96:4
**trucks** 32:3,12 32:15,16,17 33:9 47:5 49:23
**true** 38:13 55:2 78:23 98:5 99:9

**truth** 83:19
**truthful** 10:1
**truthfully** 10:6
**try** 7:5 42:10 54:18
**trying** 47:10 52:4 54:9 55:1 73:2
**turn** 90:13
**turning** 90:11
**twice** 33:6,10 36:1 43:14 48:1 49:13,14
**two** 11:4 17:16 23:18 24:3 32:14 45:3,17 47:17,18 49:14 49:19 56:19 69:8 74:25 91:18 93:14
**type** 15:7 30:8 47:7 57:1 77:17 78:9,12 78:14,24
**types** 88:17 93:14
**typically** 14:6 39:1,2 42:12 53:8 56:4 88:14 90:20 91:9,14 95:18 95:25

**u**

**u** 4:1 5:6
**uh** 8:7,7,7
**under** 6:2,4 7:11 38:9,17 63:19
**understand** 6:3 6:5,5,6 7:10,13 9:17 18:1 19:1 21:25 22:5,13 38:16 41:19 47:3 56:15 65:23 73:6 79:4
**understanding** 18:23 21:4,12 39:14,22 63:2 65:14 90:2
**understood** 8:9 8:11 16:12 18:8 43:5 48:13
**unemployment** 17:12,15,20,23 18:2,3,9,12,24 19:10,13
**union** 9:4,6,8 9:11,22 81:13 86:8
**union's** 86:4
**uniondale** 23:20,23 24:2 24:15
**unions** 85:6,8 86:2 87:6 92:13
**united** 1:1
**use** 6:17 14:6 35:5 62:21 75:8
**used** 18:25 23:11 28:19 30:11 32:14 33:15,21 36:8 46:2 48:23,24 51:5 52:3 70:20,20 79:15 82:22 90:18 93:13
**using** 7:20 12:22
**usually** 31:21 68:13 72:3,5 73:12 95:15
**utilizing** 11:21

**v**

**v** 100:3
**van** 46:4,5,9,13 46:18
**varied** 30:5 39:9 41:5
**various** 22:4 90:18 93:4
**vary** 35:15 53:19 55:19,25 56:8,16 91:4
**vehicle** 44:19 45:1,14 47:16 47:19 51:3,4 51:10 62:22,25 64:13 67:5 68:5 70:8 71:7 71:12,13,14 77:14,17 90:11
**vehicles** 60:17
**verbal** 8:5
**veritext** 100:1
**verizon** 30:15
**verrazzano** 56:19
**vicinity** 9:7,23
**violation** 22:18
**virtually** 1:14
**voice** 54:15

**w**

**w** 98:1
**wait** 7:21 55:11 65:2,3,5,6,8 70:22 71:19,23 73:18 76:1,6 76:21 79:5
**waited** 72:12
**waiting** 66:8 71:20 72:14 74:2,6 77:20
**waived** 4:6
**want** 6:13 12:12 18:3 51:25 55:13

56:15 59:25 60:1 64:2 76:13 84:1 97:1
**wanted** 42:23 48:22 49:16 60:5 65:8 66:3 88:6
**way** 16:8 19:2 22:14 48:11 55:3 76:17 88:13 99:13
**week** 57:24 58:9 92:24
**went** 21:15 26:7,14 43:14 61:21 74:8,13 74:16 83:1
**westchester** 43:16
**wheels** 91:7
**whereof** 99:15
**white** 33:16,19 33:24,25 34:5 34:6 88:9
**wi** 6:10
**windows** 11:18 11:23 12:9
**winter** 26:5 61:5
**wintertime** 25:20
**withing** 19:7
**witness** 3:2 7:4 15:7 99:7,10 99:15 100:4
**woke** 16:9
**won** 14:23
**woodbury** 2:7
**work** 18:25 19:7 24:20 25:3,14,17 26:1 28:19 29:13,22 30:2 30:8 32:15 36:7 38:23 39:5 40:10,12 51:22 52:17 57:23 58:2 60:19,20,21 61:4,16 62:6,7 62:13,13 63:9 66:12 68:11,12 68:21,24 69:4 69:5,5 72:6 73:12,15 78:9 78:12 83:1,4 84:24 88:22 89:2,7,19,22 90:10 91:17 94:11,16
**workday** 38:24 50:3,7 56:6 63:24
**worked** 18:20 21:6 25:19,20 27:19 30:12 31:15,18 39:23 40:15 45:9,11 57:25 58:8 74:25 81:8 86:13 88:17 89:1,10 92:16 94:4,8,10
**workers** 34:11 93:5 95:4
**working** 11:15 17:19 19:4,5 19:11 27:16 28:7 30:9 44:11 46:13,16 46:23 53:15 58:19,21 60:6 60:12,24 62:20 68:7 73:10 76:16 77:8 82:11,12 83:8 84:6,25 91:5,6
**works** 47:8
**worries** 20:10
**worse** 72:5,13
**worst** 72:3
**wrong** 48:11

**x**

**x** 1:2,13 3:1

**y**

**yard** 21:7 31:18,20,22 32:3,18 33:8 33:14 35:10,14 35:25 36:3 39:19 40:1,24 40:24 41:5,10 41:14,20,25 42:6,12,18 43:6,9,11,16 44:1,9,11,12,17 46:9 47:20,22 49:2,5 50:1,7 50:11,16,17,19 53:13 56:4,8 56:11,13 63:10 64:18 65:22 66:4,5,9 74:8 74:14 83:6,7,8 83:9 90:7,10 90:16,17,21,21 91:10,24 92:5 92:8,10,20,21 94:18,18,19,25 95:5,9,19,22,25 96:5
**yeah** 6:24 14:17 20:10 29:6 41:7 52:21 55:6 57:13 65:17 80:23
**year** 17:16,17 20:4 36:25 47:7,18 58:12 58:13 67:5
**years** 13:15 17:16 20:1,3

23:18 24:4 36:1 45:3,20 47:17
**yellow** 51:6
**yonkers** 17:19 18:13 25:21 26:7,10,14,16
**york** 1:1,22 2:3 2:3,7 5:2,8,15 9:7,23 10:19 17:7,8 24:11 60:13 67:22 68:6 70:5,9 72:4 99:5

**z**

**zoom** 13:3 14:13 67:16 84:17,20,22 85:3,4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.