# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MANUEL ANGEL CALDERON, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**NETWORK INFRASTRUCTURE INC. and PATRICK CLARKE, Jointly and Severally,**<br><br>**Defendants.** | **1:24-cv-05442 (ALC)(BCM)** |

**DECLARATION OF OPT-IN PLAINTIFF EVAN KUVEKE**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

OPT-IN PLAINTIFF EVAN KUVEKE hereby declares under penalty of perjury that the following is true:

1. I was employed by Network Infrastructure Inc. ("Network Infrastructure" or the "Company") as a construction worker/laborer and laborer-driver from in or around January 2023 to in or around June 2024 (my "Employment Period").

2. During the time period I worked for Network Infrastructure, I was part of the Local 731 Laborers Union. Although I was affiliated with Local 731 Laborers Union during my tenure at Network Infrastructure, I did not receive, either from the Company or any representative of the union, a copy of the collective bargaining agreement between Local 731 and Network Infrastructure. At no time during my Employment Period was I introduced to a union representative or informed of my rights under a collective bargaining agreement.

3. I am aware that Defendant Patrick Clarke ("Clarke") is an owner, operator, and manager of Network Infrastructure Inc. (Network Infrastructure and Clarke are hereby called the "Defendants"). I observed that Defendant Clarke was present at some of the company functions that were offered during the course of the year to the employees, such as the celebration of St. Patrick's Day, and it was common knowledge among the employees, his rank, role, and position at the company.

4. Throughout my Employment Period, I performed manual construction labor for the Company on utility projects and government projects on jobsites throughout Manhattan and Queens.

5. Throughout my employment period at the Company, I primarily worked out of Defendants' Bronx Yard, located at 1055-1085 Close Avenue, Bronx, New York 10472 (the "Bronx Yard"). I understood that Defendants also maintained other yards located in Hempstead, Long Island, which is the main yard of the Company (the "Hempstead Yard") and a yard in Westchester County, in or around the Pelham area (the "Pelham Yard"). I am also aware of the fact that close to the Bronx Yard, Defendants used to have a storage yard in Freeman Street. Defendants stored equipment and trucks, materials, and tools for use at jobsites at these four yards (the "Yards") and also held mandatory safety meetings and other types of training at each of the Yards on a weekly basis, which all construction workers were required to attend.

6. As a laborer-driver, I was assigned to drive a box truck with equipment, tools, materials, and supplies to the job sites. For this reason, I was required to be at the Bronx Yard at 6:00 am, to perform extensive work (discussed below) before the start of the shift at the job sites.

7. I and other Network Infrastructure construction workers were required to arrive at jobsites between 7:00 am and 8:00 am or sometimes a little later, depending upon when we were permitted by the local regulations to begin working. I typically worked eight (8) hour shifts at the job locations. Although sometimes permits only allowed us to start work at the job sites later in the day, between approximately 8:00 am and 9:00 am, we were still required to be at the Bronx Yard at 6:00 am to pick up the truck and all materials and equipment we needed at the job sites.

8. Although local permits set the times we could start operating heavy equipment and performing excavation at jobsites, my coworkers and I typically arrived at job sites earlier than that time. Between the time when we arrived and the time we could start the heavy construction work, we were required to perform work such as cleaning and organizing the truck and bringing the necessary equipment and materials to the job sites where they would be used. Drivers were also required to arrive early to the job sites so they can reserve and keep parking spaces for all the trucks, equipment, and materials the workforce will use on a given workday.

9. During my Employment Period at Network Infrastructure, I typically worked five (5) days per week, Mondays to Fridays. However, because I was mostly assigned to work on utility projects for Consolidated Edison Company of New York, Inc. ("Con Edison"), on many occasions, I and other workers on my crew were required to work at emergency jobs that sometimes arose on Saturdays and Sundays. I worked on Saturdays and Sundays a relatively small number of times during my Employment Period.

10. In total, throughout my Employment Period, I typically worked for Defendants from 6:00 am, when I arrived at the Yard, to between 4:30 pm and 5:30 pm, and sometimes later depending on the time my crew finished work at the job sites, for an average of fifty-two and one half (52.5) to fifty-seven and one half (57.5) hours per week and sometimes more, when we worked late or when I worked on Saturdays or Sundays.

11. I am aware that at all times throughout my Employment Period, Defendants tracked employees' hours through timesheets maintained by foremen and/or supervisors at job sites. At no time was I required to sign any documents containing information about the hours worked in a given workday, or any other details about the location or the project we were assigned for the day. I and other employees who were required to perform substantial work at the Bronx Yard were not provided with any means for tracking hours worked at the Yard or travel time between the Yard and jobsites.

12. Throughout my employment, I was required to perform substantial work for which I was not paid. Through observations and discussions with co-workers, I was aware that Defendants' practices resulted in all construction workers receiving no wages at all for certain hours worked each week. These wages fell into two main categories: daily work at the Yard and travel time between the Yard and jobsites performed by laborer-drivers, laborer-foremen, gas mechanics, and operators; and weekly safety meetings and other mandatory trainings that all construction workers were required to attend at one of the Yards as well as travel time from the Yards to the jobsites. Defendants did not track these categories of hours and pay employees for all hours worked at the Yard and travel time between the Yard and job sites.

**DAILY/WEEKLY YARD WORK**

13. Throughout my employment with Network Infrastructure, I performed manual construction labor at Defendants' jobsites. In addition to manual construction work I performed at jobsites, I also worked as a laborer-driver. As such, I was required to arrive at the Bronx Yard at 6:00 am each day to perform work and to return to the yard in the afternoon to return my truck and the day's materials, tools, and equipment. As a laborer driver, I typically drove a box truck, which number I cannot precisely recall, but it could be truck No. 365 or No. 356. I typically saw at least twenty (20), sometimes more, other laborer-drivers, laborer-helpers, laborer-foreman, gas mechanics, and operators at the Yard in the morning performing the same work as me.

14. As a laborer-driver, I performed substantial work at the Yard prior to the start of work at the day's jobsite. I loaded trucks with supplies, materials, tools, and equipment needed for the day's work; emptied debris, planks, wood, garbage, and other materials brought back from the jobsite the previous day; received work assignments; and checked that the box truck I was assigned to drive on that day was in good working order. I was also required to filled out pre-trip inspection reports to confirm the working status of the trucks. This task included performing a thorough inspection of the truck, checking the fuel levels, checking the air in the tires and the condition of the tire rims, checking the braking system, battery power, steering mechanics, and checking that the headlights and reflectors were in good condition.

15. As a laborer-driver, I was assigned a laborer-helper to help with all tasks we were required to fulfill in the mornings at Defendants' Bronx Yard. That laborer-helper, in my case "Milton," was required to arrive at no later than 6:00 a.m. at the Bronx yard so he could assist me and other laborer-drivers with the work needed before leaving to the job sites.

16. In the morning, beginning at 6:00 am, I typically worked at the Yard for between thirty (30) and thirty-five (35) minutes. After I finished those duties, I drove the box truck I was assigned to drive for the day to the jobsite where I was assigned. I observed that the other laborer-drivers, laborer-helpers, laborer-foremen, and operators at the Yard similarly drove their trucks and machines to the jobsites around the same time. Depending upon the location of the day's jobsite and traffic, it typically took between forty (40) up to sixty (60) minutes for me to drive from the Bronx Yard to the day's jobsite, depending on the location and traffic.

17. Among others, I recall working at the Yard with Michael Gounarides, my foreman, "Milton," my laborer-helper, and other laborers-drivers, laborer-helpers, laborer-foreman, gas mechanics, and operators including Imar O'Hagan, Daniel Goncalves, Felipe Prada, Pedro Silva, Craig Lusardi, Michael Stania, among others whose names I cannot recall. I observed that these individuals worked in the Yard on a daily or weekly basis, as I did, performing similar work.

18. At the end of work at the jobsite, I was required to return the box truck I was assigned to drive on that day, along with materials, tools, and equipment to the Yard. Typically, the travel time from the jobsites to the Yard was significantly higher in the afternoon, as that was rush hour. My travel from the jobsites to the Yard typically took between sixty (60) minutes up to two (2) hours, depending on the job site location and the distance we were required to travel.

19. I and the other laborer-drivers and operators typically arrived at the Yard at the end of the day between 4:30 pm and 5:30 pm, and sometimes later. Once I reached the Yard, I spent between ten (10) and fifteen (15) minutes parking the truck at a designated area, organizing the truck at the yard, and putting back the keys to a specific board installed in the yard's office for that purpose. The other laborer-drivers, laborer-foremen, and operators performed this task as well. Because laborer-helpers were required to be at the Bronx Yard in the morning to assist in the loading of the trucks, they were in need to return to the yard in the afternoons, so they were able to take their cars back home.

20. Defendants did not track the time I or other laborer-drivers, laborer-helpers, laborer-foremen, gas mechanics or operators spent working at the Yard, nor did Defendants track my travel time or the travel time of the other laborer-drivers, laborer-helpers, laborer-foreman, gas mechanics, or operators.

**WEEKLY MANDATORY SAFETY MEETINGS AND SAFETY TRAININGS**

21. I and all other construction workers employed by Network Infrastructure were required to attend weekly safety meetings at one of the Company's Yards. These meetings took place on Tuesdays or Wednesdays at 6:00 am and typically lasted between forty (40) and sixty (60) minutes. At the meetings, we reviewed safety policies, discussed recent incidents and near-misses, learned about potential safety hazards, and received additional training on specific topics and equipment.

22. It is my understanding that because many of the projects we were assigned to work were performed for Con Edison or government agencies, all employees on those projects were required to undergo detailed and ongoing training to avoid risks and hazards of the job sites. These mandatory safety meetings provided the workforce with information about things that could be dangerous or harmful and the prevention and protective measures we needed to take when working on utility projects.

23. I typically saw at least twenty-five (25) to fifty (50) people present at the weekly safety meetings at the Bronx Yard.

24. At no time was I or any other employee compensated for time spent at these meetings each week. Although there were sign-in sheets for safety meetings, Defendants did not track the time we spent at the safety meetings or the travel time from the Yard to the day's jobsite on those specific days.

25. In addition to the weekly mandatory safety meetings, I and other employees of Network Infrastructure were required to attend certain training sessions or obtain or renew certain certifications at the Company in order to continue performing our work. During my employment at the Company, I was required to renew some of my certifications to be allowed to perform work at the job sites. The training I received consisted of an instruction program that was carried out at the Network Infrastructure Hempstead Yard. I was not paid for this time by Defendants.

**DEFENDANTS' CLASSWIDE COMPENSATION POLICIES**

26. Throughout the relevant time period, it was Defendants' policy to track and pay workers only for time worked at jobsites and not to track hours worked at the Yard, including safety meetings, trainings, or traveling between the Yard and jobsites. I know this because I discussed unpaid yard time, unpaid safety meetings, unpaid travel time, and unpaid training, with my foreman Michael Gounarides and other employees of the company such as Imar O'Hagan, Daniel Goncalves, Felipe Prada, Pedro Silva, "Milton," and other whose names I cannot recall at this time, who worked as laborers, laborer-drivers, laborer-helpers, and laborer-foremen for the Company.

27. Due to Defendants' policy of only tracking and paying for the hours that we worked at job sites, I and Defendants' other construction employees, especially laborer-drivers and their laborer helpers, laborer-foremen, gas mechanics, and operators, were paid for fewer hours than we actually worked, as we were not paid for time spent working at the Yard or traveling between the Yard and jobsites.

28. Throughout my employment, I and other Network Infrastructure employees were told by the main supervisor, Mike Stanya and other long-term employees at the Company whose names I cannot recall, that the Company does not pay for time worked at the yard. This was an issue that I and others discussed and complained about on numerous occasions. I understood from these discussions and complaints that it was Defendants' policy to only

pay for work performed at the jobsites and that this policy applied to all construction workers.

29. When I and other employees, including my foreman Michael Gounarides, complained about the unpaid time worked for the Company, we were told that those were the policies of Network Infrastructure which applied to all employees and that no changes would be made to resolve our complaints.

30. At least on one occasion I explicitly requested to my supervisor Mike Stanya, that travel time needs to be compensated because it was time spent performing work for the company. I told my supervisor that if the Company was not agreeable to compensating me for that time effectively work, then I would need to be reassigned/moved to a different crew not assigned to emergency work. As a result of that complaint, my request for compensation was denied and I was removed from the emergency crew to a different group within the Company.

31. Throughout my employment, my supervisors and the Company were well aware that I and other laborer-drivers, laborer-foreman, laborer-helpers, gas mechanics, and operators were required to work at the Company Yards in the morning and afternoon/evening and drive vehicles to and from jobsites. They were also aware, based on my complaints and discussions with them, that we were not paid for this time.

32. For my work at Network Infrastructure jobsites, I was paid the construction laborer rate as per determination of the Local Union 731 while I worked for Defendant Network Infrastructure. I received my supplemental benefits from the Local Union 731.

33. Throughout my Employment Period, I was paid via payroll check, which I received on a weekly basis. My paycheck and paystubs reflected only the time I spent working on jobsites, not work performed at the Yard or travel time between the Yard and jobsites.

34. Throughout my Employment Period, I was not provided with any means of tracking the hours that I spent working at the Company yard and/or the hours spent on travel time from the Company yard to the job sites assigned.

35. I am aware, based on conversations with other employees of Defendants who were required to perform work at the Yard, including Imar O'Hagan, Daniel Goncalves, Felipe Prada, Pedro Silva, "Milton," and Michael Gounarides (my foreman), and others whose names I do not recall, that other workers, like myself, were not paid for time worked at the Yard or travel time between the Yard and the jobsites.

36. Throughout my employment, I also spoke with employees including Imar O'Hagan, Daniel Goncalves, Felipe Prada, Pedro Silva, "Milton," and Michael Gounarides, about hours and pay. I learned from these conversations, and conversations with other Network Infrastructure employees that they, like me, were not compensated for safety meetings and mandatory training and/or certifications. To the extent that they were required to work at the yard before traveling to jobsites, they were not paid for this time.

37. To this day, I have not been paid for all hours worked for Defendants, including hours spent at the yard, safety meetings, trainings, and travel time.

38. The failure of Network Infrastructure to pay me and other workers for all of our hours worked continued throughout my entire employment period with Defendants' Company.

Dated: 3/18/2026

DocuSigned by:
EVAN KUVEKE
647F5109A5164E1...

EVAN KUVEKE