# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MANUEL ANGEL CALDERON, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**NETWORK INFRASTRUCTURE INC. and PATRICK CLARKE, Jointly and Severally,**<br><br>**Defendants.** | **1:24-cv-05442 (ALC)(BCM)** |

**DECLARATION OF OPT-IN PLAINTIFF ELIE ILAN**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

OPT-IN PLAINTIFF ELIE ILAN hereby declares under penalty of perjury that the following is true:

1. I was employed by Network Infrastructure Inc. ("Network Infrastructure" or the "Company") as a construction worker/gas mechanic and driver from in or around March 2023 to in or around February 2024 (my "Employment Period").

2. During my Employment Period, I was part of the International Union of Operating Engineers, IUOE Local 15 ("Local 15"). Despite the fact I was affiliated with Local 15 during my tenure at Network Infrastructure, I did not receive, either from the Company or any representative of the union, a copy of the collective bargaining agreement between Local 15 and Network Infrastructure. At no time during my Employment Period was I informed of my rights under a collective bargaining agreement, including any legal options I could exercise to resolve any disputes with my employer.

3. I am aware that Defendant Patrick Clarke ("Clarke") is an owner, operator, and manager of Network Infrastructure Inc. (Network Infrastructure and Clarke are hereinafter called the "Defendants"). I observed that Defendant Clarke was present on a regular basis at Network Infrastructure's offices at the Bronx Yard and during certain Company functions during the course of my employment period at the Company.

4. Throughout my Employment Period, I performed manual construction labor for the Company on utility projects on jobsites mainly located in Westchester County.

5. Throughout my employment period at the Company, I primarily worked out of Defendants' Pelham Yard located at 40 Canal Street, Mt. Vernon, New York 10550 (the "Pelham

Yard") or from the Bronx Yard, located at 1055-1085 Close Avenue, Bronx, New York 10472 (the "Bronx Yard"). I understood that Defendants also maintained another yard located in Hempstead, Long Island (the "Hempstead Yard"), which is their main yard. Defendants stored equipment and trucks, materials, and tools for use at jobsites at those yards (the "Yards") and also held mandatory safety meetings and other types of training at each of the Yards on a weekly basis, which all construction workers were required to attend.

6. As a gas mechanic and backhoe operator I was responsible for the installation, inspection, maintenance, and repair of gas piping systems and related equipment, ensuring they meet safety regulations and code requirements. At times I operated a backhoe at the job sites in order to access the underground infrastructure, move metal plates, and place pipelines. My obligations include installing and testing high- and low-pressure piping systems, performing pipe joining techniques, and ensuring overall safety and integrity of gas systems. My crew was generally assigned to work at Consolidated Edison Company of New York, Inc. ("Con Edison") job sites, in the urban and suburban areas they operate its gas systems.

7. In addition to my duties as a gas mechanic at the Company, I was also selected as a driver for Network Infrastructure and was assigned a box truck for daily use. As such, I was required to be at the Pelham Yard or the Bronx Yard between approximately 6:00 am and 7:00 am, and many times earlier, to perform extensive work (discussed below) before the start of the shift at the job sites, in addition to receiving my job assignments and trainings for gas mechanic work.

8. I and other Network Infrastructure construction workers were required to arrive at jobsites between approximately 7:00 am and 8:00 am, occasionally later, depending upon when we were permitted by the local regulations to begin working. I was scheduled to work eight (8) hour shifts, but my crew was often required to work longer shifts of nine (9), ten (10), and sometimes more hours at the job locations. Regardless of the day's start time, we were typically required to be at the Pelham Yard or the Bronx Yard at least one hour before the starting time at the job sites, between 6:00 am and 7:00 am, and sometimes earlier, to perform work and receive information and, if necessary, training regarding the tasks that needed to be performed at the job sites.

9. Although local permits set the times we could start operating heavy equipment and performing excavation at jobsites, my coworkers and I typically arrived at job sites earlier than that time. Between the time when we arrived and the time we could start the heavy construction work, we were required to perform work such as cleaning and organizing the equipment, loading equipment and materials brought to the job sites, and the most important task, reviewing with foreman and supervisors all plans, blueprints and location maps of the underground lines provided by the utility company for the specific work we were assigned for the day.

10. During my Employment Period, I typically worked five (5) days per week, Mondays to Fridays. As explained before, I was assigned to work on utility projects for Con Edison,

and as such, I and other workers on my crew were sometimes required to work on Saturdays. I worked on Saturdays a relatively small number of times during my Employment Period.

11. Throughout my Employment Period, I typically worked for Defendants from between approximately 6:00 am and 7:00 am, and many times earlier, to between approximately 5:15 pm and 7:00 pm, when I returned to the Yard, and many times later depending on the time my crew finished work at the job sites, for an average of fifty (50) to sixty (60) hours per week and sometimes more, when we worked late or when I worked on Saturdays.

12. When I started my employment period at the Company, it was common to hear at the Pelham Yard, that individuals who were selected as drivers at Network Infrastructure, would be compensated for thirty (30) additional minutes per day for the driving task we were required to perform daily. I am not sure if I was in fact compensated in that manner. Even if I did receive payment for additional 30 minutes per day due to the driving task, the time I spent driving to and from the Pelham and/or the Bronx Yards either in the morning or in the afternoon, generally exceeded 30 minutes by a substantial amount.

13. I am aware that at all times throughout my Employment Period, Defendants tracked employees' hours through an app in a tablet maintained by foremen and/or supervisors at job sites. At no time was I required to sign any documents containing information about the hours worked in a given workday, or any other details about the location or the project we were assigned for the day. I and other employees who were required to perform substantial work at the Pelham or the Bronx Yards were not provided with any means for tracking hours worked at the Yards or travel time between the Yards and jobsites.

14. Throughout my employment, I was required to perform substantial work for which I was not paid. Through observations and discussions with co-workers, I was aware that Defendants' practices resulted in all construction workers receiving no wages at all for certain hours worked each week. These wages fell into two main categories: (1) daily work at the Yard and travel time between the Yard and jobsites performed by laborer-drivers, laborer-foremen, laborer-helpers, gas mechanics, and operators; and (2) weekly safety meetings and other mandatory trainings that all construction workers were required to attend at one of the Yards. Defendants did not track these categories of work and pay employees for all hours worked at the Yard and travel time between the Yard and job sites.

**DAILY/WEEKLY YARD WORK**

15. Throughout my employment with Network Infrastructure, I performed manual construction labor at Defendants' jobsites. As such, I was required to arrive at the Pelham or the Bronx Yard between approximately 6:00 am and 7:00 am, sometimes earlier, to perform work and to receive additional information and training regarding the job sites we were assigned for the day. I typically saw at least ten (10) to fifteen (15), sometimes more, other laborer-drivers, laborer-helpers, laborer-foreman, gas mechanics, and operators at the Pelham Yard and at least ten (10) to fifteen (15) workers, and sometimes more, at the Bronx Yard, in the morning performing the same work as me.

16. In the afternoons it was frequent to see at least ten (10) laborer-drivers, laborer-helpers, laborer-foreman, gas mechanics, and operators at the Pelham Yard and at least eight (8) to ten (10) same categories of workers at the Bronx Yard and the end of the workday, mainly returning the box trucks and other equipment to Defendants' Yards.

17. As a gas mechanic and backhoe operator, I performed substantial work at the Yard prior to the start of work at the day's jobsite. Working mostly at Con Edison job sites in the New York area, we were required to receive constant training to ensure public safety, understand and learn the position of all underground utility lines, and meet strict federal and state regulations while working on those utility lines. The training focuses on preventing life-threating incidents (to prevent dangerous leaks, fires, and explosions), mastering new, complex, and aging Con Edison infrastructure and maintaining the highest quality and efficient work for the services provided to the public. At the yard, in addition to the trainings and information regarding the assignment for the day, I and other employees of Defendants help to load trucks with supplies, materials, tools, and equipment needed for the day's work and emptied debris, planks, wood, garbage, and other materials brought back from the jobsite the previous day.

18. In the morning, beginning between 6:00 am and 7:00 am, and sometimes earlier, I typically worked and receive training at the Yard for between thirty-five (35) up to fifty (50) minutes. After I finished those duties, I drove to the job site I was assigned for the day. I observed that other gas mechanics, laborer-drivers, laborer-helpers, laborer-foremen, and operators at the Yard similarly drove the Company trucks and machines to the jobsites around the same time. In the mornings and depending upon the location of the day's jobsite and traffic, it typically took me between thirty (30) minutes up to forty-five (45) minutes to drive from the Pelham Yard to the job sites mainly located in Westchester County. If I was required to go to the Bronx Yard, it took me at least one (1) hour to reach the day's jobsite. In the afternoons, when traffic was heavier due to rush hour, it took me at least forty-five (45) to sixty (60) minutes, often more, to reach the Pelham or the Bronx Yard at the end of the day.

19. Among others, I recall working at the Yard with Michael Gounarides, a laborer-foreman, Imar O'Hagan, a laborer-driver, Daniel Goncalves, a laborer-driver, Rafael Gonzalez, a laborer-driver, James Mariano, Michael Stania, and "Craig," who were my supervisors, and other gas mechanics, laborers-drivers, laborer-helpers, laborer-foreman, and operators whose names I cannot recall. I observed that these individuals worked in the Pelham or the Bronx Yards on a daily or regular basis, as I did, performing similar work.

20. Defendants did not track the time I or other gas mechanics, laborer-drivers, laborer-helpers, laborer-foremen, or operators spent working at the Yard, nor did Defendants track my travel time or the travel time of the other gas mechanics, laborer-drivers, laborer-helpers, laborer-foreman, or operators.

**WEEKLY MANDATORY SAFETY MEETINGS AND SAFETY TRAININGS**

21. I and all other construction workers employed by Network Infrastructure were required to attend weekly safety meetings at one of the Company's Yards. At the start of my employment period at the Company, I was required to attend the meetings at the Bronx Yard, either on Tuesdays and/or Wednesdays, at approximately 6:00 am and typically lasted between forty-five (45) to sixty (60) minutes. Later in my Employment Period, I was required to attend the mandatory safety meeting at the Pelham Yard, at approximately 7:00 am, before leaving to the job sites. At that location the meetings lasted between forty (40) and sixty (60) minutes. At the meetings, we reviewed safety policies, discussed recent incidents and near-misses, learned about potential safety hazards, and received additional training on specific topics and equipment.

22. It is my understanding that because many of the projects we were assigned to work were performed for Con Edison, all employees on those projects were required to undergo detailed and ongoing training to avoid risks and hazards of the job sites. These mandatory safety meetings provided the workforce with information about things that could be dangerous or harmful and the prevention and protective measures we needed to take when working on utility projects.

23. I typically saw at least twenty-five (25) to thirty (30) employees present at the weekly safety meetings at the Pelham Yard and at least thirty (30) to sixty (60) employees at the Bronx Yard.

24. At no time was I or any other employee compensated for time spent at these meetings each week. Although there were sign-in sheets for safety meetings, Defendants did not track the time we spent at the safety meetings or the travel time from the Yard to the day's jobsite on those specific days.

25. In addition to the weekly mandatory safety meetings, I and other employees of Network Infrastructure were required to attend training sessions to obtain or renew certain certifications at the Company in order to continue performing our work. During my employment at the Company, I was required to undergo several gas mechanic trainings (at least 3 or 4) as part of the development of "…our larger careers" as it was explained to the employees by management at Network Infrastructure. The training sessions I received were imparted at the Hempstead Yard, generally two (2) days for each training consisting in eight (8) hours each day. I was not paid for this time by Defendants.

**DEFENDANTS' CLASSWIDE COMPENSATION POLICIES**

26. Throughout the relevant time period, my understanding is that it was Defendants' policy to track and pay workers only for time worked at jobsites and not to track hours worked at the Yard, including safety meetings, trainings, or traveling between the Yard and jobsites. I know this because I discussed unpaid yard time, unpaid safety meetings, unpaid travel time, and unpaid training, with Michael Gounarides, Daniel Goncalves, Rafael Gonzalez, Imar O'Hagan, and other employees whose names I cannot recall at this time, who worked

as gas mechanics, laborers, laborer-drivers, laborer-helpers, laborer-foremen, and operators for the Company.

27. Due to Defendants' policy of only tracking and paying for the hours that we worked at job sites, I and Defendants' other construction employees, especially gas mechanics, laborer-drivers and their laborer-helpers, laborer-foremen, laborers, and operators, were paid for fewer hours than we actually worked, as we were not paid for time spent working at the Yard or traveling between the Yard and jobsites.

28. Throughout my employment, my supervisors and the Company were well aware that I and other gas mechanics, laborer-drivers, laborer-foreman, laborer-helpers, and operators were required to work at the Company Yards in the morning and afternoon/evening and drive vehicles to and from jobsites.

29. For my work at Network Infrastructure jobsites, I was paid the appropriate gas mechanic rate as per determination of the Local 15 during the period I worked for Defendant Network Infrastructure. I received my supplemental benefits from the Local 15.

30. Throughout my Employment Period, I was paid via payroll check, which I received on a weekly basis. My paycheck and paystubs reflected only the time I spent working on jobsites, not work performed at the Yards or travel time between the Yards and jobsites.

31. Throughout my Employment Period, I was not provided with any means of tracking the hours that I spent working at the Company yards and/or the hours spent on travel time from the Company yards to the job sites assigned.

32. I am aware, based on conversations with other employees of Defendants who were required to perform work at the Yard, including Michael Gounarides, Daniel Goncalves, Rafael Gonzalez, Imar O'Hagan, and others whose names I do not recall, that other workers, like myself, were not paid for time worked at the Yards or travel time between the Yards and the jobsites.

33. Throughout my employment, I also spoke with employees including Michael Gounarides, Daniel Goncalves, Rafael Gonzalez, Imar O'Hagan, and other whose names I cannot recall, about hours and pay. I learned from these conversations, and conversations with other Network Infrastructure employees that they, like me, were not compensated for safety meetings and mandatory training and/or certifications. To the extent that they were required to work at the Yard before traveling to jobsites, they were not paid for this time.

34. To this day, I have not been paid for all hours worked for Defendants, including hours spent at the yard, safety meetings, trainings, and travel time.

35. The failure of Network Infrastructure to pay me and other workers for all of our hours worked continued throughout my entire Employment Period with Defendants.

Dated: 3/18/2026

Signed by:

E3CE8D7EB9474D6...

ELIE ILAN