# EXHIBIT K

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**MANUEL ANGEL CALDERON, Individually and On Behalf of All Others Similarly Situated,**

**Plaintiff,**

**-against-**

**NETWORK INFRASTRUCTURE INC. and PATRICK CLARKE, Jointly and Severally,**

**Defendants.**

**1:24-cv-05442 (ALC)(BCM)**

**DECLARATION OF OPT-IN PLAINTIFF KEITH DUNN**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

OPT-IN PLAINTIFF KEITH DUNN hereby declares under penalty of perjury that the following is true:

1. I was employed by Network Infrastructure Inc. ("Network Infrastructure" or the "Company") as a construction worker/operating engineer (backhoe operator) from in or around July 2021 to in or around October 2021 (my "Employment Period").

2. During the time period I worked for Network Infrastructure, I was part of the International Union of Operating Engineers, IUOE Local 15 ("Local 15"). Although I was affiliated with Local 15 during my tenure at Network Infrastructure, I did not receive, either from the Company or any representative of the union, a copy of the collective bargaining agreement between Local 15 and Network Infrastructure. At no time during my Employment Period was I informed of my rights under a collective bargaining agreement and all legal options I can exercise to resolve any disputes with my employer.

3. I am aware that Defendant Patrick Clarke ("Clarke") is an owner, operator, and manager of Network Infrastructure Inc. (Network Infrastructure and Clarke are hereby called the "Defendants"). I observed once Defendant Clarke present at one of the job sites supervising and verifying the work we were performing and discussing issues with "Pedro," my foreman.

4. Throughout my Employment Period, I performed manual construction labor for the Company on utility projects on jobsites throughout New York City, including Manhattan, Bronx, Queens, Staten Island, and Brooklyn boroughs, and also in Westchester County and once in Nassau County.

5. Throughout my employment period at the Company, I primarily worked out of Defendants' Bronx Yard, located at 1055-1085 Close Avenue, Bronx, New York 10472 (the "Bronx Yard") and just a few times at the Queens Yard located at Steinway Street, Astoria, Queens, New York

(the "Queens Yard"). I understood that Defendants also maintained other yards located in Hempstead, Long Island (the "Hempstead Yard") and a yard in Westchester County, in or around the Pelham area (the "Pelham Yard"). Defendants stored equipment and trucks, materials, and tools for use at jobsites at those yards (the "Yards") and also held mandatory safety meetings and other types of training at each of the Yards on a weekly basis, which all construction workers were required to attend.

6. As an operating engineer I was a skilled tradesperson responsible for the operation of a backhoe at the job sites for the installation, inspection, maintenance, and repair of gas piping systems and related equipment, ensuring they meet safety regulations and code requirements. My responsibilities include digging trenches, holes, foundations, graving and leveling land, moving earth, loading dump trucks with soil and debris, breaking concrete and lifting heavy loads daily at all job sites I was assigned to. I was trained and required to navigate confined spaces in New York and often work on roadways and around the utility lines. I was also responsible to understand the inherit risks and hazards involve in the tasks we were performing for the utility companies and required the ability to interpret construction plans and blueprints. My crew was also responsible to respond to emergency calls when gas leaking was suspected in urban or residential areas where Consolidated Edison Company of New York, Inc. ("Con Edison") or National Grid USA Company, Inc. ("National Grid") operate their gas systems.

7. During my tenure at Defendants' Company, I was mostly assigned to utility projects for Con Edison and National Grid. The completion time for the jobs we were assigned typically varied from one (1) week to two (2) weeks or sometimes longer. Among the responsibilities already mentioned, my job encompasses the moving of the backhoe machine from the Bronx Yard to the different job sites at the beginning of the assignment. Once the machine was at the assigned job site, and depending on the duration of the assignment, I was required to return the machine to the Bronx Yard at the end of the assignment.

8. When I was required to pick up and drive the backhoe machine from the Bronx Yard to the job sites, I was required to be at the yard at approximately 5:30 am to be able to drive the machine through traffic with enough time to reach the job site at approximately 7:00 am. I was also responsible to do a pre-inspection of the machine before leaving the yard. The inspection of the backhoe involved numerous checks and assessments of fuel, coolant and oil levels, damages and leaks, data plates and load rating plates, battery and terminals, and operation of the controls. I was required to make sure the backhoe was in perfect operating condition before I could leave the Bronx Yard to travel to the assignment. In total, the inspection took approximately fifteen (15) up to thirty (30) minutes.

9. I and other Network Infrastructure construction workers were required to arrive at jobsites at approximately 7:00 am depending upon when we were permitted by the local regulations to begin working. I typically worked eight (8) hour shifts at the job locations, and sometimes more.

10. Although local permits set the times we could start operating heavy equipment and performing excavation at jobsites, my coworkers and I typically arrived at job sites earlier than that time. Between the time when we arrived and the time we could start the heavy construction work, we were required to perform work such as cleaning and organizing the equipment, loading equipment and materials to be brought to the job sites, and the most important task, reviewing

with foreman and supervisors all plans, blueprints and location maps of the underground lines provided by the utility company for the specific work we were assigned for the day.

11. During my Employment Period at Network Infrastructure, I typically worked five (5) days per week, Mondays to Fridays. However, on occasion, perhaps twice per month, I and other workers on my crew were required to work on Saturdays and Sundays to finalize a Con Edison or National Grid assignment.

12. In total, throughout my Employment Period, I typically worked for Defendants from 7:00 am to 3:30 pm at the job sites, and from 5:30 am to between 3:30 pm on the days I was required to pick up the backhoe at the Bronx Yard. On the days I need to return the machine to the Bronx Yard, at the end of an assignment, I generally arrived at the yard between 4:00 pm and 4:30 pm. On average, I worked between forty-two (42) to fifty (50) hours per week.

13. I am aware that throughout my Employment Period, Defendants tracked employees' hours through timesheets maintained by foremen and/or supervisors at job sites. At the beginning of my employment period the Company was tracking hours on a regular timesheet and later, toward the end of my employment period, changed to an electronic system used by foremen on a tablet. At no time was I required to sign any documents containing information about the hours worked in a given workday, or any other details about the location or the project we were assigned for the day. I and other employees who were required to perform work at the Bronx Yard were not provide with any means for tracking hours worked at the Yard or travel time between the Yard and jobsites. At some point of my employment, I reported my hours to the foreman but my payment was often missing hours when I did so.

14. Throughout my employment, I was required to perform work for which I was not paid. Through observations and discussions with co-workers, I was aware that Defendants' practices resulted in all construction workers receiving no wages at all for certain hours worked each week. These wages fell into two main categories: work at the Yard and travel time between the Yard and jobsites performed by laborer-drivers, laborer-foremen, laborer-helpers, gas mechanics, and operators; and weekly safety meetings and other mandatory trainings that all construction workers were required to attend at one of the Yards as well as travel time from the Yards to the jobsites. Defendants did not track these categories of hours and pay employees for all hours worked at the Yard and travel time between the Yard and job sites.

**DAILY/WEEKLY YARD WORK**

15. Throughout my employment with Network Infrastructure, I performed manual construction labor at Defendants' jobsites. As such, I was required to arrive at the Bronx Yard (a few times at the Queens Yard), at the beginning and end of a given project at 5:30 am to perform work and to receive additional information and training regarding the job sites we were assigned for the day. I was also required to be early in the morning to pick up the backhoe to bring the machine to the job sites. I typically saw at least six (6) other laborer-drivers, laborer-helpers, laborer-foreman, gas mechanics, and operators at the Bronx Yard in the mornings performing the same work as me.

16. As a backhoe operator, I performed work at the Yard prior to the start of work at the day's jobsite. Working mostly at Con Edison and/or National Grid job sites in the New York area, we were required to receive constant training to ensure public safety, understand and learn the

position of all underground utility lines, and meet strict federal and state regulations while working on those utility lines. The training focuses on preventing life-threating incidents (to prevent dangerous leaks, fires, and explosions), mastering new, complex, and aging Con Edison/National Grid infrastructure and maintaining the highest quality and efficient work for the services provided to the public. At the yard, in addition to the trainings and information regarding the assignment for the day, I help to load trucks with supplies, materials, tools, and equipment needed for the day's work and prepare the backhoe to be drive to the job sites.

17. In the morning, beginning at 5:30 am, I typically worked and receive additional information regarding the assignment for about thirty (30) minutes. After I finished those duties, I drove to the job site I was assigned for the day. I observed that other gas mechanics, laborer-drivers, laborer-helpers, laborer-foremen, and operators at the Yard similarly drove the Company trucks and machines to the jobsites around the same time. Depending upon the location of the day's jobsite and traffic, it typically took me between thirty (30) minutes up to one hour and forty-five minutes (1 h 45 m) to drive from the Bronx Yard to the day's jobsite.

18. Among others, I recall working at the Yard with "Pedro," my foreman, Joe McGreedy the lead engineer, Imar O'Hagan, "Jose," and other gas mechanics, laborers-drivers, laborer-helpers, laborer-foreman, and operators whose names I cannot recall. I observed that these individuals worked in the Bronx Yard on a regular basis, as I did, performing similar work.

19. Defendants did not track the time I or other gas mechanics, laborer-drivers, laborer-helpers, laborer-foremen, or operators spent working at the Yard, nor did Defendants track my travel time or the travel time of the other gas mechanics, laborer-drivers, laborer-helpers, laborer-foreman, or operators.

**WEEKLY MANDATORY SAFETY MEETINGS AND SAFETY TRAININGS**

20. I and all other construction workers employed by Network Infrastructure were required to attend weekly safety meetings at one of the Company's Yards. These meetings took place on Wednesdays or Thursdays at 6:00 am and typically lasted between forty (40) and sixty (60) minutes. At the meetings, we reviewed safety policies, discussed recent incidents and near-misses, learned about potential safety hazards, and received additional training on specific topics and equipment.

21. It is my understanding that because many of the projects we were assigned to work were performed for Con Edison or National Grid, all employees on those projects were required to undergo detailed and ongoing training to avoid risks and hazards of the job sites, and as operators, we were required to do training on a more rigorous schedule. These mandatory safety meetings provided the workforce with information about things that could be dangerous or harmful and the prevention and protective measures we needed to take when working on utility projects.

22. I typically saw at least fifteen (15) to thirty-five (35) people present at the weekly safety meetings at the Bronx Yard.

23. At no time was I or any other employee compensated for time spent at these meetings each week. Although there were sign-in sheets for safety meetings, Defendants did not track the

time we spent at the safety meetings or the travel time from the Yard to the day's jobsite on those specific days.

24. In addition to the weekly mandatory safety meetings, I and other employees of Network Infrastructure were required to attend training sessions or obtain or renew certain certifications at the Company in order to continue performing our work. During my employment at the Company, on one occasion I was required to renew some of my certifications to be allowed to perform work at the job sites. The training I received consisted of an instruction program (8-hour shift) that was carried out at the Network Infrastructure Queens Yard. I was not paid for this time by Defendants.

**DEFENDANTS' CLASSWIDE COMPENSATION POLICIES**

25. Throughout the relevant time period, it was Defendants' policy to track and pay workers only for time worked at jobsites and not to track hours worked at the Yard, including safety meetings, trainings, or traveling between the Yard and jobsites. I know this because I heard many discussions among employees at the Bronx Yard, especially from the drivers, regarding unpaid yard time, unpaid safety meetings, unpaid travel time, and unpaid training. Many of the employees I heard discussing the unpaid issues worked as gas mechanics, laborer-drivers, laborer-helpers, laborer-foremen, and other operators for the Company.

26. Throughout my employment, I and other Network Infrastructure employees were told by management, that the Company does not pay for time worked at the yard. In brief, throughout my employment period at Defendants' Company I was told that "…once you are on the job site you get paid." This was an issue many employees of the Company discussed and complained about on numerous occasions. I understood from these complaints that it was Defendants' policy to only pay for work performed at the jobsites and that this policy applied to all construction workers.

27. Due to Defendants' policy of only tracking and paying for the hours that we worked at job sites, I and Defendants' other construction employees, especially gas mechanics, laborer-drivers and their laborer-helpers, laborer-foremen, laborers, and operators, were paid for fewer hours than we actually worked, as we were not paid for time spent working at the Yard or traveling between the Yard and jobsites.

28. Throughout my employment, my supervisors and the Company were well aware that I and other gas mechanics, laborer-drivers, laborer-foreman, laborer-helpers, and operators were required to work at the Company Yards in the morning and afternoon/evening and drive vehicles to and from jobsites.

29. For my work at Network Infrastructure jobsites, I was paid the appropriate operating engineer rate as per determination of the Local 15 during the period I worked for Defendant Network Infrastructure. I received my supplemental benefits from the Local 15.

30. Throughout my Employment Period, I was paid via payroll check, which I received on a weekly basis. My paycheck and paystubs reflected only the time I spent working on jobsites, not work performed at the Yards or travel time between the Yards and jobsites.

31. Throughout my Employment Period, I was not provided with any means of tracking the hours that I spent working at the Company yards and/or the hours spent on travel time from the Company yards to the job sites assigned.

32. I am aware, based on conversations with other employees of Defendants who were required to perform work at the Yard, including "Pedro" (my foreman), and others whose names I do not recall, that other workers, like myself, were not paid for time worked at the Yards or travel time between the Yards and the jobsites.

33. Throughout my employment, I overheard other employees discussing about hours and pay. I learned from these conversations that they, like me, were not compensated for safety meetings and mandatory training and/or certifications. To the extent that they were required to work at the yard before traveling to jobsites, they were not paid for this time.

34. To this day, I have not been paid for all hours worked for Defendants, including hours spent at the yard, safety meetings, trainings, and travel time.

35. The failure of Network Infrastructure to pay me and other workers for all of our hours worked continued throughout my entire employment period with Defendants' Company.

Dated: 3/20/2026

DocuSigned by:
[signature]
2D6AE370007A487...

KEITH DUNN